No. 18-3206

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

**Edith McCurry**
**Plaintiff-Appellant,**

**v.**

**Kenco et.al**
**Defendant-Appellee.**

COMPLAINANT-APPELLANT
SEPARATE APPENDIX

**Case No. 16-CV-2273**

**The Honorable Judge Eric Long**

**and**

**Judge Bruce Sterling**

**Presiding**

**Edith  McCurry**

/s/

**Jordan TraVaille Hoffman, P.C.**

Jordan T. Hoffman
2711 E. New York St., Suite 205
Aurora, IL 60502
888-958-4529
Plaintiff-Appellant-Edith McCurry

# APPELLANT BRIEF

## SEPARATE APPENDICES

## TABLE OF CONTENTS

Section 1-Continual Improvement Policy                             page 1

Section 2-Henry Verified Response 2015CF0990/21BA50126            page 12

Section 3-McCurry email to Fowler on Monstwillo attack on Henry    page 16

Section 4-Spotter Pay Disparity                                    page 18

Section 5-Szplettt Verified     Response 2015CA3083/21BA51536      page 21

Section 6-Regional Distribution Manager Job Description            page 33

Section 7-Assorted documents relative to Henry matters            page 39

Section 8-Defendants evidence in McCurry matter                   page 73

Section 9-Kenco 30 & 60 Day Performance Improvement Plan          page 84

Section 10-Robert Coffey LinkedIn                                  page 119

Section 11-Tom White Exit Interview                               page 127

Section 12-Jacque Morrison withdrawal for settlement             page 132

Section 13-Varvel email on the lack of unauthorized work policies  page 141

Section 14-Position Statement on Szplett's 2015CA3083/21BA51536   page 143

Section 15-Scott Marksteiner documents                            page 148

Section 16-Disability Correspondence                              page 161

Section 17-Tracy Davis 2014CF3162/21BA41748                       page 281

Section 18-Offical Record                                         page 293

Section 19-Nathan Doss email on shift changes/cancellations       page 345

Case: 18-3206    Document: 11-2    Filed: 01/18/2019    Pages: 50

SECTION I



| Document Number:<br>**ISO-QE-8.5.1.001** | Title:<br>**CONTINUAL IMPROVEMENT** | | | |
|---|---|---|---|---|
| Original Date:<br>**04/07/06** | Revision Date:<br>**07/17/12** | Revision #:<br>**1** | Effective Date:<br>**08/01/12** | **1 of 8** |

Author: **Quality Assurance and Regulatory Affairs Director, Best Practices/Date**

07/17/12

Approval: **QC, Best Practices/Date**

07/17/12

Approval: **VP, Best Practices/Date**

07/17/12

## 1.0 PURPOSE / SCOPE

The primary objective of Continual Improvement is to drive timeliness of actions and accountability to improve the effectiveness of Kenco Quality Management System (KQMS).

This document applies to all Kenco facilities.

## 2.0 ROLES AND RESPONSIBILITIES

**Kenco Management Services (KMS) – Best Practices** – has overall responsibility for the continual improvement system, including the issuance and maintenance of this procedure.

**Quality Coordinator (QC) –** responsible for ensuring training of all site personnel on this procedure and providing oversight of the CPAR process to include tracking of CPARs and A3s.

**Lean Champion –** responsible for site support in the deployment and management of the A3 process. Conducts A3 training for site employees.

**Site Management** – responsible for implementing and monitoring the site's continual improvement system.  They must also provide adequate resources to ensure that any CPARs/A3s are closed with 45 business days without undue delay, and ensure follow up activities will include the verification of actions taken and the reporting of verification results.

**All Kenco Employees –** responsible for using and following this procedure.

## 3.0 POLICY

The Continual Improvement process supports the company's drive to become more competitive, operate more effectively and efficiently, and improve our ability to meet and/or exceed customer expectations.

*Proprietary Information - Kenco*

SA-002



| Document Number: **ISO-QE-8.5.1.001** | Title: **CONTINUAL IMPROVEMENT** | | | |
|---|---|---|---|---|
| Original Date: **04/07/06** | Revision Date: **07/17/12** | Revision #: **1** | Effective Date: **08/01/12** | **2 of 8** |

The Corrective/Preventative Action Request (CPAR) form (*ISO-QE-8.5.1.001-1*), A3 form (*ISO-QE-8.5.1.001-3*), and CPAR/A3 log (*ISO-QE-8.5.1.001-2*) track and monitor the progress of action requests and create a data collection point for trend and steady-state analyses.

## 4.0 PROCEDURES

**4.1**  Requests can come from many sources, including:

- Takt Boards and Schedule Attainment
- Employee Suggestion Board
- Kaizen Events
- Gemba Walks
- 5S Events
- Customer Request
- Poor supplier or subcontractor performance
- Product/Service Nonconformities
- Internal and external audits
- Management reviews and failures to meet established quality objectives
- Facilities, equipment and production process failures and inefficiencies
- Documentation control problems
- Other

**4.2**  All suggestions and requests that require a CPAR or A3 can be submitted in any manner to the QC. The QC, with Site Management, will determine which form is appropriate for each request.

**4.3**  The QC will determine if the request is to be logged.  Unacceptable requests, which are not focused on processes, will not be logged.  Signed requests that are not accepted will be communicated to the initiator.

**4.4**  Employee suggestions for site that have not implemented the Employee Suggestion Board will be analyzed by the QC and Site Management to determine the process the suggestion relates to and if it is a corrective or preventive action (CPAR) or continual improvement (A3).

**4.5**  Site Management will determine if the request is accepted or rejected; acceptance/rejection of the request will be based on site specific business requirements, resources, and policies.

- For all accepted requests that are signed by the initiator, the responsible manager will interview the initiator.
- For all rejected requests which are signed by the initiator, the QC will communicate the reason for rejection to the initiator.

**4.6**  Site Management/QC will determine the course of action:

**4.6.1**  Use a CPAR Form for:

*Proprietary Information - Kenco*



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **ISO-QE-8.5.1.001** | **CONTINUAL IMPROVEMENT** | | | |
| Original Date: | Revision Date: | Revision #: | Effective Date: | **3 of 8** |
| **04/07/06** | **07/17/12** | **1** | **08/01/12** | |

- Corrective Action – for documentation of immediate actions when a problem occurs anywhere in our QMS, to ensure the problem is corrected and that it does not recur.
- Preventive Action – for documentation of immediate actions to prevent potential problems and their risks from occurring. This may also be used to document planned deviation from documented procedures.

**4.6.2**    Use an A3 Form for:

- Continual Improvement – for documentation. If a project team is required, the A3 Problem Solving process will be utilized. The team will be cross functional, which includes members from all affected areas and utilizes their unique expertise. The team is authorized and responsible for representing their areas in the A3 Problem Solving process.

**4.7  CPAR Process**

**4.7.1    Documentation.**  CPARs are used to initiate and record results of any request for corrective or preventive action. CPARs are initiated to drive timeliness of action and accountability. CPARs must be completed 45 business days from the initiated date.

**4.7.2    Initiation.**  An individual obtains a CPAR and enters the suggestion/comment or the description of the problem, along with the date and name of the employee submitting. QC may transfer suggestions/comments from other documents to the CPAR.

**4.7.3    Tracking and Assignment.**  The QC will:

- Assign the CPAR a unique number.
- Enter the source of the CPAR by using the codes found on the CPAR/A3 log or description of the source.
- Mark whether the CPAR is for a corrective action or preventive action.
- Determine the responsible part to investigate and develop proposed action.
- Establish a reply due date. See note below*
- Establish the completion date; 45 business days from the initiated date.
- Record all related information on the CPAR and the accompanying log. The CPAR/A3 log is a tracking system which is monitored to ensure CPARs are responded to and acted upon in a timely manner. This log is to be reviewed monthly by Site Management.

**\*Note:**  Follow up must be completed within 45 business days allowing time for effectiveness to be verified including removal of recurrence or potential occurrence of the root cause.

**4.7.4    Investigation.**  The party assigned responsible for evaluating the CPAR will:

- Interview the initiator to begin the investigation.
- Investigate the actual or potential problem using one or more of the following:
  - Interviews
  - Observations
  - Customer Requirements Reviews

*Proprietary Information - Kenco*

Case: 18-3206      Document: 11-2      RESTRICTED      Filed: 01/18/2019      Pages: 50



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **ISO-QE-8.5.1.001** | **CONTINUAL IMPROVEMENT** | | | |
| Original Date: | Revision Date: | Revision #: | Effective Date: | **4 of 8** |
| **04/07/06** | **07/17/12** | **1** | **08/01/12** | |

     o Research
     o Attach all related information and supporting documentation to the CPAR

**4.7.5**   **Root Cause Analysis.** The party assigned for determining the root cause will use information from the investigation and perform analysis to determine the reason the original error, failure, or risk occurred.

- Types of analysis tools are:
  - o 5 Why Analysis
  - o Flow Charts, Process Maps
  - o FMEA (Failure Mode Effects Analysis
  - o Cause and Effect (Fishbone or Ishikawa Diagrams)
  - o Data Analysis (Charts, Graphs, Pareto Analysis)
  - o Results of Brainstorming, Mind Mapping, Affinity Diagrams
- Attach all related information and supporting documentation to the CPAR.

**4.7.6**   **Recommended Action.** Use the results of the investigation to develop and recommend an appropriate course of action, including resource requirements, planned completion date, and record that information on or attach to the CPAR.

- Return the CPAR to the QC for tracking.

**4.7.7**   **Tracking.** The QC will log the date the investigation was completed and forward the CPAR to the appropriate approval authority.

**4.7.8**   **Approval.** The approval authority (usually a member of top management) will:

- Review investigation, root cause, and recommended action.
- Based on the recommended actions, the approval authority will approve, reject, or request further analysis from the responsible party.
  - o If the approval authority rejects the recommended action or stipulates any limitations, appropriate comments are recorded on the CPAR.
  - o If the approval authority accepts the recommended actions as documented, the CPAR is signed approved.
  - o If the approval authority requests further analysis, the CPAR is returned to the responsible party and a new deadline for reply is recorded in the "Comments by Approval Authority" section of the CPAR form.
- Upon acceptance/rejection of the CPAR, the approval authority signs and dates the form and returns it to the QC for tracking.

**4.7.9**   **Approval Tracking.** The QC logs the date of the approval/rejection and:

- If the recommended action was approved, the QC returns the CPAR to the responsible party for action to be taken.
- If the recommended action was not approved, the QC closes out the CPAR and communicates the reason(s) for the rejection to the responsible party and the initiator.

*Proprietary Information - Kenco*

Case: 18-3206   Document: 11-2   RESTRICTED   Filed: 01/18/2019   Pages: 50



| Document Number: **ISO-QE-8.5.1.001** | Title: **CONTINUAL IMPROVEMENT** | | | |
|---|---|---|---|---|
| Original Date: **04/07/06** | Revision Date: **07/17/12** | Revision #: **1** | Effective Date: **08/01/12** | **5 of 8** |

**4.7.10   Action Taken.**  The responsible party (with the support of the approval authority) will:

- Implement any approved actions.
- Document actions taken on the CPAR.
- Inform the QC and approval authority of the status of the actions.
- Sign, date, and return the CPAR to the QC when the actions are complete.

**4.7.11   Final Tracking and Follow Up.**  CPARs **must** be completed 45 business days from the initiated date.  Once the actions have been taken, the QC and Site Management will:

- Assign a follow up date that will allow a reasonable amount of time to verify the success of the actions on the CPAR/A3 log.
- Ensure (either by themselves or by delegation) that appropriate follow up is performed.
  - Some follow ups will be conducted during the course of a regularly scheduled internal audit conducted per *ISO-QE-8.2.2.001 Internal Audit*.
- If the evidence collected during the follow up assessment indicates that the actions were not effective, return the CPAR to the responsible party for additional action, while the CPAR remains open.  If the CPAR remains open beyond the 45 day period, the Site Manager must document the reasons and submit for approval to Best Practices and KLS Director or VP.  Best Practices and the KLS Director or VP with Site Management will determine the CPAR completion date.
- If there is sufficient evidence to demonstrate that the action taken was effective, attach supporting documentation to the CPAR which is then closed and logged as complete.

**4.7.12   Analysis.**  The QC periodically reviews CPAR results and other relevant data to determine the effectiveness of the CPAR process.  The QC will track and trend CPAR data and report the results of these analyses to top management for continual improvement and management review.

## 4.8   A3 Process

**4.8.1   Documentation.**  An A3 is a tool used to document the process of problem solving to include:

- Problem statement
- Team members
- Root cause
- Current state
- Future state
- Action Plan (Countermeasures)
- Follow up results

These items will be summarized on the *ISO-QE-8.5.1.001-3 A3 Form.*  An A3 is an 11 x 17 sheet of paper completed by using a pencil (use of pencil not required in regulated facilities). The foundation of this tool/lean principle is the Plan, Do, Check, Act (PDCA) problem solving methodology. **The A3 will be posted in a visual location during the entire A3 Problem Solving Process.**



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **ISO-QE-8.5.1.001** | **CONTINUAL IMPROVEMENT** | | | |
| Original Date: | Revision Date: | Revision #: | Effective Date: | **6 of 8** |
| **04/07/06** | **07/17/12** | **1** | **08/01/12** | |

**4.8.2    Tracking and Assignment**. The QC will:

- Assign the A3 a unique number.
- Enter the source of the A3 by using the codes found on the CPAR/A3 log or description of the source.
- With Site Management define the responsible team leader and establish Root Cause Analysis completion date.

- Record this information on the A3 and the accompanying CPAR/A3 log.  The CPAR/A3 log is a tracking system which is monitored to ensure A3s are responded to and acted upon in a timely manner.  This log is to be reviewed monthly by Site Management.

**4.8.3    Site Management and Team Leader develops Problem Statement**

- Describe current observed problem.
- Focus on observed problem, not solutions or opinions.
- Align with company goals.
- Include any information necessary to clarify importance of the problem.

**4.8.4    Site Management and Team Leader selects A3 Team**

- Define team members from all affected value streams.
- The team will be given the authority and responsibility to represent their areas in the A3 Problem Solving process.

**4.8.5    Team conducts Root Cause Analysis**

- At a minimum a "5 Why" Analysis will be performed. By repeating the why question five times, the nature of the problem becomes clear. Continue asking why until root cause has been determined.
- Additional root-cause analysis tools can be used and attached to the A3 Form.
- The real root cause(s) will always point toward a process. Remember "people do not fail, processes do".

**4.8.6    Team develops Problem Description and Current Condition**

- Use a hand drawn visual to show current state (e.g. process flow, trend, layout diagrams, Pareto analysis, charts, and gap analysis) as defined during root cause analysis.
- Use quantitative measures to depict current state.

**4.8.7    Team defines Metrics**

- Metrics will be relative to Problem Statement.
- Metrics will be directly related to Value Streams, for example:
  - Safety Incidence Rate

Case: 18-3206   Document: 11-2      Filed: 01/18/2019      Pages: 50



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **ISO-QE-8.5.1.001** | **CONTINUAL IMPROVEMENT** | | | |
| Original Date: | Revision Date: | Revision #: | Effective Date: | **7 of 8** |
| **04/07/06** | **07/17/12** | **1** | **08/01/12** | |

- o Units per Man Hour (UPMH)
- o Cost per Unit
- o Damage – Parts per Million (PPM)
- o Square Feet
- o Inventory Accuracy

**4.8.8   Team develops Future State** – Includes the optimized processes, systems, and or job roles defined by the A3 Team, and will be the basis for the action plan.

- Clearly depicts the envisioned state, and the gap between current and desired state.
- Uses a hand drawn visual to show desired future state (e.g. process flow, line charts, bar charts, diagrams).
- Identifies resolution of the stated problem.
- Sets SMART goal(s) to address the gap of future state from the current state. *SMART goals are Specific, Measurable, Attainable, Relevant, and Time-bound.*

**4.8.9   Team develops Action Plan (Countermeasures)**

- Consider the following principles when building the plan.
  - o A summary of who will do what by when to achieve the future state.
  - o Address root cause(s) with action items using the 5W1H (Who?, What?, When?, Where?, Why? and How?) approach.
  - o Confirm the tasks are in logical order.
  - o Identify who will help collect data and the frequency.
- Identify Tasks and record on the A3 form
  - o Clearly define the task.
  - o Identify associate responsible to implement the tasks.
  - o Establish the Due Date for completion of tasks.
  - o Identify Completed Date when task is complete.

**4.8.10   Team develops Follow-up Action Items to expand benefits across Kenco. Consider:**

- Similar processes which can benefit from this A3.
- Processes outside of the department or facilities which should know this information.
- Communicate results of this A3 with other sites for future improvements and new processes.

**4.8.11   Team Leader verifies results achieved (analysis of metrics) – 30, 60 and 90 Day Reviews**

- Document a visual comparison of actual results versus your goal in the "Work Area" section of the A3 form.
- Report actual metrics against the baseline metrics and goals.
- If goals are not being sustained, develop Action Plan(s) to close gaps.
- If the actual metrics have been maintained for over 90 days. Close out A3 and post the date in the CPAR/A3 Control Log.

*Proprietary Information - Kenco*



| Document Number:<br>**ISO-QE-8.5.1.001** | Title:<br>**CONTINUAL IMPROVEMENT** | | | |
|---|---|---|---|---|
| Original Date:<br>**04/07/06** | Revision Date:<br>**07/17/12** | Revision #:<br>**1** | Effective Date:<br>**08/01/12** | **8 of 8** |

## 5.0 REFERENCES

*ISO-QE-8.2.2.001 Internal Audit*
*ISO-QE-8.5.1.001-1 Corrective/Preventative Action Request (CPAR)*
*ISO-QE-8.5.1.001-2 CPAR/A3 System Control Log*
*ISO-QE-8.5.1.001-3 A3 Process Form*

## 6.0 REVISION TABLE

| Revision # | Revision Date | Description |
|---|---|---|
| 0 | 04/07/06 | Document created. |
| 1 | 07/17/12 | Administrative changes – remove reference (see 3.6.4) from Section 4.8.5.  New format. |

*Proprietary Information - Kenco*

# Corrective Preventive Action Request

CPAR #

Employee Suggestion/Comment, or Problem Statement, Risk, or Opportunity for Improvement:

Submitted By:

Date:

**Administrative Use Only Below This Line**

| Type (Check One) | ☐ Corrective Action | ☐ Preventive Action |
|---|---|---|
| Received/Logged into CPAR/A3 System by (print name): | Signature: | Date: |
| Investigation Assigned to (print name): | | Deadline for Reply: |

Investigation and Root Cause

| Print Name: | Signature: | Date: |
|---|---|---|

Recommended Action

| Print Name: | Signature | Date: |
|---|---|---|

Comments By Approval Authority

| Approved? | Print Name: | Signature: | Date: |
|---|---|---|---|
| Yes    No | | | |

Actions Taken

| Print Name: | Signature: | Date: |
|---|---|---|

Follow-up

| Follow-up Date: | Follow-up Completed By:  (Print Name) | Effective? | Yes   No |
|---|---|---|---|

**Closed Out By:**

| Print Name: | Signature: | Date: |
|---|---|---|

**ISO-QE-8.5.1.001-1 Effective 07/01/12**

SA-010

SECTION II

December 19, 2014

<u>VIA Certified Mail</u>

Intake Unassigned Case Unit
Illinois Department of Human Rights
100 W. Randolph St., 10th Floor
Chicago, IL 60601

**EXHIBIT M**

Re:   <u>Vernon Henry v. Kenco Logistics Services, LLC</u>
        IDHR # 2015CF0990/EEOC # 21BA50126

To Whom It May Concern:

The following is Respondent Kenco Logistics Services, LLC's ("KLS") position statement and response to the Department's questionnaire in the above-referenced matter.

1.  Kenco Logistics Services, LLC
    1125 Sycamore Street
    Manteno, IL 60950

2.  Jay Elliott
    2001 Riverside Drive
    Chattanooga, TN 37406
    (423) 643-3398

3.  A copy of the EEO-1 report for the above-referenced facility is attached as <u>Exhibit A</u>.

4.  The incident which led to Mr. Henry's charge of discrimination occurred on October 8, 2014. Mr. Henry was driving his fork truck by the co-pack area of the warehouse when Pete Monstwillo (Caucasian) pulled out in front of Mr. Henry, causing Mr. Henry to veer into the co-pack area to avoid being hit. Ultimately, Mr. Henry reported the incident to his supervisor, Saul Beck (Black), telling him that he "needed to do something about Pete. He almost hit me. I had to avoid him by driving through re-pack."

Mr. Beck found Mr. Mostwillo and asked him what happened. Mr. Monstwillo said he did pull out into Mr. Henry's way and intended for Mr. Henry to think he was going to be cut off, but Mr. Monstwillo did not believe Mr. Henry had to drive through co-pack to steer completely clear of Mr. Monstwillo. Essentially, Mr. Monstwillo thought Mr. Henry overreacted to the situation. Mr. Monstwillo also told Mr. Beck that Mr. Henry threatened Mr. Monstwillo, saying he would "kick [Mr. Monstwillo's] ass" when he catches him away from work.

Mr. Beck then went back to Mr. Henry and asked him for more details. Mr. Henry said he did not threaten Mr. Monstwillo. Instead, it was Mr. Monstwillo who challenged Mr. Henry by telling him "If you've got something to say, say it to my face." Mr. Henry also identified a witness, temporary employee Javier Barton (race unknown). Mr. Beck asked Mr. Henry to provide a written statement summarizing what happened, and Mr. Henry did. Mr. Beck

SWITCHBOARD

DEC 31 2014

RECEIVED

By:

then interviewed Mr. Barton about what he saw. Mr. Barton's version of the events most closely resembled Mr. Henry's. Mr. Beck asked Mr. Barton to prepare a written statement, and he did.

Mr. Beck spoke to Tammi Fowler (Senior Manager, Employee Relations). They decided to suspend Mr. Monstwillo for three days (unpaid) for violation of the work rule prohibiting disorderly conduct, horseplay, and intimidating behavior. Copies of the witness statements and the disciplinary action fomr issued to Mr. Monstwillo are attached as <u>Exhibit E</u>.

Individuals with knowledge of the allegation include: Saul Beck and Tammi Fowler, both of whom can be contacted through the undersigned; Javier Barton (temporary employee, telephone number unknown); and Pete Monstwillo (warehouse associate, telephone number – (815) 468-7715.

Mr. Henry was not harassed at all.

5.  Mr. Henry was hired as a full-time warehouse associate on April 14, 2014. A copy of the job description for warehouse associate is attached as <u>Exhibit B</u>. A copy of Mr. Henry's personnel file is attached as <u>Exhibit C</u>.

<u>On the Issue of Harassment:</u>

B6.     A copy of KLS's anti-harassment policy is attached as <u>Exhibit D</u>.

B7.     There is no dedicated individual who is charged with the duty of investigating internal harassment complaints, and the incident to which Mr. Henry refers was not a complaint of harassment. Supervisor Saul Beck (Black) investigated Mr. Henry's complaint that Mr. Monstwillo intentionally pulled his fork truck into the way of Mr. Henry's fork truck.

B8.     Mr. Henry did not complain that he was being harassed. He complained that Mr. Monstwillo intentionally pulled his fork truck into the way of Mr. Henry's fork truck. See KLS's response to request number 4, above.

B9.     There have not been any complaints of harassment by Mr. Monstwillo.

B10.    Mr. Monstwillo was given a three-day unpaid suspension for his misconduct. A copy of that disciplinary action and related paperwork is attached as <u>Exhibit E</u>.

<u>Regarding the basis of RETALIATION, provide the following information:</u>

ZZ1.    Mr. Henry previously filed a charge of discrimination on July 9, 2014 (IDHR # 2015CF00342/EEOC # 21BA42027). KLS provided a Verified Response to that charge on September 19, 2014. It also provided a position statement and response to the Department's request for information on October 3, 2014. Mr Henry also filed an additional charge of discrimination on December 4, 2014 (IDHR # 2015CF1315/EEOC # 21BA50333).

ZZ2.    A list of other pending charges of discrimination filed by KLS employees at the Manteno facility is included in KLS's position statement and response to the Department's request for

information filed on October 3, 2014. Since then, the following charges of discrimination have been filed by KLS employees at the Manteno facility (in addition to the above-referenced charge):

Scott Marksteiner --    IDHR # 2015CF1054/EEOC # 21BA50171, dated October 27, 2014

Nathan Doss --    IDHR # 2015CF0822/EEOC # 221BA50009, dated October 16, 2014
IDHR # 2015CF1145/EEOC # 21BA50239, dated November 5, 2014

Arnold Brownlee --    IDHR # 2015CA1464/EEOC # 21BA50433, dated December 8, 2014

Respectfully submitted,

Jay Elliott
Counsel for Kenco Logistics Services, LLC
2001 Riverside Drive
Chattanooga, TN 37406
Jay.Elliott@KencoGroup.com
Work:  (423) 643-3389

SECTION III

**McCurry, Edith**

| | |
|---|---|
| **From:** | McCurry, Edith |
| **Sent:** | Friday, October 10, 2014 10:31 AM |
| **To:** | Fowler, Tammi |
| **Cc:** | Lopez, Mario; Szplett, Len |

**Subject:** Pete Monstwillo and Vernon Henry

It was anonymously reported to me that Pete Monstwillo while on and operating his Fork truck; lifted his fork truck blades and lunged his fork truck at Vernon Henry. Vernon reported the incident to Saul Beck (Supervisor). It also was reported that Saul questioned Pete about lunging his equipment at Vernon. It was reported that Pete responded yes, I did it, what of it. It was reported that there was a witness; he is from a different Kenco location. Saul took a report from both Vernon Henry and the witness. Reportedly Saul Beck took Pete Monstwillo's timecard and escorted him from the building.

It was also reported anonymously to me that Pete Monstwillo called the company (Mars-Manteno) and threatened Vernon Henry.


Edith McCurry
_____

Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Edith.McCurry@KencoGroup.com
Office 815-468-9999, X464
Fax 1-815-468-2468

SECTION IV

*Done 9/20/14*

**McCurry, Edith**

**From:** Szplett, Len
**Sent:** Friday, September 19, 2014 12:14 PM
**To:** McCurry, Edith
**Subject:** FW: Spotter pay changes-Mars-Manteno-Kenco

FYI, to change the rates.

Len Szplett

Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Len.Szplett@KencoGroup.com
Office 815-468-9999, X488
Fax 1-815-468-2468

**From:** Szplett, Len
**Sent:** Thursday, September 18, 2014 1:14 PM
**To:** Lopez, Mario
**Subject:** Spotter pay changes-Mars-Manteno-Kenco

Mario, per our conversation today about increasing our spotters pay to $18.50 , the change will be retro to 8-4-14.

Here's where we'll be with our  spotters:

✓ Mark Baker $17.05 to $18.50
✓ Kerry Campbell $16.15 to $18.50
✓ John Montgomery $17.21 to $18.50
✓ Mandy Ringo $16.63 to $18.50
✓ Morris Tyson $16.55 to $18.50

The 2 newest spotters will stay at their hired rate of $18.00:
Tom Leach and Karl Metke.

We'll work on getting this done for the next payroll if possible.

Just wanted to confirm back to you.

Thank you.

Len Szplett

Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Len.Szplett@KencoGroup.com
Office 815-468-9999, X488
Fax 1-815-468-2468

9/20/2014

SA-018

**McCurry, Edith**

| | |
|---|---|
| **From:** | Varvel, Lori |
| **Sent:** | Friday, December 19, 2014 4:29 PM |
| **To:** | McCurry, Edith |
| **Cc:** | Lopez, Mario; Varvel, Lori |
| **Subject:** | Driver Pay |
| **Importance:** | High |

Edith-

Can you tell me if there is different pay, for different types of drivers, in the warehouse? If so:

1) Do the drivers sign something for this extra pay?
2) What are the different rates, for the different drivers
3) Does this happen at the time of certification?
4) Do you put this extra pay in?
5) Does this pay ever get removed, for any reason?

**Lori Varvel**
Human Resources Manager
1105 Sycamore Road • Manteno, IL  60950
Office: 815-468-4404 •

**KENCO**

12/19/2014

SA-019

Case: 18-3206    Document: 11-2    RESTRICTED    Filed: 01/18/2019    Pages: 50

SECTION V

**VERIFIED RESPONSE GOOD CAUSE DETERMINATION**

Charge Number 2015CA3083

Complainant  Leonard A. Szplett

Respondent  Kenco Logistics

This form **must be completed** for all cases.  Use this form to determine whether a Verified Response is **timely/untimely** filed.  *Use back of this form to chrono all events in this process.*

1.  **Verified Response received by Department (date)** July 21, 2015

2.  **Verified Response due date calculation (See 56 Ill. Admin. Code Sec. 2520.30c)**

    (a).  Notice of Charge mailed to Respondent (date)  May 29, 2015

    (b).  Add 5 days to the date the Notice of Charge was mailed to Respondent to arrive at the date it is deemed received by Respondent:(date): June 3, 2015
    *Note:  In calculations, if day 5 does not fall on a business day, go to next business day.*
    (c).  Add 60 days to the date calculated in subpart (b) above.  **IMPORTANT:  THIS IS THE DATE THE VR IS DUE, WHETHER IT IS HAND-DELIVERED OR MAILED. DATE DUE:    August 3, 2015**
     (The date stamp of the Department establishes the date the VR is filed with the Department if the VR is hand-delivered to the Department.  The postmark establishes the date the VR is filed if the VR is mailed to the Department.)
    *Note:  In calculations, if day 60 does not fall on a business day, go to next business day.*
    (d)  For VR's that have been mailed to the Department, add 5 days to the date calculated in Step (c) above, but only to allow time for the Department's receipt of the VR, not to extend the due date for the VR established above in subpart (c): (date): _____. Then examine the **postmark**, which establishes the date the VR was filed with the Department.  **The postmark date must be on or before the date established in subpart (c) above as the due date for the filing of the VR.**

3.  **Calculating when the VR is untimely received and the Department must take action:**
    The VR is **untimely** if
    (a) it is **received** after the date calculated in subpart  (c) above if **hand-delivered**; or
    (b) it is **postmarked** after the date calculated in subpart (c) above if **mailed**.

    **VR untimely?  Yes _____  No ____X_____**

4.  Spoke with Respondent regarding reason for late VR:

    Name: _____ Title: _____ Date: _____
                                    **Or**
    Letter received from Respondent explaining reason for late VR:

    Name: _____ Title: _____ Date: _____

EM002099

VR Good Cause Determination
Page Two

5.  **VR-1 Letter (correction of defective VR) sent to:** *(Chrono follow-up phone calls.)*

    Name: _____  Title: _____  Date: _____

6.  **VR-2 Letter (reminder VR due) sent to:** *(Chrono follow-up phone calls.)*

    Name: Jill Iscra-Long  Title:  VP of HR          Date:  December 23, 2014

7.  **Verified Response served on Complainant (date)** <u>July 20, 2015</u>
    (Attach supporting documentation showing proof of service on Complainant.)
    (Note:  the fact finding conference should not be held until at least thirty (30) days have
    elapsed from the date Complainant is deemed to have been served with the Verified
    Response.) (<u>See</u> 56 Ill. Admin. Code Sec. 2520.30c)

8.  **Respondent explanation for delay in filing of Verified Response:**   VP atty L. Watson
    stated that Rp has no record of receiving the charge.  Watson stated that as soon as Rp
    received the charge, they quickly provided the VR.

9.   If VR untimely, was good cause shown?   YES_____      NO _____

         **(Please refer to the Department's Administrative Code, Section 2520.405c,
         "Verified Response to Charge", effective January 13, 2006, below.**

         **INVESTIGATOR: CHECK <u>ALL</u> THAT APPLY.  IF #4 AND/OR #5 BELOW IS
         CHECKED, YOU <u>MUST</u> STATE ABOVE THE FACTS APPLICABLE TO THE
         REASONS STATED IN #4 AND/OR #5:)**

         Pursuant to Section 7A-102(B) of the Act, **good cause** for untimely filing a
         verified response may include, but shall not be limited to:
    _____  1.    Death or sudden, serious illness of respondent or respondent's
            representative;
    _____  2.    Death or sudden, serious illness of an immediate family member of
            respondent or respondent's representative;
    _____  3.    Respondent filed and served a timely verified response, but the Department
            later determined that respondent's verified response was defective;
    __X__  4.    Respondent acted with due diligence and was not deliberate or contumacious
            and did not unwarrantedly disregard the verified response process, as supported
            by affidavit or other evidence;
    _____  5.    Respondent's failure to timely file a verified response was due to
            circumstances beyond respondent's control, as supported by affidavit or
            other evidence.
Attach a copy of all supporting documentation to this completed form.  This completed form is to
be attached to the right-hand side of the charge file in the respondent section.

VR Good Cause Determination Worksheet
08/30/2006

Pages: 348    Filed: 01/23/2019    Document: 16    Case: 18-3206

VR

STATE OF ILLINOIS
DEPARTMENT OF HUMAN RIGHTS

In the Matter of:

LEONARD A. SZPLETT,                     )
                                        )
        Complainant,                    )
                                        )
And                                     )       IDHR Charge No. 2015CA3083
                                        )
KENCO LOGISTIC SERVICES, LLC,           )
                                        )
        Respondent.                     )

<u>VERIFIED RESPONSE</u>

Comes now Respondent, Kenco Logistic Services, LLC ("KLS"), and responds to the Charge of Discrimination filed against it by Complainant Leonard A. Szplett, as follows:

I.    A.    ISSUE/BASIS – UNEQUAL TERMS AND CONDITIONS OF EMPLOYMENT, REVERSE DISCRIMINATION AND HARASSMENT DUE TO MY RACE-WHITE, MY AGE-OVER 40, MY SEX-MALE, AND IN RETALIATION

      B.    PRIMA FACIE ALLEGATIONS

            1.    The allegations contained in this paragraph are denied.
            2.    The allegations contained in this paragraph are denied.
            3.    The allegations contained in this paragraph are denied.
            4.    The allegations contained in this paragraph are denied.
            5.    The allegations contained in this paragraph are denied.
            6.    The allegations contained in this paragraph are denied.
            7.    KLS admits Tammi Fowler told Mr. Szplett and others not to discuss pending legal matters with anyone. To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.
            8.    The allegations contained in this paragraph are denied.
            9.    KLS admits that it made changes to shift schedules during 2014. To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.
            10.   The allegations contained in this paragraph are denied.
            11.   The allegations contained in this paragraph are denied.

          EM002101

12.    KLS admits that Paula Hise met with employees to inform them of the decision to let Kelvin Walsh go, and that she said she was sad for Mr. Walsh since he is a nice person.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

13.    The allegations contained in this paragraph are denied.

14.    KLS admits David Jabaley gave Mr. Szplett a mid-year evaluation in 2014 which indicated Mr. Szplett was below expectations and would need development in a number of areas.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

15.    KLS admits Mr. Szplett and Valerie Lilly were invited to work from 1:00 p.m. to 9:00 a.m. for one week in August of 2014 when KLS was promoting "around the clock leadership."  They accepted.  Other supervisors and managers worked off shift during the same week.  To the extent inconsistent with these admissions, the allegations contained in this paragraph are denied.

16.    KLS admits Edith McCurry had a big problem getting payroll in on time.  KLS admits there were some manual adjustments to payroll that were required from time to time when the clock did not capture employees' working time accurately.  To the extent inconsistent with these admissions, the allegations contained in this paragraph are denied.

17.    KLS admits payroll ends and is due 5 hours later Monday morning.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

18.    The allegations contained in this paragraph are denied.

19.    KLS admits Mike Manzello was terminated on September 2, 2014.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

20.    KLS admits a new HR Manager position was posted on September 25, 2014.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

21.    KLS admits Tammi Fowler asked Mr. Szplett whether he paid Dana Woods during the time Mr. Woods was out for an unpaid, disciplinary suspension, and told him not to do it again.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

22.    KLS admits several employees were terminated for violating KLS's cell phone usage policy.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

23.    The allegations contained in this paragraph are denied.

24.    KLS admits Lori Varvel was hired as HR Manager on or around November 17, 2014, and that her salary was higher than Mr. Szplett's.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

25.    KLS admits that, while he was on medical leave, Mr. Szplett's office was temporarily moved to a cubicle next to the conference room.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

26.    The allegations contained in this paragraph are denied.

27.    KLS admits it lost the Mars contract.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

28.    The allegations contained in this paragraph are denied.

29.     KLS admits Mr. Szplett was not released to return to work by his physician on February 28, 2015.  KLS is without sufficient information to admit or deny the remaining allegations contained in this paragraph, and therefore denies same.

30.     KLS admits Mr. Szplett was not paid for March of 2015.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

31.     The allegations contained in this paragraph are denied.

II.     A.     ISSUE/BASIS – FAILURE TO ALLOW DUTIES TO BE CONTINUED AS HR MANAGER DUE TO MY RACE-WHITE (REVERSE DISCRIMINATION), MY AGE-OVER 40, MY SEX-MALE, AND IN RETALIATION

B.     PRIMA FACIE ALLEGATIONS

1.     The allegations contained in this paragraph are denied.

III.     A.     ISSUE/BASIS – DEMOTION AND HARASSMENT DUE TO MY RACE-WHITE (REVERSE DISCRIMINATION), MY AGE-OVER 40, MY SEX-MALE, AND IN RETALIATION

B.     PRIMA FACIE ALLEGATIONS

1.     The allegations contained in this paragraph are denied.

2.     KLS admits Lori Varvel's salary was higher than Mr. Szplett's.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

3.     KLS admits that, while he was on medical leave, Mr. Szplett's office was temporarily moved to a cubicle next to the conference room.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

IV.     A.     RETALIATION DUE TO MY RACE-WHITE (REVERSE DISCRIMINATION), MY AGE-OVER 40, MY SEX-MALE, AND IN RETALIATION

B.     PRIMA FACIE ALLEGATIONS

1.     The allegations contained in this paragraph are denied.

2.     The allegations contained in this paragraph are denied.

3.     The allegations contained in this paragraph are denied.

4.     The allegations contained in this paragraph are denied.

5.     The allegations contained in this paragraph are denied.

6.     KLS admits that Paula Hise met with employees to inform them of the decision to let Kelvin Walsh go, and that she said she was sad for Mr. Walsh since he is a nice person.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

7.     KLS admits David Jabaley gave Mr. Szplett a mid-year evaluation in 2014 which indicated Mr. Szplett was below expectations and would need development in a number of areas.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

EM002103

8.     KLS admits Mr. Szplett and Valerie Lilly were invited to work from 1:00 p.m. to 9:00 a.m. for one week in August of 2014 when KLS was promoting "around the clock leadership." They accepted. Other supervisors and managers worked off shift during the same week. To the extent inconsistent with these admissions, the allegations contained in this paragraph are denied.

9.     KLS admits Edith McCurry had a big problem getting payroll in on time. KLS admits there were some manual adjustments to payroll that were required from time to time when the clock did not capture employees' working time accurately. KLS admits payroll ends and is due 5 hours later Monday morning. To the extent inconsistent with these admissions, the allegations contained in this paragraph are denied.

10.     KLS admits Tammi Fowler asked Mr. Szplett whether he paid Dana Woods during the time Mr. Woods was out for an unpaid, disciplinary suspension, and told him not to do it again. To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

11.     KLS admits a new HR Manager position was posted on September 25, 2014. To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

12.     KLS admits Lori Varvel was hired as HR Manager on or around November 17, 2014, and that her salary was higher than Mr. Szplett's. KLS admits that, while he was on medical leave, Mr. Szplett's office was temporarily moved to a cubicle next to the conference room. To the extent inconsistent with these admissions, the allegations contained in this paragraph are denied.

13.     The allegations contained in this paragraph are denied.

14.     KLS admits it lost the Mars contract. To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.

15.     The allegations contained in this paragraph are denied.

V.     A.     COERCION DUE TO MY RACE-WHITE (REVERSE DISCRIMINATION), MY AGE-OVER 40, MY SEX-MALE, AND IN RETALIATION

       B.     PRIMA FACIE ALLEGATIONS

1.     The allegations contained in this paragraph are denied.

2.     The allegations contained in this paragraph are denied.

3.     The allegations contained in this paragraph are denied.

4.     The allegations contained in this paragraph are denied.

5.     The allegations contained in this paragraph are denied.

6.     Mary Madison has filed her own charges of discrimination, and so the IDHR is directed to KLS's responses.

7.     Jacque Morrison has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.

8.     Nathan Doss has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.

9.     Vernon Henry has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.

        EM002104

Case: 18-3206    Document: 16    Filed: 01/23/2019    Pages: 348

10.    (Dana Woods) KLS is without sufficient information to admit or deny the allegations contained in this paragraph, and so they are denied.

11.    Scott Marksteiner has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.

12.    Morris Tyson has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.

13.    Nathan Doss has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.

14.    The allegations contained in this paragraph are denied.

15.    The allegations contained in this paragraph are denied.

VI.    A.    AIDING AND ABETTING DUE TO MY RACE-WHITE (REVERSE DISCRIMINATION), MY AGE-OVER 40, MY SEX-MALE, AND IN RETALIATION

B.    PRIMA FACIE ALLEGATIONS

1.    The allegations contained in this paragraph are denied.

2.    The allegations contained in this paragraph are denied.

3.    The allegations contained in this paragraph are denied.

4.    The allegations contained in this paragraph are denied.

5.    The allegations contained in this paragraph are denied.

6.    The allegations contained in this paragraph are denied.

7.    Mary Madison has filed her own charges of discrimination, and so the IDHR is directed to KLS's responses.

8.    Jacque Morrison has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.

9.    Nathan Doss has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.

10.    Vernon Henry has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.

11.    (Dana Woods) KLS is without sufficient information to admit or deny the allegations contained in this paragraph, and so they are denied.

12.    Anastasia Sandness has filed her own charges of discrimination, and so the IDHR is directed to KLS's responses.

13.    Scott Marksteiner has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.

14.    Morris Tyson has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.

15.    KLS is without sufficient information to admit or deny the allegations contained in this paragraph, and so they are denied.

16.    The allegations contained in this paragraph are denied.

17.    The allegations contained in this paragraph are denied.

SA-027                    EM002105

18.     The allegations contained in this paragraph are denied.

VII.     A.     WILLFUL INTERFERENCE DUE TO MY RACE-WHITE (REVERSE DISCRIMINATION), MY AGE-OVER 40, MY SEX-MALE, AND IN RETALIATION

       B.     PRIMA FACIE ALLEGATIONS

1.     The allegations contained in this paragraph are denied.
2.     The allegations contained in this paragraph are denied.
3.     The allegations contained in this paragraph are denied.
4.     The allegations contained in this paragraph are denied.
5.     The allegations contained in this paragraph are denied.

VIII.     A.     CONSPIRACY DUE TO MY RACE-WHITE (REVERSE DISCRIMINATION), MY AGE-OVER 40, MY SEX-MALE, AND IN RETALIATION

       B.     PRIMA FACIE ALLEGATIONS

1.     The allegations contained in this paragraph are denied.
2.     Mary Madison has filed her own charges of discrimination, and so the IDHR is directed to KLS's responses.
3.     Jacque Morrison has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.
4.     Nathan Doss has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.
5.     Vernon Henry has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.
6.     (Dana Woods)  KLS is without sufficient information to admit or deny the allegations contained in this paragraph, and so they are denied.
7.     Scott Marksteiner has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.
8.     Morris Tyson has filed his own charges of discrimination, and so the IDHR is directed to KLS's responses.
9.     The allegations contained in this paragraph are denied.
10.     The allegations contained in this paragraph are denied.
11.     The allegations contained in this paragraph are denied.
12.     The allegations contained in this paragraph are denied.

IX.     A.     HOSTILE WORK ENVIRONMENT DUE TO MY RACE-WHITE (REVERSE DISCRIMINATION), MY AGE-OVER 40, MY SEX-MALE, AND IN RETALIATION

       B.     PRIMA FACIE ALLEGATIONS

     EM002106

1.    The allegations contained in this paragraph are denied.
2.    The allegations contained in this paragraph are denied.
3.    The allegations contained in this paragraph are denied.
4.    The allegations contained in this paragraph are denied.
5.    The allegations contained in this paragraph are denied.
6.    KLS admits that it made changes to shift schedules during 2014.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.
7.    KLS admits that Paula Hise met with employees to inform them of the decision to let Kelvin Walsh go, and that she said she was sad for Mr. Walsh since he is a nice person.  To the extent inconsistent with this admission, the allegations contained in this paragraph are denied.
8.    The allegations contained in this paragraph are denied.
9.    The allegations contained in this paragraph are denied.
10.    The allegations contained in this paragraph are denied.
11.    The allegations contained in this paragraph are denied.
12.    The allegations contained in this paragraph are denied.
13.    The allegations contained in this paragraph are denied.
14.    The allegations contained in this paragraph are denied.
15.    The allegations contained in this paragraph are denied.

    EM002107

Case: 18-3206     Document: 16     Filed: 01/23/2019     Pages: 348

VERIFICATION

STATE OF TENNESSEE

COUNTY OF HAMILTON

Jay Elliott being first duly sworn, deposes and says that he is VP of Legal for Respondent; that he has read the foregoing verified response to the charge of discrimination; that he knows the contents thereof based on information obtained through discovery and investigative efforts; and that said response is true and correct to the best of his knowledge, information, and belief.

_____
Jay Elliott

SUBSCRIBED and SWORN to before me

This _20th_ day of _July_, 201_5_

_____
Notary Public

My commission expires _3/7/18_

SA-030                                                    EM002108

Respectfully submitted,

Jay Elliott
Counsel for Kenco Logistics Services, LLC
2001 Riverside Drive
Chattanooga, TN 37406
(423) 643-3398

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Verified Response to the charge of discrimination was served upon:

Jordan T. Hoffman, P.C.
11528 S. Halsted
Chicago, IL 60620

Investigator John Detwiler
Illinois Department of Human Rights
100 W. Randolph Street, 10th Floor
Chicago, IL 60601-3391

By depositing same in U.S. Mail or Federal Express on the 20th day of July, 2015.

SA-031                    EM002109

Case: 18-3206   Document: 11-2   RESTRICTED   Filed: 01/18/2019   Pages: 50

SECTION VI

Case: 18-3206    Document: 112    Filed: 09/18/2019    Pages: 50

 **Job Description**

### I. Identification

| | |
|---|---|
| Job Title | **Regional Distribution Manger** |
| Location | **HKT** |

Zone:

Reports To (Title)    **Customer Care Director**

### II. Summary

Consistently and efficiently deliver integrated transportation and warehousing services within a specific geography that satisfy our customer and business needs through operational excellence and time-based activities that reduce the cash-to-cash cycle. Optimize customer satisfaction, and deliver the best logistics "value for money" on a daily basis. Provide an efficient, flexible and responsive supply chain through the effective management and direction of factory outbound logistics operations, third party logistics service providers, while developing a "best-in-class" vendor base to meet future business needs.

### III. Principal Accountabilities

- Effectively manage and deliver logistics quality, service and cost for all business units within a defined geography for (1) storage and handling, (2) freight to customer transportation, (3) freight to warehouse transportation and (4) customer service from the back end of the factory through the warehouses to customers.
- Serve as the point of contact within the Region for all Logistics issues. Liaison with SBU Supply associates, Customer Care, and Commercial Services. Monitor the logistics operations of 6 to 7 plant and warehouse sites.
- Deliver day-to-day operational excellence in factory outbound, 3PL transportation and 3PL warehousing services.
- Drive collaborative logistics and supply chain opportunities with factories and customers.
- Control and manage an average annual logistics spend of $53 million dollars within a specific geography. Lead the logistics cause of change process each period, identifying specific cost drivers vs. the plan and taking corrective action.
- Develop and manage a vendor base to ensure that the required warehouse services are available to deliver the operating plan.
  ($17MM average annual spend per each RDM position, i.e., $70MM total annual spend)
- Develop and manage a vendor base to ensure sufficient transportation service is available to meet customer demand ($29MM average annual spend per each RDM position, i.e., $117MM total annual spend)
- Manage and protect an average of $300 million (GSV) of Finished Goods and Raw Materials inventory per site, protecting those assets and corresponding brand franchises. This particularly pertains to government regulatory requirements, internal quality standards, inventory accuracy and stock rotation.
- Ensure adequate storage capacity to meet space requirements across all units for both the Plan and through the Medium Term (5-year horizon).
- Ensure processes and procedures are dynamic to meet customer order demand to ensure optimal on-time and complete service.
- Support Masterfoods manufacturing locations from a logistics perspective; ensure transportation (capacity, service) meets regional demand.

SA-033

DEF000181

## IV. Operating Environment and Guidance

- Customer Focus
- Action Oriented
- Managing and Measuring Work
- Process Management
- Planning
- Problem Solving
- Drive for Results
- Building Effective Teams
- Negotiating
- Dealing with Ambiguity
- Innovation Management
- Motivating Others

<br>

- Five Principles of Mars
- Mars Supply Chain Efficiency programs
- Supply Chain Concepts

DEF000182

## V. Decision Making Authority

#### Decisions

- Selection of transportation and warehouse vendors within the region, working with Commercial.  The selection directly impacts
  service, cost and quality.
- Decide warehouse staffing levels, MHE equipment, and all expenditures over $500 at the warehouses in accordance with
  S&F guidelines and best practice.
- Determine warehouse productivity goals, criteria and monitoring systems
- Approve all necessary safety and security measures needed to protect people, product and assets in the warehouse or in-transit.
- Decide delivery frequency within the geography.
- Approve transportation expenditures within S&F guidelines.
- Approve specific actions to handle emergency or special customer demands, balancing tradeoffs between the need to
  minimize logistics costs while meeting customer and business unit needs.
- Lead and facilitate innovation and continuous improvement via leadership of the MARC and MHE cross-functional User
  Groups.

#### Programs

- Claims & POD Management
- Freight Payment Systems Practices

#### Recommendations

- Recommend vendor and location for finished goods overflow and cold storage space, as needed.
- Support and lead plant warehouse sites in developing operational best practices, systems and equipment enhancements
  which yield improved efficiencies and delivers superior service to customers.
- Factory outbound staffing and deployment/shipping procedures.
- Support and lead Customer Care and Sales in development of logistics improvements that deliver supply chain solutions
  to our customers. (e.g. customization, specialized picking or loading, ASN)
- Working with Sales, Franchise and Quality Assurance to design and implement  innovative delivery strategies for developing
  business segments (e.g. Cocoa Via, Colorworks, frozen network)
- In conjunction with Inventory Planning and Customer Care, develop annual space planning strategy that meets seasonal
  requirements, including pay for storage and overflow alternatives.
- Help develop the Logistics Plan, ROB and budget submissions.
- Recommend changes to Quality Assurance policies regarding warehousing and transportation.  Champion continuous
  improvement to the North American Quality Manual as it pertains to the Supply Chain.

DEF000183

## VI. Knowledge and Skills

### A. List of Knowledge and skills required in order to effectively perform the job.

- Deliver superior service to customers by driving day to day operational excellence and execution within a dynamic environment (Drive for Results + Customer Focus)
- Manage the storage and handling of all DFC Finished Goods inventories (Planning)
- Manage the transportation of finished goods to customers, efficiently, while meeting all service standards (Dealing with Ambiguity)
- Execute efficient warehouse copack customization and repack activities (Process Management)
- Manage the storage of raw and packaging materials stored within the DFC's.
- Act as the interface and conduit between Commercial/Supply Site Logistics and Supply/Sales/Customer Care, providing functional/technical expertise and support to internal and external clients (Building Effective Teams)
- Effectively manage multiple remote sites and support resources
- Develop and manage external vendor relationships. Drive a continuous improvement environment providing ongoing reliability and future flexibility to the business.
- Effectively utilize the Vendor Assurance Program to manage risk; the Vendor Competency tool to develop vendors; and the Warehouse Incentive Program to drive efficiency and productivity.
- Balance the ongoing cost and service tradeoffs with the supply chain (Negotiating)

### B. Indicate how knowledge and skills are typically aquired.

#### Education

- BA/BS in Logistics, Supply Chain, Business or equivalent.
- MBA desirable
- APICS or other technical certification is a plus

#### Experience

- Five to seven years Supply Chain or Logistics Management experience, preferably with a consumer products company.
- In depth knowledge of warehousing, inventory control, "lean logistics", customer service and transportation.
- Broad and strong understanding of the total supply chain.
- Remote management skills. Ability to act independently to achieve results without on-site presence of scalar.
- Superior vendor management skills. Ability to manage co-employment complexities while achieving desired results from independent, 3rd party vendors.
- Project management skills. Direct experience leading a major project is a plus.
- Ability to plan and manage a budget of ~ $50 million.
- Experience with computer assisted solutions for transportation and warehousing opportunities and the ability to leverage and utilize them. (e.g. RFID, ASN, TME)
- Good working knowledge of transportation and contract law. Exposure to government and regulatory guidelines pertaining to Food.

### C. Explain any particular physical or mental requirements necessary to perform the essential functions of the job (i.e. travel, driving, lifting, interpersonal and communication skills or analytical/numeric ability, etc.

DEF000184

## VII. People Management

List the title and number of the jobs reporting to this job and the number who report to them (indirect).

| Direct Reports | Title | Number |
|---|---|---|
| Exempt | | |
| Non-Exempt | | |
| Indirect Reports | | |
| Exempt | | 15+ incl. 3PL warehousing |
| Non-Exempt | | 200+ incl. 3PL warehousing |

## VIII. Other Job Dimensions

| Item | Amount [$Volumne - Indicate whether accountibility is Direct (D) or Indirect (I)] |
|---|---|
| GSV (Order Management) | $3.6 Billion/4 = $900 Million (D) |
| Logistics Operations Budget | $212 Million/4 = $53 Million (D) |

## IX. Competencies

## Signatures

| Job Writer | **Mick Ward** | Date | 9/1/2009 |
|---|---|---|---|
| Approver I | | Date | |
| Approver II | | Date | |
| P & O Manag | | Date | |

SA-037

DEF000185

Case: 18-3206   Document: 11-2   RESTRICTED   Filed: 01/18/2019   Pages: 50

# SECTION VII

# MILLER & MARTIN
PLLC

### ATTORNEYS AT LAW

SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402-2289
423-756-6600
FAX 423-785-8480

Jennifer W. Terry

Direct Dial 423-785-8348
Direct Fax 423-321-1537
jterry@millermartin.com

October 3, 2014

**VIA FEDERAL EXPRESS PRIORITY OVERNIGHT**

Intake Unassigned Case Unit
Illinois Department of Human Rights
100 W. Randolph St., 10th Floor
Chicago, IL 60601

      Re:   Vernon Henry v. Kenco Logistic Services, LLC
           IDHR # 2015CF0034*l*; EEOC #21BA42027

To Whom It May Concern:

On behalf of the Respondent, Kenco Logistic Services, LLC ("Kenco"), please accept the following position statement in response to the above-referenced charge filed by Vernon Henry, as well as Kenco's response to the Agency's questionnaire.[1]

As you know, the Complainant, Vernon Henry, filed a charge of discrimination alleging that he was not promoted and was subjected to unequal terms and conditions of employment because of his race (Black) and gender (male). Mr. Henry has also alleged that he was not promoted in retaliation for having complained about racial discrimination in the workplace. As will be discussed more fully herein, Kenco denies these allegations.

## I.    BACKGROUND

Kenco is a third-party logistics company ("3PL") that operates and manages warehouses and order fulfillment operations for other companies. On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for Mars, Inc. The Complainant was temporarily assigned to Kenco through Temporary Resource Network Staffing on December 18, 2013 and hired as a full-time warehouse associate on April 14, 2014. A warehouse associate is a non-exempt position.

---

[1] This position statement is submitted in order to assist the IDHR in its investigation of the above-referenced charge. The information set forth in the position statement, while believed to be true and correct, has been prepared based on preliminary interviews of those individuals believed to have the most relevant knowledge of this matter.  It does not constitute an affidavit and is not intended to be used as evidence in any administrative or judicial proceeding. By submitting this position statement, the Respondent does not waive its right to present new or additional facts, arguments, or evidence. Likewise, inclusion of information in this statement does not constitute a waiver of any objections the Respondent may have to the relevancy of the information provided or to this or any future discovery or information requests in this or any subsequent proceeding.

From December 18, 2013 through March 21, 2014, Complainant worked first shift. Beginning March 23, 2014, Complainant was assigned to work third shift. Warehouse associates on all shifts are occasionally required to work overtime. This overtime work is typically performed at the end of an associate's shift.

With regard to promotions or transfers to other positions, full-time and temporary warehouse associates may apply for other available positions at Kenco. To be qualified for said positions, however, Kenco's hiring policies require that warehouse associates (as non-exempt employees) must first be employed in their current position for at least six months. See Exhibit 4 ¶3.1.4 and Exhibit 5 ¶5 to Kenco's Response to IDHR Questionnaire.

## II.      LEGAL ARGUMENT[2]

### A.      Burden of Proof

The burden of proof in establishing a *prima facie* claim of discrimination lies with the complainant.  A complainant seeking to establish a claim under either the Illinois Human Rights Act ("IHRA") or Title VII of the Civil Rights Act of 1964 ("Title VII") may rely on either direct or circumstantial evidence.  Direct evidence is evidence that proves the existence of a fact without requiring any inferences.  It is "smoking gun" evidence, "such as 'We fired you because of your race and/or national origin.'"  Aguilera v. Village of Hazel Crest, 234 F. Supp. 2d 840, 848 (N.D. Ill. 2002).  In this case, the Complainant has not alleged any direct evidence of discrimination or retaliation.

In the absence of direct evidence, a complainant must rely on circumstantial evidence to establish his claims.  The order, allocation, and standards of proof generally applicable to discrimination and retaliation cases under Title VII based on circumstantial evidence were first established in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 804 (1973), and clarified in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981):

> First, the [complainant] has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the [complainant] succeeds in proving the prima facie case, the burden shifts to the [respondent] to "articulate some legitimate, non-discriminatory reason for the employee's rejection" . . . Third, should the [respondent] carry this burden, the [complainant] must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reason but were a pretext for discrimination.

See also Burks v. Wisconsin Dept. of Transp., 464 F.3d 744, 750-51 (7th Cir. 2006); Aguilera, 234 F. Supp. 2d at 848-49.

---

[2] Cases brought under the Illinois Human Rights Act ("IHRA") are analyzed in the same manner as cases brought under Title VII of the Civil Rights Act of 1964. Alcequeire v. Human Rights Commission, 292 Ill. App. 3d 515, 685 N.E.2d 974, 976 (Ill. App. Ct. 1997). Thus, reference to federal case law decided under Title VII is appropriate.

Nevertheless, the complainant at all times carries the ultimate burden of proving discrimination and retaliation. Even though the burden of going forward with the evidence may shift between the parties, the burden of persuasion always remains with the complainant. Aguilera, 234 F. Supp. 2d at 848 (plaintiff bears the ultimate burden of proving that he was terminated because of his race); Lalvani v. Illinois Human Rights Comm'n, 324 Ill. App. 3d 774, 790, 755 N.E.2d 51, 64 (Ill. Ct. App. 2001) (same). The employer is never required to prove the "absence" of a discriminatory motive, and "it is not enough . . . [simply] to disbelieve the employer." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 512 n.4 (1993).

As set forth more fully herein, Mr. Henry has not alleged any facts or circumstances sufficient to carry his burden on his claims.

**B.    The Complainant Cannot Establish Unlawful Discrimination: Scheduling**

In order to establish a *prima facie* case of either race or gender discrimination, a complainant must prove all of the following elements:

(1)    he was a member of a protected class,
(2)    he was doing his job well enough to meet his employer's legitimate expectations,
(3)    he suffered an adverse employment action, and
(4)    another similarly situated individual who was not in the protected class was treated more favorably.

Burks, 464 F.3d at 750-51; Aguilera, 234 F. Supp. 2d at 849; Raines v. Health Care Serv. Corp., 1988 WL 58591 *3 (N.D. Ill. May 31, 1988). A failure to establish even one of these elements is fatal to a complainant's claims. Traylor v. Brown, 295 F.3d 783, 790 (7th Cir. 2002).

**1.    The Complainant did not Suffer an Adverse Employment Action**

In order to establish discrimination with respect to "terms, conditions, or privileges of employment," for purposes of Title VII and the IDHR, a complainant must show that he suffered a materially adverse employment action. "'[N]ot everything that makes an employee unhappy' will suffice to meet the adverse action requirement." Traylor v. Brown, 295 F.3d 783, 788 (7th Cir. 2002) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)). Indeed, mere annoyances are not enough. "To demonstrate an adverse employment action, 'an employee must be able to show a quantitative or qualitative change in the terms and conditions of employment.'" Herron v. DaimlerChrysler Corp., 388 F.3d 293, 301 (7th Cir. 2004) (quoting Haywood v. Lucent Techs., Inc., 323 F.3d 524, 532 (7th Cir. 2003)). To this end, an adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss in benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Traylor, 295 F.3d at 788 (quoting Rabinovitz v. Pena, 89 F.2d 482, 488 (7th Cir. 1996)). None of these things have occurred in this case.

Furthermore, with specific regard to scheduling, "[t]he scheduling of an employee's work hours, shifts, vacation and comp time is a determination made in the ordinary course of business by an employer as part of its daily operations, and the Seventh Circuit has made it clear that Title VII does not authorize courts to act as a super-personnel department intervening whenever an employee feels he is being treated unjustly." Beverly v. Kaupas, No. 05 C 6338, 2008 WL 624045, at *14 (N.D. Ill. Feb. 29, 2008) (quoting Cardoso v. Robert Bosch Corp., 427 F.3d 429, 435 (7th Cir. 2005)) (internal quotation marks omitted) (granting summary judgment).

Mr. Henry claims that the following adverse employment action occurred: he was denied the opportunity to complete overtime hours prior to his shift. (IDHR # 2015 CF 0034, I.B.3, II.B.3). However, the fact that Complainant did not perform his overtime hours prior to the start of his shift had no effect on his pay or number of hours worked. Though Mr. Henry may have found it less desirable, being required to perform overtime at the end of a shift rather than the beginning of a shift is not an adverse employment action. See Peters v. Wal-Mart Stores East, LP, 512 F. App'x 622, 626 (7th Cir. 2013) (affirming summary judgment, finding employer's refusal to allow the plaintiff to change shifts not an adverse employment action); Duncan v. Thorek Memorial Hosp., 784 F. Supp. 2d 910, 920 (N.D. Ill. 2011) (granting summary judgment, finding occasional assignment to less desirable work shift not an adverse employment action); Salisbury v. Potter, No. 07C5023, 2010 WL 1286842, at *7-8 (N.D. Ill. Mar. 26, 2010) (granting summary judgment, finding inconvenience related to schedule change not enough to make it an adverse employment action).[3]

Based on the above, Kenco submits that Mr. Henry has not been subjected to the type of materially adverse employment action necessary to establish a claim of discrimination.

## C.    The Complainant Cannot Establish Unlawful Discrimination: Promotion

In addition to Complainant's charge of discrimination related to scheduling, he also asserts that in February or March of 2014 he was not promoted to the position of co-pack coordinator or co-pack leader. (IDHR # 2015 CF 0034, III.B.5, IV.B.5, VI.B.5).

In order to establish a prima facie case of discrimination in a failure to promote context, a complainant must prove all of the following elements:

> (1) he is a member of a protected class;
> (2) he applied for and was qualified for the position sought;
> (3) he was rejected for that position; and
> (4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff.

Fischer v. Avanade, Inc., 519 F.3d 393, 401-402 (7th Cir. 2008)(citing Grayson v. City of Chicago, 317 F.3d 745, 748 (7th Cir. 2003)).

---

[3] No female temporary associates working on Mr. Henry's shift performed overtime prior to the start of their shifts either.

1. **The Complainant Cannot Establish that He Applied For or Was Qualified For An Open Position**

   With regard to the second element, a complainant must have applied and been qualified for an open position. Here, Complainant never actually applied for the positions listed in his charge. As such, his failure to promote claims must fail. See Peters, 512 F. App'x at 626 (affirming summary judgment, finding the plaintiff's failure to apply for the promotion at issue fatal to her failure-to-promote claim); Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 738-39 (7th Cir. 2006) (same).

   Even if Mr. Henry had applied, he was not yet qualified for *any* other position at Kenco. In order for a non-exempt employee to be eligible for another position at Kenco, he or she must have been employed in his or her current position for at least six months. See Exhibit 4 ¶3.1.4 and Exhibit 5 ¶5 to Kenco's Response to IDHR Questionnaire. Mr. Henry was temporarily placed at Kenco as a warehouse associate (a non-exempt position) in December of 2013. He claims to have applied for two positions in February or March of 2014 but, as a non-exempt employee, he would not have been eligible for any position at Kenco until June of 2014. Therefore, even if Mr. Henry had applied for a position, he would not have been qualified. His failure-to-promote claims must fail for that reason. Pafford v. Herman, 148 F.3d 658, 669-70 (7th Cir. 1998) (affirming summary judgment, noting that, in the context of a failure-to-promote claim, "[i]f [a] plaintiff was not qualified for any reason, then [he or she] falls short of establishing a prima facie case and there is no inference of discrimination"). See also Settles v. Ilinois Dept. of Human Services, 42 F. App'x 872, 874 (7th Cir. 2002) (affirming summary judgment, finding the plaintiff was not qualified for promotion due to lack of requisite four years of experience); Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 765 (7th Cir. 2001) (affirming summary judgment, finding no prima facie case of age discrimination where plaintiff lacked warehouse experience required for promotion to warehouse assistant manager position).[4]

   Based on the above, Kenco submits that Mr. Henry cannot show that he applied for any open position or that he was qualified for any open position as necessary to establish a claim of discrimination. Because Mr. Henry cannot establish a prima facie case of discrimination, his failure to promote claims must fail.

C. **The Complainant Cannot Establish Retaliation**

   A complainant can establish retaliation through either direct or indirect evidence. Burks, 464 F.3d at 758. In order to establish a claim under either method, the Complainant must prove, among other things, that he engaged in activity protected by the IHRA or Title VII and that there is a causal connection between that protected activity and an adverse employment action. Id.; Tomanovich v. City of Indianapolis, 457 F.3d 656, 662-63 (7th Cir. 2006). To be considered

---

[4] Mr. Henry complains that Roger Payne, Jose Correa, and Brian Camp received a co-pack leader position. In fact they applied for and received Co-pack Floor Coordinator positions. Unlike Mr. Henry, however, these non-exempt employees applied and were qualified as they had all been employed at Kenco for over six months. Mr. Henry also complains that Melissa Hansen received a co-pack coordinator position. In fact, Ms. Hansen applied and was qualified for a Packaging Account Coordinator position. Unlike Mr. Henry, however, Ms. Hansen was an external applicant and not a non-exempt employee of Kenco at the time of her application.

protected activity, the complaint must have been one that discrimination had allegedly occurred because of race or gender. Tomanovich, 457 F.3d at 663. "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." Id. See also Miller v. American Family. Mut. Ins. Co., 203 F.3d 997, 1008 (7th Cir. 2000) (plaintiff did not engage in protected activity where her complaints constituted general displeasures in the workplace); Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1147 (7th Cir. 1997) (plaintiff's general complaint about management style without raising the subject of sexual harassment fails to constitute protected activity). Further, an employee bringing a retaliation claim must show that the "desire to retaliate was the but for cause of the challenged employment action." University of Texas Southwestern Medical Center v. Nassar, ___ U.S. ___, 133 S. Ct. 2517, 2521 (2013). See also Tovar v. United Airlines Inc., ___ F. Supp. 2d ___, 2013 WL 5933697 *7 (N.D. Ill. Nov. 1, 2013). In other words, if anything except a desire to retaliate lead to the adverse employment action at issue, the claim must fail.

In this case, Mr. Henry alleges that he was not promoted to a co-pack coordinator position in February or March of 2014 because of a complaint that he made to former Operations Manager Mike Manzello about co-worker Peter Monstwillo. (IDHR # 2015 CF 0034, V.B.1).[5]

However, as set forth above, Mr. Henry did not actually apply for any position nor was he qualified for any position because he had not been employed with Kenco for six months as of February or March of 2014. Without proof that he was not promoted to a position for which he actually applied and was qualified, there can be no claim for retaliation. It should also be noted that Kenco eventually hired Mr. Henry as a full-time Kenco employee in April 2014, which would have been after these promotion decisions had been made. Clearly, if Kenco had desired to discriminate or retaliate against Mr. Henry, it would not have brought him on as a full-time employee.

## CONCLUSION

Based on the above, Kenco submits that Mr. Henry has failed to establish unlawful race or gender discrimination or retaliation and that a determination should be issued in Kenco's favor.

Sincerely,

*Jennifer W. Terry*

Jennifer W. Terry

JWT/ksr
Enclosures

---

[5] Specifically, Complainant once reported to Mr. Manzello that co-worker Peter Monstwillo told Complainant to "look in the mirror." Mr. Manzello met with Complainant and Mr. Monstwillo, who explained that Complainant had misunderstood him and his remark was not race related. Mr. Henry accepted this explanation and the issue was resolved. Mr. Henry has not included any complaint of harassment in the instant charge.

CHARGE NUMBER 2015CF0034  COMPLAINANT  HENRY VERNON

RESPONDENT  KENCO LOGISTICS SERVICES

## QUESTIONNAIRE

1. State the full legal name and address of Respondent named herein, and describe briefly the type of work carried on by Respondent at this address.

ANSWER: Kenco Logistic Services, LLC ("Kenco")
     1125 Sycamore Street
     Manteno, IL 60950

Kenco is a third-party logistics company that, among other things, operates and manages warehouse and order fulfillment operations for third parties, including the above-referenced facility, which Kenco operates for Mars, Inc.

2. State the full legal name, title and telephone number of the individual from whom further information concerning the charge may be obtained.

ANSWER: Karen M. Smith, Esq.
     Jennifer W. Terry, Esq.
     Miller & Martin PLLC
     Suite 1000, Volunteer Building
     832 Georgia Avenue
     Chattanooga, TN 37402
     423-785-8209
     Attorneys for Respondent

3. If Respondent employs 100 or more persons, please attach a copy of the most recent EEO report for the location in question. If not, state the total number of employees at the location and the number of employees within Complainant's position title/job classification. In addition, state the number of employees within Complainant's protected group(s), holding that position title/job classification as of the date of the alleged violation.

ANSWER: A copy of the EEO-1 report for the above-referenced facility is attached as <u>Exhibit 1</u>.

4. In addition to the information requested herein, please provide a written position statement on each of the allegations of the charge. For each person having direct knowledge of the allegation(s), provide name, title and a phone number where the person may be reached for questions. You may also include any documentary evidence, affidavits, and other written statements, where appropriate, including any additional information and explanation you deem relevant to the charge.

Charge No. 2015CF0034
Page 2

ANSWER:   A position statement will be submitted setting forth Kenco's response to the Complainant's allegations.  Individuals with direct knowledge of the allegations include:

> Tammi Fowler
> Senior Manager Employee Relations
> c/o Miller & Martin PLLC
> Suite 1000, Volunteer Building
> 832 Georgia Avenue
> Chattanooga, TN 37402
> 423-756-6600

> Michelle Hisey
> Human Resources Generalist
> c/o Miller & Martin PLLC
> Suite 1000, Volunteer Building
> 832 Georgia Avenue
> Chattanooga, TN 37402
> 423-756-6600

> Saul Beck
> Warehouse Supervisor
> c/o Miller & Martin PLLC
> Suite 1000, Volunteer Building
> 832 Georgia Avenue
> Chattanooga, TN 37402
> 423-756-6600

> Bob Thompson
> Warehouse Lead Associate
> c/o Miller & Martin PLLC
> Suite 1000, Volunteer Building
> 832 Georgia Avenue
> Chattanooga, TN 37402
> 423-756-6600

5.   If Complainant was employed at Respondent, provide the following personnel data on Complainant:

   a.   Date of hire; and name of person who made hiring decision.
   b.   Position(s) in which Complainant was employed.  (If more than one, list each, and the relevant dates).
   c.   Copies of all other personnel records relevant to the charge, including, but not limited to:
   Job Description.

2

SA-046

Charge No. 2015CF0034
Page 3

> Work quality evaluations.
> Work samples.
> Attendance records.
> Disciplinary records.
> Any medical records describing Complainant's condition, if applicable.

ANSWER: Kenco objects to the above request to the extent it is overbroad and seeks information that does not pertain to the Complainant or to those similarly situated to the Complainant. Without waiving such objection, the Complainant was temporarily placed at Kenco's Manteno facility through Temporary Reserve Network Staffing on December 18, 2013 and hired as a full-time warehouse associate at Kenco on April 14, 2014. A copy of the job description for warehouse associate is attached hereto as <u>Exhibit 2</u>. A copy of Complainant's personnel file is attached hereto as <u>Exhibit 3</u>.

### On the Issue of Promotion:

G6.   Supply a detailed explanation of Respondent's promotion, advancement, and transfer procedures including, but not limited to:

  a.   Method of posting or announcing available openings.
  b.   Procedures whereby an incumbent employee may bid or apply for each opening.
  c.   Who is eligible to bid or apply or be considered.
  d.   Who selects the employee to be promoted or transferred.
  e.   Applicable provisions of any collective bargaining agreements and/or company rules. (Please attach).

ANSWER: Kenco objects to the above request to the extent it is overbroad and seeks information that does not pertain to the Complainant or to those similarly situated to the Complainant. Without waiving such objection, a copy of Kenco's policy regarding hiring procedures for non-exempt positions is attached hereto as <u>Exhibit 4</u>. A copy of Kenco's policy regarding hiring procedures for exempt positions is attached hereto as <u>Exhibit 5</u>. To be eligible for another position at Kenco, the attached procedures require all non-exempt employees to have been in their current position for at least six months. See <u>Exhibit 4</u> ¶3.1.4; <u>Exhibit 5</u> ¶5. See also Kenco's position statement.

G7.   For the twelve month period preceding the date of the alleged violation, list the vacancies occurring for the job Complainant sought. For each vacancy filled, provide:

  a.   Name.
  b.   Title.
  c.   *Basis.
  d.   Date on which each initially applied.

3

    e.      Whether selected.

    f.      Reason(s) for each selection and non-selection.

ANSWER: Kenco objects to the above request to the extent it is overbroad and seeks information that does not pertain to the Complainant or to those similarly situated to the Complainant. Without waiving such objection, Kenco submits Complainant did not apply for any open position during the relevant time period. That said, Roger Payne (White), Jose Correa (Hispanic), and Brian Camp (White) applied for and received Co-pack Floor Coordinator positions. A job description for Co-pack Floor Coordinator is attached hereto as Exhibit 6. However, unlike Mr. Henry, these non-exempt employees were qualified as they had all been employed at Kenco for over six months. Melissa Hansen also applied and received a Packaging Account Coordinator position. A job description for Packaging Account Coordinator is attached hereto as Exhibit 7. Unlike Mr. Henry, however, Ms. Hansen was an external applicant rather than a non-exempt employee of Kenco at the time of her application. See also Kenco's position statement.

G8.    Provide a written job description for the position to which Complainant sought (or was considered for) promotion. If unavailable, state the basic requirements for the position. Indicate in what manner Complainant was deficient in meeting such requirements.

ANSWER: Kenco submits that Complainant did not apply for any position during the relevant time period. See Respondent's answers to G6, G7, and its position statement.

G9.    If Complainant has requested, been considered for, or been granted a promotion in the last five years, for each incident list:

    a.      Dates.

    b.      Provide all relevant documents and supportive information.

ANSWER: Kenco submits that Complainant did not apply for any position during the relevant time period. See Respondent's answers to G6, G7, and its position statement.

G10.    For each employee Respondent promoted or advanced during the twelve months preceding the date of the alleged violation, provide:

    a.      Name.

    b.      *Basis.

    c.      Position held/salary.

    d.      Position promoted to/salary.

    e.      Date of promotion.

    f.      Copies of relevant documents and supportive information.

12350076v1  05742-0282

SA-048

ANSWER: Kenco objects to the above request to the extent it is overbroad and seeks information that does not pertain to the Complainant or to those similarly situated to the Complainant. Without waiving such objection, see Respondent's answers to G6, G7, and its position statement.


## On the Issue of Other:

Z6.   If Complainant's job performance was a factor in the Respondent's action, provide:
- a.   A copy of Complainant's job description.
- b.   Explain specifically how Complainant was deficient in meeting the job requirements.
- c.   Explain how, when and under what circumstances Complainant was made aware of those deficiencies.
- d.   For the person(s) who measured Complainant's performance, identify by:
  - - Name.
  - - Title
  - - *Basis.
- e.   Explain the performance standards Complainant was expected to meet.
- f.   Explain how Complainant was deficient in meeting these standards.
- g.   For all employees supervised by the same person(s) who evaluated Complainant's performance for the twelve months preceding the date of the alleged violation, provide:
  - - Name.
  - - Title.
  - - *Basis.
  - - Copies of their evaluations or work samples.

ANSWER: Not applicable.


Z7.   If Complainant's attendance was a factor in the Respondent's action, respond to the following:
- a.   Explain the standards for satisfactory employee attendance, and define what constitutes an occurrence of absence, tardiness, leaving the job early, and failure to make proper notification.
- b.   Explain how Complainant was deficient in meeting attendance standards.
- c.   Explain the system of progressive discipline used relating to attendance.
- d.   Provide copies of attendance records for Complainant's department and for the comparisons named or referred to in Complainant's charge for the twelve month period preceding the alleged date of violation. Include for each:
  - - Name.
  - - Title.
  - - *Basis.

ANSWER: Not applicable.

12350076v1  05742-0282

SA-049

**Regarding the basis of RETALIATION, provide the following information:**

ZZ1.   If, in addition to filing this charge, Complainant has opposed or protested allegedly discriminatory treatment, provide:
-   Date of opposition.
-   Manner in which the opposition was made.
-   Copies of relevant documents.

ANSWER:   Complainant once reported to former Operations Manager Mike Manzello that co-worker Peter Monstwillo told Complainant to "look in the mirror." Manzello met with both Complainant and Mr. Monstwillo, who explained that Complainant had misunderstood him and that his comment was not related to race. Complainant accepted this explanation and the issue was resolved. Complainant has not included any complaint of harassment in the instant charge.

ZZ2.   State whether other persons at Respondent have in some manner opposed or protested allegedly discriminatory treatment.   State whether those person(s) named or referred to in the response to this questionnaire took any of these actions.  For example:
-   Have other discrimination charges been filed with any regulatory agency within the last five years?
-   Has anyone at Respondent filed a grievance alleging some type of discrimination?
-   Has anyone at Respondent protested or mentioned an allegation of discriminatory treatment in meeting with supervisors or managers?
-   Provide relevant documents.

ANSWER:   Kenco objects to the above request to the extent it is overbroad and seeks information that does not pertain to the Complainant or to those similarly situated to the Complainant. Without waiving such objection, a former employee, Mary Madison, filed a charge of race discrimination with the IDHR on August 29, 2013. Ms. Madison's charge was dismissed for lack of substantial evidence on May 7, 2014. See notice of dismissal attached hereto as Exhibit 8. In addition, the following employees have filed charges with the IDHR, all of which are pending:

| | |
|---|---|
| Tracy Davis – | IDHR No. 2014 CF 3162, dated June 9, 2014 |
| Nathan Doss – | IDHR No 2014 CF 2858, dated May 7, 2014 |
| | IDHR No. 2014 CF 2992, dated May 21, 2014 |
| | IDHR No. 2014 CF 3057, dated May 29, 2014 |
| | IDHR No. 2014 CF 3161, dated June 9, 2014 |
| | IDHR No. 2015 CF 0310, dated August 12, 2014 |
| Sam Rockett – | IDHR No. 2015 CF 0003, dated July 1, 2014 |
| Anastasia Sandness – | IDHR No. 2015 CF 0006, dated July 1, 2014 |
| | IDHR No. 2015 CF 0515, dated September 4, 2014 |

12350076v1  05742-0282

SA-050

Case: 18-3206      Document: 11-3      RESTRICTED      Filed: 01/18/2019      Pages: 50

Charge No. 2015CF0034
Page 7

IDHR No. 2015 CF 0516, dated September 4, 2014

Jacques Morrison –     IDHR No. 2015 CF 0008, dated July 1, 2014
IDHR No. 2015 CF 0169, dated July 24, 2014

Kenco denies all allegations in the aforementioned charges.

12350076v1  05742-0282

SA-051

Case: 18-3206     Document: 11-3     RESTRICTED     Filed: 01/18/2019     Pages: 50

# EXHIBIT 2

# KENCO

| Document No JD-5.5.1015 | Title Warehouse Associates | | Mars Manteno | | Effective Date 06/30/14 |
|---|---|---|---|---|---|
| Reports To Warehouse Supervisor | | Approved By Operations Manager | | | Page 1 of 3 |

| Approval Signature: | Approved Date: |
|---|---|

## Summary

This assignment will be responsible for but not limited to all activities surrounding the Mars distribution center in Manteno, IL. This person is responsible for the receiving, handling and shipping of product according to the established site processes.

## Essential Duties and Responsibilities

- Candidate must be safety oriented and responsible for the safe operation of equipment as not to endanger themselves or others.
- Candidate must be experienced in the proper and safe operation of powered industrial truck equipment, including but not limited to, counter-balance lifts, stand-up lifts and man-up (cherry picker) lifts
- Responsible for inspecting equipment for safe and proper operation. As described in the automated safety checklist or pre-operation check sheet.
- Able to unload product that will vary in shape/size/weight from palletized to boxed and bagged product
- Pick, pack and load orders with high level of accuracy and quality to ensure customer satisfaction.
- Environment can be extremely cold.
- Candidate must have a proven attendance and punctuality record.
- Efficiently move product from dock to storage areas and exercise good stacking practices in storage locations
- Maintain equipment in a clean, neat, safe and orderly fashion and report problems to supervisor.
- Follow all Kenco standard operating procedures
- Handle product and complete tasks according to all required procedures
- Performs all duties with a high level of accuracy and attention to detail.
- Perform activities in such a manner to ensure efficient, secure and safe flow of associates, products and documents on all inbound, outbound and returned material.
- Meet or exceed established standards. Complete all forms and documents legibly and accurately, turn in, file, or submit to the appropriate place and/or person.
- Complete material handling equipment checklists, dock door and dock plate inspection records.
- Report all incidents, resulting in injury or damage to persons, lifts or structures immediately
- Must exercise extreme care in the handling of all materials to ensure no damage.
- Miscellaneous tasks as assigned by the warehouse supervisor

## Qualifications



| Mars Manteno | | | | |
|---|---|---|---|---|
| Document No<br>JD-5.5.1015 | Title<br>Warehouse Associates | | | Effective Date:<br>06/30/14 |
| Reports To<br>Warehouse Supervisor | | Approved By:<br>Operations Manager | | Page 2 of 3 |

To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed are representative of the experience, training, knowledge education, skill and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions. This person must be able to administer all policies and procedures consistently and objectively; mentor, equip and coach associates to achieve all performance expectations.

## Education and/or Experience

High School diploma or General Education Degree (GED) required. Prefer six to twelve months related experience and/or training, or equivalent combination of education and experience. Required excellent organizational and detail oriented skills. Effective computer, analytical and communication skills needed (Word, Excel, and Power Point). Experience in Red Prairie and SAP preferred.

## Additional Skills

- Ability to communicate effectively concepts required for daily business activities to meet planned results.
- Ability to read and interpret documents such as safety rules, operating and maintenance instructions, and procedure manuals.
- Ability to write routine reports and correspondence
- Provide courteous and timely service to internal/external customers
- Effectively present information and respond to questions from individuals or groups of managers

## Physical Demands

The physical demands described are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is regularly required to sit; use hands to finger, handle or feel; and reach with hands and arms. The employee frequently is required to walk and talk or hear. The employee must occasionally lift and/or move up to 50 pounds. Specific vision abilities required by this job include close vision, distance vision and ability to adjust focus.

## Work Environment

SA-054

Case: 18-3206   Document: 11-3   RESTRICTED   Filed: 01/18/2019   Pages: 50

**KENCO**

| | Mars Manteno | | |
|---|---|---|---|
| Document No<br>JD-5.5.1015 | Title:<br>Warehouse Associates | | Effective Date<br>06/30/14 |
| Reports To<br>Warehouse Supervisor | Approved By<br>Operations Manager | | Page 3 of 3 |

The work environment characteristics described are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is occasionally exposed to warehouse environment, which includes, but not limited to: customer driven climatic conditions, fumes, dust and allergens.

The noise level in the work environment is usually moderate to loud

The statements above are intended to describe the general nature and level of work being performed by people assigned to this job. Other duties may be assigned as needed

# EXHIBIT 5



| Document Number: CP-HR-1002 | Title: Exempt Hiring Procedure | Revision: 00 |
|---|---|---|
| Revision Date: 02/25/2014 | Replaces: CP-HR-6.2.2.013 | Effective Date: 05/15/2014 |

| Approval: Human Resources/Date | 4/25/14 | Approval: Quality | 4-25-14 |
|---|---|---|---|
| Approval: Senior Manager Human Resources | 4/25/14 | Approval: Human Resources Director | 4/25/14 |

## PURPOSE

This document defines Kenco's procedure for posting, recruiting and filling exempt-level positions.

## SCOPE

This procedure applies to all Kenco facilities that hire exempt-level employees. This procedure does not apply to the hiring of non-exempt employees.

## DEFINITIONS

- N/A

## PROCEDURE

1. Roles and Responsibilities

   a. **Executive Management** – perform approval authority duties for job openings and responsible for nominating candidates for Vice President levels and above.

   b. **CFO** – performs approval authority duties as described in this procedure.

   c. **Kenco Management Services (KMS) – Director of Recruiting and Development** – performs approval authority duties throughout the exempt hiring process and responsible for the overall implementation and enforcement of this policy for the company.

   d. **KMS – Human Resources (HR) Recruiting Assistant** – performs duties outlined in this procedure to assure sites are notified of exempt job openings and that the exempt hiring process is followed through successful placement of a candidate.

   e. **KMS – Human Resources Employee Relations (ER) Administrative Assistant** – enters all exempt level background investigations into the company approved vendor's system.

   f. **ProLogistix Search Group (PLXSG)** – provides third party recruiting services.

   g. **Hiring Manager** – person responsible for hiring at the site and responsible for following the exempt hiring process outlined in this procedure.

   h. **Site Human Resources (HR) Administrator** – responsible for posting all internal openings at the site, scheduling interviews when necessary, and arranging pre-employment drug screens. In Canada, no drug screens will be performed.

   i. **Site Management** – responsible for the overall implementation and enforcement of this policy at their assigned site(s). Performs duties as described in this procedure.

Case: 18-3206   Document: 16   RESTRICTED   Filed: 01/18/2020   Pages: 50



| Document Number:<br>CP-HR-1002 | Rev #<br>00 | Title:<br>Exempt Hiring Procedure |
|---|---|---|

     j.  **All Kenco Employees** – abide by the procedures outlined when applying for an exempt level job posting.

2. The KMS-HR Recruiting Assistant is responsible for creating all exempt-level job postings.

3. Exempt employees must have twelve (12) months tenure in their current position to be considered for positions up to and including the Director level. Exceptions must be approved by the Group President or Senior Vice President and the Director of Recruiting and Development. Each employee's record will be reviewed for any disciplinary and attendance occurrences. Employee files must be free of any current disciplinary action in order to be considered for new postings.

4. VP level and above positions will not be posted through the internal process. Those positions will be filled through nominations by VPs or above to be submitted to the Group President and CFO for final approval.

5. Non-exempt employees applying for an exempt level position must have six (6) months tenure in their current position. Each employee's record will be reviewed for any disciplinary and attendance occurrences. Employee files must be free of any current disciplinary action in order to be considered for new postings.

6. All employees are required to notify their direct supervisor prior to applying for any exempt position. Employees may apply for one (1) open position at a time.

     a.  If employees are interested in multiple openings, they must select only one (1).

     b.  If an internal applicant is interested in a new posting, but has already applied for a different position, the applicant must notify the HR Recruiting Assistant as soon as possible in order to be removed from the first candidate pool. The applicant should then apply for the new posting per normal procedure through Kenco Connection.

     c.  Immediately following receipt of an internal application, the HR Recruiting Assistant will send an email to the supervisor of the applicant to ensure he/she is aware that the employee applied for an internal job posting.

7. Posting Process

     a.  The Hiring Manager will complete form *CP-HR-1002-1 Exempt Job Posting Requisition Form*, obtain the required signatures, and submit the completed form along with a current job description to the HR Recruiting Assistant. Postings for both replacement and newly created positions must be approved by the Hiring Manager's immediate Supervisor/Manager, the Director or VP of Operations, and the CFO.

        i.  All exempt job postings will be posted by the 2nd business day after the HR Recruiting Assistant receives the required documents.

        ii.  For example: Job posting requests received by 5:00 p.m. on Monday will be posted by 5:00 p.m. on Wednesday of the same week; Job posting requests received by 5:00 p.m. on Wednesday will be posted by 5:00 p.m. on Friday of the same week.

     b.  Internal recruiting methods include postings on KencoConnection and site HR communication boards.

        i.  Internal job postings will remain posted for fourteen (14) consecutive calendar days.

        ii.  Site HR Administrators must post internal postings on site communication boards within 24 hours of internal communication.

        iii.  Positions that are posted internally *only*, Hiring Managers/Supervisors and/or Site HR Advocates are responsible for the hiring process, including screening resumes, scheduling all interviews, and communicating with applicants until the position is filled.



| Document Number:<br>CP-HR-1002 | Rev #<br>00 | Title:<br>Exempt Hiring Procedure |
|---|---|---|

**NOTE: PLXSG assists with internal postings only when the position is posted externally as well.**

   c. External recruiting methods include postings on Kenco's public website and recruiting services provided by ProLogistix Search Group (PLXSG). External postings will remain open until the position is filled.

   d. The Hiring Manager will be contacted by the PLXSG Recruiter to schedule a job order call (JOC) within 24 hours of receiving a new job order from the HR Recruiting Assistant. The Kenco Hiring Manager must schedule the JOC within 24 hours of the opening of the order. PLXSG will not begin the recruitment process until the JOC has taken place.

8. Screening Process

   a. The HR Recruiting Assistant will screen the resumes of all internal applicants received during the fourteen (14) day posting period.
      i. The resumes of qualified internal applicants will be forwarded to the PLXSG Recruiter for additional screening.
      ii. All internal applicants who do not meet the job requirements at this step will be notified via email by the HR Recruiting Assistant.

   b. The PLXSG Recruiter will present three (3) to five (5) prescreened external candidates and any qualified internal candidates for the Hiring Manager's review within five (5) business days of the JOC.

   c. If the resumes submitted by the PLXSG Recruiter are unsatisfactory, the Hiring Manager must provide feedback to both the PLXSG Recruiter and the Director of Recruiting and Development within 24 hours. The PLXSG Recruiter will then work to supply additional candidates.

   d. At this time, if any internal candidates are unsatisfactory, the Hiring Manager should contact the General Manager at the site of each internal applicant to offer feedback on why they were not selected. The General Manager should then schedule a meeting with the internal applicant and his/her direct supervisor to provide appropriate feedback on career development. After this conversation has taken place, a notification email must be sent by the General Manager to Corporate HR at jobs@kencogroup.com as an accountability measure for appropriate follow up with all internal applicants. The General Manager must copy the internal applicant and his/her direct supervisor on this email.

   e. If internal applicants are selected to move forward, their direct supervisors must be notified at this step and throughout the rest of the application process.

9. Interviewing Process

   a. The PLXSG Recruiter will provide selected external applicants with a copy of *CP-HR-1002-2 Kenco Non-Driver Application* and will direct each applicant to forward the documents to the HR Recruiting Assistant prior to interview.

   b. The Hiring Manager is responsible for contacting the HR Recruiting Assistant and requesting background checks for final candidates. The HR Recruiting Assistant will give applications to the ER Administrative Assistant and will ensure each background check is processed. See *CP-HR-6.2.1.005 Background Investigation Program* for further instructions.
      i. **Successful completion of a background check must occur before a candidate is asked to travel for an interview. This will eliminate the possibility of incurring travel expenses on a candidate who does not pass our background**

SA-059



| Document Number: CP-HR-1002 | Rev # 00 | Title: Exempt Hiring Procedure |
|---|---|---|

screening process.

    ii.  In Canada, background checks may only be performed after a written job offer has been extended. No drug screens will be allowed, per the Employment Standards Act.

c.  At the Hiring Manager's request, the PLXSG Recruiter will schedule a Predictive Index Test for each of the interview candidates within two (2) days of candidate selection. The results of this test will be provided to the Hiring Manager for additional insight.

d.  It is recommended that each candidate be interviewed by at least four (4) of the approved interviewers listed in Attachment A; however, it is required to have a minimum of two (2) interviewers.

e.  The initial interview, by telephone or in person, will be conducted within seven (7) business days of candidate submittal by the PLXSG Recruiter.

f.  The Site Manager, PLXSG Recruiter, and Site HR Administrator will coordinate to schedule interviews for all site positions. At the Hiring Manager's request, the PLXSG Recruiter will schedule in-person interviews with all internal and external candidates.

g.  Each interviewer must complete form CP-HR-1002-5 Exempt Candidate Evaluation Form immediately after the interview and forward to the Hiring Manager within one (1) business day of the interview.

h.  The Hiring Manager must utilize these forms to aid in making an informed decision on each candidate. The Hiring Manager must keep a copy of each form, either electronically or manually, to be filed with each job posting. This can be handled by the Site HR Administrator, if necessary.

10. Candidate Selection

a.  Pending successful completion of the background check (external candidates only, except in Canada), the Hiring Manager will complete *CP-HR-1002-4 Offer Letter Summary Form* and send it to the HR Recruiting Assistant.
    i.  If an internal applicant is selected, the Hiring Manager should contact the applicant's direct supervisor to negotiate a start date.
    ii.  If a relocation allowance is requested, the Hiring Manager will include the relocation allowance amount and the date that the funds are needed for the new hire/transfer on the Offer Letter Summary Form. The form is then forwarded to their Vice President (VP) for approval; if the Hiring Manager is a VP, he/she can approve the relocation request provided it does not exceed the relocation allowance maximum.
        1.  If the VP deems the relocation amount acceptable, he/she will sign or approve via email the *Offer Letter Summary Form* and forward it to the HR Recruiting Assistant.
        2.  If the VP deems the relocation amount unacceptable, he/she will contact the Hiring Manager to discuss the situation.
    iii.  Maximum relocation allowance amounts by job category and relocation distance have been provided to senior management. If the VP wishes to offer a relocation allowance exceeding the maximum amount for the job category and distance, he/she must obtain approval via email from the President of the appropriate Kenco LLC as well as the President – KMS.
        1.  If both Presidents deem the relocation amount acceptable, they will sign or approve via email the *Offer Letter Summary Form* and forward it to the HR Recruiting Assistant.



| Document Number: CP-HR-1002 | Rev # 00 | Title: Exempt Hiring Procedure |
|---|---|---|

2. If either President deems the relocation amount unacceptable, he/she will contact the VP to discuss the situation.

iv. Relocation allowances will be provided as a lump sum amount to facilitate a move and are designed to offset various costs that will be incurred in the relocation process.

1. In the United States, the lump sum payment is considered taxable income and will be treated as such.

    a. The relocation allowance will be paid **Net** of income tax, social security tax, and Medicare tax.

2. In Canada, the lump sum payment is not considered taxable.

    a. Consult the Employment Standards Act for specific expenses that are considered not taxable when relocating for employment purposes.

3. The allowance should be used to cover the following costs, including, but not limited to:

    a. Transportation, lodging, meals for house hunting and temporary living expenses

    b. Lease-break expenses and new-lease expenses

    c. Transportation of household goods and vehicles

    d. Miscellaneous expenses associated with relocation

        i. Utility and cable connection

        ii. Driver's License fee

        iii. Vehicle registration, etc.

4. The employee must remain employed with Kenco on a regular, full-time basis for at least one year after their hire or transfer date.

    a. If the employee resigns or his/her employment is terminated for cause prior to the one year period referenced above, the employee will be required to repay the relocation amount on a prorated basis.

b. Pending successful completion of the background check (except in Canada), the HR Recruiting Assistant prepares the Offer Letter and emails to the Hiring Manager including the *Relocation Expense Repayment Agreement* (if applicable). The Hiring Manager will sign and extend the finalized Offer Letter to the selected candidate.

i. If the offer is accepted, the Hiring Manager or Site HR Administrator will arrange for a pre-employment drug screen and return the signed Offer Letter (including *Relocation Expense Repayment Agreement* when applicable) to the HR Recruiting Assistant immediately. If all criteria in *CP-HR-6.4.001 Drug Screen Procedure* are not met, the Hiring Manager will rescind the offer and the candidate's hiring process is terminated (external hires only).

1. In Canada, no drug screening will be allowed, per the Employment Standards Act.

2. In Canada, a background check may be requested after the written offer of employment is accepted.

ii. If the prospective employee requests a modification to the offer, the Hiring Manager will discuss with the approving VP and if approved, will repeat Section 4.4.1.

iii. If the offer is declined, the Hiring Manager will repeat Section 4.4 above for the second selected candidate. If no alternate candidate is available, the EBS Recruiter will work to provide a new selection of candidates.

c. Upon receipt of the signed Offer Letter and Relocation Expense Repayment Agreement, the HR Recruiting Assistant will obtain the final approval of the Director of Recruiting and Development.

i. Payroll will not process the Offer Letter without the signature of the prospective/transfer employee and the Director of Recruiting and Development on

SA-061





| Document Number:<br>CP-HR-1002 | Rev #<br>00 | Title:<br>Exempt Hiring Procedure |
|---|---|---|

the Offer Letter and the Relocation Expense Repayment Agreement. If the Director of Recruiting and Development is not available to sign the agreement, an email approval from the Director of Recruiting and Development will be sufficient.

    d.  The HR Recruiting Assistant will forward the signed Offer Letter to the appropriate KMS-HR Payroll Supervisor via a flagged email.

        i.  The Payroll Supervisor will generate the check with the appropriate withholding and forward it to the employee or will process with the employee's first payroll direct deposit.

11.  All new employees must complete their part of the new hire paperwork through the HRIS Onboarding Program before end of business on their first day of work with Kenco.

    a.  In Canada, all new hire paperwork must be completed by end of business on the first day of work.

12.  All employer-related new hire paperwork must be completed by the Site HR Administrator through the HRIS Onboarding Program within the first three (3) days of employment.

13.  External candidates who are not extended an offer will be notified by the PLXSG Recruiter.

14.  Internal candidates who are not extended an offer should be notified as soon as possible; however, the maximum timeframe for internal notification is 5 business days from the time the position is filled.

    a.  The Hiring Manager should contact the General Manager at the site of each internal applicant to offer feedback on why they were not selected. The General Manager should then schedule a meeting with the internal applicant and his/her direct supervisor to provide appropriate feedback on career development. After this conversation has taken place, a notification email must be sent by the General Manager to Corporate HR at jobs@kencogroup.com as an accountability measure for appropriate follow up with all internal applicants. The General Manager must copy the internal applicant and his/her direct supervisor on this email.

| REFERENCES |
|---|

CP-HR-6.2.1.005 Background Investigation Program
CP-HR-1002-1 Exempt Job Posting Requisition Form
CP-HR-1002-2 Kenco Non-Driver Application
CP-HR-1002-4 Offer Letter Summary Form
CP-HR-6.4.001 Drug Screen Procedure
CP-HR-1002-5 Exempt Candidate Evaluation Form

| HISTORY |
|---|

| Revision Number | Date | Description of Revision |
|---|---|---|
| 00 | 02/25/14 | • This document replaced CP-HR-6.2.2.013 revision 5<br>• Added information to 3 and 5 about attendance and disciplinary action. Changed EBS Recruiting to ProLogistix Search Group (PLXSG). Changed template. |

# CP-HR-1002 Attachment A:
## Approved Interviewers by Position

**Kenco Project Manager**
1. VP of Quality/Best Practices
2. Director of Quality/Best Practices
3. Quality/Best Practices Engineer
4. Director of HR
5. Manager of HR
6. VP of Operations
7. Director of Operations

**Kenco Engineer**
1. VP of Quality/Best Practices
2. Director of Quality/Best Practices
3. Quality/Best Practices Engineer
4. Director of HR
5. Manager of HR
6. VP of Operations
7. Director of Operations

**Kenco Quality Auditor**
1. VP of Quality/Best Practices
2. Director of Quality/Best Practices
3. Quality/Best Practices Engineer
4. Director of HR
5. Manager of HR
6. VP of Operations
7. Director of Operations
8. Director of Sales/Marketing

**Kenco Finance/Accounting**
1. Director of Corp. Sourcing and Internal Audit
2. Controller
3. Director of Operations
4. Manager of Operations
5. Director of HR
6. Manager of HR

**Kenco IT**
1. VP of Information Technology
2. Information Technology Manager
3. Director of HR
4. Manager of HR
5. HR Generalist
6. Quality/Best Practices Engineer
7. Director of Operations

**Site Operations Manager**
1. Site VP of Operations
2. Site Director of Operations
3. Site Manager
4. Director of HR
5. Manager of HR
6. VP of Quality/Best Practices
7. Director of Quality/Best Practices

**Site General Manager**
1. Site VP of Operations
2. Site Director of Operations
3. Director of HR
4. Manager of HR
5. HR Generalist
7. VP of Quality/Best Practices
8. Director of Quality/Best Practices

**Site Supervisor**
1. Site General Manager
2. Site Operations Manager
3. Site Manager
4. Director of HR
5. HR Generalist
6. Project Manager

SA-063



### ILLINOIS DEPARTMENT OF
# Human Rights

Bruce Rauner, Governor
Janice Glenn, Acting Director


## HENRY VERNON V. KENCO LOGISTIC SERVICES

## IDHR CHARGE NO.: 2015CF0990


Enclosed are true and correct copies of documents from the Illinois Department of Human Rights file, made and kept in the ordinary course of business, regarding the above-referenced charge filed with the Department.


MICHELLE A. ANDRE (Designee)
FREEDOM OF INFORMATION OFFICER

*Michelle Andre'*

DATE: 8-8-17


**SUBSCRIBED and SWORN to before me**

This ___8th___ day of ___August___ 2017.

*Donna M. Evans*

**NOTARY PUBLIC**

> OFFICIAL SEAL
> DONNA M EVANS
> NOTARY PUBLIC - STATE OF ILLINOIS
> MY COMMISSION EXPIRES:06/03/18


100 West Randolph Street, Suite 10-100, Chicago, IL 60601, (312) 814-6200, TTY (217)785-5125, Housing Line (800) 662-3942
222 South College Street, Room 101, Springfield, IL 62704, (217) 785-5100
2309 West Main Street, Marion, IL 62959 (618) 993-7463
www.illinois.gov/dhr



**KENCO**

Fax: 423-643-3325
6-13-14

# Termination Checklist

## INVOLUNTARY TERMINATION?
## IT MUST BE APPROVED BY KMS EMPLOYEE RELATIONS PRIOR TO ANY ACTION BEING TAKEN

*This form is to be completed by the site and returned to KMS Payroll.*

### Approvals

| KMS Human Resources (approval received from): | | Approval Date: | |
|---|---|---|---|
| Severance Approved by | | Approval Date: | |
| Termination Documentation Complete (OFI, etc.): ☐ Yes | | Date: | |

### Employee Information

Employee Name: **KELVIN WALSH**          Date: **6-6-14**

Address: **127 CALLAN AVE.**          SSN: **XXX-XX-▮▮▮▮**

City/State/Zip: **EVANSTON , ILLINOIS 60202**

Phone: **815-474-5971**          Date of Hire: **8-6-07**

Location/Site: **MARS- MANTENO**

### Payroll Information (Return Info to Payroll ASAP)

| Severance? | (YES) NO | Amount of Severance: ? as agreed |
|---|---|---|
| PTO/Vacation Available? | (YES) NO | Amount Available: 10 days |
| Tuition Reimbursement | Contact Training Dept | Amount Owed: |
| Relocation | Contact Recruiting | Amount Owed: |
| Company Credit Card | Contact Accounting | Personal Charges Owed: |
| Termination Date: 6-4-14 | | Termination Reason: RESIGNED |
| Last Pay Date: 6-13-14 | | |

### Site Human Resources Responsibilities

☒ Confer with Risk Management as to the disposition of electronic equipment

☒ Collect badge and deactivate

☒ Collect company property (keys, laptop, cell phone, credit card, etc.)

Provide documents/information:

☒ 401(k) Participant Distribution Election

☒ Hartford Life Insurance Notice of Continuation of Coverage forms

☒ Unum- Election To Continue Long Term Care Insurance Coverage

*CP-HR-1001-1    Effective 05/15/14*

SA-065

**Juarez, Maria F.**

| | |
|---|---|
| **From:** | Elliott, Jay <JAY.ELLIOTT@Kencogroup.com> |
| **Sent:** | Thursday, March 12, 2015 7:30 AM |
| **To:** | Juarez, Maria F. |
| **Subject:** | RE: Henry v. Kenco 2015CF1315 and 2015CF0990 |

Thank you for your e-mail, Maria. As I have explained in previous calls, Kenco is no longer at the Manteno site; the customer (Mars) did not re-new our contract. Kenco exited the site 2/28. As a result, all witnesses you list below are no longer Kenco employees (indeed, nobody previously employed by Kenco at the Manteno site is a Kenco employee any longer). Below are the last known home addresses and phone numbers for the witnesses. I have put the 4/21 fact-finding conference on my calendar. Based on previous calls with you, I understand I will be able to participate by phone. I am also trying to get Tammi Fowler to participate (although she is no longer with Kenco). If she is able and willing to participate, then she will also be participating by phone, per our previous calls.

Saul Beck
16 Duncan Drive
Bourbonnais, IL 60914
(815) 592-3532

Tammi Fowler
7222 Sims Road
Harrison, TN 37341
(423) 344-0624

---

**From:** Juarez, Maria F. [mailto:Maria.F.Juarez@Illinois.gov]
**Sent:** Wednesday, March 11, 2015 1:03 PM
**To:** Elliott, Jay
**Subject:** Henry v. Kenco 2015CF1315 and 2015CF0990

Good afternoon. I've been assigned the above captioned cases for investigation. I am a neutral party and my duty is to investigate the allegations made in the Complainant's charge.

I have scheduled a fact-finding conference for **April 21, 2015, at 9:00 a.m.** at the James R. Thompson Center, 100 West Randolph Street, Suite 10-100, Chicago, IL 60601. I am requesting that Saul Beck and Tammy Fowler be present at the conference. The conference should not last more than two hours.

I am required to relay that failure by Respondent to be present on the date of the conference may result in a finding of default.

Please confirm the Respondent's attendance by March 16, 2015.

Respectfully,

Maria Juarez
Investigator II
Charge Processing Division
Illinois Department of Human Rights
100 W. Randolph St. Ste. 10-100
Chicago, IL 60601
312-814-6238
312-814-6251 fax

SA-066

maria.f.juarez@illinois.gov

**Confidentiality Notice:** This e-mail transmission (and/or documents accompanying such) may contain confidential information. Such information is intended only for the use of the individual or entity named above. If you are not the named or intended recipient, you are hereby notified that any such disclosure, copying, distribution, or the taking of any action in reliance on the contents of such information is strictly prohibited. If you have received this transmission in error, please immediately notify the sender by telephone to arrange for the secure return of the documents.

SA-067

# Witness Statement Form

Re: Charge No.:     2015CA0990 and
                    2015CF1315

Complainant:    Vernon Henry          Respondent:    Kenco

Witness Name:   Edith McCurry         EEO Category:   Black

Witness Address:   c/o Jordan Hoffman, Attorney, 11528 S. Halsted Chicago, IL  60628

Telephone Number:   773-995-7900 ext. 102

Title/position of witness:   Former Human Resources Administrator
        (e.g. witness worked with Complainant as a packer on the same assembly line, same shift.)

Interviewed witness by    X   telephone _____  in person
Date:    9/15/15 _____    Time:    2 p.m. _____
Location (if in person): _____
Indicated below are the relevant facts obtained from above named witness (continued on attached lined paper if more space needed.)

Leonard Szplett was her boss.

3/2014 Terrance Lindsay reported to her that CP and Monstwillo had an incident.  Monstwillo called CP a "nigger"; told CP to look in the mirror; look at you and look at me; and he could have Complainant's job because he had friends in mgmt.  She told Leonard.  She told Lindsay to tell Kelvin Walsh, and he did.  Walsh told Mike Manzello to handle it.  Manzello called them both into the office, and told them that this couldn't happen again, and they needed to get along.  They were split up and put on different shifts.  Did not witness firsthand.

10/14  Monstwillo told her some of what happened.  Monstwillo said they got into an argument because they were in each other's way.  Monstwillo was sent home.  He was suspended w/pay and returned the day after CP was discharged.  Saul Beck, Supervisor, told her that he asked Monstwillo if he tried to stab CP, and Monstwillo said yes.  Monstwillo put his blades up on the forklift and they are supposed to be on the ground.  Monstwillo tried to stab CP with the blades.  She never seen any statements or paperwork on this incident.  CP was so upset that he was afraid to go back to work.  CP filed a police report against Monstwillo and they didn't do anything about it.  CP said that Monstwillo threatened him all night long.  Curtis Verett, Lead, told her that Monstwillo called the Leads threatening CP.  Did not witness firsthand.

CP was termed for taking a picture of a spill.  She had nothing to do with his discharge.

_____        9/15/15 _____
Investigator                            Date
#14 Witness Statement  07/08

SA-068

Every time he tried to get justice, he was told to be quiet.  It was a hostile environment.

RP treated black more harshly than whites, and everyone at RP knew.  A lot of people were afraid to make any complaints.  Believes that RP willfully did that to blacks.  RP didn't follow its own policies, they changed them as they went.  They expected her and Szplett to go along w/it.  They felt uncomfortable and under pressure.  RP excluded them.  They didn't want employees talking to her.  They wanted to keep everything under cover.  They didn't want any documentation.  Scott Marksteiner (white), sent her an email that she forwarded to Lori Varvel (white), Human Resources, and Varvel told her not to respond to him.  That was part of her job.

**Juarez, Maria F.**

| | |
|---|---|
| **From:** | Elliott, Jay <JAY.ELLIOTT@Kencogroup.com> |
| **Sent:** | Tuesday, March 31, 2015 1:01 PM |
| **To:** | Juarez, Maria F. |
| **Subject:** | RE: Vernon Henry v. Kenco, 2015CF0034 |

Anthony Willis is African-American.  Kenco does not know the races of the two applicants for the Co-Pack Floor Coordinator position.

---

**From:** Juarez, Maria F. [mailto:Maria.F.Juarez@Illinois.gov]
**Sent:** Tuesday, March 31, 2015 1:29 PM
**To:** Elliott, Jay
**Subject:** RE: Vernon Henry v. Kenco, 2015CF0034

Thank you!  Is Respondent aware what these applicants races are?

---

**From:** Elliott, Jay [mailto:JAY.ELLIOTT@Kencogroup.com]
**Sent:** Monday, March 23, 2015 12:49 PM
**To:** Juarez, Maria F.
**Subject:** RE: Vernon Henry v. Kenco, 2015CF0034

Anthony Willis was the only internal applicant to apply for the Packaging Account Coordinator position. His resume is attached. His title at the time was Inventory Control Associate. (Because he was internal, he did not fill out an app.)  The two external candidates other than Melissa Hansen who made it far enough in the process to fill out applications were Jeffrey Keller and Michael Lanoue. Their applications and resumes are attached.

---

**From:** Elliott, Jay
**Sent:** Wednesday, March 18, 2015 8:25 PM
**To:** 'Juarez, Maria F.'
**Subject:** RE: Vernon Henry v. Kenco, 2015CF0034

I can tell you that the sign up sheets for employees to indicate an interest in transferring into a non-exempt positions were not kept, so we don't have a copy to send you for the Co-Pack Leader position at issue.  I will inquire about the resumes and other paperwork submitted by people interested in the Co-Pack Floor Coordinator position that Hansen received, if there were any (other than Hansen).  I'm out of the office through Friday, so I won't be able to get back to you until next week.

---

**From:** Juarez, Maria F. [mailto:Maria.F.Juarez@Illinois.gov]
**Sent:** Wednesday, March 18, 2015 3:53 PM
**To:** Elliott, Jay
**Subject:** RE: Vernon Henry v. Kenco, 2015CF0034

Good afternoon.  I think I switched 5 and 6 around.  Fowler stated that for the Co-pack leader position, interested people signed up on a sign-up sheet, which is what I'm looking for.  For number 6, I'm looking for the applications and resumes from the other persons who applied for the Co-pack Floor Coordinator position that Hansen received.  Can you send me this information, or do you need me to do another request for information?
Thanks much!

Maria Juarez
Human Rights Investigator II
Charge Processing Division

1

Illinois Department of Employment Security
Appeals - Chicago
33 S State St - 8th Floor
Chicago, IL 60603
Phone: (800) 244-5631 · TTY: (312) 793-3184
www.ides.illinois.gov

|||ıl||ıı||ı|ıı|ı||ıı|ı|ı||ı|ıı|ıı|ı|ıl|ıı||ıı||ı|

JORDAN TRAVAILLE HOFFMAN
LAW OFFICE OF JORDAN TRAVAILLE HOFFMAN
11528 S HALSTED ST
CHICAGO, IL  60628-5218

| | |
|---|---|
| Date Mailed: | 12/17/2014 |
| Claimant ID: | 3175122 |
| Docket Number: | 1444857 |
| Appeal Filed Date: | 11/18/2014 |
| Date of Hearing: | 12/16/2014 |
| Type of Hearing: | Telephone |
| Place of Hearing: | Chicago |

## Administrative Law Judge's Decision

**(Este es un documento importante. Si usted necesita un intérprete, póngase en contacto con su oficina local.)**

**Claimant Appellant**
VERNON HENRY
4541  175TH PL
CNTRY CLB HLS, IL 60478-4561

**Employer**
KENCO LOGISTICS SERVICES LLC KENCO LOGISTICS
SERVICES LLC
c/o THOMAS & THORNGREN GWEN BENSON

**Employer's Agent**
C/O THOMAS & THORNGREN
PO BOX 280100
NASHVILLE, TN 37228-0100

**Appearances/Issues/Employer Status:** The claimant and employer appeared and testified. The claimant was represented by an attorney. The employer appeared without a representative. Whether the claimant was discharged for misconduct connected with the work? See 820 ILCS 405/602A. The employer is a party to the appeal.

**Findings of Fact:** The claimant worked, until October of 2014, as a full-time warehouse worker.  The employer has a electronic device use policy which prohibits of personal electronic devices at the workplace without the authorization of the employer.  The claimant was discharged when the employer learned that, posted on the claimant's social media site, was a photograph taken at the workplace.  Without questioning the claimant about the matter, the claimant was discharged.  The claimant has steadfastly denied ever taking the photograph or posting it on his social media site.

**Conclusion:** 820 ILCS 405/602A provides that an individual shall be ineligible for benefits for the weeks in which he has been discharged for misconduct connected with his work and, thereafter, until he has become re-employed and has had earnings equal to or in excess of his current weekly benefit amount in each of four calendar weeks.  The term "misconduct" means the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has harmed the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit.

Every justifiable discharge does not disqualify the discharged employee from receiving benefits.  An employee's conduct may be such that the employer may properly discharge him or her.  Such conduct might not, however, constitute " misconduct in connection with the work."

In this case, there is insufficient evidence to demonstrate that the claimant engaged in actions that would amount to the misconduct contemplated under the provisions of Section 602A of the Illinois Unemployment Insurance Act.  Therefore, this separation from employment did not occur under disqualifying circumstances.  Accordingly, this Administrative Law Judge concludes, based upon a preponderance of the evidence, the claimant was discharged not for misconduct in connection with the work and is not disqualified from receiving benefits under Section 602A of the Illinois Unemployment Insurance Act.

**Decision:** The Local Office Determination is SET ASIDE. Pursuant to 820 ILCS 405/602A, the claimant is eligible for benefits, as to this issue only, from 10/26/2014.

THOMAS L. PLOTKE, Administrative Law Judge
Appeals - Chicago
Fax: (312) 793-6518

SECTION VIII

Case: 18-3206          Document: 11-3          Filed: 01/18/2019          Pages: 50



**Edith McCurry v. Kenco Logistic Services**

**IDHR** #2015CA1804 and 2015CA2495



| Mt. Vernon MJN Distribution Center | | | |
|---|---|---|---|
| Document No.<br>JD-5.5.1.011 | Title:<br>**Payroll/Benefits Administrator** | | Effective Date:<br>**12/21/12** |
| Reports To:<br>**Accounting Supervisor** | Approved By:<br>**General Manager** | | Page 1 of 3 |
| Approval Signature: | | Approved Date: | |

## Summary

This position will be responsible for, but not limited to, all activities surrounding payroll and benefits administration at the Mt. Vernon Mead Johnson Nutrition (MJN) Distribution Center, Dock 33 and 41, Transportation, Plant Support and Zeeland Operations. This position plans, directs, coordinates, implements and carries out policies relating to payroll and benefits.

## Essential Duties and Responsibilities

- Responsible for retrieving messages from absence line and distributing absence list daily.
- Responsible for maintaining the daily evacuation roster for the office area.
- Distributes daily Time & Labor reports to supervisors and managers and makes changes based on supervisor and manager approval.
- Records and tracks all time off request forms and makes notation in employee attendance calendars as necessary.
- Responsible for generating and submitting weekly payroll to Kenco Management Services (KMS).
- Responsible for tracking temporary employee hours and submitting weekly payroll information to temporary agencies.
- Responsible for retrieving quality, productivity, and safety information for employee bonuses.
- Adds ASAP points into employees calendars and maintains the ASAP database.
- Maintains the hours worked safety spreadsheet for Kenco and temporary associates.
- Maintains the employee headcount spreadsheet for Kenco and temporary associates.
- Assists all associates with Ultipro, IPay, tax withholding, direct deposit, BB&T, and other benefits and payroll related issues.
- Maintains Ultipro software by adjusting associates schedules, department changes and employee maintenance screens.
- Assists the HR Generalist in planning associate and visitor events.
- Collects and coordinates United Way contribution cards.
- Responsible for assigning badge numbers to new hires.
- Assists new hires with benefits and payroll enrollment.
- Publishes the monthly site Kenco Khronicles newsletter.
- Coordinates the annual open enrollment for all associates.
- Perform audits by reviewing benefit and billing documents from Ameritas, Hartford, VSP, Colonial and Cigna.
- Misc. tasks as assigned by the Accounting Supervisor.



| Mt. Vernon MJN Distribution Center | | |
|---|---|---|
| Document No. **JD-5.5.1.011** | Title: **Payroll/Benefits Administrator** | Effective Date: **12/21/12** |
| Reports To: **Accounting Supervisor** | Approved By: **General Manager** | **Page 2 of 3** |

## Qualifications

To perform this job successfully, an individual must be able to perform each essential duty satisfactorily.  The requirements listed are representative of the knowledge, skill and/or ability required.  Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.  Must be able to read, count accurately, perform basic math calculations and write legibly.  Must be able to shift priorities easily and demonstrate work assignment flexibility.  This position requires a high level of confidentiality.

## Education and/or Experience

High School Diploma or General Education Degree (GED) required.  Must have 1 year of related experience and/or training or equivalent combination of education and experience.  Requires excellent organizational and detail oriented skills.  Effective computer, analytical and communication skills needed.  Must be proficient in the use of Microsoft Office, including; Word, Excel, PowerPoint and Access.  Prior UP/UTM payroll experience preferred.

## Communication Skills

Ability to read and interpret documents such as safety rules, operating and maintenance instructions, and procedure manuals.  Ability to communicate effectively concepts for daily business activities to meet planned results.  Ability to write routine reports and correspondence.

## Additional Skills

- Prior payroll or benefits training preferred
- Knowledge of payroll and benefits law preferred

## Physical Demands

The physical demands described are representative of those that must be met by an employee to successfully perform the essential functions of this job.  Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is regularly required to sit; use hands to handle or feel; and reach with hands and arms.  The employee frequently is required to walk and talk or hear.  The employee must occasionally lift and/or move up to 50 pounds.  Specific vision abilities required by this job include close vision, distance vision and ability to adjust focus.



| | Mt. Vernon MJN Distribution Center | | |
|---|---|---|---|
| Document No.<br>JD-5.5.1.011 | Title:<br>Payroll/Benefits Administrator | | Effective Date:<br>12/21/12 |
| Reports To:<br>Accounting Supervisor | Approved By:<br>General Manager | | Page 3 of 3 |

## Work Environment

The work environment characteristics described are representative of those an employee encounters while performing the essential functions of this job.  Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is occasionally exposed to (details).

The noise level in the work environment is usually acceptable.

The statements above are intended to describe the general nature and level of work being performed by people assigned to this job.  Other duties may be assigned as needed.

**Edith McCurry v. Kenco Logistic Services**

**IDHR #2015CA1804 and 2015CA2495**



Kenco-Honeywell
JD-5.5.1.006 Rev/Eff 07/11/08
HR / Payroll Clerk
Page 1 of 2

**Job Title:** Payroll / HR Clerk
**Location:** Kenco – Honeywell
**Reports To:** Office Manager
**Approved By:** General Manager        **Signature:** _____
**Approved Date:** 7.11.08

| Summary |
| --- |
| This assignment will be responsible for, but not limited to, functions pertaining to assisting the Office Manager in the operation of the site payroll and Human Resources departments. |

| Essential Duties and Responsibilities |
| --- |
| <ul><li>Data entry</li><li>Upkeep of Attendance Records</li><li>Maintaining employee vacation records</li><li>Resolving payroll discrepancies</li><li>Maintaining personnel files</li><li>Coordinating between site and corporate HR departments (site HR Advocate)</li><li>Misc. tasks as assigned by the Office Manager, or General Manager.</li></ul> |

| Qualifications |
| --- |
| To perform this job successfully, an individual must be able to perform each essential duty satisfactorily.  The requirements listed are representative of the knowledge, skill and/or ability required.  Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions. |

| Education and/or Experience |
| --- |
| At least one year of Clerical background and HR experience preferred |

| Communication Skills |
| --- |
| Ability to read and interpret documents such as safety rules, operating and maintenance instructions, and procedure manuals.  Ability to write routine reports and correspondence. Ability to speak effectively before groups or customers or employees of the organization. |



SA-078



Kenco-Honeywell
JD-5.5.1.006  Rev/Eff 07/11/08
HR / Payroll Clerk
Page 2 of 2

### Additional Skills

- Microsoft Excel
- General computer skills
- Good Math skills
- Organizational and File-keeping skills
- Job will involve sensitive information, must understand legal implications
- Ability to interpret a variety of instructions furnished in written, oral, diagram or schedule form.

### Physical Demands

The physical demands described are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is regularly required to sit; use hands to handle or feel; and reach with hands and arms. The employee frequently is required to walk and talk or hear. The employee must occasionally lift and/or move up to 20 pounds. Specific vision abilities required by this job include close vision, distance vision and ability to adjust focus.

### Work Environment

The work environment characteristics described are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee may be occasionally exposed to ambient heat.

The noise level in the work environment is usually moderate to loud.

The statements above are intended to describe the general nature and level of work being performed by people assigned to this job. Other duties may be assigned as needed.

Case: 18-3206　　Document: 11-3　　RESTRICTED　　Filed: 01/18/2019　　Pages: 50



**Edith McCurry v. Kenco Logistic Services**

**IDHR #2015CA1804 and 2015CA2495**



This document must be destroyed in five (5) days: 11/18/2015

| KENCO-WHIRLPOOL INTEGRATED NETWORK | | |
|---|---|---|
| Document No.<br>**JD-5.5.1.502** | Title:<br>**SHIPPING CLERK** | Effective Date:<br>**10/15/2013** |
| Reports to:<br>**WAREHOUSE SUPERVISOR** | Approved By:<br>**K-WIN Director of Operations** | Page 1 of 2 |

| Approval Signature: | Approved Date:<br><br>**09/23/2013** |
|---|---|

## Summary

The Shipping clerk is responsible for multiple duties in the shipping and receiving office, which include, managing the Will Call Process, processing orders shipped via FedEx and LTL if applicable, performing customer services duties, and running various reports.. Must work in a safe and efficient manner while ensuring that the highest quality and productivity standards are met to ensure customer satisfaction. This is accomplished by following all standard operating procedures, standard work and work instructions that apply to the Kenco Whirlpool Integrated Network as well as customer provided documentation. Must be able to directly communicate with the end-user customer by phone or in person in a professional manner. The work environment is very fast-paced and clerk must possess strong multi-tasking abilities.

## Essential Duties and Responsibilities

- Create and stage, if applicable, FedEx loads
- Coordinate Will Call customer pickup either prior to or at arrival on site, if applicable
- Perform order cancellations, if required
- Perform load cuts as required
- Assists other SRO positions, as needed
- Addresses carrier and customer needs and concerns
- Completes reports, forms and documents legibly and accurately
- Report all incidents resulting in injury or damage to persons, lifts or structures, immediately
- Continuous focus on fostering a safe work environment
- Practices safe work procedures, and follows all safety rules at all times
- Misscellaneous tasks as assigned by site management

## Qualifications

To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed are representative of the knowledge, skill and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

- Ability to handle and prioritize multiple tasks to ensure required deadlines are met
- Must be organized and detail oriented
- Must possess basic mathematical skills
- Competent knowledge of computers,
- WMS knowledge helpful
- Customer focused and oriented
- Ability to pass a drug screen and background check if applicable

JD-5.5.1.502 SHIPPING CLERK



This document must be destroyed in five (5) days: **11/18/2015**

| KENCO-WHIRLPOOL INTEGRATED NETWORK | | |
|---|---|---|
| Document No.<br>**JD-5.5.1.502** | Title:<br>**SHIPPING CLERK** | Effective Date:<br>**10/15/2013** |
| Reports to:<br>**WAREHOUSE SUPERVISOR** | Approved By:<br>**K-WIN Director of Operations** | Page 2 of 2 |

## Education and/or Experience

- High School diploma or equivalent is desired
- Lift truck experience is an asset, but not required
- A minimum of six (6) months in current position or previous experience is preferred

## Communication Skills

Ability to read and interpret documents such as safety rules, operating and maintenance instructions, and procedure manuals. Ability to complete routine reports and documentation related to the position. Ability to read, write and speak English fluently.

## Additional Skills

- Ability to work with all departments
- Ability to work extended hours, especially during peak seasons

## Physical Demands

The physical demands described are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is regularly required to sit; use hands to handle or feel; and reach with hands and arms. The employee frequently is required to walk and talk or hear. The employee must occasionally lift and/or move up to 50 pounds. Specific vision abilities required by this job include close vision, distance vision and ability to adjust focus.

## Work Environment

The work environment characteristics described are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is occasionally exposed to fumes or airborne particles, extreme heat, extreme cold and dust. .

The noise level in the work environment is usually moderate to loud.

The statements above are intended to describe the general nature and level of work being performed by people assigned to this job. Other duties may be assigned as needed.

JD-5.5.1.502 SHIPPING CLERK

SECTION IX

**Rebekah Funk**

| | |
|---|---|
| **From:** | Craig, Judy <Judy.Craig@Kencogroup.com> |
| **Sent:** | Friday, November 07, 2014 10:53 AM |
| **To:** | Sheldon, Steven; Moore, Todd; Coffey, Robert; Helveston, Andrew; Weisel, Gabi |
| **Cc:** | Johnson, Todd; Spier, Trace; Jabaley, David; Hise, Paula |
| **Subject:** | PIP - 30 Day Review |
| **Attachments:** | TJMars Improvement Plan 30 day review.pptx |

All,

Please see our presentation for our call this morning.

Thanks,

**Judy Craig**
Vice President, Sales
2001 Riverside Drive • Chattanooga, TN 37406
Office: 423-643-3312 • Mobile: 423-290-8061



The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.

SA-084        DEF002016

# KENCO

## Mars Manteno - 30 Day PIP Review

November 7, 2014

Confidential & Proprietary

CONFIDENTIAL

CONFIDENTIAL



# PIP - 30 Day Review

## PIP Expectations

| Performance Area of Improvement | Performance Objective & Desired Outcome | Measurement | Timelines to Meet Desired Outcome | Comments/ Current Status |
|---|---|---|---|---|
| **Cost** | A. Improve productivity | 1. Pallets/Man Hour | 0-30 days- 6.5/hour | 6.5 is the peak 2 periods post RP, 7.2 equals pre RP MAA and 7.8 is Kenco bid promise, adjusted to 6.9 for 12% MARC to RP calculation variance |
| | B. Overtime reduction | 2. 4.5% OT | 30-90 days- 6.9/hour<br><br>5% OT in 90 days | |
| **Service** | A. On Time Appointment | 1. 92.5% | OTA 0-30 days >80%, 30-60 days >85%, 60-90 days 92.5% | 2013 OTA 84%<br><br>2014 OTA YTD 77% |
| | B. Load Ready & Put-away | 2. Load ready 8 hours ahead and no put-away >48 | Load Ready and Put-away- current on both 0-30 days and throughout the entire 90 days. | |
| | C. Inbound Trailers = 0->48 hours | | | |
| **Personnel and Culture** | A. Staffing | 1. Estimated 80% of hourly associates full time and trained in all task | Hourly 60 days, Leadership 30 days, Finance & Inventory Control 30 days. | No further period end disruptions to Mars S&F will be acceptable and may result in immediate termination. |
| | B. Finance and Inventory Control | 2. All required Leadership roles filled and trained on Kenco processes | | |
| | | 3. Current resources either removed from roles or retrained by both Kenco and Mars. | | |

Kenco's objective is to demonstrate significant and immediate improvement on cost and service and strive to out perform the desired outcomes on the targeted timeline.

2

CONFIDENTIAL

CONFIDENTIAL

*Confidential & Proprietary*

SA-086          DEF002018

# PIP – 30 Day Review

## Weekly Throughput Improvement

KENCO



### Throughput Loads Actal Vs. Plan By Week

| | P10W1 | P10W2 | P10W3 | P10W4 | P11W1 | P11W2 | P11W3 | P11W4 |
|---|---|---|---|---|---|---|---|---|
| NonCPK Total | 359 | 365 | 411 | 403 | 372 | 255 | 307 | 242 |
| CPK Total | 173 | 239 | 182 | 181 | 186 | 106 | 100 | 159 |
| Total All | 756 | 829 | 872 | 928 | 769 | 540 | 637 | 637 |
| Total Plan | 765 | 966 | 928 | 878 | 688 | 571 | 625 | 583 |

CONFIDENTIAL

Confidential & Proprietary

3



# PIP - 30 Day Review

## Cost Results - Pallets/Man Hour (PPMH)

» Goal = 6.5 in 30 days; 6.9 in 30-90 days



Throughput Pallets per Hour

|  | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | P13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 TPPH | 5.95 | 6.44 | 6.40 | 6.37 | 6.64 | 7.27 | 6.19 | 6.59 | 6.05 | 5.84 | 6.66 | 7.15 | 6.29 |
| 2014 TPPH | 5.67 | 5.49 | 5.93 | 4.75 | 6.08 | 6.46 | 6.45 | 5.95 | 5.07 | 5.71 | 5.15 |  |  |
| TPPH Goal | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 |  |  |

2013 TPPH   2014 TPPH   TPPH Goal

## Key Productivity Improvement Drivers:

- RP reconfiguration – In process
- Shipping and receiving from same side of building – Started yesterday
- Interleaving – Started today
- Additional supervisor training on RP functionality - Completed last week

*Confidential & Proprietary*

CONFIDENTIAL
CONFIDENTIAL

SA-088     DEF002020

# PIP - 30 Day Review

## Cost Results - Overtime (OT)

» Goal = 5% in 90 days

- P2 - P4: Red Prairie Training
- P9 - P11: 2% YOY Improvement



Overtime %

| | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | P13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 OT | 9% | 7% | 4% | 10% | 18% | 24% | 26% | 25% | 28% | 26% | 16% | 17% | 17% |
| 2014 OT | 11% | 14% | 20% | 14% | 15% | 11% | 19% | 22% | 28% | 19% | 17% | | |
| OT Goal | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| OT Budget | 7.7% | 7.7% | 7.7% | 7.7% | 7.7% | 7.7% | 7.7% | 7.7% | 7.7% | 7.7% | 7.7% | 7.7% | 7.7% |

—— 2013 OT    —— 2014 OT    - - - OT Goal    - - - OT Budget

*Confidential & Proprietary*

CONFIDENTIAL
CONFIDENTIAL

SA-089    DEF002021

5

**PIP - 30 Day Review**

## Cost - Action Plan

» Effective use of RP screens and process work flows to free up time on the floor

» Complete pick path, zoning, slotting, and cross docking, initiatives resulting from Kaizen event

» Implement RP WFM with Engineered Standards

» Implement recommendations from IE productivity assessment

» Improve business intelligence/business analytics - Information access in RP, reports, and data management

» Establish Kenco non-exempt employee incentive program

» Launch Manteno employee recognition and appreciation program

CONFIDENTIAL

*Confidential & Proprietary*

CONFIDENTIAL

SA-090

DEF002022

# PIP - 30 Day Review

## Service Results - On Time Appointment (OTA - Delivery)

» Goal > 80% in 0-30 days; > 85% in 30-60days; > 92.5% in 60-90 days

- Achieved initial goal for P11
- P12 goal is in line with prior year performance



On-Time Arrival %

| | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | P13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 OTA | 88% | 89% | 85% | 90% | 88% | 85% | 82% | 76% | 74% | 82% | 86% | 86% | 83% |
| 2014 OTA | 67% | 72% | 74% | 81% | 81% | 88% | 83% | 75% | 75% | 63% | 83% | | |
| OTA Goal | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | | |





7

*Confidential & Proprietary*

SA-091          DEF002023

Case: 18-3206    Document: 11-3    RESTRICTED    Filed: 01/18/2019    Pages: 50



# PIP - 30 Day Review

## Service Results - Load Ready (Load Complete)

» Goal = OB Loads closed 8 hours ahead of scheduled pick up



LRDT & Load Ahead (8 Hrs)

|  | P11W1 | P11W2 | P11W3 | P11W4 |
|---|---|---|---|---|
| LRDT% | 88.08% | 87.50% | 38.86% | 73.02% |
| Load Ahead % | 58.39% | 60.61% | 25.29% | 45.76% |
| LRDT Goal | 100.00% | 100.00% | 100.00% | 100.00% |
| Load Ahead Goal | 67.00% | 67.00% | 67.00% | 67.00% |

— LRDT%    — Load Ahead %    --- LRDT Goal    --- Load Ahead Goal

- W3 & W4 performance dip due to initial Christmas volume surge and poor performance on one weekend.

- We need confirmation from Mars that this measurement is consistent with the intention of the PIP.

*Confidential & Proprietary*

8

CONFIDENTIAL

CONFIDENTIAL

SA-092    DEF002024



# PIP - 30 Day Review

## Service Results - Put Away (Inbound)

» Goal = Inbound Trailers scanned to dock and available for OB orders (ie. load finish) in < 48 hours from arrival in yard



**% Inbound Loads Complete < 48 Hours**

**SNAPSHOT: % Inbound Loads < 48 Hours**

Failure of "Daily Snapshot" as leading indicator to indicate decline

CONFIDENTIAL

CONFIDENTIAL

Confidential & Proprietary

9

SA-093   DEF002025

Case: 18-3206    Document: 11-3    RESTRICTED    Filed: 01/18/2019    Pages: 50



**KENCO**

# PIP - 30 Day Review

## Service - Action Plan

» Implement Red Prairie configuration improvements relative to Order Prioritization

» Complete OTA root cause analysis

» Monitor results of Supervisor training regarding load balancing/Leads IB and OB work around vs RP

» Assist Mars in aggressively managing carrier performance and capacity.

10

CONFIDENTIAL

*Confidential & Proprietary*

CONFIDENTIAL

SA-094    DEF002026

# PIP - 30 Day Review

## Personnel and Culture - Staffing

### Measurement - Goals

» 80% of hourly associates full time and trained in all task in 60 Days

» All required Leadership roles filled and trained on Kenco processes in 30 days

### Status

» Current Perm/Temp Ratio = 74% (86 Kenco and 22 Temps for week of 10/27) which will vary relative to volume with the goal of averaging 80% per year.

» Completed hourly MHE certification

» Hourly training by value stream targeted for completion in November

» Leadership recruiting and training

– HR Leadership position hired to start on Nov 11 and on target for training completion in November, funded by Kenco.

– We have solid candidates for the following 3 open positions, but are holding back on offers pending discussion on 2014 cost over runs.

- Ops Manager
- 2nd shift week end supervisor
- Red Prairie Power User / Business Analyst

*Confidential & Proprietary*

11

CONFIDENTIAL

CONFIDENTIAL

Case: 18-3206　Document: 11-3　Filed: 01/18/2019　Pages: 50

# PIP - 30 Day Review



## Personnel and Culture - Finance and Inventory Control

### Measurement - Goal

» Current resources either removed from roles or retrained by both Kenco and Mars in 30 days

### Status

» Site Finance Leader, is on FMLA related to job stress and role is currently being filled by Kenco corporate finance. Note that P11 EOM financial files were transmitted as planned.

» Training complete with Kenco corporate finance on site accounting processes and period model.

» Training complete on new inventory control SOP which includes adjustment limits and escalation process.

12

CONFIDENTIAL

CONFIDENTIAL

*Confidential & Proprietary*

SA-096　　DEF002028

Case: 18-3206    Document: 11-3    Filed: 01/18/2019    Pages: 50



**PIP - 30 Day Review**

## Personnel and Culture - Action Plan

» Reset Temp/Perm targeted ratio's for 2015 based on volume and productivity expectations

» Decide on go forward plan for open leadership positions

» Transition Plan/Job Description/Recruiting for new accounting position

» Develop and implement a new hire MHE cross training plan

» Conduct refresher training before peak.

» Develop Job Rotation Plan for associates that have been cross-trained

» Implement and train on new RP system alerts to limit inventory transactions

» Develop site level succession plan

13

CONFIDENTIAL

*Confidential & Proprietary*

SA-097        DEF002029



**Improvement Plan**

14

# Final Questions and Next Steps

CONFIDENTIAL

Confidential & Proprietary

CONFIDENTIAL

SA-098    DEF002030

**Rebekah Funk**

| | |
|---|---|
| **From:** | Craig, Judy <Judy.Craig@Kencogroup.com> |
| **Sent:** | Friday, December 05, 2014 10:37 AM |
| **To:** | Helveston, Andrew; Moore, Todd; Coffey, Robert; Sheldon, Steven; Weisel, Gabi |
| **Cc:** | Johnson, Todd; Spier, Trace; Hise, Paula; Jabaley, David |
| **Subject:** | 60 Day PIP Review Deck |
| **Attachments:** | TJMars Improvement Plan 60 day review (4)[1].pptx |

Good Morning All,
Please see the deck for our review this morning at 11AM.

Thank you,

**Judy Craig**
Vice President, Sales
2001 Riverside Drive • Chattanooga, TN  37406
Office: 423-643-3312 • Mobile: 423-290-8061




The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee.  Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful.  If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.

SA-099        DEF002031

# KENCO

# Mars Manteno - 60 Day PIP Review

## December 5, 2014

Confidential & Proprietary

CONFIDENTIAL



# PIP - 60 Day Review

## PIP Expectations

| Performance Area of Improvement | Performance Objective & Desired Outcome | Measurement | Timelines to Meet Desired Outcome | Comments/ Current Status |
|---|---|---|---|---|
| **Cost** | A. Improve productivity | 1. Pallets/Man Hour | 0-30 days- 6.5/hour | 6.5 is the peak 2 periods post RP, 7.2 equals pre RP MAA and 7.8 is Kenco bid promise, adjusted to 6.9 for 12% MARC to RP calculation variance |
| | B. Overtime reduction | 2. 4.5% OT | 30-90 days- 6.9/hour  5% OT in 90 days | |
| **Service** | A. On Time Appointment | 1. 92.5% | OTA 0-30 days >80%, 30-60 days >85%, 60-90 days 92.5% | 2013 OTA 84%  2014 OTA YTD 77% |
| | B. Load Ready & Put-away | 2. Load ready 8 hours ahead and no put-away >48 | Load Ready and Put-away- current on both 0-30 days and throughout the entire 90 days. | |
| | C. Inbound Trailers = 0>48 hours | | | |
| **Personnel and Culture** | A. Staffing | 1. Estimated 80% of hourly associates full time and trained in all task | Hourly 60 days, Leadership 30 days, Finance & Inventory Control 30 days. | No further period end disruptions to Mars S&F will be acceptable and may result in immediate termination. |
| | B. Finance and Inventory Control | 2. All required Leadership roles filled and trained on Kenco processes | | |
| | | 3. Current resources either removed from roles or retrained by both Kenco and Mars. | | |

Kenco's objective is to demonstrate significant and immediate improvement on cost and service and strive to out perform the desired outcomes on the targeted timeline.

CONFIDENTIAL

*Confidential & Proprietary*

2

# David PIP - 60 Day Review

**KENCO**

## Recent Accomplishments

» Developed a White Glove Process for high priority orders for Walmart resulting in 100% LRDT.

» Better than expected McLane visit - McLane complimented Kenco on tremendous improvement in processes and reduced OS&D's. "We appreciate Kenco taking the initiative to improve processes and not waiting until this meeting to do so." - Bryan Nead, Vice President, Distribution.

» Timely weekly invoicing and month end financial model submission in P11&12.

» Established Inventory SOP with tighter controls and adjustment escalation process. Corrected adjustment error representing 2395 cases valued at ~ $100k due to escalation to General Manager and Mars on 11/21.

» Enhanced RP Cycle counting processes resulting in improved efficiencies.

» Improved daily performance dashboard used on daily call with Mars.

» Completed Office 5S, Work step training, Inbounds direct to door and dock doors flex, RP Level Load scheduling.

3

CONFIDENTIAL

*Confidential & Proprietary*

# David PIP - 60 Day Review

**KENCO**

## Recent Accomplishments

» RP Interleaving implemented with some initial success. Configuration issues have been addressed and another trial on 12/4 to assess improvement potential.

» Productivity reports posted for every shift and used for coaching.

» Established a Training Leader (Jackie Nelson) and conducted 400+ hours of initial/cross training.

» Fully implemented New Hire Cross Training Plan (All MHE types included).

» Implemented Temp Provider performance tracking and accountability measures; HR Manager is reviewing daily.

» Reset Kenco attendance performance tracking and accountability measures; We have issued 8 verbal warnings and 8 OFI 3 suspensions.

» Established 2015 Temp vs Perm targets.

» Hired Lori Varvel as new HR Mgr and promoted Melissa Hansen to Ops Mgr.

» Load Planner (Julie Wade) is cross training on Power User responsibilities and Co-pack support.

» Open supervisor position was filled internally by Tony Willis.

*Confidential & Proprietary*

CONFIDENTIAL

4

Case: 18-3206 Document: 11-4 Filed: 01/18/2019 Pages: 50

# PIP - 60 Day Review

## Ongoing Opportunities

» Pick path, zoning, slotting, and cross docking - Warehouse zoned, velocity SKUs identified, testing this week as volume increases

» Implement recommendations from IE productivity assessment – Floor 5S has begun; suggestion and accountability boards; restart Gemba walks; use of radios to reduce waste

» Implement RP WFM with Engineered Standards - on schedule. Installation and user training by year-end; go-live P1. Currently establishing engineered standards with Tryon based on other Mars site experience.

» RP configuration improvements relative to Order Prioritization

» Additional RP training, use RP screens and work flows

» Improve business intelligence/business analytics - Cross Training of Load Planner to free up RP Super user to focus on this area.

» Take action on OTA root cause analysis and Carrier performance management - analyses complete and targeted carriers identified

*Confidential & Proprietary*

CONFIDENTIAL

5

Case: 18-3206    Document: 11-4    Filed: 01/18/2019    Pages: 50



# PIP - 60 Day Review

## Ongoing Opportunities

» Site finance position - Len eligible to return on January 13. Recruiting launch prepared as a contingency.

» New Incentive program - being led by corp. with planned completion in Q115

» Job Rotation – implemented informally; full implementation to include all jobs twice a period by year end.

» Conduct refresher training before peak.

» Develop site level succession plan.

» Final KOS Blitz - team being assembled and action plan developed.

» Inventory Accuracy/Cuts - A3 drafted, downed pallets being cleaned up and cross bars being installed, new SOP's on receipt process.

» Out of period cost - P11 cost falling into P12 issues resulted from Len's leave of Absence - working to resolve going forward.

6

CONFIDENTIAL

*Confidential & Proprietary*

# PIP - 60 Day Review

## Cost Results - Pallets/Man Hour (PPMH)

» Goal = 6.5 in 30 days; 6.9 in 30-90 days



Throughput Pallets per Hour

P12W4 PPMH = 5.83 w/o holiday hours which reflects ongoing moderate progress

|  | P10W1 | P10W2 | P10W3 | P10W4 | P11W1 | P11W2 | P11W3 | P11W4 | P12W1 | P12W2 | P12W3 | P12W4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TPPH | 5.67 | 5.85 | 5.20 | 5.62 | 5.20 | 4.58 | 4.91 | 4.89 | 4.60 | 5.62 | 5.63 | 4.76 |
| TPPH Goal | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.90 | 6.90 | 6.90 | 6.90 |

— TPPH     - - - TPPH Goal

## Key Productivity Improvement Drivers:

- RP WFM
- Interleaving - second trial
- Work force right sizing relative to volume declines and productivity gains

CONFIDENTIAL

*Confidential & Proprietary*

SA-106        DEF002038

7

# PIP - 60 Day Review

## Cost Results - Overtime (OT)

» Goal = 5% in 90 days

Reached a low of 10.1% in P12W4 which is a significant improvement since peaking in P10W4 at 26.4%.



| | P10W1 | P10W2 | P10W3 | P10W4 | P11W1 | P11W2 | P11W3 | P11W4 | P12W1 | P12W2 | P12W3 | P12W4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OT% | 12.29% | 19.70% | 26.00% | 26.36% | 22.85% | 10.63% | 16.16% | 14.10% | 17.45% | 12.57% | 18.77% | 10.10% |
| OT% Goal | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| OT% Budget | 7.70% | 7.70% | 7.70% | 7.70% | 7.70% | 7.70% | 7.70% | 7.70% | 7.70% | 7.70% | 7.70% | 7.70% |

KENCO

CONFIDENTIAL

Confidential & Proprietary

SA-107     DEF002039



# PIP - 60 Day Review

## Service Results - On Time Appointment (OTA - Delivery)

» Goal > 80% in 0-30 days; > 85% in 30-60days; > 92.5% in 60-90 days



Achieved goals for P11 and 12.

Recent misses:
- 35% = Shipper
- 25% = Carrier
- 18% = Appt*

* really not late

|  | P10W1 | P10W2 | P10W3 | P10W4 | P11W1 | P11W2 | P11W3 | P11W4 | P12W1 | P12W2 | P12W3 | P12W4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OTA | 65.03% | 53.43% | 65.64% | 73.32% | 84.95% | 83.74% | 77.70% | 87.50% | 89.27% | 82.02% | 91.72% | 91.11% |
| OTA Goal | 80.00% | 80.00% | 80.00% | 80.00% | 80.00% | 80.00% | 80.00% | 80.00% | 85.00% | 85.00% | 85.00% | 85.00% |

OTA — OTA Goal

CONFIDENTIAL

9

Confidential & Proprietary

SA-108    DEF002040

# PIP - 60 Day Review

**KENCO**

## Service Results - Load Ready (Load Complete)

» Goal = OB Loads closed 8 hours ahead of scheduled pick up

### LRDT & Load Ahead (8 Hrs)

Performance remains choppy, however 26.4% of the days in P10-12, 100% LTD was achieved.

| | P11W1 | P11W2 | P11W3 | P11W4 | P12W1 | P12W2 | P12W3 | P12W4 |
|---|---|---|---|---|---|---|---|---|
| LRDT% | 88.08% | 87.50% | 38.86% | 73.02% | 80.53% | 55.45% | 46.34% | 65.88% |
| Load Ahead % | 56.39% | 60.61% | 25.29% | 45.76% | 65.74% | 39.08% | 27.94% | 56.25% |
| LRDT Goal | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Load Ahead Goal | 67.00% | 67.00% | 67.00% | 67.00% | 67.00% | 67.00% | 67.00% | 67.00% |

Legend: LRDT% — Load Ahead % — LRDT Goal - - - - Load Ahead Goal



CONFIDENTIAL

10





# PIP - 60 Day Review

## Sample of missed loads - average time past LRDT.

Avg Late Time Sample (Minutes) - Missed LRDT

Initially, Late Time exceeded signifcantly 6 hours on average. Now the process variation has been tightened to the point that the average Late Time has been reduced to 3 hours or less.

| | P11W1 | P11W2 | P11W3 | P11W4 | P12W1 | P12W2 | P12W3 | P12W4 | P13W1 |
|---|---|---|---|---|---|---|---|---|---|
| Avg Late Time Sample | 316.25 | 198.05 | 374.15 | 298.58 | 226.18 | 134.65 | 142.14 | 229.90 | 204.50 |

11

Confidential & Proprietary

CONFIDENTIAL



# PIP - 60 Day Review

## Service Results - Put Away (Inbound)

» Goal = Inbound Trailers scanned to dock and available for OB orders (ie. load finish) in < 48 hours from arrival in yard



Performance remains choppy, due to P12W2 & 3 OB Walmart waves taking priority over IB.

% Inbound Loads Complete < 48 Hours

120.00%
100.00%
80.00%
60.00%
40.00%
20.00%
0.00%

P11W1 P11W2 P11W3 P11W4 P12W1 P12W2 P12W3 P12W4

Goal   % < 48 Hrs

12

CONFIDENTIAL

*Confidential & Proprietary*

SA-111        DEF002043

# PIP - 60 Day Review

## Personnel and Culture - Staffing

### Measurement - Goals

» All required Leadership roles filled and trained on Kenco processes in 30 days

» 80% of hourly associates full time and trained in all task in 60 Days

### Status

» Current Site Leadership Team and Recent Changes (No vacancies at this time)

Color Key

No recent Change

Recent Change

Potential Change

GM LOPEZ

HR MGR VARVEL

OPS MGR HANSEN

Willis Ops Sup

IT/RP SU WADE

FINANCE SZPLETT

TRANS MGR DEROSIER

KOS MARQUEZ

13

CONFIDENTIAL

SA-112    DEF002044



# PIP - 60 Day Review

## Permanent to Temporary Ratio

**KENCO**

CONFIDENTIAL

14

*Confidential & Proprietary*



# PIP - 60 Day Review

## Total Headcount by Week



HC levels continue to decline.

Planned reduction to 76 HC (no temps) by year end unless it puts business at risk.

15

CONFIDENTIAL

Confidential & Proprietary

# 2015 Labor Plan (2015 budget = 6.1PPMH)

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Total Pallets / Hr | 6.0 | 6.0 | 6.0 | 5.2 | 5.4 | 6.8 | 8.1 |
| Non Exempt Pallets / Hr | 7.0 | 7.0 | 7.0 | 6.0 | 6.0 | 7.5 | 9.0 |
| OT Target | 3.5% | 4.7% | 2.6% | 3.4% | 9.6% | 21.0% | 4.6% |
| Total Pallets Forecasted | 75,449 | 76,367 | 74,729 | 71,552 | 95,564 | 136,765 | 135,877 |
| Total Hours Required | 12,538 | 12,670 | 12,436 | 13,685 | 17,687 | 19,995 | 16,857 |
| Less Exempt Hours | 1,760 | 1,760 | 1,760 | 1,760 | 1,760 | 1,760 | 1,760 |
| Total Non Exempt Hours Required | 10,778 | 10,910 | 10,676 | 11,925 | 15,927 | 18,235 | 15,097 |
| Total RT Hours Required | 10,400 | 10,400 | 10,400 | 11,520 | 14,400 | 14,400 | 14,400 |
| Total OT Hours Required | 378 | 510 | 276 | 405 | 1,527 | 3,835 | 697 |
| Total HC Needed | 76 | 76 | 76 | 83 | 101 | 101 | 101 |
| Total Kenco Exempt HC Needed | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Total Non Exempt HC Needed | 65 | 65 | 65 | 72 | 90 | 90 | 90 |
| Total Kenco Non exempt HC Needed | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| Total Temp Non exempt HC Needed | - | - | - | 7 | 25 | 25 | 25 |
| Perm Ratio | 100% | 100% | 100% | 92% | 75% | 75% | 75% |

| Period | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|
| Total Pallets / Hr | 8.5 | 8.5 | 7.1 | 7.1 | 7.0 | 6.6 | 6.9 |
| Non Exempt Pallets / Hr | 9.5 | 9.5 | 8.0 | 8.0 | 8.0 | 7.5 | 7.8 |
| OT Target | 0.3% | 6.0% | 0.4% | 10.3% | 5.9% | 6.3% | 6.6% |
| Total Pallets Forecasted | 137,212 | 145,574 | 115,680 | 107,001 | 101,974 | 96,000 | 1,369,744 |
| Total Hours Required | 16,203 | 17,084 | 16,220 | 15,135 | 14,507 | 14,560 | 199,578 |
| Less Exempt Hours | 1,760 | 1,760 | 1,760 | 1,760 | 1,760 | 1,760 | 22,880 |
| Total Non Exempt Hours Required | 14,443 | 15,324 | 14,460 | 13,375 | 12,747 | 12,800 | 176,698 |
| Total RT Hours Required | 14,400 | 14,400 | 14,400 | 12,000 | 12,000 | 12,000 | 165,120 |
| Total OT Hours Required | 43 | 924 | 60 | 1,375 | 747 | 800 | 11,578 |
| Total HC Needed | 101 | 101 | 101 | 86 | 86 | 86 | 90 |
| Total Kenco Exempt HC Needed | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Total Non Exempt HC Needed | 90 | 90 | 90 | 75 | 75 | 75 | 79 |
| Total Kenco Non exempt HC Needed | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| Total Temp Non exempt HC Needed | 25 | 25 | 25 | 10 | 10 | 10 | 14 |
| Perm Ratio | 75% | 75% | 75% | 88% | 88% | 88% | 84% |

- Based on 6.9 PPMH Target
-------
- Annual OT = 6.6%
-------
- Kenco Perm Exempt Staffing = 11 and non exempt = 65
-------
- Temp Staffing levels are volume dependent and range from 7 to 25
-------
- Perm/Temp ratios vary from 75% - 100%, with an annualized average of 84%

*Note: reflects temps being hired 4 weeks in advance of demand to allow for training

*Confidential & Proprietary*

CONFIDENTIAL

16





# PIP - 60 Day Review

## Personnel and Culture - Finance and Inventory Control

### Measurement - Goal

» Current resources either removed from roles or retrained by both Kenco and Mars in 30 days

### Status

» Site Finance Leader, is on FMLA related to job stress and role is currently being filled by Kenco corporate finance.

» Training complete with Kenco corporate finance on site accounting processes and period model.

» Training complete on new inventory control SOP which includes adjustment limits and escalation process.



17

*Confidential & Proprietary*

# PIP - 60 Day Review

**KENCO**

# Final Questions and Next Steps

18

CONFIDENTIAL

*Confidential & Proprietary*

SECTION X

Case: 18-3206     Document: 11-4     Filed: 01/18/2019     Pages: 50

# Robert Coffey RDM at Mars Manteno

Thursday, May 05, 2016     7:59 AM

SA-119

Top 20 Regional Distribution Manager profiles at Mars | LinkedIn                    Page 1 of 2

**Regional Distribution Manager - Mars**

Articles, experts, jobs, and more: get all the professional insights you need on LinkedIn

Learn essential skills for this career · 20

    

**Supply Chain Management Fundamentals**
Lynda
Online course

**Fundamentals of Logistics**
Lynda
Online course

**Operations Management Fundamentals**
Lynda
Online course

**Excel Data Analysis: Forecasting**
Lynda
Online course

**Management Fundame**
Lynda
Online course

Professionals on LinkedIn                    See all 22 professionals ›


**Larry Terrell**
Regional Distribution Manager at Mars
Greater Atlanta Area · Logistics and Supply Chain

| | |
|---|---|
| Current | Regional Distribution Manager at Mars |
| Past | Warehouse Manager at Ralston Purina, Distribution Center Operations Manager at Wal-Mart, Logistics Officer at US Army, Alumni at Texas... |
| Education | Texas A&M University |


**Eric Gunter**
Sumter, South Carolina Area · Retail


**Meghan Charboneau**
Regional Distribution Manager - Southwest at Mars
Austin, Texas Area · Consumer Goods

| | |
|---|---|
| Current | Regional Distribution Manager - Southwest at Mars |
| Past | Transportation &amp; Commercial Manager at Mars, Project Manager - Supplier Owned Inventory at Wrigley, Drop Ship Transportation Analyst at... |
| Education | Michigan State University |


**Nancy Gray**
Regional Distribution Manager
Greater Los Angeles Area · Consumer Goods

| | |
|---|---|
| Current | Regional Distribution Manager at Mars Petcare |
| Past | Manager, Customer Logistics &amp; Finance at Mars Petcare, Trade Manager at Hamburg Sud, Trade Analyst at Hamburg Sud |
| Education | Texas A&M University at Galveston |


**Robert Coffey, MS**
Analytical Logistics Manager with expertise in Supply Planning | Strategic Thought Leader Driving Profitable Growth
Greater Chicago Area · Logistics and Supply Chain

| | |
|---|---|
| Current | Supply Chain Manager at HARIBO of America, Inc., Regional Distribution Manager at Mars |
| Past | Logistics / Supply Chain Manager at Mars Snackfood, Inc, Customer Care and Finance Manager at Mars Snackfood, Inc., Supply Chain Manager... |
| Education | Purdue University, Eastern Illinois University |


**Carlos Lovera**
Regional Distribution Manager NAM
Toronto, Canada Area · Telecommunications

| | |
|---|---|
| Current | Regional Distribution Manager - NAM at Nokia Networks |
| Past | |

https://www.linkedin.com/title/regional-distribution-manager-at-mars                    5/5/2016

SA-120

Top 20 Regional Distribution Manager profiles at Mars | LinkedIn                    Page 2 of 2

What is LinkedIn?    Join Today    Sign In

Head of Canada Supply Chain Management at Nokia Networks, Account Logistics Manager at Nokia Networks, Logistic Manager at Z
TE, Logistics...

| Education | Universidad Marítima del Caribe, IUNP - UAH, Instituto Universitario de Nuevas Profesiones |
| Summary | 17 Years experience End to End Supply Chain Management for the Food Sector and Telecommunications. Very strong experience in I nternational... |

**Tony Keffaber**
Implementation Manager - External Manufacturing at Mars
Greater Nashville Area • Food Production

| Current | SAP Implementation Manager at Mars |
| Past | Operations Manager - External Manufacturing at Mars, Regional Distribution Manager at Mars, Project Manager - Supply Simplification a t... |
| Education | Purdue University |

Bernardo
Tovar
Perez

**Bernardo Tovar Perez**
Corporate Strategic Sourcing Mgr @ Mars México,+28 yrs Supply Chain & Procurement experience in FMCG Companies.
Querétaro Area, Mexico • Consumer Goods

| Current | Corporate Sr Strategic Sourcing Mgr. Indirect Goods &amp; Services - Petcare, Chocolate &amp; Wrigley at Mars, Prof de Cátedra Licenci atura... |
| Past | Grain and Vegetal Protein Trading and services Manager at Mars, Logistics, Customer Service &amp; Purchasing Manager at Lucas at M ars, Sr.... |
| Education | Universidad de las Américas, A.C., Tecnológico de Monterrey, The Gap Partnership, Universidad Autónoma Metropolitana, Universidad A utónoma... |
| Summary | Experienced & Engaged Executive Business Professional with wide background in Supply Chain, Procurement, Strategic Sourcing and Lo gistics,... |

Ahmed
Abdelkader

**Ahmed Abdelkader**
Head of Modern Trade - Mars Gulf
Consumer Goods

| Current | Head of Modern Trade Sales - Mars Gulf at Mars, META Head of Sales - Developing Categories Division @ Mars Inc. at Mars |
| Past | Developing Categories National Business development manager at Mars, Senior Business Development Manager at Nokia KSA &amp; Y emen, Business... |
| Education | Alexandria University, Victory college |
| Summary | Versatile , Result-oriented professional possessing over 14 years of experience with proven expertise in managing sales operations ,... |

**Michael Millerick**
Waco, Texas Area • Logistics and Supply Chain

| Summary | Director | Manager Supply Chain mikemillerick@gmail.com 254-640-4870 Supply Chain – Logistics – Warehousing – Transportation –... |

SEE MORE

Search for Regional Distribution Manager - Mars jobs

| 💼 Regional Distribution Manager | 📍 City or state | 🔍 |

| 📇 | 👤 | 💼 |
| Discover news and ideas | Connect with the experts | Find your dream job |

Join LinkedIn to see more **"Regional Distribution Manager - Mars"** profiles, jobs, and more     Join LinkedIn

© 2016    |    User Agreement    |    Privacy Policy    |    Community Guidelines    |    Cookie Policy    |    Copyright Policy    |    Unsubscribe

https://www.linkedin.com/title/regional-distribution-manager-at-mars                    5/5/2016

SA-121

# Robert Coffey, LinkedIn

Thursday, May 05, 2016    8:01 AM

Robert Coffey, MS | LinkedIn                                                                Page 1 of 3



# Robert Coffey, MS

**369** connections

Analytical Logistics Manager with expertise in Supply Planning | Strategic Thought Leader Driving Profitable Growth

Chicago, Illinois | Logistics and Supply Chain

Current     HARIBO of America, Inc., Mars
Previous    Mars Snackfood, Inc, Mars Snackfood, Inc., HB Fuller
Education   Purdue University

## Search by name

Over 400 million professionals are already on LinkedIn. Find who you know.

First Name | Last Name | 🔍

Example: Jeff Weiner

## People Also Viewed

 **Kevin Barnes**
Global Purchasing Director, Logistics and North America Indirect

 **Douglas Van Den Bosch, MBA, CSCP**
Supply Chain Manager at HARIBO of America

 **Richard Thome**
COO at Lansinoh Laboratories

**Dale Davenport**
Executive Sales Director

 **Andrea Girke**
Director Global Procurement - Capital Invest at Mars

 **Adrian Engele, MBA, CF APMP**
Proposal Manager | Mobile Software Product Manager | Consultant | Expert "Cat Herder"

 **Melanie Fleiss, PHR, SHRM-CP**
Human Resources Director

 **Veronica Lill, MBA**
Sr Manager Logistics and Distribution at Constellation Brands Inc

**Edgar Christen**
Senior Operations, Logistics and Supply Chain

## Join LinkedIn and access Robert's full profile. It's free!

As a LinkedIn member, you'll join 400 million other professionals who are sharing connections, ideas, and opportunities.

- See who you know in common
- Get introduced
- Contact Robert directly

**View Robert's Full Profile**

## Experience

### Supply Chain Manager
HARIBO of America, Inc.
October 2015 – Present (8 months)



Manage the daily operations of Supply Chain Department to ensure that the material and service requirements of the Company are met in a timely, efficient, effective and ethical manner. Provide oversight of all purchases in compliance with Company procurement policies and procedures. Analyze changes in global market conditions, prices, trends and manage through an effective vendor /supplier database. Conduct risk assessments of critical/complex supply chain elements. Identify potential interruption in materials supply and recommend alternatives
Through evaluation of competitive proposals, assist internal customers in selecting the vendor most appropriate to meet their needs. Ensure selection is fair and legally defensible. Monitor vendor and product performance to ensure they continually meet the highest standards.
Plan for future operations of the department with emphasis on efficiency and effectiveness in meeting the needs of both internal and external customers, as well as statutory and regulatory compliance.
Maintain current knowledge of advance procurement methods and techniques, and applicable laws, rules and regulations, and be able to recommend revisions to existing practices maximizing efficiency, effectiveness, customer satisfaction and statutory compliance.

### Regional Distribution Manager
Mars
October 2006 – Present (9 years 8 months)

As the Regional Distribution Manager for the largest DC in the network, my role was to optimize customer satisfaction and consistently deliver continuous improvement across several KPI's. Cost savings, improvement in truckload utilization, safety and efficiency improvement were some of the KPI's that we tracked. I also managed the North American Frozen network totaling over $50 million annual transportation and warehousing budget that includes 6 different locations involving over 200 warehouse managers and employees.
- Effectively controlled $300 million of finished goods inventory to provide an efficient, flexible and responsive supply chain through direction of factory outbound logistics operations and third party service providers.
- Achieved annual Operational Cost Savings in excess of 2% ($ 1 million) of budget responsibility.


SHOP >     SHOP >

https://www.linkedin.com/in/robertmcoffey?trk=seokp-title_posts_secondary_cluster_res_a...    5/5/2016

SA-123

Case: 18-3206    Document: 11-4    RESTRICTED    Filed: 01/18/2019    Pages: 50

- Reconfigured the entire Mars midwestern supply chain and led the project team that determined where to put the largest speculative land deal in the country for 2015.
- Led the project team that transitioned from single sourced Mars frozen products to co-mingled freight which resulted in a 30% savings in LCC's.

What is LinkedIn?    Join Today    Sign In

### Logistics / Supply Chain Manager
Mars Snackfood, Inc
March 2008 – October 2012 (4 years 8 months)

- Responsible for developing the demand and supply plan which drives the production, inventory and financial plans for the Ice Cream segment.
- Work closely with all departments to determine the 5 year strategy of the business and the resulting needs.
- Developed a cross functional Scheduling and Replenishment Team that has consistently been #1 in the company, delivering Order Fill Rate of over 98%.
- Reduced Raw & Pack inventory from $2.98MM in 2008 to $0.9MM in 2009. Decreased transshipment expenses from $414K in 2008 to $228K in 2009.
- Sole individual in the business with ownership of both the demand and supply plan. Leads the Supply & Operations Planning team, reporting directly to upper management.
- Researche trends, issues and gaps within the demand and operating plan and how to bridge them.
- Develop the risk/opportunity profile for the business and responsible for articulating issues with the business plan such as the need to bring the YEE down by 10% in 2009.
- Drove the success of the New Item Transition Project which resulted in replacing 35% of our items in the first quarter of 2010 with 0 stock outs and less than $100K in write-off expenses.

### Customer Care and Finance Manager
Mars Snackfood, Inc.
October 2006 – March 2008 (1 year 6 months)

- Management lead on the Target, Meijer and HEB accounts representing over $240MM in GSV across all segments. Promoted within the first 6 months to manage the most CSR's at the site. Initiated and led the Daily Communication call which communicates supply and inventory issues across North America.
- Instrumental part of increasing Target In-stocks from 85% - 96%, Identifying inefficient order practices such as non-layered quantities and improving ASN average rates from 80% to 90%.
- Essential team player in achieving above plan GSV by $163,500 with 20% growth in 2007 for the Target business as well as over 15% growth across HEB and Meijer segments.
- Effectively managed the amount of outstanding deductions to under 60 days on key accounts and decreased the Target open deductions from over $1MM to under $80K in less than 6 months by identifying root causes and issues inherent to the order process.

### Supply Chain Manager
HB Fuller
October 1999 – October 2006 (7 years 1 month)

- Managed 5 facilities nationwide and coordinated inventory practices of over 1,000 sku's with sales over $100MM annually.
- Responsible for recruiting, hiring, supervising and evaluating the Production Planning/Inventory Control Team
- Oversaw supply chain trends and issues in purchasing, planning and material allocation while maintaining a 96% On Time and Complete order rate and 99% fill rate while moving from a 6 to a 3 day lead time.
- Responsible for managing inventory requirements by overseeing cycle counts, managing inventory turns, creating queries, organizing the annual physical inventory and forecasting demand.
- Reported directly to upper management on a daily basis and conducted the monthly Business Planning Meeting which plans our production goals for the next 5-12 months and reports on our progress YTD/YTG
- Pioneered the first Vendor Managed Inventory program which allows Fuller to place orders collaboratively with our customers such as Tru Value in a web based tool.
- Implemented a bar-coded warehouse management system for all 5 facilities that allows our company to track material movements instantaneously and produce meaningful Oracle reports.
- Worked extensively on Marketing and Customer Focused Teams as a Lean Six Sigma Yellow Belt in planning and implementing new products into the existing product line.
- Implemented and maintained 'Futurcast', which is an operating system that forecasts demand, based on history, seasonal trends and promotional activity.

SA-124

Robert Coffey, MS | LinkedIn

Page 3 of 3

What is LinkedIn?    Join Today    Sign In

Skills

Cross-functional Team Leadership    Supply Chain    Six Sigma    Forecasting

Logistics    Budgets    Continuous Improvement    ERP    Management

Project Planning    Purchasing    Strategy    Supply Chain Management

Inventory Management    Process Improvement    FMCG    Strategic Sourcing

Education

**Purdue University**
Master of Science, Project Management / Industrial Technology Emphasis
1997 – 1999

Teaching Assistant /Full Ride Scholarship
Led classroom activities for over 300 students/year, including troubleshooting problems, evaluating
coursework, supervising and teaching Microsoft Applications- Word, Excel, PowerPoint, Access

**Eastern Illinois University**
Bachelor of Science, Industrial Technology (Project Mgmt)
1992 – 1997

## View Robert's full profile to...

· See who you know in common
· Get introduced
· Contact **Robert** directly

View Robert's Full Profile

LinkedIn member directory: a b c d e f g h i j k l m n o p q r s t u v w x y z more  |  Browse members  by country

© 2016  |  User Agreement  |  Privacy Policy  |  Community Guidelines  |  Cookie Policy  |  Copyright Policy  |  Unsubscribe

https://www.linkedin.com/in/robertmcoffey?trk=seokp-title_posts_secondary_cluster_res_a...    5/5/2016

SA-125

SECTION XI

# Tom White Exit

Saturday, November 19, 2016    10:59 AM

## Exit Interview

**Date Completed:**

### Employee Information

| Employee Name: | Tom White | Title: | Supervisor |
| --- | --- | --- | --- |
| Hire Date: 9-27-99 | | Termination Date: resignation 4-18-14 | |
| Location: MARS-MANTENO | | Supervisor/Manager: | |
| Gender: Male | Age: 42 | Rate: | Race: White |
| Reason for termination: Resigned | | | |

**1. Kenco was a great place to work.**
☐ Strongly Agree  ☐ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments: I want to say yes but it is hard for me to say after the way I was treated.

**2. Management was accessible and approachable.**
☐ Strongly Agree  ☒ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments: OM yes
GM No- GM seemed like you were bothering him and had little time to listen to you when I did talk to him it seemed like was'nt ever listening

**3. I was always informed of changes in company policies and practices.**
☐ Strongly Agree  ☒ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments:

**4. Managers / supervisors communicated with employees on a timely basis.**
☐ Strongly Agree  ☒ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments: For the most part with the floor employees but not so much with the supervisors. Instead of giving me a huge write up for all the things I was doing wrong all at once. They could have let me know what ahead of time

**5. Managers / supervisors were fair and consistent.**
☐ Strongly Agree  ☒ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

things could improv

Comments: All of the supervisors should have been wrote up if everything was true in my write up. Because we were all performing the same and I don't believe that they were written up.

**6. I was fairly compensated for the work I did.**
☒ Strongly Agree  ☐ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments:

**7. I was given enough information about the company and the job.**
☐ Strongly Agree  ☒ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments:

**SA-128**

8. The job was challenging.

| | ☐ Strongly Agree | ☒ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |

Comments:

---

9. I was given sufficient training to perform my job satisfactorily.

| | ☐ Strongly Agree | ☒ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |

Comments:

---

10. There was opportunity for advancement.

| | ☐ Strongly Agree | ☒ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |

Comments:

---

11. I had the opportunity to learn new skills.

| | ☐ Strongly Agree | ☒ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |

Comments:

---

12. I received regular feedback about my job performance.

| | ☐ Strongly Agree | ☐ Agree | ☐ Disagree | ☒ Strongly Disagree | ☐ N/A |

Comments: Never was told good job, and never had anything encouraging to say to me. I was hardly ever told how I was doing. I should say I was never told good job one on one.

---

13. The company provided a safe work environment.

| | ☐ Strongly Agree | ☒ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |

Comments:

---

14. The company provided the appropriate equipment for me to do my job.

| | ☐ Strongly Agree | ☒ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |

Comments:

---

15. The working conditions were satisfactory (i.e. ventilation, lighting, restrooms, eating facilities).

| | ☐ Strongly Agree | ☒ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |

Comments:

---

16. Ethical and honest behavior was always displayed in the workplace.

| | ☐ Strongly Agree | ☐ Agree | ☒ Disagree | ☐ Strongly Disagree | ☐ N/A |

Comments:

**SA-129**

**17. The workplace was free of discrimination of any kind.**

☐ Strongly Agree  ☐ Agree  ☒ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments:

Like I wrote in the comments field on the first page. I was the only supervisor wrote up for the same performance. 90% of the stuff in the write up was inaccurate, which led me to resign.

**18. The company benefit plan was fully explained to me at the beginning of my employment**

☒ Strongly Agree  ☐ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments:

**19. My benefit plan met my needs.**

☐ Strongly Agree  ☒ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments:

**20. The company could have done something different to keep me.**

☒ Strongly Agree  ☐ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments:

The OM or the GM did not want to even go into detail about the write up. Nor could they explain to me why some of the stuff was in the write up.

**21. I would consider returning to work for Kenco.**

☒ Strongly Agree  ☐ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments:

**22. I would recommend Kenco to a friend looking for employment.**

☒ Strongly Agree  ☐ Agree  ☐ Disagree  ☐ Strongly Disagree  ☐ N/A

Comments:

**23. Are there any issues Human Resources or the executive staff should be aware of?**

Comments:

The GM told me I needed to be more of an asshole. He told me that on my last day. Those words made my mind up to leave Kenco.

**24. What are your plans after leaving the company?**

Comments:

Look for another job

**25. Is there anything else you would like to add?**

Comments:

You don't have to be an asshole to get a job done or to be successful. You do it by treating people with honesty and respect. I worked in that building for over 15 yea and it is very disheartening to leave this way. It really ripped my heart and soul to receive a write up so untrue and inaccurate after all the hard work I have done.

**SA-130**

SECTION XII

**Defrates, Gabriel**

| | |
|---|---|
| **From:** | Karen Smith <ksmith@millermartin.com> |
| **Sent:** | Tuesday, November 25, 2014 1:42 PM |
| **To:** | Defrates, Gabriel |
| **Subject:** | Jacques Morrison/Kenco |
| **Attachments:** | Scan0006.pdf; Scan0007.pdf |

Mr. Defrates:

Attached please find documents we received today from OSHA pertaining to a voluntary withdrawal of Jacques Morrison's IDHR and EEOC charges. We assume that Mr. Morrison has provided you with copies but wanted to make sure. We also assume that his two charges will be withdrawn as requested, but please let us know if that is not the case. Thank you.

-------- Original message --------
From: "Jones-Mullins, Lemaya - OSHA"
Date:11/25/2014 12:16 PM (GMT-06:00)
To: "Day, Daniel"
Subject: RE: Mars-Kenco/Morrision/ Settlement

Please see the attached.

Thanks

*Lemaya Jones-Mullins*

Investigator

U.S. Department of Labor-OSHA

1600 167th St. SuiteJones-mullins.lemaya@dol.gov

**Karen M. Smith**
**Miller & Martin PLLC**

Suite 1000 Volunteer Bldg.
832 Georgia Avenue
Chattanooga, TN 37402
Phone (423) 785-8209
Fax (423) 321-1565

1

SA-132

<u>VOLUNTARY WITHDRAWAL REQUEST FORM</u>

RESPONDENT: Kenco Logistic Services, LLC

COMPLAINANT: Jacques Morrison

I hereby request to withdraw my charge filed against the above named Respondent with the Illinois Department of Human Rights (Charge Number 2015CF0008) and the Federal Equal Employment Opportunity Commission (Charge Number 21BA41962). Withdrawal is being made of my own free will, without pressure from any organization or individual.

If I am withdrawing this charge because I have reached a settlement with the Respondent, which has not been approved by both the Department and the Human Rights Commission, those agencies cannot enforce that settlement.

I understand that the withdrawal of my charge is effective upon receipt by the Department of my signed and dated Voluntary Withdrawal Request Form. The Department will then issue an Order of Closure as soon as administratively feasible and will not otherwise delay processing.

_____
Signature

11/25/14
_____
Date

NOTE: The Department of Human Rights will not accept or process a Voluntary Withdrawal Request Form with different, additional, edited or changed text from its standard form above.

#6
05/12

SA-133

Case 18-3206 Document: 11-4 Filed: 01/18/2019 Pages: 50

**From:** Fowler, Tammi
**Sent:** Wednesday, July 02, 2014 10:20 AM
**To:** McCurry, Edith
**Subject:** RE: Jacques Morrison

Edith,

What temporary agency does he work for and who is his supervisor?

Thanks,

**Tammi A. Fowler**
Senior Manager of Employee Relations
2001 Riverside Drive • Chattanooga, TN 37406
Office: 423-643-3249 • Fax: 423-643-3325



**VOTE
KENCO
A TOP 3PL**
*We can't do it without you.*

---

**From:** McCurry, Edith
**Sent:** Wednesday, July 02, 2014 11:07 AM
**To:** Fowler, Tammi
**Subject:** Jacques Morrison

Hi Tammi,
Monday Jacques Morrison told me Mike and Valerie had him sign a paper saying he didn't get hurt here at Kenco. He said he hurt his back loading the destruction trailer. He went to the doctor. I don't know what he told his temporary agency.

Sorry about the delay, I was super busy and just saw my note.

Edith McCurry

Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Edith.McCurry@KencoGroup.com
Office 815-468-9999, X464
Fax 1-815-468-2468

**Jabaley, David**

---

| | |
|---|---|
| **Subject:** | FW: OSHA Complaint Question Sheet - Morrison |
| **Attachments:** | OSHA Complaint  Question Sheet 1 Aug .docx |

**From:** Day, Daniel
**Sent:** Friday, August 01, 2014 11:10 AM
**To:** Jabaley, David
**Subject:** OSHA Complaint Question Sheet - Morrison

Jabo,

FYI attached.


Have them complete...either on this sheet or type on an additional sheet...any knowledge of any information they have concerning the statements...in detail.  If they have no knowledge fine...just state so.  If they use the attached sheets please have them sign them.  If they type up in another way their responses I'd like those signed as well.

Can I please have these back by close of business Wednesday, Aug 6.  After which I will set up times to speak with them individually if needed.

Once again when you speak to these individuals this is a confidential investigation and we expect this to be a private matter.  If they have questions they speak with you or call me.

Thanks.


**Dan Day, CPP, CCSP**
Director, Risk Management & Security
2001 Riverside Drive • Chattanooga, TN  37406
Office: 423-643-3436 • Mobile: 423-443-7541

## OSHA COMPLAINT CONCERNING JACQUE MORRISON

## THIS IS A CONFIDENTIAL DOCUMENT

Completed by: _Edith McCurry_     Date: _8/6/14_

### 1. June 13 Injury

1a. I was injured at work loading the destruction truck at the Mars Manteno facility on June 13, 2014.

_I heard about it._

1b. I am required to load the destruction truck with pallets manually, only with a pallet jack and pushing and pulling large totes on the pig farmer trailer, when other persons are using fork trucks to move pallets. _He told me about this._

1c. Also, I have to bend and pick up boxes.

_I know (but don't know if he was injured and doing this)_

1d. My injury consisted of a sprained back.

_I didn't know_

1e. Loading of the truck can consist of several tons of discarded candy.

_I know; that's where the candy comes from when it's given away. (The good candy is checked before given)._

1f. After asking for help again it was discovered again that I had hurt my back.

_I didn't know._

1g. I was then told I could then be fired for not reporting it.

_I didn't know he was told this._

1h. I was then also forced by Mike Manzello and Valerie Lillie to sign a paper around June 17 saying I was not hurt at the job or else get fired.

_He told me about this. He asked who could he talk to about Valerie and Mike making him sign the paper. I gave him Tammi Fowler's card and said tell her._

**OSHA COMPLAINT CONCERNING JACQUE MORRISON**

**THIS IS A CONFIDENTIAL DOCUMENT**

Completed by: _Edith McCurry_      Date: _8/6/14_

### 2. Previous Injury One – Alleged Back

2a. This was not the first time I hurt my back; late February or the beginning of March I hurt my back.

*I don't believe I know about this.*

2b. No one else had to sign a paper saying they weren't hurt.

*I don't know about this*

2c. I reported this to Edith McCurry in HR that I was forced to sign the paper.

*Yes he did.*

2d. I had repeatedly asked for help and/or forklift training of which I got none of.

*He told me this when he told me about the paper he had to sign.*

### 3. Previous Injury Two – Nail in Foot

3a. A nail went through my foot in March when I was again loading the destruction truck.

*I heard about this. I over heard people talking about it. Who specifically I couldn't tell you.*

3b. My foot was bleeding and hurting.

*These are details I don't know about.*

3c. I was begging to go to the doctor and held in the office for over two (2) Jackie Nelson Safety and Mike Manzello Operations Manager hours being questioned. I had to leave and go to the doctor. (I believe he means he was questioned for two hours before he was able to go to the doctor.)

*I don't know about this.*

**OSHA COMPLAINT CONCERNING JACQUE MORRISON**

**THIS IS A CONFIDENTIAL DOCUMENT**

**Completed by:** _Edith McCurry_      **Date:** _8/6/14_

## 4. Injury Allegations

**4a.** People complaining about them holding back their pay raises because of getting injured.

_I don't know about this._

**4b.** People getting fired like me for getting hurt.

_This is possible._

_Tiovani McCurry was a temporary employee through PeopleLink, He worked 5/30/13 8/27/13 (Approx.) In general, He was hit by a Co-Pack Employee with a ForkLift Truck while working For Kenco in Destruction/Sanitation. He was Not Allowed to return._

## 5. Changing Light Bulbs on the Roof

**5a.** I have also had to get on the roof last September without a harness to change light bulbs.

_I don't know about this._

**5b.** This was at least 50 feet in the air.

_I don't know about this._

**5c.** I complained about that if I fell it would have been a serious injury.

_I don't know about this._

**5d.** Wayne Bell told me to get up there. He was telling me what to do.

_Wayne is who he reports to, And get his orders; As well As Mike Manzello. Stacy Bushey is first shift Supervisor, I don't know how much of a role in his position that she has._

# OSHA COMPLAINT CONCERNING JACQUE MORRISON

## THIS IS A CONFIDENTIAL DOCUMENT

Completed by: _Edith McCurry_      Date: _8/6/14_

### 9. Ending Assignment

9a. July 9 at around 7:30 am Stacey came to me again and told me to get my stuff because she was walking me out.

*I heard the part where she told him to get his stuff. Stacy and I believe Chuck Richards walked him out.*

9b. When she was telling me this Edith from HR walked up and Stacy just walked me out.

*True*

9c. The place is hostile place to work and other people say racial and hateful stuff all the time.

*I've had employees tell me this.*

SECTION XIII

**McCurry, Edith**

| | |
|---|---|
| **From:** | Varvel, Lori |
| **Sent:** | Tuesday, December 30, 2014 8:30 AM |
| **To:** | Schippits, Russell |
| **Cc:** | McCurry, Edith |
| **Subject:** | RE: Lunch breaks |

You are right, the point is added when there is a long lunch. You will need to monitor the short lunches, and an OFI will be issued for short lunches. At this point, you need to remind the associates that are not taking the full 30 minutes, that they need to. In the very near future, we will set some guidelines, that if not adhered to, will result in discipline.

**Lori Varvel**
Human Resources Manager
1125 Sycamore Road • Manteno, IL 60950
Office: 815-468-4404 •



**From:** Schippits, Russell
**Sent:** Tuesday, December 30, 2014 8:25 AM
**To:** Varvel, Lori
**Cc:** McCurry, Edith
**Subject:** Lunch breaks

Good Morning Ladies;

At one point in time it was mentioned that if an individual did not take a full 30 minute lunch break they would be assessed a ¼ point. If that is the case, we may need to look into entering that info into Ultipro. There is a provision for too a long of a lunch break, but not a short lunch break.

Regards;
Russell Schippits

Pages: 348    Filed: 01/23/2019    Document: 16    Case: 18-3206

12/30/2014

SECTION XIV

 

August 5, 2015

<u>VIA ELECTRONIC MAIL ONLY</u>

Investigator John Detwiler
Illinois Department of Human Rights
John.Detwiler@Illinois.gov

      Re:    <u>Leonard A. Szplett v. Kenco Logistic Services, LLC</u>
               IDHR # 2015CA3083/EEOC # 21BA51536

Dear Investigator Detwiler:

    The following is Respondent Kenco Logistic Services, LLC's ("KLS") position statement and response to the Department's questionnaire in the above-referenced matter.

    1.  Kenco Logistic Services, LLC
        1125 Sycamore Street
        Manteno, IL 60950[1]

    2.  Jay Elliott
        2001 Riverside Drive
        Chattanooga, TN 37406
        (423) 643-3398

    3.  A copy of the EEO-1 report for the above-referenced facility is attached as <u>Exhibit A</u>.

    4.  The narrative included with Mr. Szplett's charge is rambling, unfocused, and extremely hard to follow. He often repeats himself. And most of the time his attention is paid to activity that is either time-barred or had nothing to do with decisions affecting his own employment, or both. It appears that the following are the only allegations that are appropriate for his charge of discrimination:

    Mr. Szplett alleges that he was demoted when Lori Varvel (female, Caucasian, 35 years old) was hired as the new Human Resources Manager in November of 2014. Mr. Szplett was never the Human Resources Manager. He was the Office Manager (<u>see</u> a copy of his offer letter in his personnel file at <u>Exhibit B</u>). So Ms. Varvel didn't replace him. She didn't replace anyone. There was no Human Resource Manager before Ms. Varvel was hired. So there could be no demotion for Mr. Szplett. He continued as the Office Manager before, during, and after Ms. Varvel's hire, with no change in his salary or his job duties and responsibilities. It is important to note that, at the time of Ms. Varvel's hire, KLS was experiencing various problems with its customer (Mars) which could be fairly attributed to the lack of a strong Human Resource-related presence on site. Additionally, KLS was becoming the subject of more and more charges of discrimination at that time. And so, whether it was the absence of a dedicated on-site Human Resources Manager or because of Mr. Szplett's failing efforts as Office Manager to handle those Human Resource-related issues on site when they came up, KLS decided it needed a dedicated Human Resources Manager. And so it hired one – Lori Varvel.

---

[1] KLS lost the contract on the work at this site. As a result, all KLS employees were terminated effective February 28, 2015. KLS no longer has any employee working at the Manteno site.



Mr. Szplett alleges that he was paid less than Ms. Varvel. This allegation is accurate. Although Ms. Varvel was paid more than Mr. Szplett, the difference in pay was based on their different job duties and responsibilities. Mr. Szplett was responsible for the Office Manager duties (see Exhibit C for a job description). Ms. Varvel was responsible for a completely different set of duties and responsibilities – those of the Human Resources Manager (see Exhibit D for a job description). Of course, basing the difference in pay on the difference between job duties and responsibilities is absolutely permissible under the law. See Warren v. Solo Cup Co., 516 F.3d 627, 630–31 (7th Cir. 2008) (outlining factors to consider when determining whether employees are similarly situated).

Mr. Szplett alleges that his office was temporarily relocated after Ms. Varvel was hired. At the time Ms. Varvel was hired, Mr. Szplett was out on an open-ended FMLA leave with no specified return date. While he was out on leave, Ms. Varvel temporarily occupied Mr. Szplett's office. Succinctly, she needed an office immediately and he wasn't coming to work at the time. Mr. Szplett's things were moved down the hall into a cubicle while he was out on leave. KLS lost the contract with Mars before Mr. Szplett returned from leave. In any event, a temporary relocation of an office is not an adverse employment action significant enough to support a discrimination claim. See Traylor v. Brown, 295 F.3d 783, 788 (7th Cir. 2002) (explaining that an adverse employment action requires something more than an annoyance or an inconvenience).

Finally, Mr. Szplett alleges he was not paid for March (2015). That allegation is accurate. Quite simply, KLS didn't pay Mr. Szplett for March of 2015 because he didn't work during that time. Instead, he was on leave. Mr. Szplett first went out for FMLA on October 22, 2014. Toward the end of January of 2015, his 12 weeks of FMLA were about to expire. At that time, KLS inquired about Mr. Szplett's intentions to return to work. Mr. Szplett's doctor represented that Mr. Szplett could not work "in any capacity," and that he would be restricted from performing his job functions for another "6-12 months." See Exhibit E for a copy of the Physician's Statement from Mr. Szplett's doctor. Instead of terminating Mr. Szplett at that time, however, KLS allowed Mr. Szplett to stay out on leave in case his condition improved. At the same time, since he wasn't working, KLS did not pay Mr. Szplett. To KLS's knowledge, Mr. Szplett's condition did not change through the date of his separation.

These decisions (hiring Ms. Varvel, setting her salary, allowing her to temporarily use Mr. Szplett's office while he was out on leave, and not paying Mr. Szplett for March of 2015) had nothing to do with Mr. Szplett's race, sex, or age. And they were not in retaliation for any complaint that Mr. Szplett made about discrimination or harassment. In fact, Mr. Szplett never made such a complaint.

Mr. Szplett alleges that KLS violated the WARN Act. First of all, the IDHR does not have jurisdiction over WARN Act complaints (state or federal). In any event, neither the federal act nor the state act was triggered since only 12 employees suffered an employment loss (the federal WARN Act requires 50 employment losses, and the state WARN Act requires 25 employment losses). Assuming for purposes of argument that either WARN Act was triggered, KLS provided the required 60-day notice since it notified employees on January 26, 2015, of the loss of the contract and accompanying termination of employment on March 29, 2015.[2] More specifically, on January 26, 2015, all employees were informed of Mars's decision not to renew KLS's contract at the Manteno site. The communication was made verbally during all employee meetings to those employees who were not on leave at the time

---

[2] Employees were separated effective February 28, 2015, but those who were not on leave were paid through March 29, 2015.



(plus a notice was handed to each of those employees). For those employees who were on leave at the time (FMLA or otherwise), a notice was mailed to their home addresses. Mr. Szplett was on leave, and so his notice was mailed to him. Attached as Exhibit F is a copy of the form notice mailed to employees on leave (like Mr. Szplett). The communication that was mailed is the same as the notice handed out at all employee meetings. Therein, all employees were informed that they would be permitted the opportunity to apply for employment with the new provider (the company taking KLS's place).

To the extent Mr. Szplett alleges an FMLA violation (interference or retaliation), such claims should be dismissed since the IDHR does not have jurisdiction over such claims.

5. Mr. Szplett was hired as Office Manager on April 21, 2013. A copy of the job description for Office Manager is attached as Exhibit C. A copy of Mr. Szplett's personnel file is attached as Exhibit B.

On the Issue of Harassment:

B1. A copy of KLS's anti-harassment policy is attached as Exhibit G.

B2. The individual primarily responsible for investigating internal complaints of harassment at the Manteno facility was Tammi Fowler (Caucasian), Senior Employee Relations Manager.

B3. Mr. Szplett did not bring any complaint of harassment to anyone's attention.

B4. No other complaint of harassment has been made against anyone listed in the charge of discrimination (outside the charges of discrimination listed below).

B5. No discipline has been issued at the Manteno facility within the past twelve months for violation of KLS's anti-harassment policy.

On the Issue of Demotion:

N1-7. Not applicable. Mr. Szplett was not demoted.

Regarding the basis of RETALIATION, provide the following information:

ZZ1. Mr. Szplett never opposed or protested allegedly discriminatory treatment.

ZZ2. Other pending charges of discrimination filed by KLS employees at the Manteno facility:

Nathan Doss --   IDHR # 2014CF2858, dated May 7, 2014
                 IDHR # 2014CF2992, dated May 21, 2014
                 IDHR # 2014CF3057, dated May 29, 2014
                 IDHR # 2014CF3161, dated June 9, 2014
                 IDHR # 2015CF0310, dated August 12, 2014
                 IDHR # 2015CF0822, dated October 16, 2014
                 IDHR # 2015CF1145, dated November 12, 2014
                 IDHR # 2015CF1660, dated January 6, 2015
                 IDHR # 2015CF2725, dated April 16, 2015

Vernon Henry --   IDHR # 2015CF00342, dated July 9, 2014
                  IDHR # 2015CF0990, dated October 29, 2014
                  IDHR # 2015CF1315, dated December 4, 2014
                  IDHR # 2015CF2497, dated March 27, 2015

Arnold Brownlee --   IDHR # 2015CA1464, dated December 8, 2014

Tracy Davis --   IDHR # 2014CF3162, dated June 9, 2014

Sam Rockett --   IDHR # 2015CF0003, dated July 1, 2014

Anastasia Sandness --   IDHR # 2015CF0006, dated July 1, 2014
                        IDHR # 2015CF0515, dated September 4, 2014
                        IDHR # 2015CF0516, dated September 4, 2014
                        IDHR # 2015CF1655, dated January 6, 2015

Morris Tyson   IDHR # 2015CF0699, dated September 22, 2014
               IDHR # 2015CA2692, dated April 24, 2015

Scott Marksteiner   IDHR # 2015CA1054, dated November 3, 2014
                    IDHR # 20151650, dated January 7, 2015

Mardy Ringo   IDHR # 2015CA1590, dated December 30, 2014

Edith McCurry --   IDHR # 2015CA1804, dated January 13, 2015
                   IDHR # 2015CA2495, dated March 27, 2015

Robert Cates   IDHR # 2015CA1354, dated November 19, 2014

Derrick Nixon   IDHR # 2015CF1828, dated February 10, 2015

Respectfully submitted,

Jay Elliott
Counsel for Kenco Logistic Services, LLC
2001 Riverside Drive
Chattanooga, TN 37406
Jay.Elliott@KencoGroup.com
Work: (423) 643-3398

SECTION XV

**McCurry, Edith**

---

| | |
|---|---|
| **From:** | Scott Marksteiner [sfm428@gmail.com] |
| **Sent:** | Wednesday, December 10, 2014 8:05 AM |
| **To:** | Fowler, Tammi; McCurry, Edith |
| **Subject:** | Suspension |

Ms. Edith can you please forward this to Mario and Lori because I am trying to follow up on the random drug test I was given. Can someone please explain the investigation process that will be used, since the urine sample was not at an acceptable temperature at 90 degrees? What are the next steps in this process?     Thanks Scott Marksteiner

12/10/2014

## McCurry, Edith

| | |
|---|---|
| **From:** | Varvel, Lori |
| **Sent:** | Wednesday, December 10, 2014 8:32 AM |
| **To:** | McCurry, Edith; Fowler, Tammi |
| **Cc:** | Lopez, Mario |
| **Subject:** | RE: Suspension |

Edith

Please don't respond back to him, or give him any information. At this point, he can work through me, if he needs something. Thanks

**Lori Varvel**
Human Resources Manager
1125 Sycamore Road • Manteno, IL 60950
Office: 815-468-4404 •



---

**From:** McCurry, Edith
**Sent:** Wednesday, December 10, 2014 8:15 AM
**To:** 'Scott Marksteiner'; Fowler, Tammi
**Cc:** Lopez, Mario; Varvel, Lori
**Subject:** RE: Suspension

Yes, I am now.

Edith McCurry

Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Edith.McCurry@KencoGroup.com
Office 815-468-9999, X464
Fax 1-815-468-2468

**From:** Scott Marksteiner [mailto:sfm428@gmail.com]
**Sent:** Wednesday, December 10, 2014 8:05 AM
**To:** Fowler, Tammi; McCurry, Edith
**Subject:** Suspension

Ms. Edith can you please forward this to Mario and Lori because I am trying to follow up on the random drug test I was given. Can someone please explain the investigation process that will be used, since the urine sample was not at an acceptable temperature at 90 degrees? What are the next steps in this process?        Thanks Scott Marksteiner

12/10/2014

## McCurry, Edith

| | |
|---|---|
| **From:** | Scott Marksteiner [sfm428@gmail.com] |
| **Sent:** | Sunday, December 21, 2014 1:41 PM |
| **To:** | Varvel, Lori; Lopez, Mario; Fowler, Tammi; reports |
| **Subject:** | Suspension |

There has been something bothering me from my meeting with you (lori) and mario. You said to me that I should have taken everything involving my drug test and the future of my job more seriously and I should have questioned the drug test lady about my sample not being within specifications 90 degrees. On the day of my test I had repeatedly told you that I was very sick and in your presence made several trips to the bathroom to be sick with several people upstairs witnessing me being sick by hearing me in the bathroom. I had also told you that I was supposed to be picking up my child after school and also stated that I had been unable to get ahold of anyone to pick him up. At about 3:20 pm my 13 year old son was standing on a corner all alone waiting for me to pick him up not knowing where I was. Who has someone detained awaiting a urine sample while there minor child is alone on a corner?? I dont know anyone who would put their job in front of their childs safety and can't even imagine how someone who has children could even suggest this. So I am interested in how you could suggest that I should have taken my jobs future more seriously by questioning the drug test lady or you after my sample was supposedly not at temperature or question why it was disposed of. First I wasnt aware that these issues were wrong to even question until I was home and did some research. Second I dont know anyone who would be concerned with these events while their child was standing on a corner. And lastly how do I handle a situation that I felt I was being singled out, considering this is my 4 th or 5th random?? This feeling comes from the fact that my job had been threatened on 2 seperate occasions by Mario in retaliation for opposing injustice to others. With Mario being involved in this whole situation I feel that this was all a setup and Mario was trying to go thru with his threat of removing me from the building. This whole situation has been eating away at me destroying my way of life. I am having a very difficult time trying to sleep 1-2 hours per day. At this point I have been sitting home for 12 days awaiting some sort of investigation which I still dont know what this consists of. With all this being said I am feeling extremely embarrassed and traumatized by this whole situation and at thsi point I am unsure if I would even be able to go back into that building.

Scott Marksteiner
1st shift lead
Kenco Mars Manteno
(708)670-4456
sfm428@gmail.com

12/22/2014

SA-151

## Doss, Nathan

| | |
|---|---|
| **From:** | Marksteiner, Scott |
| **Sent:** | Wednesday, July 23, 2014 8:48 PM |
| **To:** | Doss, Nathan |
| **Subject:** | FW: |

**Scott Marksteiner**

**2nd Shift Lead**
1125 Sycamore Dr • Manteno, IL  60950
Office: 815-468-4480 • Mobile: 708-670-4456

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

**From:** Marksteiner, Scott
**Sent:** Wednesday, July 23, 2014 8:48 PM
**To:** Jabaley, David
**Subject:**

There has been on 2 instances in the last couple weeks that were not right. The first time Karl Meyer stopped me in the aisle and approached me on the issue when Nate went to Stacy about him with headphones on while blowing a stop sign. He was questioning me on why Nate would do that and was mad as he was talking to me second time is when I sent an email about him not doing his overtime when his help was needed on 2nd shift. He again approached me in the aisle and confronted me on this issue. Both times were uncomfortable and I don't think should have happened. First off you call this guy a lead and day in and out there is constant issues with him. He was having cans of monster down at the frt desk he got caught by several people with head phones in his ears and also blowing stop signs while headphones on hes been talked to about his overtime and also again with with juice in the warehouse. First I don't understand why someone can violate rules like this especially safety rules and more concerning the fact that this person is made aware of who is turning him in for these issues and continues to carry a lead title. There is absolutely no reason why I should be getting confronted in aisles about these issues. A work environment like this makes me not want to address issues and just turn the other way.

**Scott Marksteiner**

**2nd Shift Lead**
1125 Sycamore Dr • Manteno, IL  60950
Office: 815-468-4480 • Mobile: 708-670-4456

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

8/2/2014

KENCO 000788

Case: 18-3206    Document: 16    RESTRICTED    Filed: 01/23/2019    Pages: 348
Case: 18-3206    Document: 11-5    RESTRICTED    Filed: 01/18/2019    Pages: 50

Page 1 of 1

**McCurry, Edith**

| | |
|---|---|
| **From:** | Marksteiner, Scott |
| **Sent:** | Friday, August 08, 2014 1:02 PM |
| **To:** | McCurry, Edith |
| **Subject:** | FW: |

**From:** Marksteiner, Scott
**Sent:** Thursday, August 07, 2014 10:29 PM
**To:** Jabaley, David
**Cc:** Manzello, Mike; Doss, Nathan
**Subject:**

Nate asked me to comment on a situation that occurred Tuesday night shortly after 11pm. At about 11:10pm I was at my computer and Nate was standing behind me waiting for me to finish the shift report when Saul came up in front of me and started asking Nate about not completing inbound paperwork. Saul was telling him that he had to do this paperwork that was left Nate said it wasn't his and he shouldn't have to clean up after other people he needs to find out who is responsible and have them fix them. Saul also told Nate that he put 13 trailers on the spot move when they were unloaded which I replied that its kinda funny that we unloaded 13 trailers the night before so that would mean that he didn't move any trailers out all night which is far from true. At no point during the communication was there anything done wrong on Nate's part. If anything was handled incorrectly it was on Saul's part. During this discussion Kyle Rose and Noah Richcreek walked into the office and like every other night asked me if I needed anything and before I could answer Saul told them to go and leave the office while there was a 2 3rd shift people in the office. This was disrespectful to me. I have been here performing the duties of supervisor for about 6 months first if there was a problem with the way things were being done on my shift I should have been the one that was confronted after it was put into the shift hand off which none of this was done so proper procedure was not followed and again procedure was not followed by not getting statements from all the people in the room. I am very upset how this has been handled and again feel very violated by this company.

**Scott Marksteiner**

**2nd Shift Lead**
1125 Sycamore Dr • Manteno, IL  60950
Office: 815-468-4480 • Mobile: 708-670-4456

The information contained in the electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.

8/8/2014   2:22 pm  EM

KENCO 000789

Case: 18-3206    Document: 16    RESTRICTED    Filed: 01/23/2019    Pages: 348
Case: 18-3206    Document: 11    RESTRICTED    Filed: 01/18/2019    Pages: 50

Page 1 of 1

## McCurry, Edith

| | |
|---|---|
| **From:** | Doss, Nathan |
| **Sent:** | Monday, August 11, 2014 5:20 PM |
| **To:** | McCurry, Edith |
| **Subject:** | SUSPENSION PROCEDURE |

Ms. Edith,

Can you explain to me or do you know the process of investigation during a suspension? Can you tell me what the Kenco policy or procedure used in this process, or specifically what is being used in my case because I was suspended for being insubordinate. I submitted my account of what happened by email because I was suspended before I could give it and have not gotten any feedback, so I do not know what the next steps are, how long this should take, or anything about how this matter will be resolved. Also I copied you in my response can you please place a copy in my file along with the other witness statement below.

From: Richcreek, Noah
**Sent:** Thursday, August 07, 2014 10:01 PM
**To:** Manzello, Mike; Jabaley, David
**Cc:** Marksteiner, Scott; Doss, Nathan
**Subject:** Nate Doss

I was asked my Nate Doss to comment on what I witnessed the other night between him and Saul Beck. According to Nate he was suspended due to insubordination.  Granted I wasn't in the office for the whole conversation.  What I did witness was Saul questioning Nate about a stack of paper work.  Saul seemed upset about the paper work for some reason.  At one point, Saul turned to me and Kyle Rose and told us to leave the office.  Why Saul had me and Kyel and no body else, I don't know.  At no point did I perceive or witness Nate doing or saying anything that would constitute him being insubordinate or disrespectful to Saul Beck.

**Noah Richcreek**
2nd Shift Lead
1125 Sycamore Dr • Manteno, IL  60950
Office: 815-468-4480 • 815-922-3647

**McCurry, Edith**

| | |
|---|---|
| **From:** | Noah Richcreek [noahrichcreek@gmail.com] |
| **Sent:** | Saturday, November 08, 2014 11:40 AM |
| **To:** | Fowler, Tammi; Jabaley, David; Lopez, Mario |
| **Cc:** | melissa15301@aol.com; McCurry, Edith |
| **Subject:** | Manteno Kenco |

To whom it may concern,

   I work for the the Manteno Mars Kenco. I have been a loyal employee before and since Kenco took over. Since Kenco came in, I have taken a pay cut and marking Sunday November 9th I will have had my schedule changed 4 times since January. Sunday November 9th will mark the 3rd time since May of this year that my schedule will have been changed. I have gone from working weekend days to working weekday nights, back to working weekday days and now come Sunday I will be being pushed into working weekend nights. All because, according to Mario Lopez our new GM, I'm good at my job and he needs someone to fill a 'gap' and he needs someone who is "flexible." It was also stated that I was being moved to basically retrain the other shift lead and the new supervisor that are on the weekend night shift. I stated to Mario that I would like some sort of monetary compensation. He said he would look into it, but I would for sure be receiving a .30 cent shift differential for going to this new shift. 30 cents to retrain a shift lead and to essentially train a supervisor from the ground up doesn't seem very fair. When I asked Mario, what if I say no. His response was demotion and possible termination. When I asked why not someone else, Mario avoided the question. I asked does my seniority not count for anything? Basically, Mario doesn't believe in such things. I have a hard time accepting this due to the fact that I work with two leads who where hired off the street and haven't had to put in a days hard work to get where they are. Unless I'm mistaken but isn't Kenco's policy to promote internally? Although, I am flattered that Mario thinks this highly of me. I do not want this shift change. I do not want to be placed in a situation where I am going to have to train my superior, especially for only a additional .30 cents a hour. I have a problem with the fact that I'm being forced into something that I don't even want and my only alternatives are demotion and possible termination.

   I was promoted in May to a warehouse lead. I spent the first 3 months after my promotion having to learn how to do my job and learn a new system without any formal training and for the most part by myself. The last three months, when I had my schedule changed again placing me back on days, I was forced to learn a whole new side to my job, again with no formal training. I take my job seriously and I work on average 12 hours a day I volunteer to come in on my off days on a regular basis all this in a attempt to make this a better company and a better place for people to work. Essentially, since my promotion I have been placed in sink or swim situations with little to no help. Not only have I been able to keep my head above water, but I have excelled at what I do. I don't understand how I haven't been flexible. With the situations I have been placed in with no formal training, the pay cut I received when Kenco came in and the many shift changes I have gone through. In my opinion I have been not only flexible but loyal to this company.

   I understand that I play a small role in this company. What I have gone through and what I am being forced to accept isn't right. With all these shift changes and all the additional hours I have had to work, I have had to miss out on so much in my personal life. I only ask to be treated fairly and compensated accordingly. I ask that this be looked into and that no ill repercussions towards me follow. I have copied Melissa Hansen in on this e-mail due to the fact that she was part of this meeting between Mario and myself. I have also cc Edith McCurry our in house HR rep.

Sincerely,

Noah Richcreek

11/10/2014

KENCO 000874

SA-155

## McCurry, Edith

| | |
|---|---|
| **From:** | McCurry, Edith |
| **Sent:** | Tuesday, December 23, 2014 9:23 AM |
| **To:** | Varvel, Lori |
| **Cc:** | 'Coy L. Jones' |
| **Subject:** | RE: UI Claim - Scott Marksteiner due: 12/30 |

Lori
You can better give the details requested below about Scott.

Edith McCurry

Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Edith.McCurry@KencoGroup.com
Office 815-468-9999, X464
Fax 1-815-468-2468

**From:** Coy L. Jones [mailto:cjones@tntnash.com]
**Sent:** Tuesday, December 23, 2014 8:14 AM
**To:** McCurry, Edith
**Subject:** UI Claim - Scott Marksteiner due: 12/30

Good morning,

I have received an unemployment claim on the following individual. In order to provide a complete and timely claim response, I will need the information requested below. In some cases, failure to respond to unemployment claims on the date they are due may result in penalty charges or the claim is ruled in the claimants favor. Due to the newly implemented change of the Integrity Bill, every claim need to have full details on what led to separation.

### SCOTT MARKSTEINER (**9348)
First Day Worked:
Last Day Worked:
Reason for Separation:
Details of the final incident that led to their separation:
DUE: **12/30/14**

Supporting Documentation:
If this was a **discharge,** I will need the date and details of the final incident, any previous warnings, copies of witness statements, copy of policy violated, and signed acknowledgement of policy. If this was a **voluntary resignation**, please provide the reason and a copy of the resignation letter, if one was provided. Please provide as much detail as possible in order for us to provide the best possible protest to this claim.

If the employee is **still employed** he/she may still qualify for unemployment benefits.

Current status (full time, part time, per diem):
Is this person working fewer hours than normal?
Is he/she accepting all available work?

**NEW LAW:** *Passed as a part of the Trade Adjustment Assistant Extension Act of 2011, the Unemployment Insurance (UI) Integrity mandate requires all employers to provide a complete and timely response to the state's first request for information about an unemployment claim. The UI Integrity Act requires full compliance from all states no later than October 21, 2013. To ensure the reform yields the necessary savings, there will be penalties on employers for non-compliance. In addition, if the state identifies a pattern of failure to provide complete and timely responses, organizations are at risk of*

12/23/2014

*permanently losing valuable protest rights and/or facing monetary penalties.*

**Please feel free to contact me to discuss this case in detail or if you have any questions. Thank you for your help!**

**Coy L. Jones | Claims Analyst | THOMAS & THORNGREN, INC.**
P: 615.242.8246| F: 615.242.5826
One Vantage Way, Suite A-105 | Nashville, TN 37228
P.O. Box 280100 | WWW.THOMASANDTHORNGREN.COM

Communication Privacy Notice

"The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this message and deleting it from your computer."

Thank you,

Thomas & Thorngren

****** CONFIDENTIALITY NOTICE ******

NOTICE: This message and any attachments are confidential and for the sole use of the intended recipient. If you are not the intended recipient, any copying, forwarding, disclosure, distribution or use of any part of this message or its attachments is strictly prohibited and may be unlawful. If you believe that you received this email in error, please do not read it or any attachments thereto, and notify the sender immediately by email and then delete this message from your system. Thank you.

Communication Privacy Notice

"The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this message and deleting it from your computer."

Thank you,
Thomas & Thorngren

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended recipient, please delete

Communication Privacy Notice

"The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this message and deleting it from your computer."

Thank you,
Thomas & Thorngren

12/23/2014

## McCurry, Edith

**From:** Varvel, Lori
**Sent:** Tuesday, December 23, 2014 9:25 AM
**To:** McCurry, Edith
**Subject:** RE: UI Claim - Scott Marksteiner due: 12/30

Thank you

**Lori Varvel**
Human Resources Manager
1125 Sycamore Road • Manteno, IL 60950
Office: 815-468-4404 •



**From:** McCurry, Edith
**Sent:** Tuesday, December 23, 2014 9:23 AM
**To:** Varvel, Lori
**Cc:** 'Coy L. Jones'
**Subject:** RE: UI Claim - Scott Marksteiner due: 12/30

Lori
You can better give the details requested below about Scott.

Edith McCurry

_____
Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Edith.McCurry@KencoGroup.com
Office 815-468-9999, X464
Fax 1-815-468-2468

**From:** Coy L. Jones [mailto:cjones@tntnash.com]
**Sent:** Tuesday, December 23, 2014 8:14 AM
**To:** McCurry, Edith
**Subject:** UI Claim - Scott Marksteiner due: 12/30

Good morning,

I have received an unemployment claim on the following individual. In order to provide a complete and timely claim response, I will need the information requested below. In some cases, failure to respond to unemployment claims on the date they are due may result in penalty charges or the claim is ruled in the claimants favor. Due to the newly implemented change of the Integrity Bill, every claim need to have full details on what led to separation.

**SCOTT MARKSTEINER (**9348)**
First Day Worked:
Last Day Worked:
Reason for Separation:
Details of the final incident that led to their separation:
**DUE: 12/30/14**

12/23/2014

**Supporting Documentation:**
If this was a **discharge,** I will need the date and details of the final incident, any previous warnings, copies of witness statements, copy of policy violated, and signed acknowledgement of policy. If this was a **voluntary resignation,** please provide the reason and a copy of the resignation letter, if one was provided. Please provide as much detail as possible in order for us to provide the best possible protest to this claim.

If the employee is **still employed** he/she may still qualify for unemployment benefits.

     Current status (full time, part time, per diem):

     Is this person working fewer hours than normal?

     Is he/she accepting all available work?

**NEW LAW:** *Passed as a part of the Trade Adjustment Assistant Extension Act of 2011, the Unemployment Insurance (UI) Integrity mandate requires all employers to provide a complete and timely response to the state's first request for information about an unemployment claim. The UI Integrity Act requires full compliance from all states no later than October 21, 2013. To ensure the reform yields the necessary savings, there will be penalties on employers for non-compliance. In addition, if the state identifies a pattern of failure to provide complete and timely responses, organizations are at risk of permanently losing valuable protest rights and/or facing monetary penalties.*

Please feel free to contact me to discuss this case in detail or if you have any questions. Thank you for your help!

*Coy L. Jones | Claims Analyst |* THOMAS & THORNGREN, INC.
P: 615.242.8246| F: 615.242.5826
One Vantage Way, Suite A-105 | Nashville, TN 37228
P.O. Box 280100 | WWW.THOMASANDTHORNGREN.COM

Communication Privacy Notice

"The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this message and deleting it from your computer."

Thank you,
Thomas & Thorngren

****** CONFIDENTIALITY NOTICE ******
NOTICE: This message and any attachments are confidential and for the sole use of the intended recipient. If you are not the intended recipient, any copying, forwarding, disclosure, distribution or use of any part of this message or its attachments is strictly prohibited and may be unlawful. If you believe that you received this email in error, please do not read it or any attachments thereto, and notify the sender immediately by email and then delete this message from your system. Thank you.

Communication Privacy Notice

"The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this message and deleting it from your computer."

Thank you,
Thomas & Thorngren
This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended recipient, please delete

Communication Privacy Notice

"The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this message and deleting it from your computer."

12/23/2014

Thank you,
Thomas & Thorngren

SECTION XVI



**THE HARTFORD**

October 29, 2018

Jordan Hoffman, P.C.
Law Office Of Jordan TraVaille Hoffman P.C.
2711 E. New York St., Suite 205
Aurora, IL  60502

Policy Holder:     Kenco
Claimant:          Edith Mccurry
Insured ID:        9004534048
Policy Number:     GLT674076
RE:                Long Term Disability

Dear Attorney Hoffman:

We are writing to you about your client's claim for Long Term Disability (LTD) benefits.

We have received additional information in the appeals department in response to the 09/24/2018 letter. We have not yet received an appeal request dated later than the 09/24/2018 determination. An appeal review has not begun at this time.

Appeal rights were provided in the 09/24/2018 letter. If it is your intent to appeal, please provide your appeal letter, and inform us when your appeal request is complete.

If you have any questions, please feel free to contact our office at 916-294-1322. Our office hours are 8:00 AM - 4:00 PM CST, Monday through Friday.

Sincerely,

*Shelley Scheidel*

Shelley Scheidel, Appeal Specialist
Hartford Life and Accident Insurance Co.



The Hartford
P.O. Box 14305
Lexington, KY 40512-4305
800-549-6514
Fax (866) 411-5613

LAW OFFICE OF

# *Jordan TraVaille Hoffman, P.C.*

"Balancing the Scales of Justice"

November 5, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Shelley Scheidel
P.O. Box 14305
Lexington, KY 40512-4305

RE:   Policy Holder:      Kenco
      Claimant:          Edith McCurry
      Insured ID:        9004534048
      Policy Number:     GRH674076

Good Day Ms. Scheidel:

This is a follow up to your November 2, 2018 correspondence.

My request was written, simple and straight forward and attached for your review is my October 30, 2018, request for the communications that were outlined in the correspondence, from Eric Lee of the Hartford, dated October 19, 2018 regarding the correspondence that was sent to Dr. Throupe on July 11, 2018 and again on August 31, 2018 regarding Ms. McCurry.

Consequently, in my opinion again it is the same request; please provide the correspondence that was allegedly sent to Dr. Throupe on the aforementioned dates and times within three (3) business days.

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

Moreover, the previous request and communications were to gather information to ascertain the path in which we will ultimately approach this matter.  Therefore, that is the reason that we had not previously made such an appeal.

With that being said, please constitute this as an appeal for Ms. McCurry's benefits.


Thanks for your prompt cooperation in this matter.

The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com


Cc:    Edith McCurry
       Eric Lee


**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

LAW OFFICE OF
## *Jordan TraVaille Hoffman, P.C.*
*"Balancing the Scales of Justice"*

October 30, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Eric Lee
P.O. Box 14305
Lexington, KY 40512-4305

RE:     Policy Holder:       Kenco
        Claimant:            Edith McCurry
        Insured ID:          9004534048
        Policy Number:       GRH674076

Good Day Mr. Lee,

This is a follow up to your October 19, 2018 correspondence.

Ms. McCurry and my office followed up with Dr. Throupe's office in regards to the communications that you outlined in your October 19, 2018 correspondence regarding the dates and times that the Hartford or its agent allegedly contacted Dr. Throupe.

Dr. Throupe's office denies receiving any correspondence or calls from the Hartford or an affiliate of the Hartford regarding Ms. McCurry. Ms. McCurry's file was reviewed and it does not indicate any such correspondence. Specifically, his assistant provided this information, as she is the person who handles the correspondence by mail, fax, hone or any other means.

With that being said can you provide to us the correspondence that you allege was sent to Dr. Throupe on July 11 and August 31, 2018. Additionally, can you provide the contact information used for Dr. Throupe.

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

We would appreciate this information as promptly as possible.

Also, we noted your acknowledgment of Ms. McCurry's correct title as H.R. Administrator opposed to the Administrative Assistant title referenced in the immediate past communications.

Thanks for your prompt cooperation in this matter.

The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com

Cc:     Edith McCurry
        Ashley Thrasher

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com



**THE HARTFORD**

November 9, 2018

Jordan Hoffman
Law Office Of Jordan Travaille Hoffman P.C.
2711 E New York St. Suite 205
Aurora, IL 60502

Policy Holder:   Kenco
Claimant:        Edith Mccurry
Insured ID:      9004534048
Policy Number:   GLT674076

Dear Attorney Hoffman:

This letter is about your client's claim for Long Term Disability (LTD) benefits. We are writing to you in response to your notice of appeal letter dated 11/05/2018.

I have reviewed your request for the 07/11/2018 correspondence to Dr. Troupe. However, I find no confirmation that the correspondence was successfully faxed or mailed to Dr. Troupe.

With regards to the 08/31/2018 correspondence, there was a successful fax transmission to 815-230-3652. However only 3 pages were sent, and I cannot comment on what information was sent. Additional information is enclosed, including the 08/31/2018 letter, and 08/31/2018 and 09/04/2018 comments.

**Please confirm when your appeal submission is complete and you'd like for us to move forward with an appeal review.**

If you have any questions, please feel free to contact our office at 916-294-1322. Our office hours are 8:00 AM - 8:00 PM CST, Monday through Friday.

Sincerely,

*Shelley Scheidel*

Shelley Scheidel, Appeals Specialist
Hartford Life and Accident Insurance Co.

Enclosure
McCurryAug31

Benefit Management Services
Minneapolis Disability Claim Office
The Hartford
P.O. Box 14305
Lexington, KY 40512-4305
800-549-6514
Fax (866) 411-5613

LAW OFFICE OF

## Jordan TraVaille Hoffman, P.C.

"Balancing the Scales of Justice"

November 11, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Shelley Scheidel
P.O. Box 14305
Lexington, KY 40512-4305

RE:    Policy Holder:    Kenco
         Claimant:        Edith McCurry
         Insured ID:      9004534048
         Policy Number:   GRH674076

Good Day Ms. Scheidel:

This is a follow up to your November 9, 2018 correspondence.

My request was written, simple and straight forward with regards to the November 5, 2018 correspondence constituting an appeal for Ms. McCurry. Conversely, it is not clear what constitutes a completed appeal submission, as you have not outlined what that contains.

Attached you will find Eric Lee's correspondence dated October 19, 2018 **Exhibit A** that specifically states that written correspondence was sent to Dr. Throupe on July 11, 2018.

Likewise you have stated that you cannot find confirmation of this July 11, 2018 correspondence to Dr. Throupe in your records.  Therefore, we must conclude that your company did not contact Dr. Throupe on that day as previously stated.

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

Consequently, Dr. Throupe was not afforded an opportunity to communicate his assessment of Ms. McCurry to your company at that time.

Additionally, your November 9, 2018 correspondence goes on to say that three (3) pages were successfully faxed to 815-230-3652 on August 31, 2018, of which you attached two (2) pages dated August 31, 2018, in which you have entitled the letter.  Verify that the attachments to your November 9, 2018 letter dated August 31, 2018 were two (2) of the three pages faxed to 815-230-3652.

However, the report referenced in the October 19, 2018 correspondence and in your November 9, 2018 correspondence is not attached to your November 9, 2018 correspondence that was allegedly sent to Dr. Throupe, along with presumably, the August 31, 2018 letter that you attached.  Please produce the report sent to Dr. Throupe upon receipt of this correspondence.  To date this is the third (3) request for the information sent to Dr. Throupe.

While I do appreciate the additional information that you furnished that was not requested, I am unclear why the report was not sent as requested, as it was a clear and concise request.  Please state specifically why you did not send the report as requested.

In addition, I am requesting clarification as to the specific reason why you cannot comment on the information that was sent on August 31, 2018.

Thanks for your prompt cooperation in this matter.

The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com


Cc:    Edith McCurry
       Eric Lee


**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

Case: 16-3206   Document: 16   RESTRICTED   Filed: 01/28/2019   Pages: 50



**THE HARTFORD**

## *Fax Cover Page*

Date:             10/19/18 05:29:14 PM

To:               Jordan Hoffman
Fax Number:       8889584529
Subject:          9004534048, Edith Mccurry

From:             Eric Lee
                  Minneapolis Regional Office

Company:          The Hartford
Address:          PO BOX 14305
                  Lexington, KY  40512-4305

Phone:            860-547-5000

Fax:              1-877-454-7217

Total Pages:      4  including cover page

This electronic communication, including attachments, is for the exclusive use of addressee and may contain proprietary, confidential and/or privileged information.  If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited.  If you are not the intended recipient, please notify sender immediately by phone, destroy this communication and all copies.

The Hartford® is underwriting companies Hartford Life and Accident Insurance Company and Hartford Life Insurance Company and administrator Hartford-Comprehensive Employee Benefit Service Company

Memo:


Eric Lee
Specialty Analyst, Long Term Disability
Group Benefit Claims

[The Hartford]<http://www.thehartford.com/>

The Hartford Financial Services Group, Inc.
One Hartford Plaza | (Building/Floor)
Hartford, Connecticut 06155
W: 800-549-6514, ext 2308955
F: 866-411-5613

Eric.Lee@TheHartford.com<mailto:Eric.Lee@TheHartford.com>
www.thehartford.com<http://www.thehartford.com/>
www.facebook.com/thehartford<http://www.facebook.com/thehartford>
www.twitter.com/thehartford<http://www.twitter.com/thehartford>


The Hartford(r) is underwriting companies Hartford Life and Accident Insurance Company and Hartford Life Insurance Company.

**Exhibit A- November 11, 2018**
**Correspondence to Hartford**



THE
**HARTFORD**

October 19, 2018

Jordan T. Hoffman, Esquire
Law Office Of Jordan Travaille Hoffman Pc
2711 East New York St
Aurora, IL 60502

Policy Holder:    Kenco
Claimant:         Edith Mccurry
Insured ID:       9004534048
Policy Number:    GLT674076

Dear Mr. Hoffman:

This letter is regarding your client's Long Term Disability (LTD) benefits.

In response to your letter dated 10/10/18:

The information provided by Kenco detailed that Ms. McCurry's job title was Administrative Assistant and that is why it was communicated that way in the denial letter. I have attempted to contact Kenco to clarify her position but have received no response. I have reviewed the Vocational Case Manager's employability analysis and it was actually prepared using Ms. McCurry's stated position of HR Administrator. As such, the determination was made based on Ms. McCurry's stated job title of HR Administrator rather than Administrative Assistant.

As detailed in the denial letter, Dr. Troupe was very much included in the overall analysis of Ms. McCurry's claim. Our Behavioral Health Case Manager sent Dr. Troupe a letter on 7/11/18 seeking to clarify Ms. McCurry's restrictions. No response was received. The independent outside medical professional reviewed the entire file, including Dr. Troupe's office visit notes. That professional also attempted to contact Dr. Troupe on 8/1/18, 8/2/18 (twice) and 8/3/18. Dr. Troupe did call back on 8/2/18 and leave a voice message but did not respond otherwise. A copy of the independent peer report was sent to Dr. Troupe on 8/31/18 for comment. Dr. Troupe did not respond. All of this information just recited (except for the last line detailing that the report was sent to Dr. Troupe) was detailed in the denial letter.

As to reduced benefits, there is no provision in the Policy that calls for reduced benefits unless Ms. McCurry is paid an Other Income Benefit (such as Social Security Disability) or if she is working and has Current Monthly Earnings. As set forth in the denial letter, the determination is that Ms. McCurry is capable of a level of work that would allow her to earn more than the sum of her Indexed Pre-disability Earnings and the Benefit Percentage as detailed in the definitions of Disability and of Any Occupation. As she does not meet the definition of Disability, she is not entitled to benefits as of 7/20/17.

Benefit Management Services
Minneapolis Disability Claim Office
The Hartford
P.O. Box 14305
Lexington, KY 40512-4305
800-549-6514
Fax (866) 411-5613

Case: 18-3206 Document: 16 RESTRICTED Filed: 01/18/2019 Pages: 348

As set forth in the letter, if you disagree with the determination, you may appeal the decision and submit any additional medical information you wish to have considered and our appeals department will evaluate it.

Finally, the Attending Physician Statement sent from the Reed Group was not sent by the Hartford. The Reed Group is a different company. It would normally be sent to initiate a period of Disability from work. If Ms. McCurry is or has been working during the last 2 years, please provide details of her work including employer, job title and paystubs.

If you have any questions, please call Customer Service at 800-549-6514. Our hours are Monday through Friday, between 8:00 AM - 8:00 PM CST.

Sincerely,

*Eric Lee*

Eric Lee, Senior Ability Analyst
Hartford Life and Accident Insurance Co.

Benefit Management Services
Minneapolis Disability Claim Office
The Hartford
P.O. Box 14305
Lexington, KY 40512-4305
800-549-6514
Fax (866) 411-5613

Case: 1:23-cv-03206 Document: 16 RESTRICTED: 01/28/2009 Filed: 01/18/2009 Pages: 348 Pages: 50


**THE HARTFORD**

November 15, 2018

Jordan Hoffman
Law Office Of Jordan Travaille Hoffman P.C.
2711 E New York St. Suite 205
Aurora, IL  60502

| Policy Holder: | Kenco |
| Claimant: | Edith Mccurry |
| Insured ID: | 9004534048 |
| Policy Number: | GLT674076 |

Dear Attorney Hoffman:

This letter is about your client's claim for Long Term Disability (LTD) benefits. We are writing in response to your 11/11/2018 letter.

You are asking for a copy of the report that was sent to Dr. Troupe on 08/31/2018. The information provided to you on 11/09/2018 included the comments, which indicate that on 08/31/2018 a letter and copy of the Peer review were faxed to Dr. Troupe. However, only 3 pages were faxed successfully. Per your request, we are enclosing a copy of the 08/15/2018 and 08/29/2018 MCN Peer Review reports. As I am not the person that faxed the information on 08/31/2018, I am unable to comment or confirm which 3 pages were successfully faxed.

If you would like further detail, you may request a copy of the complete claim file.

Please confirm when your appeal submission is complete and you'd like for us to move forward with an appeal review.

If you have any questions, please feel free to contact our office at 916-294-1322. Our office hours are 8:00 AM - 8:00 PM CST, Monday through Friday.

Sincerely,

*Shelley Scheidel*

Shelley Scheidel, Appeal Specialist
Hartford Life and Accident Insurance Co.

Enclosure

McCurryMCNReport

Benefit Management Services
Minneapolis Disability Claim Office
The Hartford
P.O. Box 14305
Lexington, KY 40512-4305
800-549-6514
Fax (866) 411-5613

LAW OFFICE OF

# *Jordan TraVaille Hoffman, P.C.*

"Balancing the Scales of Justice"

November 20, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Shelley Scheidel
P.O. Box 14305
Lexington, KY 40512-4305

RE:   Policy Holder:      Kenco
      Claimant:           Edith McCurry
      Insured ID:         9004534048
      Policy Number:      GRH674076

Good Day Ms. Scheidel:

This is a follow up to your November 15, 2018 correspondence.

Since we have been able to get to the crux of the matter the correspondence that Eric Lee's dated October 19, 2018 that specifically states that written correspondence was sent to Dr. Throupe on July 11, 2018 and August 31, 2018 was patently false and misleading, as correspondence was not sent to Dr. Throupe as indicated.

Therefore, we must conclude that your company did not contact Dr. Throupe on those days as previously stated and consequently, as previously assert did not take Dr. Throupe's restrictions and evaluations into the analysis that denied Ms. McCurry her benefits.

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

Ms. McCurry contends and asserts that these actions were intentional, willful, and deliberate; having defrauded her out of her due benefits.

Again Ms. McCurry demands the benefits due her.  Additionally, the physician's statement sent to Dr. Throupe on September 26, 2018, again points her having been continuously disable since she had been under his care since 2016.

Please immediately release Ms. McCurry's benefits, as they are past overdue. Furthermore, Ms. McCurry does not agree that she should appeal something that was not properly adjudicated, as this has been a quintessential vexatious delay in the tendering of her benefits.

Thanks for your prompt cooperation in this matter.

The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com


Cc:    Edith McCurry
       Eric Lee



LAW OFFICE OF

# Jordan TraVaille Hoffman, P.C.

"Balancing the Scales of Justice"

November 26, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Shelley Scheidel
P.O. Box 14305
Lexington, KY 40512-4305

RE:   Policy Holder:    Kenco
      Claimant:         Edith McCurry
      Insured ID:       9004534048
      Policy Number:    GRH674076

Good Day Ms. Scheidel:

This is a follow up to my November 20, 2018 correspondence.

There was some additional follow-up information needed regarding how the analysis was conducted for Ms. McCurry's administration of benefits.

In your previous correspondence you indicated that you were not the person who had disseminated the information to Dr. Throupe for Ms. McCurry's evaluation.  Please provide the person who was tasked with disseminating the information to Dr. Throupe for his review and comment in August of 2018.

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

Additionally, it seems according to your records that an unsuccessful attempt to contact Dr. Throupe was not made until August 31, 2018, more than sixty (60) days after the McCurry appeal was made on June 22, 2018.

Please provide an explanation as to why there was a delay in contacting Dr. Throupe well after the forty five (45) day timeframe in which a decision was to have been given regarding the administration of McCurry's benefits.

Moreover, with regards to the benefits previously tendered, there is a discrepancy in the amount that was actually tendered and the amount actually received. More specifically, according to the award letters received, McCurry was to have received $394.62 per week, 60% of her weekly earnings for both Short and Long term Disability; however, McCurry only received $364.43 per week beginning the week January 19, 2015; a lower benefit than the designated amount.

In addition, when McCurry was paid monthly payments of $1526.68 beginning in July of 2016, retroactive to July of 2015, the monthly payment was now the equivalent to $352.310 per week, a substantially lower benefit than the 60% of her weekly earnings in which McCurry was entitled to of $394.62.

More specifically, the W-2 issued by Hartford for 2017 reflects the average weekly rate of $352.310/week for payments received from January 1 through July 19, 2017 for a total of $10,126.97 reported to the IRS. See Exhibit A

The attached 2017 W-2 does not reflect in any way the difference in the monies withheld and the monies reported to the IRS. Immediately, provide a response to the designation of the monies withheld and why these monies were not reported on McCurry's W-2 that was issued by you.

Immediate explanations are required regarding the aforementioned matters. Thanks for your prompt cooperation in this matter.


The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com


Cc:    Edith McCurry
       Eric Lee

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

| Copy B-To Be Filed With Payee's FEDERAL Tax Return. | | Tax Year **2017** OMB No. 1545-0008 |
|---|---|---|
| a. Payee's social security number XXX-XX-0408 | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
| b. Payor ID number 06-0974148 | 3 Social security wages | 4 Social security tax withheld |
| d. Control number 674076G | 5 Medicare wages and tips | 6 Medicare tax withheld |
| 7 Social security tips | 8 Allocated tips | 9 Verification code |

c. Payor's name, address, and ZIP code

HARTFORD LIFE INSURANCE CO  800-293-8607
ACCOUNTING CONTROLS TAX SERVICES UNITS
P.O. BOX 14772
LEXINGTON, KY 40512

e. Payee's name, address, and ZIP code

EDITH MCCURRY
C/O JORDAN HOFFMAN. P.C.
2711 EAST NEW YORK STREET
AURORA, IL 60502

| 10 Dependent care benefits | 11 Nonqualified plans | See instructions for box 12 12a  J     10,126.97 |
|---|---|---|
| 13 Statutory payee ☐ Retirement plan ☐ Third-party sick pay ☒ | 14 Other 3rd Party Sick Pay | 12b |
| | | 12c |
| | | 12d |
| | | 12e |
| | | 12f |
| 15 State/Payor's state ID IL   1004-7549 | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form **W-2**  **Wage and Tax Statement**  Department of the Treasury - Internal Revenue Service
This information is being furnished to the Internal Revenue Service.

Tracking #:  27390020T4

---

| Copy 2-To Be Filed With Payee's State, City, or Local Income Tax Return. | | Tax Year **2017** OMB No. 1545-0008 |
|---|---|---|
| a. Payee's social security number XXX-XX-0408 | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
| b. Payor ID number 06-0974148 | 3 Social security wages | 4 Social security tax withheld |
| d. Control number 674076G | 5 Medicare wages and tips | 6 Medicare tax withheld |
| 7 Social security tips | 8 Allocated tips | 9 Verification code |

c. Payor's name, address, and ZIP code

HARTFORD LIFE INSURANCE CO  800-293-8607
ACCOUNTING CONTROLS TAX SERVICES UNITS
P.O. BOX 14772
LEXINGTON, KY 40512

e. Payee's name, address, and ZIP code

EDITH MCCURRY
C/O JORDAN HOFFMAN. P.C.
2711 EAST NEW YORK STREET
AURORA, IL 60502

| 10 Dependent care benefits | 11 Nonqualified plans | 12a  J     10,126.97 |
|---|---|---|
| 13 Statutory payee ☐ Retirement plan ☐ Third-party sick pay ☒ | 14 Other 3rd Party Sick Pay | 12b |
| | | 12c |
| | | 12d |
| | | 12e |
| | | 12f |
| 15 State/Payor's state ID IL   1004-7549 | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form **W-2**  **Wage and Tax Statement**  Department of the Treasury - Internal Revenue Service

Tracking #:  27390020T4

---

| Copy C-For PAYEE'S RECORDS. (see Notice to Payee on back of Copy B.) | | Tax Year **2017** OMB No. 1545-0008 |
|---|---|---|
| a. Payee's social security number XXX-XX-0408 | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
| b. Payor ID number 06-0974148 | 3 Social security wages | 4 Social security tax withheld |
| d. Control number 674076G | 5 Medicare wages and tips | 6 Medicare tax withheld |
| 7 Social security tips | 8 Allocated tips | 9 Verification code |

c. Payor's name, address, and ZIP code

HARTFORD LIFE INSURANCE CO  800-293-8607
ACCOUNTING CONTROLS TAX SERVICES UNITS
P.O. BOX 14772
LEXINGTON, KY 40512

e. Payee's name, address, and ZIP code

EDITH MCCURRY
C/O JORDAN HOFFMAN. P.C.
2711 EAST NEW YORK STREET
AURORA, IL 60502

| 10 Dependent care benefits | 11 Nonqualified plans | See instructions for box 12 12a  J     10,126.97 |
|---|---|---|
| 13 Statutory payee ☐ Retirement plan ☐ Third-party sick pay ☒ | 14 Other 3rd Party Sick Pay | 12b |
| | | 12c |
| | | 12d |
| | | 12e |
| | | 12f |
| 15 State/Payor's state ID IL   1004-7549 | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form **W-2**  **Wage and Tax Statement**  Department of the Treasury - Internal Revenue Service
This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Tracking #:  27390020T4

---

| Copy 2-To Be Filed With Payee's State, City, or Local Income Tax Return. | | Tax Year **2017** OMB No. 1545-0008 |
|---|---|---|
| a. Payee's social security number XXX-XX-0408 | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
| b. Payor ID number 06-0974148 | 3 Social security wages | 4 Social security tax withheld |
| d. Control number 674076G | 5 Medicare wages and tips | 6 Medicare tax withheld |
| 7 Social security tips | 8 Allocated tips | 9 Verification code |

c. Payor's name, address, and ZIP code

HARTFORD LIFE INSURANCE CO  800-293-8607
ACCOUNTING CONTROLS TAX SERVICES UNITS
P.O. BOX 14772
LEXINGTON, KY 40512

e. Payee's name, address, and ZIP code

EDITH MCCURRY
C/O JORDAN HOFFMAN. P.C.
2711 EAST NEW YORK STREET
AURORA, IL 60502

| 10 Dependent care benefits | 11 Nonqualified plans | 12a  J     10,126.97 |
|---|---|---|
| 13 Statutory payee ☐ Retirement plan ☐ Third-party sick pay ☒ | 14 Other 3rd Party Sick Pay | 12b |
| | | 12c |
| | | 12d |
| | | 12e |
| | | 12f |
| 15 State/Payor's state ID IL   1004-7549 | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form **W-2**  **Wage and Tax Statement**  Department of the Treasury - Internal Revenue Service

Tracking #:  27390020T4

7H8131 2.000

Case: 1:18-cv-3206 Document: 16 RESTRICTED: 01/28/2019 Filed: 01/18/2019 Pages: 50



**THE HARTFORD**

November 28, 2018

Jordan Hoffman
Law Office Of Jordan Travaille Hoffman P.C.
2711 E New York St. Suite 205
Aurora, IL 60502

| Policy Holder: | Kenco |
| Claimant: | Edith Mccurry |
| Insured ID: | 9004534048 |
| Policy Number: | GLT674076 |

Dear Attorney Hoffman:

This letter is about your client's claim for Long Term Disability (LTD) benefits. We are writing to you in response to your letters dated 11/20/2018, 11/26/2018, and 11/27/2018.

Your 11/20/2018 letter demands the immediate release of benefits. We are unable to consider this request; however your client is entitled to receive a full and fair appeal review. Please refer to the letter dated 09/24/2018 which outlined her appeal rights.

Your letters also pose several questions regarding Ms. McCurry's claim, and you have requested a copy of Ms. McCurry's LTD claim file. Please be advised that a copy of the complete claim file will be sent to you under separate cover within 10-15 business days. Receipt of this information should provide you with the information you were requesting. Should you still have additional concerns, we will address such information upon written request, after the appeal decision has been rendered if the adverse determination is upheld.

You may submit any documentation or evidence you feel is appropriate regarding your client's claim. Please confirm when your appeal submission is complete and you'd like for us to move forward with an appeal review. We will not begin the evaluation of your client's appeal until you instruct us to proceed or as of 03/23/2019.

If you have any questions, please feel free to contact our office at 916-294-1322. Our office hours are 8:00 AM - 8:00 PM CST, Monday through Friday.

Sincerely,

*Shelley Scheidel*

Shelley Scheidel, Appeal Specialist
Hartford Life and Accident Insurance Co.

The Hartford
P.O. Box 14305
Lexington, KY 40512-4305
800-549-6514
Fax (866) 411-5613

LAW OFFICE OF

# *Jordan TraVaille Hoffman, P.C.*

"Balancing the Scales of Justice"

November 29, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Shelley Scheidel
P.O. Box 14305
Lexington, KY 40512-4305

RE:     Policy Holder:        Kenco
        Claimant:            Edith McCurry
        Insured ID:          9004534048
        Policy Number:       GRH674076

Good Day Ms. Scheidel:

This is a follow up to your correspondence dated November 28, 2018.

While I do appreciate that you will be forwarding the file within 10-15 business days, there remains some unanswered questions about the accounting of the monies slated and the actual monies received by McCurry.

More specifically, the November 26, 2018 correspondence addressed this issue and we are desirous of a response to that query that specifically address this issue, as that is what we requested.  Furthermore, we do not believe that the forthcoming file can address that issue, especially since it was not address on the W-2 that was issued.

Thanks for your prompt cooperation in this matter.

The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com

Cc:     Edith McCurry
        Eric Lee

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**

jthoffmanlaw@gmail.com

LAW OFFICE OF

## *Jordan TraVaille Hoffman, P.C.*

"Balancing the Scales of Justice"

November 29, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Shelley Scheidel
P.O. Box 14305
Lexington, KY 40512-4305

RE:     Policy Holder:       Kenco
        Claimant:            Edith McCurry
        Insured ID:          9004534048
        Policy Number:       GRH674076

Good Day Ms. Scheidel:

This is a follow up to your correspondence regarding the McCurry appeal.

On November 5, 2018 notice of appeal was given to you (see attached-Exhibit A). Furthermore, if you are suggesting that this November 5, 2018 correspondence did not constitute notice, please direct such in writing along with the reasons it does not constitute notice.

Thanks for your prompt cooperation in this matter.

The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com

Cc:     Edith McCurry
        Eric Lee

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

LAW OFFICE OF

# *Jordan TraVaille Hoffman, P.C.*

"Balancing the Scales of Justice"

November 5, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Shelley Scheidel
P.O. Box 14305
Lexington, KY 40512-4305

RE:   Policy Holder:      Kenco
      Claimant:          Edith McCurry
      Insured ID:        9004534048
      Policy Number:     GRH674076

Good Day Ms. Scheidel:

This is a follow up to your November 2, 2018 correspondence.

My request was written, simple and straight forward and attached for your
review is my October 30, 2018, request for the communications that were
outlined in the correspondence, from Eric Lee of the Hartford, dated October
19, 2018 regarding the correspondence that was sent to Dr. Throupe on July
11, 2018 and again on August 31, 2018 regarding Ms. McCurry.

Consequently, in my opinion again it is the same request; please provide the
correspondence that was allegedly sent to Dr. Throupe on the aforementioned
dates and times within three (3) business days.

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

Moreover, the previous request and communications were to gather information to ascertain the path in which we will ultimately approach this matter.  Therefore, that is the reason that we had not previously made such an appeal.

With that being said, please constitute this as an appeal for Ms. McCurry's benefits.


Thanks for your prompt cooperation in this matter.

The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com


Cc:    Edith McCurry
       Eric Lee

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

LAW OFFICE OF

# *Jordan TraVaille Hoffman, P.C.*

"Balancing the Scales of Justice"

October 30, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Eric Lee
P.O. Box 14305
Lexington, KY 40512-4305

RE:    Policy Holder:    Kenco
          Claimant:         Edith McCurry
          Insured ID:        9004534048
          Policy Number:   GRH674076

Good Day Mr. Lee,

This is a follow up to your October 19, 2018 correspondence.

Ms. McCurry and my office followed up with Dr. Throupe's office in regards to the communications that you outlined in your October 19, 2018 correspondence regarding the dates and times that the Hartford or its agent allegedly contacted Dr. Throupe.

Dr. Throupe's office denies receiving any correspondence or calls from the Hartford or an affiliate of the Hartford regarding Ms. McCurry. Ms. McCurry's file was reviewed and it does not indicate any such correspondence. Specifically, his assistant provided this information, as she is the person who handles the correspondence by mail, fax, hone or any other means.

With that being said can you provide to us the correspondence that you allege was sent to Dr. Throupe on July 11 and August 31, 2018. Additionally, can you provide the contact information used for Dr. Throupe.

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

We would appreciate this information as promptly as possible.

Also, we noted your acknowledgment of Ms. McCurry's correct title as H.R. Administrator opposed to the Administrative Assistant title referenced in the immediate past communications.


Thanks for your prompt cooperation in this matter.

The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com


Cc:    Edith McCurry
       Ashley Thrasher

LAW OFFICE OF
## *Jordan TraVaille Hoffman, P.C.*
"Balancing the Scales of Justice"

December 2, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Shelley Scheidel
P.O. Box 14305
Lexington, KY 40512-4305

RE:    Policy Holder:      Kenco
       Claimant:           Edith McCurry
       Insured ID:         9004534048
       Policy Number:      GRH674076

Good Day Ms. Scheidel:

This is a follow up to your voicemail message of November 30, 2018 regarding the query of the benefit amount paid to McCurry.

The award letter from the Hartford states that McCurry is entitled to 60% of her weekly earnings for Short and Long Term Disability.  That amount was calculated to be $394.62 per week.

As evidenced by Exhibit A and B respectively, McCurry has not been the 60% of her weekly earnings of $394.62 per week.  McCurry has been paid a lesser amount.

The questions were:

1) Why was McCurry not paid the $394.62 per week, which was 60% of her weekly earnings, as per the terms of the Short and Long Term Disability Policy?

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

2) What line item or cost reduced the amount due of $394.62 per week to McCurry that caused her weekly and eventually her monthly payment to be less than the 60% of her weekly earnings?

3) Was this reduction in weekly payment a taxable or non-taxable deduction?

4) Why did you fail to report the reduction in earnings on McCurry's w-2 form to the IRS?

5) Where did these monies go that were deducted from the 60% of McCurry's weekly earnings?

Hopefully this clarifies that we are essentially seeking, why she did not get all of her money that was due her from the 60% of her weekly earnings that she was due, as well as, who and where the money went that she did not receive.

Please provide a written response to this inquiry.

Thanks for your prompt cooperation in this matter.

The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com

Cc:   Edith McCurry
      Eric Lee

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

Case: 18-3206    Document: 16    RESTRICTED    Filed: 01/23/2019    Pages: 348

Case: 18-3206    Document: 11-5    Filed: 01/18/2019    Pages: 50

**Exhibit A**

THE
HARTFORD

| If this employee has returned to work, please contact the claim office at the number indicated below. |
|---|

**Claims Status**

| | | | |
|---|---|---|---|
| Employee Name: | EDITH MCCURRY | Leave of Absence Status | |
| Employee SSN: | 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 | | |
| Claim Office #: | -- | Claim Notes | |
| Claim Handler: | | | |
| Claim Appealed: | No | | |

| Type of Claim | Employee Group | Insured ID | Date of Disability | Benefit Effective Date | Benefits Approved Through |
|---|---|---|---|---|---|
| STD - NST | KLS101-MARS | 9004534048 | 01/05/2015 | 01/19/2015 | 07/19/2015 |

| Status | Effective Date of Status | Status Reason |
|---|---|---|
| TERMINATE | 07/20/2015 | BENEFITS EXPIRE |
| APPROVED | 05/16/2015 | OTHER |
| TERMINATE | 05/16/2015 | NO LONGER MEETS DEFINITION OF DISABILITY |
| APPROVED | 05/01/2015 | OTHER |
| TERMINATE | 05/01/2015 | RELEASED TO RETURN TO WORK |
| APPROVED | 02/02/2015 | OTHER |
| TERMINATE | 02/02/2015 | NO LONGER MEETS DEFINITION OF DISABILITY |
| APPROVED | 01/23/2015 | N/A |
| PENDING | 01/13/2015 | N/A |
| PAPERLESS INTAKE | 01/05/2015 | N/A |

Definitions: AP = attending physician

**Claims Payment**

| Check Number | Payee | Payment Date | Amount* | Payment From | Payment Through |
|---|---|---|---|---|---|
| EFT | EDITH MCCURRY | 07/17/2015 | $364.43 | 07/13/2015 | 07/19/2015 |
| EFT | EDITH MCCURRY | 07/10/2015 | $364.43 | 07/06/2015 | 07/12/2015 |
| EFT | EDITH MCCURRY | 07/01/2015 | $364.43 | 06/29/2015 | 07/05/2015 |
| EFT | EDITH MCCURRY | 06/26/2015 | $364.43 | 06/22/2015 | 06/28/2015 |
| EFT | EDITH MCCURRY | 06/16/2015 | $1,822.15 | 05/16/2015 | 06/21/2015 |
| EFT | EDITH MCCURRY | 06/01/2015 | $801.75 | 05/01/2015 | 05/15/2015 |
| EFT | EDITH MCCURRY | 04/30/2015 | $291.55 | 04/27/2015 | 04/30/2015 |
| EFT | EDITH MCCURRY | 04/24/2015 | $364.43 | 04/20/2015 | 04/26/2015 |
| EFT | EDITH MCCURRY | 04/14/2015 | $1,093.29 | 03/29/2015 | 04/19/2015 |
| EFT | EDITH MCCURRY | 03/27/2015 | $364.43 | 03/23/2015 | 03/28/2015 |
| EFT | EDITH MCCURRY | 03/20/2015 | $364.43 | 03/16/2015 | 03/22/2015 |
| EFT | EDITH MCCURRY | 03/13/2015 | $364.43 | 03/09/2015 | 03/15/2015 |
| EFT | EDITH MCCURRY | 03/06/2015 | $364.43 | 03/02/2015 | 03/08/2015 |
| EFT | EDITH MCCURRY | 02/25/2015 | $1,457.72 | 02/02/2015 | 03/01/2015 |
| EFT | EDITH MCCURRY | 01/30/2015 | $364.43 | 01/26/2015 | 02/01/2015 |
| EFT | EDITH MCCURRY | 01/23/2015 | $364.43 | 01/19/2015 | 01/25/2015 |

Cancel

© 2017 The Hartford

Terms of Use    Security    Privacy Policy    About Us

Case: 18-3206   Document: 16   Filed: 01/23/2019   Pages: 348
Case: 18-3206   Document: 11-5   RESTRICTED   Filed: 01/18/2019   Pages: 50

**Exhibit B**



---

> If this employee has returned to work, please contact the claim office at the number indicated below.

### Claims Status

| | | |
|---|---|---|
| Employee Name: | EDITH MCCURRY | Claim Notes |
| Employee SSN: | 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 | |
| Claim Office #: | -- Ext. 2308955 | |
| Claim Handler: | ERIC LEE | |
| Claim Appealed: | No | |

| Type of Claim | Employee Group | Insured ID | Date of Disability | Benefit Effective Date | Benefits Approved Through |
|---|---|---|---|---|---|
| LTD - ABIL | KLS101-MARS | 9004534048 | 01/05/2015 | 07/20/2016 | 07/19/2017 |

| Status | Effective Date of Status | Status Reason |
|---|---|---|
| APPROVED | 07/13/2016 | N/A |
| PENDING | 04/17/2016 | OTHER |
| DENIED | 11/13/2015 | LACK OF ATTENDING PHYSICIAN INFORMATION |
| PENDING | 06/19/2015 | N/A |
| FIRST NOTICE | 06/16/2015 | N/A |

Definitions: AP = attending physician

### Claims Payment

| Check Number | Payee | Payment Date | Amount* | Payment From | Payment Through |
|---|---|---|---|---|---|
| EFT | EDITH MCCURRY | 07/18/2017 | $966.89 | 07/01/2017 | 07/19/2017 |
| EFT | EDITH MCCURRY | 06/16/2017 | $1,526.68 | 06/01/2017 | 06/30/2017 |
| EFT | EDITH MCCURRY | 05/17/2017 | $1,526.68 | 05/01/2017 | 05/31/2017 |
| EFT | EDITH MCCURRY | 04/18/2017 | $1,526.68 | 04/01/2017 | 04/30/2017 |
| EFT | EDITH MCCURRY | 03/16/2017 | $1,526.68 | 03/01/2017 | 03/31/2017 |
| EFT | EDITH MCCURRY | 02/16/2017 | $1,526.68 | 02/01/2017 | 02/28/2017 |
| EFT | EDITH MCCURRY | 01/18/2017 | $1,526.68 | 01/01/2017 | 01/31/2017 |
| EFT | EDITH MCCURRY | 12/16/2016 | $1,526.68 | 12/01/2016 | 12/31/2016 |
| EFT | EDITH MCCURRY | 11/16/2016 | $1,526.68 | 11/01/2016 | 11/30/2016 |
| EFT | EDITH MCCURRY | 10/18/2016 | $1,526.68 | 10/01/2016 | 10/31/2016 |
| EFT | EDITH MCCURRY | 09/16/2016 | $1,526.68 | 09/01/2016 | 09/30/2016 |
| EFT | EDITH MCCURRY | 08/17/2016 | $1,526.68 | 08/01/2016 | 08/31/2016 |
| EFT | EDITH MCCURRY | 07/13/2016 | $18,930.83 | 07/20/2015 | 07/31/2016 |

Cancel

---

© 2017 The Hartford          Terms of Use   Security   Privacy Policy   About Us



**THE HARTFORD**

December 6, 2018

Jordan Hoffman
Law Office Of Jordan Travaille Hoffman P.C.
2711 E New York St. Suite 205
Aurora, IL 60502

Policy Holder:    Kenco
Claimant:         Edith Mccurry
Insured ID:       9004534048
Policy Number:    GLT674076

Dear Attorney Hoffman:

This letter is about your client's claim for Long Term Disability (LTD) benefits. We are writing to you in response to your letters dated 12/02/2018.

You requested that we provide our procedure in writing. The Policy states under the General Provision section, on page 18:

"**Claim Appeal:** *What recourse do I have if my claim is denied?*
On any claim, You or Your representative may appeal to Us for a full and fair review. To do so You:
  1) must request a review upon written application within:
      a) 180 days of receipt of claim denial if the claim requires Us to make a determination of disability; or
      b) 60 days of receipt of claim denial if the claim does not require Us to make a determination of disability; and
  2) may request copies of all documents, records, and other information relevant to Your claim; and
  3) may submit written comments, documents, records and other information relating to Your claim.
We will respond to You in writing with Our final decision on the claim."

You also posed several questions regarding your client's benefit amounts. A copy of the claim file was recently sent to you under separate cover, and should be received shortly. Please refer to the letter dated 08/11/2016, which should address your questions, in addition to the copy of the claim file. Should you still have additional concerns, we will address such information upon written request, after the appeal decision has been rendered if the adverse determination is upheld.



The Hartford
P.O. Box 14305
Lexington, KY 40512-4305
800-549-6514
Fax (866) 411-5613

We acknowledge receipt of your notice of appeal. You may submit any documentation or evidence you feel is appropriate regarding your client's claim. We will not begin the evaluation of your clients appeal until you instruct us to proceed or as of 03/23/2019.

If you have any questions, please feel free to contact our office at 916-294-1322. Our office hours are 8:00 AM - 8:00 PM CST, Monday through Friday.

Sincerely,

*Shelley Scheidel*

Shelley Scheidel, Appeal Specialist
Hartford Life and Accident Insurance Co.

The Hartford
P.O. Box 14305
Lexington, KY 40512-4305
800-549-6514
Fax (866) 411-5613

Claim ID: 16209161

LAW OFFICE OF

# *Jordan TraVaille Hoffman, P.C.*

"Balancing the Scales of Justice"

December 7, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Shelley Scheidel
P.O. Box 14305
Lexington, KY 40512-4305

RE:    Policy Holder:    Kenco
           Claimant:        Edith McCurry
           Insured ID:       9004534048
           Policy Number:   GRH674076

Good Day Ms. Scheidel:

This is a follow up to your correspondence regarding Ms. McCurry's benefits.

With all due respect, Ms. Scheidel, you continue to present a circular argument and fail to answer the questions posed.

Please do not refer me to another piece of correspondence that you assume that I have.

Address the questions square on with a response and attach the supporting documentation to which you reference.

McCurry is to have received 60% of her weekly earnings.  McCurry has not received 60% of her earnings at no time.

Please explain and provide documentation to substantiate why McCurry was paid less than the 60% of her weekly earnings to which she was entitled to according to the policy and the award letter.

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

The Hartford has a fiduciary obligation to McCurry under ERISA to provide this information when requested.

Additionally, the question still has not been answered how will McCurry successfully make her appeal and the Hartford has not contacted her doctor and indicated what they are looking for.

Specifically, the Hartford has not corrected or remedied its failure to contact Dr. Throupe. Nor have you specifically indicated what your policy is when the Hartford has neglected, whether intentional or accidentally, to execute its due diligence; a due diligence under law to which you are to adhere to.

Again, it is the Hartford's fiduciary obligation to discharge its obligations under ERISA.

Thanks for your prompt cooperation in this matter.


The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com


Cc:    Edith McCurry
       Eric Lee

LAW OFFICE OF

# *Jordan TraVaille Hoffman, P.C.*

"Balancing the Scales of Justice"

December 14, 2018

The Hartford
3rd Party Administrator for Kenco Logistics
C/o Shelley Scheidel
P.O. Box 14305
Lexington, KY 40512-4305

RE:    Policy Holder:        Kenco
         Claimant:            Edith McCurry
         Insured ID:          9004534048
         Policy Number:    GRH674076

Cc:     Good Day Ms. Scheidel:

This is a follow up to the attached correspondence sent to you on December 7, 2018
regarding Ms. McCurry's benefits, to which you have yet to respond.

It was pointed out in the communication that it is the Hartford's fiduciary obligation to
respond to questions about benefits, to which there has been no response.

We are still seeking that response.  However, if we do not have a response to the
specific questions asked in the attached document by the close of business, we will
take that as being a refusal to respond to the questions pertaining to McCurry not
receiving the full 60% of her earnings and what the corrective action the Hartford will
be taking for not contacting McCurry's doctor prior to denying her June 21, 2018
appeal for benefits On September 24, 2018.

Thanks for your prompt cooperation in this matter.

The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com

Cc: Edith McCurry, Eric Lee

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com



LAW OFFICE OF                                        **Exhibit A**

# *Jordan TraVaille Hoffman, P.C.*
"Balancing the Scales of Justice"


December 7, 2018


The Hartford
3rd Party Administrator for Kenco Logistics
C/o Shelley Scheidel
P.O. Box 14305
Lexington, KY 40512-4305


RE:   Policy Holder:      Kenco
        Claimant:          Edith McCurry
        Insured ID:        9004534048
        Policy Number:    GRH674076


Good Day Ms. Scheidel:

This is a follow up to your correspondence regarding Ms. McCurry's benefits.

With all due respect, Ms. Scheidel, you continue to present a circular argument and fail to answer the questions posed.

Please do not refer me to another piece of correspondence that you assume that I have.

Address the questions square on with a response and attach the supporting documentation to which you reference.

McCurry is to have received 60% of her weekly earnings.  McCurry has not received 60% of her earnings at no time.

Please explain and provide documentation to substantiate why McCurry was paid less than the 60% of her weekly earnings to which she was entitled to according to the policy and the award letter.


**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Fax and Phone**
jthoffmanlaw@gmail.com

Case: 18-3206    Document: 11-5    RESTRICTED    Filed: 01/18/2019    Pages: 50

The Hartford has a fiduciary obligation to McCurry under ERISA to provide this information when requested.

Additionally, the question still has not been answered how will McCurry successfully make her appeal and the Hartford has not contacted her doctor and indicated what they are looking for.

Specifically, the Hartford has not corrected or remedied its failure to contact Dr. Throupe.  Nor have you specifically indicated what your policy is when the Hartford has neglected, whether intentional or accidentally, to execute its due diligence; a due diligence under law to which you are to adhere to.

Again, it is the Hartford's fiduciary obligation to discharge its obligations under ERISA.

Thanks for your prompt cooperation in this matter.


The Law Office of
Jordan T. Hoffman, P.C.
"Balancing the Scales of Justice"
www.attyjthoffman.com


Cc:    Edith McCurry
       Eric Lee



**THE HARTFORD**

December 21, 2018

Jordan Hoffman
Law Office Of Jordan Travaille Hoffman P.C.
2711 E New York St. Suite 205
Aurora, IL  60502

Policy Holder:    Kenco
Claimant:         Edith Mccurry
Insured ID:       9004534048
Policy Number:    GLT674076

Dear Attorney Hoffman:

This letter is about your client's claim for Long Term Disability (LTD) benefits. We are writing to you in response to our letters dated 12/07/2018 and 12/14/2018.

Your written correspondence posed questions regarding your client's benefit amounts and the adverse decision dated 09/24/2018. A complete copy of the complete claim file was sent to you on 12/05/2018 and 12/11/2018. No additional questions will be addressed at this time.

We acknowledge receipt of your notice of appeal. You may submit any documentation or evidence you feel is appropriate regarding your client's claim. We will not begin the evaluation of your clients appeal until you instruct us to proceed or as of 03/23/2019.

Upon receipt of your complete appeal submission, we will complete a full and fair review. We will address any issues or questions in scope of the 09/24/2018 determination upon request after the appeal decision has been rendered if the adverse determination is upheld.

The Policy states under the General Provision section, on page 18:

"**Claim Appeal:** *What recourse do I have if my claim is denied?*
On any claim, You or Your representative may appeal to Us for a full and fair review. To do so You:
1)  must request a review upon written application within:
     a)  180 days of receipt of claim denial if the claim requires Us to make a determination of disability; or
     b)  60 days of receipt of claim denial if the claim does not require Us to make a determination of disability; and
2)  may request copies of all documents, records, and other information relevant to Your claim; and
3)  may submit written comments, documents, records and other information relating to Your claim.

The Hartford
P.O. Box 14305
Lexington, KY 40512-4305
800-549-6514
Fax (866) 411-5613

Claim ID: 18209161

001102 2/2

SA-198

We will respond to You in writing with Our final decision on the claim."

If you have any questions, please feel free to contact our office at 916-294-1322. Our office hours are 8:00 AM - 8:00 PM CST, Monday through Friday.

Sincerely,

*Shelley Scheidel*

Shelley Scheidel, Appeal Specialist
Hartford Life and Accident Insurance Co.

Claim ID: 16209161

The Hartford
P.O. Box 14305
Lexington, KY 40512-4305
800-549-6514
Fax (866) 411-5613

# YOUR
# BENEFIT
# PLAN

KENCO

Case: 18-3206 Document: 116 Filed: 02/18/2019 Pages: 50

**Questions or Complaints about Your Coverage**

**In the event You have questions or complaints regarding any aspect of Your coverage, You should contact Your Employee Benefits Manager or You may write to us at:**
The Hartford
Group Benefits Division, Customer Service
P.O. Box 2999
Hartford, CT 06104-2999

**Or call Us at:** 1-800-523-2233
When calling, please give Us the following information:
1) the policy number; and
2) the name of the policyholder (employer or organization), as shown in Your Certificate of Insurance.

**Or You may contact Our Sales Office:**
Hartford Life and Accident Insurance Company
Group Sales Department
1125 Sanctuary Parkway
Suite 450
Alpharetta, GA 30009
TOLL FREE: 888-560-9632
FAX: 770-475-1404

**If you have a complaint, and contacts between you and the insurer or an agent or other representative of the insurer have failed to produce a satisfactory solution to the problem, the following states require we provide you with additional contact information:**

| For residents of: | Write | Telephone |
|---|---|---|
| **Arkansas** | Arkansas Insurance Department<br>Consumer Services Division<br>1200 West Third Street<br>Little Rock, AR 72201-1904 | 1(800) 852-5494<br>1(501) 371-2640 (in the Little Rock area) |
| **California** | State of California Insurance Department<br>Consumer Communications Bureau<br>300 South Spring Street, South Tower<br>Los Angeles, CA 90013 | 1(800) 927-HELP |
| **Idaho** | Idaho Department of Insurance<br>Consumer Affairs<br>700 W State Street, 3rd Floor<br>PO Box 83720<br>Boise, ID 83720-0043 | 1-800-721-3272 or www.DOI.Idaho.gov |
| **Illinois** | Illinois Department of Insurance<br>Consumer Services Station<br>Springfield, Illinois 62767 | Consumer Assistance: 1(866) 445-5364<br>Officer of Consumer Health Insurance:<br>1(877) 527-9431 |
| **Indiana** | Public Information/Market Conduct<br>Indiana Department of Insurance<br>311 W. Washington St. Suite 300<br>Indianapolis, IN 46204-2787 | Consumer Hotline: 1(800) 622-4461<br>1(317) 232-2395 (in the Indianapolis Area) |
| **Virginia** | Life and Health Division<br>Bureau of Insurance<br>P.O. Box 1157<br>Richmond, VA 23209 | 1(804) 371-9741 (inside Virginia)<br>1(800) 552-7945 (outside Virginia) |
| **Wisconsin** | Office of the Commissioner of Insurance<br>Complaints Department<br>P.O. Box 7873 | 1(800) 236-8517 (outside of Madison)<br>1(608) 266-0103 (in Madison)<br>to request a complaint form. |

Madison, WI 53707-7873

**The following states require that We provide these notices to You about Your coverage:**

**For residents of:**

**Arizona**       This certificate of insurance may not provide all benefits and protections provided by law in Arizona.  Please read This certificate carefully.

**Florida**       The benefits of the policy providing you coverage are governed primarily by the laws of a state other than Florida.

# STATE OF DELAWARE
## The Civil Union and Equality Act of 2011
## Effective January 1, 2012

In accordance with Delaware law, insurers are required to provide the following notice to applicants of insurance policies issued in Delaware.

The Civil Union and Equality Act of 2011 ("the Act") creates a legal relationship between two persons of the same sex who form a civil union.  The Act provides that the parties to a civil union are entitled to the same legal obligations, responsibilities, protections and benefits that are afforded or recognized by the laws of Delaware to spouses in a legal marriage. The law further provides that a party to a civil union shall be included in any definition or use of the terms "spouse," "family," "immediate family," "dependent," "next of kin," and other terms descriptive of spousal relationships as those terms are used throughout Delaware law. This includes the terms "marriage" or "married," or variations thereon. Insurance policies are required to provide identical benefits and protections to both civil unions and marriages.  If policies of insurance provide coverage for children, the children of civil unions must also be provided coverage.  The Act also requires recognition of same sex civil unions or marriages legally entered into in other jurisdictions.

For more information regarding the Act, refer to Chapter 2 of Title 13 of the Delaware Code or the State of Delaware website at www.delaware.gov/CivilUnions.

### Georgia

The laws of the state of Georgia prohibit insurers from unfairly discriminating against any person based upon his or her status as a victim of family abuse.

# STATE OF ILLINOIS
## The Religious Freedom Protection and Civil Union Act
## Effective June 1, 2011

In accordance with Illinois law, insurers are required to provide the following notice to applicants of insurance policies issued in Illinois.

The Religious Freedom Protection and Civil Union Act ("the Act") creates a legal relationship between two persons of the same or opposite sex who form a civil union.  The Act provides that the parties to a civil union are entitled to the same legal obligations, responsibilities, protections and benefits that are afforded or recognized by the laws of Illinois to spouses. The law further provides that a party to a civil union shall be included in any definition or use of the terms "spouse," "family," "immediate family," "dependent," "next of kin," and other terms descriptive of spousal relationships as those terms are used throughout Illinois law. This includes the terms "marriage" or "married," or variations thereon. Insurance policies are required to provide identical benefits and protections to both civil unions and marriages.  If policies of insurance provide coverage for children, the children of civil unions must also be provided coverage. The Act also requires recognition of civil unions or same sex civil unions or marriages legally entered into in other jurisdictions.

For more information regarding the Act, refer to 750 ILCS 75/1 *et seq*. Examples of the interaction between the Act and existing law can be found in the Illinois Insurance Facts, Civil Unions and Insurance Benefits document available on the Illinois Department of Insurance's website at www.insurance.illinois.gov.

### Maine

1. The benefits under this policy are subject to reduction due to other sources of income.

   This means that your benefits will be reduced by the amount of any other benefits for loss of time provided to you or for which you are eligible as a result of the same period of disability for which you claim benefits under this policy.

   Other sources of income are plans or arrangements of coverage that provide disability-related benefits such as Worker's Compensation or other similar governmental programs or laws, or disability-related benefits received from your employer or as the result of your employment, membership or association with any group, union, association or other organization. Other sources of income include disability-related benefits under the United States Social Security Act or an alternate governmental plan, the Railroad Retirement Act, and other similar plans or acts. Other sources of income may also include certain disability-related or retirement benefits that you receive because of your retirement unless you were receiving them prior to becoming disabled.

   What comprises other sources of income under this policy is determined by the nature of the policyholder. Therefore, we strongly urge you to **Read Your Certificate Carefully.** A full description of the plans and types of plans considered to be other sources of income under this policy will be found in the definition of "Other Income Benefits" located in the Definitions section of your certificate.

2. The laws of the State of Maine require notification of the right to designate a third party to receive notice of cancellation, to change the designation and, policy reinstatement if the insured suffers from organic brain disease and the ground for cancellation was the insured's nonpayment of premium or other lapse or default on the part of the insured.

   Within 10 days after a request by an insured, a Third Party Notice Request Form shall be mailed or personally delivered to the insured.

### Maryland

**The group insurance policy providing coverage under this certificate was issued in a jurisdiction other than Maryland and may not provide all of the benefits required by Maryland law.**

### Montana

Conformity with Montana statutes:  The provisions of this certificate conform to the minimum requirements of Montana law and control over any conflicting statutes of any state in which the insured resides on or after the effective date of this certificate.

### North Carolina

UNDER NORTH CAROLINA GENERAL STATUTE SECTION 58-50-40, NO PERSON, EMPLOYER, FINANCIAL AGENT, TRUSTEE, OR THIRD PARTY ADMINISTRATOR, WHO IS RESPONSIBLE FOR THE PAYMENT OF GROUP LIFE INSURANCE, GROUP HEALTH OR GROUP HEALTH PLAN PREMIUMS, SHALL:
1) CAUSE THE CANCELLATION OR NONRENEWAL OF GROUP LIFE INSURANCE, GROUP HEALTH INSURANCE, HOSPITAL, MEDICAL, OR DENTAL SERVICE CORPORATION PLAN, MULTIPLE EMPLOYER WELFARE ARRANGEMENT, OR GROUP HEALTH PLAN COVERAGES AND THE CONSEQUENTIAL LOSS OF THE COVERAGES OF THE PERSON INSURED, BY WILLFULLY FAILING TO PAY THOSE PREMIUMS IN ACCORDANCE WITH THE TERMS OF THE INSURANCE OR PLAN CONTRACT; AND
2) WILLFULLY FAIL TO DELIVER, AT LEAST 45 DAYS BEFORE THE TERMINATION OF THOSE COVERAGES, TO ALL PERSONS COVERED BY THE GROUP POLICY WRITTEN NOTICE OF THE PERSON'S INTENTION TO STOP PAYMENT OF PREMIUMS. VIOLATION OF THIS LAW IS A FELONY. ANY PERSON VIOLATING THIS LAW IS ALSO SUBJECT TO A COURT ORDER REQUIRING THE PERSON TO COMPENSATE PERSONS INSURED FOR EXPENSES OR LOSSES INCURRED AS A RESULT OF THE TERMINATION OF THE INSURANCE.

## IMPORTANT TERMINATION INFORMATION

**YOUR INSURANCE MAY BE CANCELLED BY THE COMPANY. PLEASE READ THE TERMINATION PROVISION IN THIS CERTIFICATE.**

**THIS CERTIFICATE OF INSURANCE PROVIDES COVERAGE UNDER A GROUP MASTER POLICY. THIS CERTIFICATE PROVIDES ALL OF THE BENEFITS MANDATED BY THE NORTH CAROLINA INSURANCE CODE, BUT YOU MAY NOT RECEIVE ALL OF THE PROTECTIONS PROVIDED BY A POLICY ISSUED IN NORTH CAROLINA AND GOVERNED BY ALL OF THE LAWS OF NORTH CAROLINA.**

### PRE-EXISTING LIMITATION
### READ CAREFULLY

**NO BENEFITS WILL BE PAYABLE UNDER THIS PLAN FOR PRE-EXISTING CONDITIONS WHICH ARE NOT COVERED UNDER THE PRIOR PLAN. PLEASE READ THE LIMITATIONS IN THIS CERTIFICATE.**

### READ YOUR CERTIFICATE CAREFULLY.

**Texas**

| | |
|---|---|
| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |
| To obtain information or make a complaint: | Para obtener informacion o para someter una queja: |
| You may call The Hartford's toll-free telephone number for information or to make a complaint at: | Usted puede llamar al numero de telefono gratis de The Hartford para informacion o para someter una queja al: |
| 1-800-523-2233 | 1-800-523-2233 |
| You may also write to The Hartford at:<br>P.O. Box 2999<br>Hartford, CT 06104-2999 | Usted tambien puede escribir a The Hartford:<br>P.O. Box 2999<br>Hartford, CT 06104-2999 |
| You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at: | Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al: |
| 1-800-252-3439 | 1-800-252-3439 |
| You may write the Texas Department of Insurance at:<br>P.O. Box 149104<br>Austin, TX 78714-9410<br>Fax # (512) 475-1771<br>Web: http://www.tdi.state.tx.us<br>E-mail: ConsumerProtection@tdi.state.tx.us | Puede escribir al Departamento de Seguros de Texas:<br>P.O. Box 149104<br>Austin, TX 78714-9410<br>Fax # (512) 475-1771<br>Web: http://www.tdi.state.tx.us<br>E-mail: ConsumerProtection@tdi.state.tx.us |
| **PREMIUM OR CLAIM DISPUTES:**<br>Should you have a dispute concerning your premium or about a claim you should contact the agent or The Hartford first. If the dispute is not resolved, you may contact the Texas Department of Insurance. | **DISPUTAS SOBRE PRIMAS O RECLAMOS:**<br>Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o The Hartford primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI). |
| **ATTACH THIS NOTICE TO YOUR POLICY:**<br>This notice is for information only and does not become a part or condition of the attached document. | **UNA ESTE AVISO A SU POLIZA:**<br>Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto. |

Group Disability Income Insurance



## THE HARTFORD

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**
200 Hopmeadow Street
Simsbury, Connecticut 06089
(A stock insurance company)

**CERTIFICATE OF INSURANCE**

**Policyholder:** KENCO
**Policy Number:** GLT-674076
**Policy Effective Date:** June 1, 2001
**Policy Anniversary Date:** January 1, 2015

We have issued The Policy to the Policyholder. Our name, the Policyholder's name and the Policy Number are shown above. The provisions of The Policy, which are important to You, are summarized in this certificate consisting of this form and any additional forms which have been made a part of this certificate. This certificate replaces any other certificate We may have given to You earlier under The Policy. The Policy alone is the only contract under which payment will be made. Any difference between The Policy and this certificate will be settled according to the provisions of The Policy on file with Us at Our home office. The Policy may be inspected at the office of the Policyholder.

Signed for the Company

**Terence Shields,** *Secretary*          **Michael Concannon,** *Executive Vice President*

---

*A note on capitalization in this certificate:*
Capitalization of a term, not normally capitalized according to the rules of standard punctuation, indicates a word or phrase that is a defined term in The Policy or refers to a specific provision contained herein.

Form GBD-1200 (10/08)                                                    (674076) 3.06

# TABLE OF CONTENTS

| | |
|---|---|
| SCHEDULE OF INSURANCE | 9 |
| Cost of Coverage | 9 |
| Eligible Class(es) For Coverage | 9 |
| Eligibility Waiting Period for Coverage | 9 |
| Monthly Benefit | 9 |
| ELIGIBILITY AND ENROLLMENT | 10 |
| Eligible Persons | 10 |
| Eligibility for Coverage | 10 |
| Enrollment | 10 |
| Evidence of Insurability | 10 |
| PERIOD OF COVERAGE | 11 |
| Effective Date | 11 |
| Deferred Effective Date | 11 |
| Changes in Coverage | 11 |
| Termination | 12 |
| Continuation Provisions | 12 |
| BENEFITS | 13 |
| Disability Benefit | 13 |
| Mental Illness and Substance Abuse Benefits | 13 |
| Calculation of Monthly Benefit | 14 |
| Termination of Payment | 14 |
| Family Care Credit Benefit | 15 |
| Survivor Income Benefit | 15 |
| Workplace Modification Benefit | 16 |
| EXCLUSIONS AND LIMITATIONS | 16 |
| Pre-existing Condition Limitation | 16 |
| GENERAL PROVISIONS | 17 |
| DEFINITIONS | 21 |
| AMENDATORY RIDER | 25 |
| ERISA | 32 |

SA-206

## SCHEDULE OF INSURANCE

The Policy of long term Disability insurance provides You with long term income protection if You become Disabled from a covered injury, sickness or pregnancy.

**The benefits described herein are those in effect as of January 1, 2015.**

**Cost of Coverage:**
You must contribute toward the cost of coverage.

**Disclosure of Fees:**
We may reduce or adjust premiums, rates, fees and/or other expenses for programs under The Policy.

**Disclosure of Services:**
In addition to the insurance coverage, We may offer noninsurance benefits and services to Active Employees.

**Eligible Class(es) For Coverage:** All Full-time Active Employees who are citizens or legal residents of the United States, its territories and protectorates; excluding temporary, leased or seasonal employees.

Full-time Employment: at least 30 hours weekly

**Eligibility Waiting Period for Coverage:**
90 day(s)

The time period(s) referenced above are continuous. The Eligibility Waiting Period for Coverage will be reduced by the period of time You were a Full-time Active Employee with the Employer under the Prior Policy.

**Elimination Period:** 180 day(s)

**Maximum Monthly Benefit:** $5,000

**Minimum Monthly Benefit:** The greater of:
1) $100; or
2) 10% of the benefit based on Monthly Income Loss before the deduction of Other Income Benefits.

**Benefit Percentage:** 60%

### Maximum Duration of Benefits

**Maximum Duration of Benefits Table**

| Age When Disabled | Benefits Payable |
| --- | --- |
| Prior to Age 63 | To Normal Retirement Age or 48 months, if greater |
| Age 63 | To Normal Retirement Age or 42 months, if greater |
| Age 64 | 36 months |
| Age 65 | 30 months |
| Age 66 | 27 months |
| Age 67 | 24 months |
| Age 68 | 21 months |
| Age 69 and over | 18 months |

Normal Retirement Age means the Social Security Normal Retirement Age as stated in the 1983 revision of the United States Social Security Act. It is determined by Your date of birth as follows:

| Year of Birth | Normal Retirement Age |
| --- | --- |
| 1937 or before | 65 |
| 1938 | 65 + 2 months |
| 1939 | 65 + 4 months |

9

| | |
|---|---|
| 1940 | 65 + 6 months |
| 1941 | 65 + 8 months |
| 1942 | 65 + 10 months |
| 1943 thru 1954 | 66 |
| 1955 | 66 + 2 months |
| 1956 | 66 + 4 months |
| 1957 | 66 + 6 months |
| 1958 | 66 + 8 months |
| 1959 | 66 + 10 months |
| 1960 or after | 67 |

**Additional Benefit:**

**Family Care Credit Benefit**
see benefit

**Survivor Income Benefit**
see benefit

**Workplace Modification Benefit**
see benefit

# ELIGIBILITY AND ENROLLMENT

**Eligible Persons:** *Who is eligible for coverage?*
All persons in the class or classes shown in the Schedule of Insurance will be considered Eligible Persons.

**Eligibility for Coverage:** *When will I become eligible?*
You will become eligible for coverage on the later of:
1) the Policy Effective Date; or
2) the date on which You complete the Eligibility Waiting Period for Coverage shown in the Schedule of Insurance, if applicable.

**Enrollment:** *How do I enroll for coverage?*
To enroll for coverage You must:
1) complete and sign a group insurance enrollment form which is satisfactory to Us; and
2) deliver it to Your Employer.

If You do not enroll within 31 days after becoming eligible under The Policy, or if You were eligible to enroll under the Prior Policy and did not do so, and later choose to enroll:
1) You must give Us Evidence of Insurability satisfactory to Us; and
2) You may enroll at any time.

**Evidence of Insurability:** *What is Evidence of Insurability and what happens if Evidence of Insurability is not satisfactory to Us?*
Evidence of Insurability must be satisfactory to Us and may include, but will not be limited to:
1) a completed and signed application approved by Us;
2) a medical examination, if requested;
3) attending Physicians' statements; and
4) any additional information We may require.

All Evidence of Insurability will be furnished at Our expense. We will then determine if You are insurable under The Policy.

If Your Evidence of Insurability is not satisfactory to Us:
1) Your Monthly Benefit will equal the amount for which You were eligible without providing Evidence of Insurability, provided You enrolled within 31 days of the date You were first eligible to enroll; and

10

SA-208

2) You will not be covered under The Policy if You enrolled more than 31 days after the date You were first eligible to enroll.

## PERIOD OF COVERAGE

**Effective Date:** *When does my coverage start?*
Your coverage will start on the earliest of:
1) the date You become eligible, if You enroll or have enrolled by then;
2) the date on which You enroll, if You do so within 31 days after the date You are eligible; or
3) the date We approve Your Evidence of Insurability, for benefit amounts requiring Evidence of Insurability.

**Deferred Effective Date:** *When will my effective date for coverage or a change in my coverage be deferred?*
If You are absent from work due to:
1) accidental bodily injury;
2) sickness;
3) Mental Illness;
4) Substance Abuse; or
5) pregnancy;
on the date Your insurance, or increase in coverage, would otherwise have become effective, Your insurance, or increase in coverage will not become effective until You are Actively at Work one full day.

**Changes in Coverage:** *Can I change my benefit options?*
You may change Your benefit option at any time. You may decrease coverage, or increase coverage to a higher option. An increase in coverage will be subject to Your submission of an application that meets Our approval.

Any such increase in coverage is subject to the following provisions:
1) Deferred Effective Date; and
2) Pre-existing Conditions Limitations.

*Do coverage amounts change if there is a change in my class or my rate of pay?*
Your coverage may increase or decrease on the date there is a change in Your class or Pre-disability Earnings. However, no increase in coverage will be effective unless on that date You:
1) are an Active Employee; and
2) are not absent from work due to being Disabled. If You were so absent from work, the effective date of such increase will be deferred until You are Actively at Work for one full day.

No change in Your Pre-disability Earnings will become effective until the date We receive notice of the change.

*What happens if the Employer changes The Policy?*
Any increase or decrease in coverage because of a change in The Policy will become effective on the date of the change, subject to the following provisions:
1) the Deferred Effective Date provision; and
2) Pre-existing Conditions Limitations.

**Continuity From A Prior Policy:** *Is there continuity of coverage from a Prior Policy?*
If You were:
1) insured under the Prior Policy; and
2) not eligible to receive benefits under the Prior Policy;
on the day before the Policy Effective Date, the Deferred Effective Date provision will not apply.

*Is my coverage under The Policy subject to the Pre-existing Condition Limitation?*
If You become insured under The Policy on the Policy Effective Date and were covered under the Prior Policy on the day before the Policy Effective Date, the Pre-existing Conditions Limitation will end on the earliest of:
1) the Policy Effective Date, if Your coverage for the Disability was not limited by a pre-existing condition restriction under the Prior Policy; or
2) the date the restriction would have ceased to apply had the Prior Policy remained in force, if Your coverage was limited by a pre-existing condition limitation under the Prior Policy.

The amount of the Monthly Benefit payable for a Pre-existing Condition in accordance with the above paragraph will be the lesser of:
1)   the Monthly Benefit which was paid by the Prior Policy; or
2)   the Monthly Benefit provided by The Policy.

The Pre-existing Conditions Limitation will apply after the Policy Effective Date to the amount of a benefit increase which results from a change from the Prior Policy to The Policy, a change in benefit options, a change of class or a change in The Policy.

*Do I have to satisfy an Elimination Period under The Policy if I was Disabled under the Prior Policy?*
If You received monthly benefits for disability under the Prior Policy, and You returned to work as a Full-time Active Employee before the Policy Effective Date, then, if within 6 months of Your return to work:
1)   You have a recurrence of the same disability while covered under The Policy; and
2)   there are no benefits available for the recurrence under the Prior Policy;
the Elimination Period, which would otherwise apply, will be waived if the recurrence would have been covered without any further elimination period under the Prior Policy.

**Termination:**  *When will my coverage end?*
Your coverage will end on the earliest of the following:
1)   the date The Policy terminates;
2)   the date The Policy no longer insures Your class;
3)   the date premium payment is due but not paid;
4)   the last day of the period for which You make any required premium contribution;
5)   the date Your Employer terminates Your employment; or
6)   the date You cease to be a Full-time Active Employee in an eligible class for any reason;
unless continued in accordance with any of the Continuation Provisions.

**Continuation Provisions:**  *Can my coverage be continued beyond the date it would otherwise terminate?*
Coverage can be continued by Your Employer beyond a date shown in the Termination provision, if Your Employer provides a plan of continuation which applies to all employees the same way.  Continued coverage:
1)   is subject to any reductions in The Policy;
2)   is subject to payment of premium by the Employer; and
3)   terminates if:
     a)   The Policy terminates; or
     b)   coverage for Your class terminates.

In any event, Your benefit level, or the amount of earnings upon which Your benefits may be based, will be that in effect on the day before Your coverage was continued.  Coverage may be continued in accordance with the above restrictions and as described below:

Leave of Absence:  If You are on a documented leave of absence, other than Family and Medical Leave, Your coverage may be continued until the last day of the month following the month in which the leave of absence commenced.  If the leave terminates prior to the agreed upon date, this continuation will cease immediately.

Layoff:  If You are temporarily laid off by the Employer due to lack of work, Your coverage may be continued until the last day of the month following the month in which the layoff commenced.  If the layoff becomes permanent, this continuation will cease immediately.

Family and Medical Leave:  If You are granted a leave of absence, in writing, according to the Family and Medical Leave Act of 1993, or other applicable state or local law, Your coverage may be continued for up to 12 weeks, or 26 weeks if You qualify for Family Military Leave, or longer if required by other applicable law, following the date Your leave commenced.  If the leave terminates prior to the agreed upon date, this continuation will cease immediately.

**Coverage while Disabled:**  *Does my insurance continue while I am Disabled and no longer an Active Employee?*
If You are Disabled and You cease to be an Active Employee, Your insurance will be continued:
1)   during the Elimination Period while You remain Disabled by the same Disability; and
2)   after the Elimination Period for as long as You are entitled to benefits under The Policy.

**Waiver of Premium:**  *Am I required to pay premiums while I am Disabled?*
No premium will be due for You:

   1) after the Elimination Period; and
   2) for as long as benefits are payable.

**Extension of Benefits for Disability:** *Do my benefits continue if The Policy terminates?*
If You are entitled to benefits while Disabled and The Policy terminates, benefits:
   1) will continue as long as You remain Disabled by the same Disability; but
   2) will not be provided beyond the date We would have ceased to pay benefits had the insurance remained in force.
Termination of The Policy for any reason will have no effect on Our liability under this provision.


# BENEFITS

**Disability Benefit:** *What are my Disability Benefits under The Policy?*
We will pay You a Monthly Benefit if You:
   1) become Disabled while insured under The Policy;
   2) are Disabled throughout the Elimination Period;
   3) remain Disabled beyond the Elimination Period; and
   4) submit Proof of Loss to Us.
Benefits accrue as of the first day after the Elimination Period and are paid monthly. However, benefits will not exceed the Maximum Duration of Benefits.

**Mental Illness and Substance Abuse Benefits:** *Are benefits limited for Mental Illness or Substance Abuse?*
If You are Disabled because of:
   1) Mental Illness that results from any cause;
   2) any condition that may result from Mental Illness;
   3) alcoholism; or
   4) the non-medical use of narcotics, sedatives, stimulants, hallucinogens, or any other such substance;
then, subject to all other provisions of The Policy, We will limit the Maximum Duration of Benefits.

Benefits will be payable:
   1) for as long as You are confined in a hospital or other place licensed to provide medical care for the disabling condition; or
   2) if not confined, or after You are discharged and still Disabled, for a total of 24 months for all such disabilities during Your lifetime.

**Recurrent Disability:** *What happens if I Recover but become Disabled again?*
Periods of Recovery during the Elimination Period will not interrupt the Elimination Period, if the number of days You return to work as an Active Employee are less than one-half (1/2) the number of days of Your Elimination Period.

Any day within such period of Recovery, will not count toward the Elimination Period.

After the Elimination Period, if You return to work as an Active Employee and then become Disabled and such Disability is:
   1) due to the same cause; or
   2) due to a related cause; and
   3) within 6 months of the return to work;
the Period of Disability prior to Your return to work and the recurrent Disability will be considered one Period of Disability, provided The Policy remains in force.

If You return to work as an Active Employee for 6 months or more, any recurrence of a Disability will be treated as a new Disability. The new Disability is subject to a new Elimination Period and a new Maximum Duration of Benefits.

**Period of Disability** means a continuous length of time during which You are Disabled under The Policy.

**Recover or Recovery** means that You are no longer Disabled and have returned to work with the Employer and premiums are being paid for You.

**Calculation of Monthly Benefit: Return to Work Incentive:** *How are my Disability benefits calculated?*

If You remain Disabled after the Elimination Period, but work while You are Disabled, We will determine Your Monthly Benefit for a period of up to 12 consecutive months as follows:
1)    multiply Your Pre-disability Earnings by the Benefit Percentage;
2)    compare the result with the Maximum Benefit; and
3)    from the lesser amount, deduct Other Income Benefits.
The result is Your Monthly Benefit. Current Monthly Earnings will not be used to reduce Your Monthly Benefit.  However, if the sum of Your Monthly Benefit and Your Current Monthly Earnings exceeds 100% of Your Pre-disability Earnings, We will reduce Your Monthly Benefit by the amount of excess.

The 12 consecutive month period will start on the last to occur of:
1)    the day You first start work; or
2)    the end of the Elimination Period.

If You are Disabled and not receiving benefits under the Return to Work Incentive, We will calculate Your Monthly Benefit as follows:
1)    multiply Your Monthly Income Loss by the Benefit Percentage;
2)    compare the result with the Maximum Benefit; and
3)    from the lesser amount, deduct Other Income Benefits.
The result is Your Monthly Benefit.

**Calculation of Monthly Benefit:**  *What happens if the sum of my Monthly Benefit, Current Monthly Earnings, and Other Income Benefits exceeds 100% of my Pre-disability Earnings?*
If the sum of Your Monthly Benefit, Current Monthly Earnings, and Other Income Benefits exceeds 100% of Your Pre-disability Earnings, We will reduce Your Monthly Benefit by the amount of the excess.  However, Your Monthly Benefit will not be less than the Minimum Monthly Benefit.

If an overpayment occurs, We may recover all or any portion of the overpayment, in accordance with the Overpayment Recovery provision.

**Minimum Monthly Benefit:**  *Is there a Minimum Monthly Benefit?*
Your Monthly Benefit will not be less than the Minimum Monthly Benefit shown in the Schedule of Insurance.

**Partial Month Payment:**  *How is the benefit calculated for a period of less than a month?*
If a Monthly Benefit is payable for a period of less than a month, We will pay 1/30 of the Monthly Benefit for each day You were Disabled.

**Termination of Payment:**  *When will my benefit payments end?*
Benefit payments will stop on the earliest of:
1)    the date You are no longer Disabled;
2)    the date You fail to furnish Proof of Loss;
3)    the date You are no longer under the Regular Care of a Physician;
4)    the date You refuse Our request that You submit to an examination by a Physician or other qualified medical professional;
5)    the date of Your death;
6)    the date You refuse to receive recommended treatment that is generally acknowledged by Physicians to cure, correct or limit the disabling condition;
7)    the last day benefits are payable according to the Maximum Duration of Benefits Table;
8)    the date Your Current Monthly Earnings:
    a)    are equal to or greater than 80% of Your Indexed Pre-disability Earnings if You are receiving benefits for being Disabled from Your Occupation; or
    b)    are greater than the lesser of the product of Your Indexed Pre-disability Earnings and the Benefit Percentage or the Maximum Monthly Benefit if You are receiving benefits for being Disabled from Any Occupation;
9)    the date no further benefits are payable under any provision in The Policy that limits benefit duration;
10)   the date You refuse to participate in a Rehabilitation program, or refuse to cooperate with or try:
    a)    modifications made to the work site or job process to accommodate Your identified medical limitations to enable You to perform the Essential Duties of Your Occupation;
    b)    adaptive equipment or devices designed to accommodate Your identified medical limitations to enable You to perform the Essential Duties of Your Occupation;

    c) modifications made to the work site or job process to accommodate Your identified medical limitations to enable You to perform the Essential Duties of Any Occupation, if You were receiving benefits for being disabled from Any Occupation; or

    d) adaptive equipment or devices designed to accommodate Your identified medical limitations to enable You to perform the Essential Duties of Any Occupation, if You were receiving benefits for being disabled from Any Occupation;

provided a qualified Physician or other qualified medical professional agrees that such modifications, Rehabilitation program or adaptive equipment accommodate Your medical limitation; or

11) the date You receive retirement benefits from any employer's Retirement Plan, unless:

    a) You were receiving them prior to becoming Disabled; or

    b) You immediately transfer the payment to another plan qualified by the United States Internal Revenue Service for the funding of a future retirement.

**Family Care Credit Benefit:** *What if I must incur expenses for Family Care Services in order to participate in a Rehabilitation program?*

If You are working as part of a program of Rehabilitation, We will, for the purpose of calculating Your benefit, deduct the cost of Family Care from earnings received from work as a part of a program of Rehabilitation, subject to the following limitations:

1) Family Care means the care or supervision of:
    a) Your children under age 13; or
    b) a member of Your household who is mentally or physically handicapped and dependent upon You for support and maintenance;
2) the maximum monthly deduction allowed for each qualifying child or family member is:
    a) $350 during the first 12 months of Rehabilitation; and
    b) $175 thereafter;
but in no event may the deduction exceed the amount of Your monthly earnings;
3) Family Care Credits may not exceed a total of $2,500 during a calendar year;
4) the deduction will be reduced proportionally for periods of less than a month;
5) the charges for Family Care must be documented by a receipt from the caregiver;
6) the credit will cease on the first to occur of the following:
    a) You are no longer in a Rehabilitation program; or
    b) Family Care Credits for 24 months have been deducted during Your Disability; and
7) no Family Care provided by someone Related to the family member receiving the care will be eligible as a deduction under this provision.

Your Current Monthly Earnings after the deduction of Your Family Care Credit will be used to determine Your Monthly Income Loss. In no event will You be eligible to receive a Monthly Benefit under The Policy if Your Current Monthly Earnings before the deduction of the Family Care Credit exceed 80% of Your Indexed Pre-disability Earnings.

**Survivor Income Benefit:** *Will my survivors receive a benefit if I die while receiving Disability Benefits?*

If You were receiving a Monthly Benefit at the time of Your death, We will pay a Survivor Income Benefit, when We receive proof satisfactory to Us:

1) of Your death; and
2) that the person claiming the benefit is entitled to it.

We must receive the satisfactory proof for Survivor Income Benefits within 1 year of the date of Your death.

The Survivor Income Benefit will only be paid:

1) to Your Surviving Spouse; or
2) if no Surviving Spouse, in equal shares to Your Surviving Children.

If there is no Surviving Spouse or Surviving Children, then no benefit will be paid.

However, We will first apply the Survivor Income Benefit to any overpayment which may exist on Your claim.

If a minor child is entitled to benefits, We may, at Our option, make benefit payments to the person caring for and supporting the child until a legal guardian is appointed.

The Survivor Income Benefit is calculated as 3 times the lesser of:

1) Your Monthly Income Loss multiplied by the Benefit Percentage in effect on the date of Your death; or
2) The Maximum Monthly Benefit.

**Surviving Spouse** means Your wife or husband who was not legally separated or divorced from You when You died.

**Surviving Children** means Your unmarried children, step children, legally adopted children who, on the date You die, are primarily dependent on You for support and maintenance and who are under age 24.

The term Surviving Children will also include any other children related to You by blood or marriage and who:
1) lived with You in a regular parent-child relationship; and
2) were eligible to be claimed as dependents on Your federal income tax return for the last tax year prior to Your death.

**Workplace Modification Benefit:** *Will the Rehabilitation program provide for modifications to my workplace to accommodate my return to work?*
We will reimburse Your Employer for the expense of reasonable Workplace Modifications to accommodate Your Disability and enable You to return to work as an Active Employee. You qualify for this benefit if:
1) Your Disability is covered by The Policy;
2) the Employer agrees to make modifications to the workplace in order to reasonably accommodate Your return to work and the performance of the Essential Duties of Your job; and
3) We approve, in writing, any proposed Workplace Modifications.

Benefits paid for such Workplace Modification shall not exceed the amount equal to the amount of the Maximum Monthly Benefit.

We have the right, at Our expense, to have You examined or evaluated by:
1) a Physician or other health care professional; or
2) a vocational expert or rehabilitation specialist;
of Our choice so that We may evaluate the appropriateness of any proposed modification.

We will reimburse the Employer's costs for approved Workplace Modifications after:
1) the proposed modifications made on Your behalf are complete;
2) We have been provided written proof of the expenses incurred to provide such modification; and
3) You have returned to work as an Active Employee.

**Workplace Modification** means change in Your work environment, or in the way a job is performed, to allow You to perform, while Disabled, the Essential Duties of Your job. Payment of this benefit will not reduce or deny any benefit You are eligible to receive under the terms of The Policy.

## EXCLUSIONS AND LIMITATIONS

**Exclusions:** *What Disabilities are not covered?*
The Policy does not cover, and We will not pay a benefit for, any Disability:
1) unless You are under the Regular Care of a Physician;
2) that is caused or contributed to by war or act of war, whether declared or not;
3) caused by Your commission of or attempt to commit a felony;
4) caused or contributed to by Your being engaged in an illegal occupation; or
5) caused or contributed to by an intentionally self-inflicted injury.

If You are receiving or are eligible for benefits for a Disability under a prior disability plan that:
1) was sponsored by Your Employer; and
2) was terminated before the Effective Date of The Policy;
no benefits will be payable for the Disability under The Policy.

**Pre-existing Condition Limitation:** *Are benefits limited for Pre-existing Conditions?*
We will not pay any benefit, or any increase in benefits, under The Policy for any Disability that results from, or is caused or contributed to by, a Pre-existing Condition, unless, at the time You become Disabled:
1) You have not received Medical Care for the condition for 3 consecutive month(s) while insured under The Policy; or
2) You have been continuously insured under The Policy for 12 consecutive month(s).

SA-214

**Pre-existing Condition** means:
1) any accidental bodily injury, sickness, Mental Illness, pregnancy, or episode of Substance Abuse; or
2) any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, Mental Illness, pregnancy, or Substance Abuse;

for which You received Medical Care during the 3 consecutive month(s) period that ends the day before:
1) Your effective date of coverage; or
2) the effective date of a Change in Coverage.

**Medical Care** is received when a Physician or other health care provider:
1) is consulted or gives medical advice; or
2) recommends, prescribes, or provides Treatment.

**Treatment** includes but is not limited to:
1) medical examinations, tests, attendance or observation; and
2) use of drugs, medicines, medical services, supplies or equipment.

# GENERAL PROVISIONS

**Notice of Claim:**  *When should I notify the Company of a claim?*
You must give Us written notice of a claim within 30 days after Disability or loss occurs.  Failure to give notice within such time shall not invalidate or reduce any claim if it shall be shown not to have been reasonably possible to give such notice and that notice was given as soon as was reasonably possible.  Such notice must include Your name, Your address and the Policy Number.

**Claim Forms:**  *Are special forms required to file a claim?*
We will send forms to You to provide Proof of Loss, within 15 days of receiving a Notice of Claim.  If We do not send the forms within 15 days, You may submit any other written proof which fully describes the nature and extent of Your claim.

**Proof of Loss:**  *What is Proof of Loss?*
Proof of Loss may include but is not limited to the following:
1) documentation of:
   a) the date Your Disability began;
   b) the cause of Your Disability;
   c) the prognosis of Your Disability;
   d) Your Pre-disability Earnings, Current Monthly Earnings or any income, including but not limited to copies of Your filed and signed federal and state tax returns; and
   e) evidence that You are under the Regular Care of a Physician;
2) any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes;
3) the names and addresses of all:
   a) Physicians or other qualified medical professionals You have consulted;
   b) hospitals or other medical facilities in which You have been treated; and
   c) pharmacies which have filled Your prescriptions within the past three years;
4) Your signed authorization for Us to obtain and release:
   a) medical, employment and financial information; and
   b) any other information We may reasonably require;
5) Your signed statement identifying all Other Income Benefits; and
6) proof that You and Your dependents have applied for all Other Income Benefits which are available.

You will not be required to claim any retirement benefits which You may only get on a reduced basis.  All proof submitted must be satisfactory to Us.

**Additional Proof of Loss:**  *What Additional Proof of Loss is the Company entitled to?*
To assist Us in determining if You are Disabled, or to determine if You meet any other term or condition of The Policy, We have the right to require You to:
1) meet and interview with Our representative; and
2) be examined by a Physician, vocational expert, functional expert, or other medical or vocational professional of Our choice.

Any such interview, meeting or examination will be:

17

Case: 18-3206 Document: 11-6 Filed: 01/18/2019 Pages: 50

1) at Our expense; and
2) as reasonably required by Us.

Your Additional Proof of Loss must be satisfactory to Us. Unless We determine You have a valid reason for refusal, We may deny, suspend or terminate Your benefits if You refuse to be examined or meet to be interviewed by Our representative.

**Sending Proof of Loss:** *When must Proof of Loss be given?*
Written Proof of Loss must be sent to Us within 90 days following the completion of the Elimination Period. If proof is not given by the time it is due, it will not affect the claim if:
1) it was not reasonably possible to give proof within the required time; and
2) proof is given as soon as reasonably possible; but
3) not later than 1 year after it is due, unless You are not legally competent.

We may request Proof of Loss throughout Your Disability, as reasonably required. In such cases, We must receive the proof within 30 day(s) of the request.

**Claim Payment:** *When are benefit payments issued?*
When We determine that You;
1) are Disabled; and
2) eligible to receive benefits;

We will pay accrued benefits at the end of each month that You are Disabled. We may, at Our option, make an advance benefit payment based on Your estimated duration of Your Disability. If any payment is due after a claim is terminated, it will be paid as soon as Proof of Loss satisfactory to Us is received.

Benefits may be subject to interest payments as required by applicable law.

**Claims to be Paid:** *To whom will benefits for my claim be paid?*
All payments are payable to You. Any payments owed at Your death may be paid to Your estate. If any payment is owed to:
1) Your estate;
2) a person who is a minor; or
3) a person who is not legally competent;

then We may pay up to $1,000 to a person who is Related to You and who, at Our sole discretion, is entitled to it. Any such payment shall fulfill Our responsibility for the amount paid.

**Claim Denial:** *What notification will I receive if my claim is denied?*
If a claim for benefits is wholly or partly denied, You will be furnished with written notification of the decision. This written notification will:
1) give the specific reason(s) for the denial;
2) make specific reference to The Policy provisions on which the denial is based;
3) provide a description of any additional information necessary to perfect a claim and an explanation of why it is necessary; and
4) provide an explanation of the review procedure.

**Claim Appeal:** *What recourse do I have if my claim is denied?*
On any claim, You or Your representative may appeal to Us for a full and fair review. To do so You:
1) must request a review upon written application within:
   a) 180 days of receipt of claim denial if the claim requires Us to make a determination of disability; or
   b) 60 days of receipt of claim denial if the claim does not require Us to make a determination of disability; and
2) may request copies of all documents, records, and other information relevant to Your claim; and
3) may submit written comments, documents, records and other information relating to Your claim.

We will respond to You in writing with Our final decision on the claim.

**Social Security:** *When must I apply for Social Security Benefits?*
You must apply for Social Security disability benefits when the length of Your Disability meets the minimum duration required to apply for such benefits. You must apply within 45 days from the date of Our request. If the Social Security Administration denies Your eligibility for benefits, You will be required:
1) to follow the process established by the Social Security Administration to reconsider the denial; and
2) if denied again, to request a hearing before an Administrative Law Judge of the Office of Hearing and Appeals.

**Benefit Estimates:** *How does the Company estimate Disability benefits under the United States Social Security Act?*
We reserve the right to reduce Your Monthly Benefit by estimating the Social Security disability benefits You or Your spouse and children may be eligible to receive.

When We determine that You or Your dependent may be eligible for benefits, We may estimate the amount of these benefits. We may reduce Your Monthly Benefit by the estimated amount.
Your Monthly Benefit will not be reduced by estimated Social Security disability benefits if:
1) You apply for Social Security disability benefits and pursue all required appeals in accordance with the Social Security provision; and
2) You have signed a form authorizing the Social Security Administration to release information about awards directly to Us; and
3) You have signed and returned Our reimbursement agreement, which confirms that You agree to repay all overpayments.

If We have reduced Your Monthly Benefit by an estimated amount and:
1) You or Your dependent are later awarded Social Security disability benefits, We will adjust Your Monthly Benefit when We receive proof of the amount awarded, and determine if it was higher or lower than Our estimate; or
2) Your application for Social Security disability benefits has been denied, We will adjust Your Monthly Benefit when You provide Us proof of final denial from which You cannot appeal from an Administrative Law Judge of the Office of Hearing and Appeals.

If Your Social Security benefits were lower than We estimated, and We owe You a refund, We will make such refund in a lump sum. If Your Social Security benefits were higher than We estimated, and if Your Monthly Benefit has been overpaid, You must make a lump sum refund to Us equal to all overpayments, in accordance with the Overpayment Recovery provision.

**Overpayment:** *When does an overpayment occur?*
An overpayment occurs:
1) when We determine that the total amount We have paid in benefits is more than the amount that was due to You under The Policy; or
2) when payment is made by Us that should have been made under another group policy.

This includes, but is not limited to, overpayments resulting from:
1) retroactive awards received from sources listed in the Other Income Benefits definition;
2) failure to report, or late notification to Us of any Other Income Benefit(s) or earned income;
3) misstatement;
4) fraud; or
5) any error We may make.

**Overpayment Recovery:** *How does the Company exercise the right to recover overpayments?*
We have the right to recover from You any amount that We determine to be an overpayment. You have the obligation to refund to Us any such amount. Our rights and Your obligations in this regard may also be set forth in the reimbursement agreement You will be required to sign when You become eligible for benefits under The Policy.

If benefits are overpaid on any claim, You must reimburse Us within 30 days.

If reimbursement is not made in a timely manner, We have the right to:
1) recover such overpayments from:
   a) You;
   b) any other organization;
   c) any other insurance company;
   d) any other person to or for whom payment was made; and
   e) Your estate;
2) reduce or offset against any future benefits payable to You or Your survivors, including the Minimum Monthly Benefit, until full reimbursement is made. Payments may continue when the overpayment has been recovered;
3) refer Your unpaid balance to a collection agency; and
4) pursue and enforce all legal and equitable rights in court.

**Subrogation:** *What are the Company's subrogation rights?*
If You:

1) suffer a Disability because of the act or omission of a Third Party;
2) become entitled to and are paid benefits under The Policy in compensation for lost wages; and
3) do not initiate legal action for the recovery of such benefits from the Third Party in a reasonable period of time;
then We will be subrogated to any rights You may have against the Third Party and may, at Our option, bring legal action against the Third Party to recover any payments made by Us in connection with the Disability.

**Third Party** as used in this provision, means any person or legal entity whose act or omission, in full or in part, causes You to suffer a Disability for which benefits are paid or payable under The Policy.

**Reimbursement:**  *What are the Company's Reimbursement Rights?*
We have the right to request to be reimbursed for any benefit payments made or required to be made under The Policy for a Disability for which You recover payment from a Third Party.

If You recover payment from a Third Party as:
   a) a legal judgment;
   b) an arbitration award; or
   c) a settlement or otherwise;
You must reimburse Us for the lesser of:
   a) the amount of payment made or required to be made by Us; or
   b) the amount recovered from the Third Party less any reasonable legal fees associated with the recovery.

**Third Party** as used in this provision, means any person or legal entity whose act or omission, in full or in part, causes You to suffer a Disability for which benefits are paid or payable under The Policy.

**Legal Actions:**  *When can legal action be taken against Us?*
Legal action cannot be taken against Us:
   1) sooner than 60 days after the date Proof of Loss is given; or
   2) more than 3 years after the date Proof of Loss is required to be given according to the terms of The Policy.

**Insurance Fraud:**  *How does the Company deal with fraud?*
Insurance Fraud occurs when You and/or Your Employer provide Us with false information or file a claim for benefits that contains any false, incomplete or misleading information with the intent to injure, defraud or deceive Us.  It is a crime if You and/or Your Employer commit Insurance Fraud.  We will use all means available to Us to detect, investigate, deter and prosecute those who commit Insurance Fraud.  We will pursue all available legal remedies if You and/or Your Employer perpetrate Insurance Fraud.

**Misstatements:**  *What happens if facts are misstated?*
If material facts about You were not stated accurately:
   1) Your premium may be adjusted; and
   2) the true facts will be used to determine if, and for what amount, coverage should have been in force.

No statement, except fraudulent misstatements, made by You relating to Your insurability will be used to contest the insurance for which the statement was made after the insurance has been in force for two years during Your lifetime.  In order to be used, the statement must be in writing and signed by You.

All statements made by the Policyholder, the Employer or You under The Policy will be deemed representations and not warranties.  No statement will be used to affect this insurance will be used in any contest unless it is in writing and a copy of it is given to the person who made it, or to his or her beneficiary or Your representative.

**Policy Interpretation:**  *Who interprets the terms and conditions of The Policy?*
We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy.  This provision applies where the interpretation of The Policy is governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA).

**Physical Examinations and Autopsy:**  *Will I be examined during the course of my claim?*
While a claim is pending We have the right at Our expense:
   1) to have the person who has a loss examined by a Physician when and as often as reasonably necessary; and
   2) to make an autopsy in case of death where it is not forbidden by law.

## DEFINITIONS

**Actively at Work** means at work with the Employer on a day that is one of the Employer's scheduled workdays. On that day, You must be performing for wage or profit all of the regular duties of Your Occupation:
1) in the usual way; and
2) for Your usual number of hours.

We will consider You Actively at Work on a day that is not a scheduled work day only if You were Actively at Work on the preceding scheduled work day.

**Active Employee** means an employee who works for the Employer on a regular basis in the usual course of the Employer's business. This must be at least the number of hours shown in the Schedule of Insurance.

**Any Occupation** means any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of:
1) the product of Your Indexed Pre-disability Earnings and the Benefit Percentage; or
2) the Maximum Monthly Benefit.

**Current Monthly Earnings** means monthly earnings You receive from:
1) Your Employer; and
2) other employment;
while You are Disabled.

However, if the other employment is a job You held in addition to Your job with Your Employer, then during any period that You are entitled to benefits for being Disabled from Your Occupation, only the portion of Your earnings that exceeds Your average earnings from the other employer over the 6 month period just before You became Disabled will count as Current Monthly Earnings.

Current Monthly Earnings also includes the pay You could have received for another job or a modified job if:
1) such job was offered to You by Your Employer, or another employer, and You refused the offer; and
2) the requirements of the position were consistent with:
   a) Your education, training and experience; and
   b) Your capabilities as medically substantiated by Your Physician.

**Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of:
1) Your Occupation during the Elimination Period;
2) Your Occupation, for the 24 months following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
3) after that, Any Occupation.

If at the end of the Elimination Period, You are prevented from performing one or more of the Essential Duties of Your Occupation, but Your Current Monthly Earnings are equal to or greater than 80% of Your Pre-disability Earnings, Your Elimination Period will be extended for a total period of 12 months from the original date of Disability, or until such time as Your Current Monthly Earnings are less than 80% of Your Pre-disability Earnings, whichever occurs first. For the purposes of extending Your Elimination Period, Your Current Monthly Earnings will not include the pay You could have received for another job or a modified job if such job was offered to You by Your Employer, or another employer, and You refused the offer.

Your Disability must result from:
1) accidental bodily injury;
2) sickness;
3) Mental Illness;
4) Substance Abuse; or
5) pregnancy.
Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation, alone, does not mean that You are Disabled.

SA-219

**Elimination Period** means the longer of the number of consecutive days at the beginning of any one period of Disability which must elapse before benefits are payable or the expiration of any Employer sponsored short term Disability benefits or salary continuation program, excluding benefits required by state law.

**Employer** means the Policyholder.

**Indexed Pre-disability Earnings** means Your Pre-disability Earnings adjusted annually by adding the lesser of:
1) 10%; or
2) the percentage change in the Consumer Price Index (CPI-W).

The percentage change in the CPI-W means the difference between the current year's CPI-W as of July 31, and the prior year's CPI-W as of July 31, divided by the prior year's CPI-W.  The adjustment is made January 1st each year after You have been Disabled for 12 consecutive month(s), provided You are receiving benefits at the time the adjustment is made.

The term Consumer Price Index (CPI-W) means the index for Urban Wage Earners and Clerical Workers published by the United States Department of Labor.  It measures on a periodic (usually monthly) basis the change in the cost of typical urban wage earners' and clerical workers' purchase of certain goods and services.  If the index is discontinued or changed, We may use another nationally published index that is comparable to the CPI-W.

**Mental Illness** means a mental disorder as listed in the current version of the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association.  A Mental Illness may be caused by biological factors or result in physical symptoms or manifestations.

For the purpose of The Policy, Mental Illness does not include the following mental disorders outlined in the Diagnostic and Statistical Manual of Mental Disorders:
1) Mental Retardation;
2) Pervasive Developmental Disorders;
3) Motor Skills Disorder;
4) Substance-Related Disorders;
5) Delirium, Dementia, and Amnesic and Other Cognitive Disorders; or
6) Narcolepsy and Sleep Disorders related to a General Medical Condition.

**Monthly Benefit** means a monthly sum payable to You while You are Disabled, subject to the terms of The Policy.

**Monthly Income Loss** means Your Pre-disability Earnings minus Your Current Monthly Earnings.

**Other Income Benefits** means the amount of any benefit for loss of income, provided to You or Your family, as a result of the period of Disability for which you are claiming benefits under The Policy.  This includes any such benefits that are paid to You or Your family, or to a third party on Your behalf, pursuant to any:
1) temporary, permanent disability, or impairment benefits under a Workers' Compensation Law, the Jones Act, occupational disease law, similar law or substitutes or exchanges for such benefits;
2) governmental law or program that provides disability or unemployment benefits as a result of Your job with Your Employer;
3) plan or arrangement of coverage, whether insured or not, which is received from Your Employer as a result of employment by or association with Your Employer or which is the result of membership in or association with any group, association, union or other organization;
4) mandatory "no-fault" automobile insurance plan;
5) disability benefits under:
   a) the United States Social Security Act or alternative plan offered by a state or municipal government;
   b) the Railroad Retirement Act;
   c) the Canada Pension Plan, the Canada Old Age Security Act, the Quebec Pension Plan or any provincial pension or disability plan; or
   d) similar plan or act;
   that You, Your spouse and/or children, are eligible to receive because of Your Disability; or
6) disability benefit from the Department of Veterans Affairs, or any other foreign or domestic governmental agency:
   a) that begins after You become Disabled; or
   b) that You were receiving before becoming Disabled, but only as to the amount of any increase in the benefit attributed to Your Disability.

22

SA-220

Other Income Benefits also means any payments that are made to You or to Your family, or to a third party on Your behalf, pursuant to any:

1) disability benefit under Your Employer's Retirement Plan;
2) temporary, permanent disability or impairment benefits under a Workers' Compensation Law, the Jones Act, occupational disease law, similar law or substitutes or exchanges for such benefits;
3) portion of a judgment or settlement, minus associated costs, of a claim or lawsuit that represents or compensates for Your loss of earnings; or
4) retirement benefits under:
   a) the United States Social Security Act or alternative plan offered by a state or municipal government;
   b) the Railroad Retirement Act;
   c) the Canada Pension Plan, the Canada Old Age Security Act, the Quebec Pension Plan or any provincial pension or disability plan; or
   d) similar plan or act;
   that You, Your spouse and/or children receive because of Your retirement, unless You were receiving them prior to becoming Disabled.

If You are paid Other Income Benefits in a lump sum or settlement, You must provide proof satisfactory to Us of:
1) the amount attributed to loss of income; and
2) the period of time covered by the lump sum or settlement.

We will pro-rate the lump sum or settlement over this period of time.  If You cannot or do not provide this information, We will assume the entire sum to be for loss of income, and the time period to be 24 month(s).  We may make a retroactive allocation of any retroactive Other Income Benefit.  A retroactive allocation may result in an overpayment of Your claim.

The amount of any increase in Other Income Benefits will not be included as Other Income Benefits if such increase:
1) takes effect after the date benefits become payable under The Policy; and
2) is a general increase which applies to all persons who are entitled to such benefits.

**Physician** means a person who is:
1) a doctor of medicine, osteopathy, psychology or other legally qualified practitioner of a healing art that We recognize or are required by law to recognize;
2) licensed to practice in the jurisdiction where care is being given;
3) practicing within the scope of that license; and
4) not You or Related to You by blood or marriage.

**Pre-disability Earnings** means Your regular monthly rate of pay from Your Employer based on Your Statement of Wages Earned and Taxes Withheld (Form W-2) for:
1) the one full tax year immediately prior to the last day You were Actively at Work before You became Disabled; or
2) the total number of calendar months You worked for Your Employer as an Active Employee, if less than the above period.

**Prior Policy** means the long term disability insurance carried by the Employer on the day before the Policy Effective Date.

**Regular Care of a Physician** means that You are being treated by a Physician:
1) whose medical training and clinical experience are suitable to treat Your disabling condition; and
2) whose treatment is:
   a) consistent with the diagnosis of the disabling condition;
   b) according to guidelines established by medical, research, and rehabilitative organizations; and
   c) administered as often as needed;
   to achieve the maximum medical improvement.

**Rehabilitation** means a process of Our working together with You in order for Us to plan, adapt, and put into use options and services to meet Your return to work needs.  A Rehabilitation program may include, when We consider it to be appropriate, any necessary and feasible:
1) vocational testing;
2) vocational training;
3) alternative treatment plans such as:
   a) support groups;
   b) physical therapy;
   c) occupational therapy; or

   d)  speech therapy;
4)  work-place modification to the extent not otherwise provided;
5)  job placement;
6)  transitional work; and
7)  similar services.

**Related** means Your spouse, or other adult living with You, or Your sibling, parent, step-parent, grandparent, aunt, uncle, niece, nephew, son, daughter, or grandchild.

**Retirement Plan** means a defined benefit or defined contribution plan that provides benefits for Your retirement and which is not funded wholly by Your contributions.  It does not include:
1)  a profit sharing plan;
2)  thrift, savings or stock ownership plans;
3)  a non-qualified deferred compensation plan; or
4)  an individual retirement account (IRA), a tax sheltered annuity (TSA), Keogh Plan, 401(k) plan, 403(b) plan or 457 deferred compensation arrangement.

**Substance Abuse** means the pattern of pathological use of alcohol or other psychoactive drugs and substances characterized by:
1)  impairments in social and/or occupational functioning;
2)  debilitating physical condition;
3)  inability to abstain from or reduce consumption of the substance; or
4)  the need for daily substance use to maintain adequate functioning.

Substance includes alcohol and drugs but excludes tobacco and caffeine.

**The Policy** means the policy which We issued to the Policyholder under the Policy Number shown on the face page.

**We, Our, or Us** means the insurance company named on the face page of The Policy.

**Your Occupation** means Your Occupation as it is recognized in the general workplace.  Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location.

**You or Your** means the person to whom this certificate is issued.

**Amendatory Rider**



## HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
### 200 Hopmeadow Street
### Simsbury, Connecticut 06089
### (A stock insurance company)

This rider is attached to a certificate given in connection with The Policy.

This rider becomes effective on the certificate effective date.

This rider is intended to amend Your certificate, as indicated below, to comply with the laws of Your state of residence. Only those references to benefits, provisions or terms actually included in Your certificate will affect Your coverage. However, if Your policy is governed under the laws of Maryland, any of the benefits, provisions or terms that apply to the state you reside in as shown below will apply only to the extent that such state requirements are more beneficial to You.

For <u>Alaska</u> residents:
1) The provision titled **Policy Interpretation** is deleted in its entirety.
2) The following provision is added to the **General Provisions** section of Your certificate:
   **Eligibility Determination**: How will We determine Your eligibility for benefits?
   We, and not Your Employer or plan administrator, have the responsibility to fairly, thoroughly, objectively and timely investigate, evaluate and determine Your eligibility or Your Spouse's or Your beneficiaries for benefits for any claim You or Your Spouse or Your beneficiaries make on The Policy.
   We will:
   1) obtain with Your or Your Spouse's cooperation and authorization if required by law, only such information that is necessary to evaluate Your or Your Spouse's claim and decide whether to accept or deny Your or Your Spouse's claim for benefits. We may obtain this information from Your or Your Spouse's Notice of Claim, submitted proofs of loss, statements, or other materials provided by You or Your Spouse or others on Your or Your Spouse's behalf; or, at Our expense We may obtain necessary information, or have You or Your Spouse physically examined when and as often as We may reasonably require while the claim is pending. In addition, and at Your or Your Spouse's option and at Your or Your Spouse's expense, You or Your Spouse may provide Us and We will consider any other information, including but not limited to, reports from a Physician or other expert of Your or Your Spouse's choice. You or Your Spouse should provide Us with all information that You or Your Spouse want Us to consider regarding Your or Your Spouse's claim;
   2) consider and interpret The Policy and all information obtained by Us and submitted by You or Your Spouse that relates to Your or Your Spouse's claim for benefits and make Our determination of Your or Your Spouse's eligibility for benefits based on that information and in accordance with The Policy and applicable law;
   3) if We approve Your or Your Spouse's claim, We will review Our decision to approve Your or Your Spouse's claim for benefits as often as is reasonably necessary to determine Your or Your Spouse's continued eligibility for benefits;
   4) if We deny Your or Your Spouse's claim, We will explain in writing to You or Your Spouse or Your beneficiaries the basis for an adverse determination in accordance with The Policy as described in the provision entitled **Claim Denial**.
   In the event We deny Your or Your Spouse's claim for benefits, in whole or in part, You can appeal the decision to Us. If You or Your Spouse choose to appeal Our decision, the process You or Your Spouse must follow is set forth in The Policy provision entitled **Claim Appeal**. If You or Your Spouse do not appeal the decision to Us, then the decision will be Our final decision.

For <u>Arkansas</u> residents:
   The provision titled **Policy Interpretation** is deleted in its entirety.

For Colorado residents:
1) The **Change in Family Status** provision is amended to read as follows:
   **Change in Family Status:** *What constitutes a Change in Family Status?*
   1) You get married or enter a civil union or You execute a domestic partner affidavit;
   2) You or Your spouse divorce or terminate a civil union or You terminate a domestic partnership;
   3) Your child is born or You adopt or become the legal guardian of a child;
   4) Your spouse or party to a civil union or domestic partner dies;
   5) Your child is emancipated or dies;
   6) Your spouse or party to a civil union or domestic partner is no longer employed, which results in a loss of group insurance; or
   7) You have a change in classification from part-time to full-time or from full-time to part-time.
2) The definition of **Surviving Spouse** in the **Survivor Income Benefit** is amended to read as follows:
   **Surviving Spouse** means Your wife or husband who was not legally separated or divorced from You when You died.  Spouse will include Your partner in a civil union.
   "Spouse" will include Your domestic partner provided You:
   1) have executed a domestic partner affidavit satisfactory to Us, establishing that You and Your partner are domestic partners for purposes of The Policy: or
   2) have registered as domestic partners with a government agency or office where such registration is available and provide proof of such registration unless requiring proof is prohibited by law.
   You will continue to be considered domestic partners provided You continue to meet the requirements described in the domestic partner affidavit or required by law.
3) The definition of **Surviving Children** in the **Survivor Income Benefit** is amended to read as follows:
   **Surviving Children** means Your unmarried children, step children, legally adopted children who, on the date You die, are primarily dependent on You for support and maintenance and who are:
   1) under age 19; or
   2) between the ages of age 19 and 23, inclusive, and in full-time attendance at an institution of learning.
   The term Surviving Children will also include any other children related to You by blood or marriage or civil union or domestic partnership and who:
   1) lived with You in a regular parent-child relationship; and
   2) were eligible to be claimed as dependents on Your federal income tax return for the last tax year prior to Your death.

For Delaware residents:
The definition of **Surviving Spouse** in the **Survivor Income Benefit** is amended to read as follows:
**Surviving Spouse** means Your spouse who was not legally separated or divorced from You when You died.
"Spouse" will include Your domestic partner provided You:
1) have executed a domestic partner affidavit satisfactory to Us, establishing that You and Your partner are domestic partners for purposes of The Policy; or
2) have registered as domestic partners with a government agency or office where such registration is available and provide proof of such registration unless requiring proof is prohibited by law.
You will continue to be considered domestic partners provided You continue to meet the requirements described in the Domestic Partner Affidavit or required by law.

For Indiana residents, the following sentence is added to the **Policy Interpretation** provision:
This provision applies where the interpretation of The Policy is governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA).

For Louisiana residents, the following provision is added:
**Reinstatement after Military Service**: *Can my coverage be reinstated after return from active military service?*
If Your coverage terminates because You enter active military service, coverage for You may be reinstated, provided You request such reinstatement upon Your return to work from active military service.

The reinstated coverage will:
1) be the same coverage amounts in force on the date coverage terminated; and
2) not be subject to any Waiting Period for Coverage, Evidence of Insurability or Pre-existing Conditions Limitations; and be subject to all the terms and provisions of The Policy Reference.

For Massachusetts residents,
1) The following is added to the **Continuation Provisions**:

In accordance with Massachusetts state law, if Your insurance terminates because Your employment terminates or You cease to be a member of an eligible class, Your insurance will automatically be continued until the end of a 31 day period from the date Your insurance terminates or the date You become eligible for similar benefits under another group plan, whichever occurs first.

Additionally, if Your insurance terminates because Your employment is terminated as a result of a plant closing or covered partial closing, Your insurance may be continued.  You must elect in writing to continue insurance and pay the required premium for continued coverage.  Coverage will cease on the earliest to occur of the following dates:

    1)   90 days from the date You were no longer eligible for coverage as a Full-time Active Employee;
    2)   the date You become eligible for similar benefits under another group plan;
    3)   the last day of the period for which required premium is made;
    4)   the date the group insurance policy terminates; or
    5)   the date Your Employer ceases to be a Participant Employer, if applicable.

Continued coverage is subject to all other applicable terms and conditions of The Policy.

2)   The **Surviving Children** definition in the **Survivor Income Benefit** will also include a child in the process of adoption.

For <u>Maine</u> residents, the following provision is added:

**Reinstatement:** *Can my coverage be reinstated after it ends?*

We will reinstate The Policy upon receipt of all current and late premiums if:

    1)   You, any person authorized to act on Your behalf, or any of Your dependents may request reinstatement of The Policy within 90 days following cancellation of The Policy for nonpayment of premium provided You suffered from cognitive impairment or functional incapacity at the time the contract cancelled; and
    2)   all current and late premium payments are received within 15 days of Our request.

We may request a medical demonstration, at Your expense, that You suffered from cognitive impairment or functional incapacity at the time of cancellation of The Policy.

For <u>Minnesota</u> residents:

    1)   the definition of **Any Occupation** is amended by the addition of the phrase "or may reasonably become qualified" to the first line;
    2)   The first two paragraphs of the **Pre-Existing Conditions Limitation** provision are deleted and replaced by the following:

No benefit will be payable under The Policy for any Disability that is due to, contributed to by, or results from a Pre-Existing Condition, unless such Disability or loss is incurred:

    1)   After the lesser of the last day of:
        a)   the number of days stated in Your certificate; or
        b)   730 consecutive days;
       while insured, during which you receive no medical care for the Pre-Existing Condition; or
    2)   After the lesser of the last day of:
        a)   the number of days stated in Your certificate; or
        b)   730 consecutive days;
       during which you have been continuously insured under The Policy.

The amount of a benefit increase, which results from a change in benefit options, a change of class or a change in The Policy, will not be paid for any disability that is due to, contributed to by, or results from a Pre-Existing Condition, unless such Disability begins:

    1)   After the lesser of the last day of :
        a)   the number of days stated in Your certificate; or
        b)   730 consecutive days;
       while insured for the increased benefit amount during which you receive no medical care for the Pre-Existing Condition; or
    2)   After the lesser of the last day of :
        a)   the number of days stated in Your certificate; or
        b)   730 consecutive days;
       during which you have been continuously insured for the increased benefit amount.

    3)   The definition of **Pre-existing Condition** in the **Pre-Existing Conditions Limitation** provision is deleted and is replaced by the following:

**Pre-existing Condition** means any accidental bodily injury, sickness, Mental Illness, pregnancy, or episode of Substance Abuse for which You received Medical Care during the lesser of:

SA-225

1)  the period of time stated in Your certificate; or
2)  the 730 day period;
that ends the day before:
1)  Your effective date of coverage; or
2)  the effective date of a Change in Coverage.

For <u>Missouri</u> residents, the **Exclusion** related to intentionally self-inflicted Injury is replaced by the following:
  intentionally self-inflicted Injury, suicide or attempted suicide, while sane; or

For <u>Montana</u> residents, pregnancy will be covered, the same as any other Sickness, anything in the Policy to the contrary notwithstanding.

For <u>New Hampshire</u> residents:
1)  The **Policy Interpretation** provision is deleted and replaced by the following:
    Under ERISA, We are hereby designated by the plan sponsor as a claim fiduciary with discretionary authority to determine eligibility for benefits and to interpret and construe the terms and provisions of The Policy. As claim fiduciary, We have a duty to administer claims solely in the interest of the participants and beneficiaries of the employee benefit plan and in accordance with the documents and instruments governing the plan. This assignment of discretionary authority does not prohibit a participant or beneficiary from seeking judicial review of Our benefit eligibility determination after exhausting administrative remedies. The assignment of discretionary authority made under this provision may affect the standard of review that a court will use in reviewing the appropriateness of Our determination. In order to prevail, a plan participant or beneficiary may be required to prove that Our determination was arbitrary and capricious or an abuse of discretion.
2)  The time periods stated in the **Claim Appeal** provision are changed to 180 days, if less than 180 days.

For <u>New York</u> residents, the definition of **Surviving Spouse** in the **Survivor Income Benefit** deleted and replaced by the following:
    **Surviving Spouse** means Your wife, husband or partner in a same-sex marriage who was not legally separated or divorced from You when You died. "Spouse" will include Your domestic partner, provided You have executed a Domestic Partner Affidavit acceptable to us, establishing that You and Your partner are domestic partners for purposes of The Policy. You will continue to be considered domestic partners provided You continue to meet the requirements described in the Domestic Partner Affidavit.

For all <u>North Carolina</u> residents:
1)  The definition of **Other Income Benefits** is amended by the deletion of mandatory "no-fault" automobile insurance plan;
2)  The following is added to the definition of **Regular Care of a Physician:**
    You are not required to be under the Regular Care of a Physician if qualified medical professionals have determined that further medical care and treatment would be of no benefit to You.
3)  The exclusion regarding Workers' Compensation benefits is replaced by the following in the **Exclusions** provision:
    for which the final adjudication of a Workers' Compensation claim determines that benefits are paid, or may be paid, if duly claimed;
4)  The **Subrogation** provision is deleted.
5)  The **Reimbursement** provision is deleted.

For North Carolina residents covered under a policy issued to a Trust:
1)  The **Misstatement** provision is amended by the deletion of the phrase except fraudulent misstatements.
2)  The **Sending Proof of Loss** provision is amended as follows:
    Written Proof of Loss must be sent to Us within 180 days following the completion of the Elimination Period.
3)  The **Claims to be Paid** provision is amended as follows:
    We may pay up to $3,000 to a person who is Related to You and who, at Our sole discretion, is entitled to it. Any such payment shall fulfill Our responsibility for the amount paid.
4)  The **Notice of Claim** provision is amended to require the phrase or Our representative in the first sentence.

For <u>Oregon</u> residents:
1)  The following is added to the definition of **Surviving Spouse** in the **Survivor Income Benefit**:
    Spouse will include Your domestic partner provided You have registered as domestic partners with a government agency or office where such registration is available.
2)  The definition of **Surviving Children** in the **Survivor Income Benefit** is amended to include children related to

28

You by domestic partnership.

3)   The following is added to the **Continuation Provisions** for Employers with 10 or more employees:

Jury Duty:   If You are scheduled to serve or are required to serve as a juror, Your coverage may be continued until the last day of Your Jury Duty, provided You:

1)   elected to have Your coverage continued; and
2)   provided notice of the election to Your Employer in accordance with Your Employer's notification policy.

For Rhode Island residents:

1)   The definition of **Surviving Spouse** in the **Survivor Income Benefit** is amended to read as follows:
**Surviving Spouse** means Your spouse who was not legally separated or divorced from You when You died. "Spouse" will include Your domestic partner provided You:

1)   have executed a domestic partner affidavit satisfactory to Us, establishing that You and Your partner are domestic partners for purposes of The Policy; or
2)   have registered as domestic partners with a government agency or office where such registration is available and provide proof of such registration unless requiring proof is prohibited by law.

You will continue to be considered domestic partners provided You continue to meet the requirements described in the Domestic Partner Affidavit or required by law.

2)   The provision titled **Policy Interpretation** is deleted in its entirety.

For South Carolina residents:

1)   The second paragraph of the **Continuity from a Prior Policy** provision is replaced by the following:
*Is my coverage under The Policy subject to the Pre-existing Condition Limitation?*
If You become insured under The Policy on the Policy Effective Date and were covered under the Prior Policy within 30 days of being covered under The Policy, the Pre-existing Conditions Limitation will end on the earliest of:

1)   the Policy Effective Date, if Your coverage for the Disability was not limited by a pre-existing condition restriction under the Prior Policy; or
2)   the date the restriction would have ceased to apply had the Prior Policy remained in force, if Your coverage was limited by a pre-existing condition limitation under the Prior Policy.

2)   The following is added to the **Physical Examinations and Autopsy** provision:  "Such autopsy must be performed during the period of contestability and must take place in the state of South Carolina."

For South Dakota residents:

1)   The definition of **Physician** is deleted and replaced by the following:
**Physician** means a person who is:

1)   a doctor of medicine, osteopathy, psychology or other legally qualified practitioner of a healing art that We recognize or are required by law to recognize;
2)   licensed to practice in the jurisdiction where care is being given;
3)   practicing within the scope of that license; and
4)   not You or Your Spouse or Related to You or Your Spouse by blood or marriage, unless such physician is the only one in the area and is acting within the scope of their normal employment.

2)   The definition of **Other Income Benefits** is amended by the deletion of all references to Your family, Your spouse and/or children.

3)   The provision titled **Policy Interpretation** is deleted in its entirety.

For Utah residents:

1)   The **Policy Interpretation** provision is replaced by the following:

**Policy Interpretation:**  *Who interprets the terms and conditions of The Policy?*
**Benefits under this plan will be paid only if We decide in Our discretion that You are entitled to them.  We also have discretion to determine eligibility for benefits and to interpret the terms of conditions of the benefit plan.  Determinations made by Us pursuant to this reservation of discretion do not prohibit or prevent You from seeking judicial review in federal court of Our determinations.**

**The reservation of discretion made under this provision only establishes the scope of review that a federal court will apply when You seek judicial review of Our determination of eligibility for benefits, the payment of benefits, or interpretation of the terms and conditions applicable to the benefit plan.**

29

**We are an insurance company that provides insurance to this benefit plan and the federal court will determine the level of discretion that it will accord to Our determinations.**

2) Item 3 of the second paragraph of the **Sending Proof of Loss** provision is deleted.

For <u>Vermont</u> residents:

**Purpose**:  Vermont law requires that health insurers offer coverage to parties to a civil union that is equivalent to coverage provided to married persons.

**Definitions, Terms, Conditions and Provisions**:  The definitions, terms, conditions or any other provisions of the policy, contract, certificate and/or riders and endorsements to which this mandatory endorsement is attached are hereby amended and superseded as follows:

1) Terms that mean or refer to a marital relationship, or that may be construed to mean or refer to a marital relationship, such as "marriage", "spouse", "husband", "wife", "dependent", "next of kin", "relative", "beneficiary", "survivor", "immediate family" and any other such terms, include the relationship created by a civil union established according to Vermont law.

2) Terms that mean or refer to the inception or dissolution of a marriage, such as "date of marriage", "divorce decree", "termination of marriage" and any other such terms include the inception or dissolution of a civil union established according to Vermont law.

3) Terms that mean or refer to family relationships arising from a marriage, such as "family", "immediate family", "dependent", "children", "next of kin", "relative", "beneficiary", "survivor" and any other such terms include family relationships created by a civil union established according to Vermont law.

4) "Dependent" means a spouse, a party to a civil union established according to Vermont law, and a child or children (natural, stepchild, legally adopted or a minor or disabled child who is dependent on the insured for support and maintenance) who is born to or brought to a marriage or to a civil union established according to Vermont law.

5) "Child or covered child" means a child (natural, step-child, legally adopted or a minor or disabled child who is dependent on the insured for support and maintenance) who is born to or brought to a marriage or to a civil union established according to Vermont law.

**CAUTION:  FEDERAL LAW RIGHTS MAY OR MAY NOT BE AVAILABLE**

Vermont law grants parties to a civil union the same benefits, protections and responsibilities that flow from marriage under state law.  However, some or all of the benefits, protections and responsibilities related to health insurance that are available to married persons under federal law may not be available to parties to a civil union.  For example, federal law, the Employee Income Retirement Security Act of 1974 known as "ERISA", controls the employer/employee relationship with regard to determining eligibility for enrollment in private employer health benefit plans.  Because of ERISA, Act 91 does not state requirements pertaining to a private employer's enrollment of a party to a civil union in an ERISA employee welfare benefit plan.  However, governmental employers (not federal government) are required to provide health benefits to the dependents of a party to a civil union if the public employer provides health benefits to the dependents of married persons.  Federal law also controls group health insurance continuation rights under COBRA for employers with 20 or more employees as well as the Internal Revenue Code treatment of health insurance premiums.  As a result, parties to a civil union and their families may or may not have access to certain benefits under this policy, contract, certificate, rider or endorsement that derive from federal law.  You are advised to seek expert advice to determine your rights under this contract.

For <u>Washington</u> residents:

1) The following is added to the **Continuation Provisions** provision:

<u>General Work Stoppage</u> (including a strike or lockout): If Your employment terminates due to a cessation of active work as the result of a general work stoppage (including a strike or lockout), Your coverage shall be continued during the work stoppage for a period not exceeding 6 months.  If the work stoppage ends, this continuation will cease immediately.

2) The provision titled **Policy Interpretation** is deleted in its entirety.

3) The following provision is added to the **General Provisions** section of Your certificate:

**Eligibility Determination:** *How will We determine Your eligibility for benefits?*

We, and not Your Employer or plan administrator, have the responsibility to fairly, thoroughly, objectively and timely investigate, evaluate and determine Your or Your Spouse's or Your beneficiaries' eligibility for benefits for any claim You or Your Spouse or Your beneficiaries make on The Policy.  We will:

1) obtain with Your or Your Spouse's cooperation and authorization if required by law, only such information that is necessary to evaluate Your or Your Spouse's claim and decide whether to accept or deny Your or Your Spouse's claim for benefits.  We may obtain this information from Your or Your Spouse's Notice of

30

Claim, submitted proofs of loss, statements, or other materials provided by You or Your Spouse or others on Your or Your Spouse's behalf; or, at Our expense We may obtain necessary information, or have You or Your Spouse physically examined when and as often as We may reasonably require while the claim is pending.  In addition, and at Your or Your Spouse's option and at Your or Your Spouse's expense, You or Your Spouse may provide Us and We will consider any other information, including but not limited to, reports from a Physician or other expert of Your or Your Spouse's choice.  You or Your Spouse should provide Us with all information that You or Your Spouse want Us to consider regarding Your or Your Spouse's claim;

2)  consider and interpret The Policy and all information obtained by Us and submitted by You or Your Spouse that relates to Your or Your Spouse's claim for benefits and make Our determination of Your or Your Spouse's eligibility for benefits based on that information and in accordance with The Policy and applicable law;

3)  if We approve Your or Your Spouse's claim, We will review Our decision to approve Your or Your Spouse's claim for benefits as often as is reasonably necessary to determine Your or Your Spouse's continued eligibility for benefits;

4)  if We deny Your or Your Spouse's claim, We will explain in writing to You or Your Spouse or Your beneficiaries the basis for an adverse determination in accordance with The Policy as described in the provision entitled **Claim Denial**.

In the event We deny Your or Your Spouse's claim for benefits, in whole or in part, You can appeal the decision to Us.  If You or Your Spouse choose to appeal Our decision, the process You or Your Spouse must follow is set forth in The Policy provision entitled **Claim Appeal**.  If You or Your Spouse do not appeal the decision to Us, then the decision will be Our final decision.

In all other respects the certificate remains the same.


Signed for Hartford Life and Accident Insurance Company


**Terence Shields,** *Secretary*          **Michael Concannon,** *Executive Vice President*

## ERISA INFORMATION
## THE FOLLOWING NOTICE
## CONTAINS IMPORTANT INFORMATION

This employee welfare benefit plan (Plan) is subject to certain requirements of the Employee Retirement Income Security Act of 1974 (ERISA), as amended.  ERISA requires that you receive a Statement of ERISA Rights, a description of Claim Procedures, and other specific information about the Plan.  This document serves to meet ERISA requirements and provides important information about the Plan.

The benefits described in your booklet-certificate (Booklet) are provided under a group insurance policy (Policy) issued by the Hartford Life and Accident Insurance Company (Insurance Company) and are subject to the Policy's terms and conditions.  The Policy is incorporated into, and forms a part of, the Plan.  The Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy.  The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

A copy of the Plan is available for your review during normal working hours in the office of the Plan Administrator.

---

1. **Plan Name**

   Group Long Term Disability Plan for employees of KENCO.

---

2. **Plan Number**

   LTD - 504

   LTD - 505

---

3. **Employer/Plan Sponsor**

   KENCO
   2001 Riverside Drive
   Chattanooga, TN 37406

---

4. **Employer Identification Number**

   62-0799523

---

5. **Type of Plan**

   Welfare Benefit Plan providing Group Long Term Disability.

---

6. **Plan Administrator**

   KENCO
   2001 Riverside Drive
   Chattanooga, TN 37406

---

7. **Agent for Service of Legal Process**

SA-230

For the Plan

KENCO
2001 Riverside Drive
Chattanooga, TN 37406

For the Policy:

Hartford Life and Accident Insurance Company
200 Hopmeadow St.
Simsbury, CT 06089

In addition to the above, Service of Legal Process may be made on a plan trustee or the plan administrator.

8. **Sources of Contributions**   The Employer pays the premium for the insurance, but may allocate part of the cost to the employee, or the employee may pay the entire premium.  The Employer determines the portion of the cost to be paid by the employee.  The insurance company/provider determines the cost according to the rate structure reflected in the Policy of Incorporation.

9. **Type of Administration**   The plan is administered by the Plan Administrator with benefits provided in accordance with the provisions of the applicable group plan.

10. The Plan and its records are kept on a Policy Year basis.

11. **Labor Organizations**

None

12. **Names and Addresses of Trustees**

None

13. **Plan Amendment Procedure**

The Plan Administrator reserves full authority, at its sole discretion, to terminate, suspend, withdraw, reduce, amend or modify the Plan, in whole or in part, at any time, without prior notice.

The Employer also reserves the right to adjust your share of the cost to continue coverage by the same procedures.

SA-231

## STATEMENT OF ERISA RIGHTS

As a participant in the Plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA), as amended. ERISA provides that all Plan participants shall be entitled to:

1. **Receive Information About Your Plan and Benefits**

   a) Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all documents governing the Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

   b) Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary Plan description. The administrator may make a reasonable charge for the copies.

   c) Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

2. **Prudent Actions by Plan Fiduciaries**

In addition to creating rights for Plan participants ERISA imposes duties upon the people who are responsible for the operation of the employee benefit Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

3. **Enforce Your Rights**

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. If the Plan requires you to complete administrative appeals prior to filing in court, your right to file suit in state or Federal court may be affected if you do not complete the required appeals. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

4. **Assistance with Your Questions**

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration (formerly known as the Pension and Welfare Benefits Administration), U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## CLAIM PROCEDURES

The Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

**Claim Procedures for Claims Requiring a Determination of Disability**

Claims for Benefits

If you or your authorized representative would like to file a claim for benefits for yourself or your insured dependents, you or your authorized representative should obtain a claim form(s) from your Employer or Plan Administrator.  The applicable section of such form(s) must be completed by (1) you, (2) the Employer or Plan Administrator and (3) the attending physician or hospital.  Following completion, the claim form(s) must be forwarded to the Insurance Company's claim representative.  The Insurance Company will evaluate your claim and determine if benefits are payable.

The Insurance Company will make a decision no more than 45 days after receipt of your properly filed claim.  The time for decision may be extended for two additional 30 day periods provided that, prior to any extension period, the Insurance Company notifies you in writing that an extension is necessary due to matters beyond the control of the Plan, identifies those matters and gives the date by which it expects to render its decision.  If your claim is extended due to your failure to submit information necessary to decide your claim, the time for decision may be tolled from the date on which the notification of the extension is sent to you until the date we receive your response to our request.  If the Insurance Company approves your claim, the decision will contain information sufficient to reasonably inform you of that decision.

Any adverse benefit determination will be in writing and include:  1) specific reasons for the decision, 2) specific references to the Policy provisions on which the decision is based, 3) a description of any additional material or information necessary for you to perfect the claim and an explanation of why such material or information is necessary, 4) a description of the review procedures and time limits applicable to such procedures, 5) a statement that you have the right to bring a civil action under section 502(a) of ERISA after you appeal our decision and after you receive a written denial on appeal, and 6) (A) if an internal rule, guideline, protocol, or other similar criterion was relied upon in making the denial, either (i) the specific rule, guideline, protocol or other similar criterion, or (ii) a statement that such a rule, guideline, protocol or other similar criterion was relied upon in making the denial and that a copy will be provided free of charge to you upon request, or (B) if denial is based on medical judgment, either (i) an explanation of the scientific or clinical judgment for the determination, applying the terms of the Policy to your medical circumstances, or (ii) a statement that such explanation will be provided to you free of charge upon request.

Appealing Denials of Claims for Benefits

On any wholly or partially denied claim, you or your representative must appeal once to the Insurance Company for a full and fair review.  You must complete this claim appeal process before you file an action in court.  Your appeal request must be in writing and received by the Insurance Company no later than the expiration of 180 days from the date you received your claim denial.  As part of your appeal:

1.   you may request, free of charge, copies of all documents, records, and other information relevant to your claim; and
2.   you may submit written comments, documents, records and other information relating to your claim.

The Insurance Company's review on appeal shall take into account all comments, documents, records and other information submitted by you relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

The Insurance Company will make a final decision no more than 45 days after it receives your timely appeal.  The time for final decision may be extended for one additional 45 day period provided that, prior to the extension, the Insurance Company notifies you in writing that an extension is necessary due to special circumstances, identifies those circumstances and gives the date by which it expects to render its decision.  If your claim is extended due to your failure to submit information necessary to decide your claim on appeal, the time for decision shall be tolled from the date on which the notification of the extension is sent to you until the date we receive your response to the request.

The individual reviewing your appeal shall give no deference to the initial benefit decision and shall be an individual who is neither the individual who made the initial benefit decision, nor the subordinate of such individual.  The review process provides for the identification of the medical or vocational experts whose advice was obtained in connection with an initial adverse decision, without regard to whether that advice was relied upon in making that decision.  When deciding an appeal that is based in whole or part on medical judgment, we will consult with a medical professional having the appropriate training and experience in the field of medicine involved in the medical judgment and who is neither an individual consulted in connection with the initial benefit decision, nor a subordinate of such individual.  If the Insurance Company grants your claim appeal, the decision will contain information sufficient to reasonably inform you of that decision.

However, any final adverse benefit determination on review will be in writing and include: 1) specific reasons for the decision, 2) specific references to the Policy provisions on which the decision is based, 3) a statement that you have the right to bring a civil action under section 502(a) of ERISA, 4) a statement that you may request, free of charge, copies of all documents, records, and other information relevant to your claim; 5) (A) if an internal rule, guideline, protocol, or other similar criterion was relied upon in making the decision on appeal, either (i) the specific rule, guideline, protocol or other similar criterion, or (ii) a statement that such a rule, guideline, protocol or other similar criterion was relied upon in making the decision on appeal and that a copy will be provided free of charge to you upon request, or (B) if the decision on appeal is based on medical judgment, either (i) an explanation of the scientific or clinical judgment for the decision on appeal, applying the terms of the Policy to your medical circumstances, or (ii) a statement that such explanation will be provided to you free of charge upon request, and 6) any other notice(s), statement(s) or information required by applicable law.

## Claim Procedures for Claims Not Requiring a Determination of Disability

Claims for Benefits

If you or your authorized representative would like to file a claim for benefits for yourself or your insured dependents, you or your authorized representative should obtain a claim form(s) from your Employer or Plan Administrator. The applicable section of such form(s) must be completed by (1) you, (2) the Employer or Plan Administrator and (3) the attending physician or hospital. Following completion, the claim form(s) must be forwarded to the Insurance Company's claim representative. The Insurance Company will evaluate your claim and determine if benefits are payable.

The Insurance Company will make a decision no more than 90 days after receipt of your properly filed claim. However, if the Insurance Company determines that special circumstances require an extension, the time for its decision will be extended for an additional 90 days, provided that, prior to the beginning of the extension period, the Insurance Company notifies you in writing of the special circumstances and gives the date by which it expects to render its decision. If extended, a decision shall be made no more than 180 days after your claim was received. If the Insurance Company approves your claim, the decision will contain information sufficient to reasonably inform you of that decision.

However, any adverse benefit determination will be in writing and include: 1) specific reasons for the decision; 2) specific references to Policy provisions on which the decision is based; 3) a description of any additional material or information necessary for you to perfect the claim and an explanation of why such material or information is necessary; 4) a description of the review procedures and time limits applicable to such, and 5) a statement that you have the right to bring a civil action under section 502(a) of ERISA after you appeal our decision and after you receive a written denial on appeal.

Appealing Denials of Claims for Benefits

On any wholly or partially denied claim, you or your representative must appeal once to the Insurance Company for a full and fair review. You must complete this claim appeal process before you file an action in court. Your appeal request must be in writing and be received by the Insurance Company no later than the expiration of 60 days from the date you received your claim denial. As part of your appeal:

1. you may request, free of charge, copies of all documents, records, and other information relevant to your claim; and
2. you may submit written comments, documents, records and other information relating to your claim.

The Insurance Company's review on appeal shall take into account all comments, documents, records and other information submitted by you relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

The Insurance Company will make a final decision no more than 60 days after it receives your timely appeal. However, if the Insurance Company determines that special circumstances require an extension, the time for its decision will be extended for an additional 60 days, provided that, prior to the beginning of the extension period, the Insurance Company notifies you in writing of the special circumstances and gives the date by which it expects to render its decision. If extended, a decision shall be made no more than 120 days after your appeal was received. If the Insurance Company grants your claim appeal, the decision will contain information sufficient to reasonably inform you of that decision.

However, any final adverse benefit determination on review will be in writing and include: 1) specific reasons for the decision and specific references to the Policy provisions on which the decision is based, 2) a statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and

SA-234

other information relevant to the claim, 3) a statement of your right to bring a civil action under section 502(a) of ERISA, and 4) any other notice(s), statement(s) or information required by applicable law.

**The Plan Described in this Booklet
is Insured by the**

Hartford Life and Accident Insurance Company
Simsbury, Connecticut
Member of The Hartford Insurance Group

 **Gmail**

**Edith Mccurry <emccurry1@gmail.com>**

### Fwd: FW: Cobra Letter sending via Mail
2 messages

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                    Tue, Feb 16, 2016 at 8:55 AM
To: Edith Mccurry <emccurry1@gmail.com>

---------- Forwarded message ----------
From: **Elliott, Jay** <Jay.Elliott@kencogroup.com>
Date: Tuesday, February 16, 2016
Subject: Re: FW: Cobra Letter sending via Mail
To: "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>

Mr. Hoffman – Ms. McCurry's below e-mail re: COBRA was forwarded to my attention.  I trust you will forward this response to her:

Kenco renews its welfare benefit plans on an annual basis.  As is often the case when these plans renew, the cost or the plans themselves are subject to change.  Cost increases can be a result of a number of factors -- including medical inflation, high usage, high claims, etc.  In addition to premium increases, plan sponsors will try to limit the amount of the increase by making changes to the benefits themselves.  Plan participants do not have to approve or sign off on these changes.  The changes you received did not result from anything you signed or have to sign. The changes you were recently notified of by U.S. Admin. were a result of Kenco's annual renewal.   Employers and/or their third party administrator are required to notify plan participants of changes.   You received a copy of the plan's SBC as well as a letter stating that the rates were changing.   Due to the letter being sent after the first of January, we will honor the December 2015 rates for January of 2016.  The new rates, noted on the coupons you received with the letter, should be used/paid starting February 1, 2106.

Thank you.

**Jay Elliott**
Vice President - Legal
2001 Riverside Drive • Chattanooga, TN  37406
Office: 423-643-3398 • Mobile: 423-227-9182

https://mail.google.com/mail/u/0?ik=a57e16f619&view=pt&search=all&permthid=thread-...

Case: 18-3206  Document: 16  RESTRICTED  Filed: 01/23/2019  Pages: 348  Case: 18-3206  Document: 11-8  Filed: 02/18/2019  Pages: 50

Gmail - Fwd: FW: Cobra Letter sending via Mail                                    Page 2 of 5



*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

**From:** Edith Mccurry [mailto:edymccurry@gmail.com]
**Sent:** Thursday, February 11, 2016 2:10 PM
**To:** Debbie Robinson <drobinson@usadmin.com>
**Cc:** US Administrative Services <flex@usadmin.com>; Jthoffmanlaw@gmail.com
**Subject:** Re: FW: Cobra Letter sending via Mail

Good day,

I am really not sure how to interpret the attached form. My sense impression is that you are being crass by sending me a blank form, when I specifically requested on two (2) separate accessions a copy of the signed form that initiated and /or prompted the change in my insurance coverage.

By law you are to have a written record of such change. Therefore, I am formally demanding the form that prompted this change whether it is a replica of the attached form with my signature or some other documentation provided by Kenco to make this change effective. This documentation is being demanded within three (3) business days of receipt of this notice.

Edith McCurry

On Tuesday, February 9, 2016, Debbie Robinson <drobinson@usadmin.com> wrote:

> Ms Mccury
>
> Attached is a copy of the open enrollment form that you requested. Should you have any questions regarding this form, please contact Cherie Davis at Kenco.
>
> Thank you

https://mail.google.com/mail/u/0?ik=a57e16f619&view=pt&search=all&permthid=thread-...

**From:** Edith Mccurry [mailto:edymccurry@gmail.com]
**Sent:** Thursday, February 04, 2016 8:03 PM
**To:** Debbie Robinson <drobinson@usadmin.com>
**Cc:** US Administrative Services <flex@usadmin.com>
**Subject:** Re: FW: Cobra Letter sending via Mail

To Debbie Robinson,

    In our conversation February 3, 2016, you stated that there was no change in my coverage other than the annual cost adjustment for renewal of medical plan. How was this cost derived? Additionally, I have attached a copy of my 2015 and 2016 Cigna Group Health Plan Cards. From these cards you can see that my coverage has changed. Please explain to me why there is a change in my coverage. Finally, I appreciate you noting there was 'no benefit changes' in referencing the completed and signed open enrollment form but what my written request was for is a copy of the 2016 form. Please provide me with the form as requested.


  Thank you


  Edith McCurry




On Wed, Feb 3, 2016 at 3:12 PM, Debbie Robinson <drobinson@usadmin.com> wrote:

---

**From:** Debbie Robinson [mailto:drobinson@usadmin.com]
**Sent:** Wednesday, February 03, 2016 12:58 PM
**To:** 'US Administrative Services' <flex@usadmin.com>
**Subject:** RE: Cobra Letter sending via Mail

Ms. McCurry

I have attached a copy of the new SBC from Kenco. Please note we have supplied the answers to your questions in your letter as well.

Thank you

https://mail.google.com/mail/u/0?ik=a57e16f619&view=pt&search=all&permthid=thread-...

**From:** US Administrative Services [mailto:flex@usadmin.com]
**Sent:** Wednesday, January 27, 2016 11:43 AM
**To:** drobinson@usadmin.com
**Subject:** Fw: Cobra Letter sending via Mail

----- Original Message -----

**From:** Edith Mccurry

**To:** flex@usadmin.com

**Sent:** Tuesday, January 26, 2016 1:17 PM

**Subject:** Cobra Letter sending via Mail

See attachment

Thank you

---

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                              Mon, Mar 21, 2016 at 8:28 PM
To: "Elliott, Jay" <Jay.Elliott@kencogroup.com>
Cc: Miller.Scott.A@dol.gov, Edith Mccurry <edymccurry@gmail.com>, Edith Mccurry
<emccurry1@gmail.com>, drobinson@usaadmin.com, flex@usadmin.com

Good Day,

Please find attached, by electronic mail only, the response to your February 16, 2016 correspondence
regarding Mrs. McCurry's continued health benefits under Cobra.

Thanks

The Law Office of
Jordan T. Hoffman
11528 S. Halsted
Chicago, Il 60628
773.995.7900 Ext 102
773.995.7921 Fax
[Quoted text hidden]

---

**3 attachments**

 **EM JE cobra 2.odt**
29K

**Cobra selection and cost4.21.15_2.19.16.pdf**
2226K

https://mail.google.com/mail/u/0?ik=a57e16f619&view=pt&search=all&permthid=thread-...

 **Scott, Miller DOL.pdf**
466K

 LAW OFFICE OF

# *Jordan TraVaille Hoffman, P.C.*

"Balancing the Scales of Justice"

March 21, 2016

Electronic Mail

Jay Elliott, Esquire
Kenco Logistics Services, LLC.
2001 Riverside Drive
Chattanooga, TN 37406

RE: Edith McCurry

Mr. Elliott:

We are in receipt of your corresponding email dated February 16, 2016 regarding Mrs. McCurry's Cobra Benefits.

We are understanding of the infrastructural workings of business realignment and adjustments, as well as, that those changes are business necessities and often dictate price restructuring.

We also realize that Mrs. McCurry would not have control or influence on these particular business decisions, as they specifically relate to the Health Care Benefits.

With that being said, the issue was not surrounded around the business decisions made that prompted the price increase in her Health Care Benefits (Cobra), but that she was not afforded the opportunity by law to continue to choose the coverage provided by Kenco.

Pointedly, Mrs. McCurry was never communicated with during Kenco's open enrollment in 2015, as required by law.

More specifically, the law mandates that any changes to these types of benefits be done in writing.

11528 S. Halsted Street • Chicago, Illinois 60628 • (773) 995-7900 PH • (773) 995-7921 FAX
jthoffmanlaw@gmail.com

We appreciate Ms. Cathy Phillips, Senior Manager of Benefits for Kenco, providing to Mr. Scott Miller of the U.S. Department of Labor a sample of the 2015 open enrollment form. (See Attached)  Upon information and belief, Mr. Miller indicated that Ms. Phillips indicated that there must have been a mistake in Mrs. McCurry not being informed of her benefits.

Upon review of that form it specifically has a spot for a signature, reiterating that fact that any changes are to be ratified by signature.

Further review of the various documents disseminated by US Admin on behalf of Kenco reveal the following:

The premium has changed on (5) five separate occasions since its qualifying inception date of March 29, 2015 (See Attached Exhibit 1-5).  Furthermore, the coverage has been reduced from 100% to 80% in network (See Attached 6).  In addition to that, some of Mrs. McCurry's current providers are no longer covered under this new plan.

The law mandates that all Cobra Benefactors are to be treated equally, as though they are active employees of the company.    Mrs. McCurry feels as though she has not been treated equally.

Pointedly, to date Mrs. McCurry is unaware of the actual coverages that she is being afforded.  She is requesting that these coverages be explained in detail in writing.

Next, Mrs. McCurry's is requesting how her coverage continued without her agreeing to such?  Is that the standard operating procedure?

Since you indicated that these changes are annualized, the question is, how is that these premiums have changed (5) five times within the last year?

Is that customary with an annualized schedule?

Specifically, why were these changes implemented?

With the inception of the omission in notifying and allowing Mrs. McCurry to participate in the open enrollment at Kenco, Mrs. McCurry was disallowed the opportunity to participate in the open market for benefits that may have better suited her needs from a coverage and financial perspective.

You also had indicated that due to the lateness of the communication outlining the current rates, the December rate would be honored in January.  However, as you know, the payments are due on the first of each month, with a grace period.  The month was more than mid-way over when the letter was drafted and three-quarters over when received.

Matter of fact, the adjustment that was proffered has not been made to date.

11528 S. Halsted Street • Chicago, Illinois 60628 • (773) 995-7900 PH • (773) 995-7921 FAX
jthoffmanlaw@gmail.com

Pointedly, the question of the day remains, if the open enrollment was between October and November 2015 according to the form supplied by Ms. Phillips, why did it take so long to render this information to Mrs. McCurry?

Lastly, Mrs. McCurry has indicated that her sense impression is that she feels as though these actions are contrived and in continued retaliation and harassment to her for formal complaints of disparate and disparaging treatment.

If you could please, provide the answers to aforementioned queries within (3) three business days of receipt of this correspondence.

If you should have any subsequent questions, comments or concerns, please feel free to contact the office at the below mentioned information.

Respectfully yours,


The Law Office of
Jordan T. Hoffman




11528 S. Halsted Street • Chicago, Illinois 60628 • (773) 995-7900 PH • (773) 995-7921 FAX
jthoffmanlaw@gmail.com

Case: 18-3206    Document: 11-6    RESTRICTED    Filed: 01/18/2019    Pages: 50

# EXHIBIT 1



April 21, 2015

Jordan TraVille Hoffman, PC
11528 S Halsted Street
Chicago, IL  60628


Mr. Hoffman:

We are writing in response to the recent letter we received from your office concerning your client, Edith McCurry.

In regards to the missing information in her COBRA packet, LTD (Long Term Disability) and Life Insurance are not eligible benefits under COBRA so would not have been included in the notice.

The benefits that were listed on her enrollment form were provided to us by her former employer. We are required to offer the participant the same benefits that she had at her time of termination.

Mrs. McCurry will need to complete her original enrollment form indicating any changes to the benefits that should be made. For your convenience, I have provided the single coverage rates below:

**Single Medical - $363.71 per month**
**Single Dental - $17.71 per month**
**Single Vision - $4.62 per month**

Please let us know if you need further assistance.


Sincerely yours,


USAdmin Services
COBRA Administration
423-266-5100

# EXHIBIT 2

## PREMIUM COMPUTATION FORM
### USAdmin Services LLC

Thursday, May 21, 2015

QB Name:   EDITH MCCURRY

---

Final IRS Federal Regulations require that employers provide premium computations reflecting the total cost of the group health coverage (including the portion paid by the employee and any portion paid by the employer before the qualifying event), plus 2% for administrative costs. The following information represents premiums owed retroactively to the date of the loss of coverage due to your qualifying event. Premium rates are subject to change on an annual basis and may be adjusted if coverages are increased or decreased for "similarly situated active employees", who have not experienced a Qualifying Event.

The Health Benefits Continuation Plan requires you to pay premiums according to the schedule shown below. Your initial premium must be made within 45 days after the date of the COBRA election and must cover the period of coverage **from the date of COBRA election retroactively to the date of the loss of coverage** due to the qualifying event. The premium for the **first partial month (applicable only if coverage ends the day following your qualifying event)** has been calculated for the remaining number of days in the month in which the Qualifying Event occured. Subsequent due dates (following your first month's premium due date) are provided cumulatively to reflect 60 and 45 day time periods allowed by law.

| | |
|---|---|
| **Your Qualifying Event Date:** | 03/29/2015 |
| **Your Last Day to Enroll:** | 06/05/2015 |

| Plan Description | Coverage Level | Premium |
|---|---|---|
| Ameritas Dental Plan | QB + Spouse | $35.15 |
| VSP | EE + SPOUSE | $9.25 |
| CIGNA Medical Coverage 2014 | QB Only | $363.71 |
| Total: | | $408.11 |

| Schedule Of First Payment | Premium |
|---|---|
| Amount Due with Enrollment Form Signed to Pay Premiums to April 01, 2015 | $26.33 |
| Amount Due if Enrollment Form Signed to Pay Premiums to May 01, 2015 | $434.44 |
| Amount Due to Pay Premiums to June 01, 2015 | $842.55 |
| Amount Due to Pay Premiums to July 01, 2015 | $1,250.66 |

Premiums must be paid by **check or money order** made payable to COBRA Administration and must be POSTMARKED on or before the end of the 30 day grace period. The grace period is determined by the due date shown on premium payment coupons provided upon COBRA enrollment. Please include the Social Security number of the Qualified Beneficiary on any remittance. Please DO NOT SEND CASH

**Mailing Address:**
**COBRA Administration, P. O. Box 11045, Chattanooga, TN 37401**
**Overnight/2 Day Delivery Address:**
**COBRA ADMINISTRATION, 701 Cherokee Blvd., Suite 201, Chattanooga, TN 37405**

## COBRA CONTINUATION ENROLLMENT FORM
### Please read and complete carefully
### KENCO MANAGEMENT

05/21/2015
Ms. EDITH MCCURRY
6239 S. 13110 E. Rd
PEMBROKE TOWNSHIP, IL  60958
Qualifying Event: Termination
First Day After Loss of Coverage / First Day Continuation Coverage will Begin: 03/30/2015

List Eligible Persons to be Covered Below: (Persons Previously Covered Only)

| Name: Last | First | M | Birth Date | Sex | SSN # |
|---|---|---|---|---|---|
| McCurry | Edith | | 8/26/62 | M/(F) | 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 |
| McCurry | Richard | L | 2/8/60 | (M)/F | 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 |
| | | | _/_/_ | M/F | _-_-_ |
| | | | _/_/_ | M/F | _-_-_ |
| | | | _/_/_ | M/F | _-_-_ |

Please indicate the plan(s) in which you would like to enroll. Please note the amounts listed below are for monthly premiums.

☑ Ameritas Dental Plan   QB + Spouse      $35.15
☑ VSP                    EE + SPOUSE      $9.25
☑ CIGNA Medical          QB Only          $363.71
   Coverage 2014

Total: $408.11

As an active employee, were you enrolled in a Flexible Spending Account (FSA), Health Reimbursement Account (HRA) or a Medical Expense Reimbursemejnt Account (MERP)?

✓ YES ____ NO     Plan: ✓ FSA ___ HRA ___ MERP

If YES, do you wish to be contacted to discuss whether you qualify to continue the FSA, HRA or MERP through COBRA? ✓ YES ____ NO
If yes, Please provide phone number or email: edy mccurry@gmail.com
I/WE HEREBY REQUEST ENROLLMENT IN THE HEALTH BENEFITS CONTINUATION PLAN FOR MYSELF AND ELIGIBLE QUALIFIED DEPENDENTS INDICATED ON THIS FORM AND AGREE TO PAY THE PREMIUM AS REQUIRED. I UNDERSTAND THAT CONTINUATION COVERAGE WILL TERMINATE UNDER SEVERAL CIRCUMSTANCES, INCLUDING: THE DATE I OR A CONTINUED DEPENDENT BECOME COVERED UNDER ANOTHER GROUP HEALTH/DENTAL PLAN, BECOME ENTITLED TO MEDICARE, OR ON THE DATE ON WHICH THE GROUP HEALTH/DENTAL PLAN ENDS. I ALSO UNDERSTAND THAT IF I WAS DISABLED WITHIN 60 DAYS OF THE COBRA QUALIFYING EVENT, I MAY BE ELIGIBLE FOR EXTENDED CONTINUATION COVERAGE, AND THAT ANY BREAK IN CONTINUED COVERAGE OF MORE THAN SIXTY-THREE DAYS MAY CAUSE LOSS OF COVERAGE "PORTABILITY". THE PQB MAY ACCEPT COVERAGE FOR ALL QUALIFIED DEPENDENTS BUT ONLY THE RESPSONIBLE PARTY MAY ELECT TO ACCEPT OR DECLINE COVERAGE WHEN THE PQB HAS DECLINED COVERAGE FOR HIMSELF/HERSELF. YOU MAY DELAY PREMIUM PAYMENT AFTER ENROLLMENT AND TAKE ADVANTAGE OF A ONE TIME 45-DAY GRACE PERIOD FOR PAYMENT, ONCE YOU HAVE SUBMITTED YOUR COMPLETED ENROLLMENT FORM TO USADMIN SERVICES. REMEMBER THE ENROLLMENT FORM MUST BE POSTMARKED WITHIN THE 60-DAY ENROLLMENT PERIOD.
**PLEASE INDICATE ACCEPTOR DECLINE OF COVERAGE:**

Edith McCurry _____ DATE: 6/1/15 ACCEPT ___ ✓ DECLINE ___
Signature of EDITH MCCURRY

Richard L McCurry _____ DATE: 6/1/15 ACCEPT ___ ✓ DECLINE ___
Signature of Spouse(if applicable)

EMAIL ADDRESS: edymccurry@gmail.com  PHONE: 815-735-4281
NOTE: In order to be enrolled in the Health Benefits Continuation Plan this ENROLLMENT FORM must be received no later than 06/05/2015.
Please send completed form to:
USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN 37401

SA-249

# EXHIBIT 3

Case: 18-3206

Document: 16

Filed: 01/23/2019

Pages: 248

BENEFITS ADMINISTRATION
P.O. BOX 11040
CHATTANOOGA, TN 37401

*Cobra payment*
*Coupons Enclosed*

CHATTANOOGA
TN. 334
23 JUN 2015

$ 00.48
0 2 1M
0004275469          JUN 22   2015
MAILED FROM ZIP CODE 37402

OPEN PROMPTLY
TIME SENSITIVE MATERIAL ENCLOSED

8095834534

**USAdmin Services LLC**
**PO Box 11045**
**Chattanooga TN 37401**

**MONTHLY PREMIUM COUPONS**

06/22/2015

Ms. EDITH MCCURRY
6239 S. 13110 E. Rd
PEMBROKE TOWNSHIP, IL 60958

Dear Ms. MCCURRY:
We are enclosing premium payment coupons for your convenience in paying COBRA premiums to USAdmin Services, the COBRA Administrator for KENCO MANAGEMENT. The health coverage and monthly premium cost of the coverage to be maintained thru COBRA continuation are reflected below. **Please review the coverage information and the premium coupons carefully. If any of the information is incorrect or unclear, please contact our office immediately at 423-266-5100.**

COBRA premiums due, after receipt of your initial COBRA enrollment form and the initial premium payment, **are due on a monthly basis and allow a 30 day grace period. The 30 day grace period for postmarking COBRA premiums is determined from the monthly premium due date which is reflected on the premium coupons attached.**

Payment is considered timely if **"postmarked"** on or before the end of your grace period. Failure to "postmark" premiums on or before the end of your grace period may terminate your participation in the Health Benefits Continuation Plan with no recourse for reinstatement.

Questions concerning any premium payment; grace period remaining for the next premium payment due, or any other COBRA issue, should be directed to USAdmin Services 423-266-5100.

USAdmin Services is pleased to provide COBRA services to you, your spouse and dependents, if any, and encourage you to contact our office any time COBRA assistance is needed.

Sincerely,
USAdmin Services LLC

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA premiums. You WILL NOT receive monthly statements or reminders of premiums due. Please submit the appropriate coupon when paying premiums due.

Premiums are subject to change, therefore COBRA premium payment coupons reflecting out dated or incorrect premium rates are null and void. To avoid TERMINATION of COBRA continuation with no recourse for reinstatement, payments must be postmarked on or before the end of your 30 day grace period. The grace period is 30 days from the due date listed on coupon.

Change of Address?
Y / N – print on back

Due Date:
01/01/2016
Amount Due:
$408.11
Amount Enclosed:
$_____

KENCO MANAGEMENT

---

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA premiums. You WILL NOT receive monthly statements or reminders of premiums due. Please submit the appropriate coupon when paying premiums due.

Premiums are subject to change, therefore COBRA premium payment coupons reflecting out dated or incorrect premium rates are null and void. To avoid TERMINATION of COBRA continuation with no recourse for reinstatement, payments must be postmarked on or before the end of your 30 day grace period. The grace period is 30 days from the due date listed on coupon.

Change of Address?
Y / N – print on back

Due Date:
02/01/2016
Amount Due:
$408.11
Amount Enclosed:
$_____

KENCO MANAGEMENT

---

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA premiums. You WILL NOT receive monthly statements or reminders of premiums due. Please submit the appropriate coupon when paying premiums due.

Premiums are subject to change, therefore COBRA premium payment coupons reflecting out dated or incorrect premium rates are null and void. To avoid TERMINATION of COBRA continuation with no recourse for reinstatement, payments must be postmarked on or before the end of your 30 day grace period. The grace period is 30 days from the due date listed on coupon.

Change of Address?
Y / N – print on back

Due Date:
03/01/2016
Amount Due:
$408.11
Amount Enclosed:
$_____

KENCO MANAGEMENT

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN 37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.
Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Change of Address?
Y / N – print on back

Due Date:
04/01/2016
Amount Due:
$408.11
Amount Enclosed:
$_____

KENCO MANAGEMENT

---

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN 37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.
Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Change of Address?
Y / N – print on back

Due Date:
05/01/2016
Amount Due:
$408.11
Amount Enclosed:
$_____

KENCO MANAGEMENT

---

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN 37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.
Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Change of Address?
Y / N – print on back

Due Date:
06/01/2016
Amount Due:
$408.11
Amount Enclosed:
$_____

KENCO MANAGEMENT

# EXHIBIT 4



BENEFITS ADMINISTRATION
P.O. BOX 11045
CHATTANOOGA, TN 37401

**OPEN PROMPTLY**
**TIME SENSITIVE MATERIAL ENCLOSED**

CHATTANOOGA
TN 374
19 JAN 2016

UNITED STATES POSTAGE
$ 00.48⁰
02 1M
0004275469     JAN 18 2016
MAILED FROM ZIP CODE 37402

**USAdmin Services**
**PO Box 11045**
**Chattanooga, TN 37401**

01/18/2016

Ms. EDITH MCCURRY
6239 S. 13110 E. Rd
PEMBROKE TOWNSHIP, IL 60958

Dear Ms. MCCURRY:

You are hereby notified that the monthly premium rates for the Health Benefits Continuation Plan listed below have changed.

| | | |
|---|---|---|
| Plan Name: | CIGNA Medical Coverage 2016 | Effective Date: 1/1/2016 |
| Coverage Level: QB Only | | Cost: $438.88 |

Reason for Change:  Premium Rates for all employees are being changed.

Sincerely,

USAdmin Services
COBRA Administrator

Your current account balance is:  $483.28

Please send this payment to:
USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

**USAdmin Services LLC**
**PO Box 11045**
**Chattanooga TN  37401**

**MONTHLY PREMIUM COUPONS**

01/18/2016

Ms. EDITH MCCURRY
6239 S. 13110 E. Rd
PEMBROKE TOWNSHIP, IL 60958

Dear Ms. MCCURRY:
We are enclosing premium payment coupons for your convenience in paying  COBRA premiums to USAdmin Services, the COBRA Administrator for KENCO MANAGEMENT.  The health coverage and monthly premium cost of the coverage to be maintained thru COBRA continuation are reflected below.  **Please review the coverage information and the premium coupons carefully.  If any of the information is incorrect or unclear, please contact our office immediately at 423-266-5100.**

COBRA premiums due, after receipt of your initial COBRA enrollment form and the initial premium payment, **are due on a monthly basis** and allow a **30 day grace period.  The 30 day grace period for postmarking COBRA premiums is determined from the monthly premium due date which is reflected on the premium coupons attached.**

Payment is considered timely if **"postmarked"** on or before the end of your grace period.  Failure to "postmark" premiums on or before the end of your grace period  may terminate your participation in the Health Benefits Continuation Plan with no recourse for reinstatement.

Questions concerning any premium payment; grace period remaining for the next premium payment due, or any other COBRA issue, should be directed to USAdmin Services 423-266-5100.

USAdmin Services is pleased to provide COBRA services to you, your spouse and dependents, if any, and encourage you to contact our office any time COBRA assistance is needed.

Sincerely,
USAdmin Services LLC

SA-258

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN 37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA premiums. You WILL NOT receive monthly statements or reminders of premiums due. Please submit the appropriate coupon when paying premiums due.

Premiums are subject to change, therefore COBRA premium payment coupons reflecting out dated or incorrect premium rates are null and void.

To avoid TERMINATION of COBRA continuation with no recourse for reinstatement, payments must be postmarked on or before the end of your 30 day grace period. The grace period is 30 days from the due date listed on coupon.

Change of Address?
Y / N – print on back

Due Date:
02/01/2016
Amount Due:
$483.28
Amount Enclosed:
$_____

KENCO MANAGEMENT

---

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN 37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA premiums. You WILL NOT receive monthly statements or reminders of premiums due. Please submit the appropriate coupon when paying premiums due.

Premiums are subject to change, therefore COBRA premium payment coupons reflecting out dated or incorrect premium rates are null and void.

To avoid TERMINATION of COBRA continuation with no recourse for reinstatement, payments must be postmarked on or before the end of your 30 day grace period. The grace period is 30 days from the due date listed on coupon.

Change of Address?
Y / N – print on back

Due Date:
03/01/2016
Amount Due:
$483.28
Amount Enclosed:
$_____

KENCO MANAGEMENT

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.

Change of Address?
Y / N – print on back

Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Due Date:
04/01/2016
Amount Due:
$483.28
Amount Enclosed:
$_____

KENCO MANAGEMENT

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.

Change of Address?
Y / N – print on back

Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Due Date:
05/01/2016
Amount Due:
$483.28
Amount Enclosed:
$_____

KENCO MANAGEMENT

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.

Change of Address?
Y / N – print on back

Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Due Date:
06/01/2016
Amount Due:
$483.28
Amount Enclosed:
$_____

KENCO MANAGEMENT

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.
Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Change of Address?
Y / N – *print on back*

*Due Date:*
*07/01/2016*
*Amount Due:*
*$483.28*
*Amount Enclosed:*
*$_____*

KENCO MANAGEMENT


Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.
Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Change of Address?
Y / N – *print on back*

*Due Date:*
*08/01/2016*
*Amount Due:*
*$483.28*
*Amount Enclosed:*
*$_____*

KENCO MANAGEMENT


Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.
Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Change of Address?
Y / N – *print on back*

*Due Date:*
*09/01/2016*
*Amount Due:*
*$467.18*
*Amount Enclosed:*
*$_____*

KENCO MANAGEMENT

# EXHIBIT 5

**BENEFITS ADMINISTRATION**
**P.O. BOX 11045**
**CHATTANOOGA, TN 37401**

CHATTANOOGA
TN 3
19 FEB 20

$ 00.48
02 1M
0004275469    FEB 19 2016
MAILED FROM ZIP CODE 37402

**OPEN PROMPTLY**
**TIME SENSITIVE MATERIAL ENCLOSED**

6.0966846954



February 19, 2016

Ms. Edith McCurry
6239 S 13110E Rd
Pembroke Township, IL  60958

Dear Ms. McCurry:

Recently you received notification from USAdmin that your former employer, Kenco, had incurred a premium rate change effective 01/01/16 resulting in an increase in premiums.

Kenco has made the decision to delay the effective date of the rate change to 02/01/16.

If you have already paid the premium increase, this will result in a credit towards your next premium due date.

Revised coupons are enclosed for your convenience. If you have any questions, please contact our office at 423-266-5100.

Sincerely,


COBRA Administration

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.
Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Change of Address?
Y / N – print on back

Due Date:
02/01/2016
Amount Due:
$380.57
Amount Enclosed:
$_____

KENCO MANAGEMENT

---

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.
Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Change of Address?
Y / N – print on back

Due Date:
03/01/2016
Amount Due:
$455.74
Amount Enclosed:
$_____

KENCO MANAGEMENT

---

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.
Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

Change of Address?
Y / N – print on back

Due Date:
04/01/2016
Amount Due:
$455.74
Amount Enclosed:
$_____

KENCO MANAGEMENT

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.

Change of Address?
Y / N – print on back

Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

*Due Date:*
*05/01/2016*
*Amount Due:*
*$455.74*
*Amount Enclosed:*
*$_____*

KENCO MANAGEMENT


Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.

Change of Address?
Y / N – print on back

Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

*Due Date:*
*06/01/2016*
*Amount Due:*
*$455.74*
*Amount Enclosed:*
*$_____*

KENCO MANAGEMENT


Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA
premiums. You WILL NOT receive monthly statements or reminders of
premiums due. Please submit the appropriate coupon when paying
premiums due.

Change of Address?
Y / N – print on back

Premiums are subject to change, therefore COBRA premium payment
coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for
reinstatement, payments must be postmarked on or before the end of your
30 day grace period. The grace period is 30 days from the due date listed on
coupon.

*Due Date:*
*07/01/2016*
*Amount Due:*
*$455.74*
*Amount Enclosed:*
*$_____*

KENCO MANAGEMENT

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA premiums. You WILL NOT receive monthly statements or reminders of premiums due. Please submit the appropriate coupon when paying premiums due.

*Change of Address?*
*Y / N – print on back*

Premiums are subject to change, therefore COBRA premium payment coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for reinstatement, payments must be postmarked on or before the end of your 30 day grace period. The grace period is 30 days from the due date listed on coupon.

*Due Date:*
*08/01/2016*
*Amount Due:*
*$455.74*
*Amount Enclosed:*
*$_____*

KENCO MANAGEMENT

Mail All Payments To:

USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

Ms. EDITH
MCCURRY
6239 S. 13110 E. Rd
PEMBROKE
TOWNSHIP, IL
60958

These are premium coupons for your convenience in paying monthly COBRA premiums. You WILL NOT receive monthly statements or reminders of premiums due. Please submit the appropriate coupon when paying premiums due.

*Change of Address?*
*Y / N – print on back*

Premiums are subject to change, therefore COBRA premium payment coupons reflecting out dated or incorrect premium rates are null and void.
To avoid TERMINATION of COBRA continuation with no recourse for reinstatement, payments must be postmarked on or before the end of your 30 day grace period. The grace period is 30 days from the due date listed on coupon.

*Due Date:*
*09/01/2016*
*Amount Due:*
*$440.56*
*Amount Enclosed:*
*$_____*

KENCO MANAGEMENT

# EXHIBIT 6

**myCigna.com**

Administered By Cigna Health and Life Insurance Co.

Coverage Effective Date: 03/30/2015

Group: 3172256

Issuer (80840)

ID: **U49722880 01**

Name: **Edith McCurry**

Kenco

RxBIN 017010 RxPCN 02150000

MultiPlan

Network Savings Program

**Open Access Plus**

No Referral Required

| | |
|---|---|
| PCP Visit | 0% |
| Specialist | 0% |
| Hospital ER | 0% |
| Urgent Care | 0% |
| Rx | 0%/0%/0% |

Network Coinsurance:

| | |
|---|---|
| In | 100%/0% |
| Out | 80%/20% |

Med/Rx Deductible Applies

NMCWEBC

---

**myCigna.com**

Administered By Cigna Health and Life Insurance Co.

Coverage Effective Date: 01/01/2016

Group: 3172256

Issuer (80840)

ID: **U49722880 01**

Name: **Edith McCurry**

Kenco

RxBIN 017010 RxPCN 02150000

Network Savings Program

**SA-269**

**Open Access Plus**

No Referral Required

| | |
|---|---|
| PCP Visit | 20% |
| Specialist | 20% |
| Hospital ER | 20% |
| Urgent Care | 20% |
| Rx | 20%/20%/20% |

Network Coinsurance:

| | |
|---|---|
| In | 80%/20% |
| Out | 60%/40% |

Med/Rx Deductible Applies

NMCWEBC

Case: 18-3206    Document: 16    RESTRICTED    Filed: 01/23/2019    Pages: 348
Case: 18-3206    Document: 11-7    RESTRICTED    Filed: 01/18/2019    Pages: 50



**Jordan Hoffman <jthoffmanlaw@gmail.com>**

---

## Fwd: Kenco Employee Benefits Plan

---

**Edith Mccurry** <emccurry1@gmail.com>
To: Jordan Hoffman <jthoffmanlaw@gmail.com>

Mon, Mar 21, 2016 at 8:03 PM

---

---------- Forwarded message ----------
From: **Miller, Scott - EBSA** <Miller.Scott.A@dol.gov>
Date: Friday, March 4, 2016
Subject: Kenco Employee Benefits Plan
To: "emccurry1@gmail.com" <emccurry1@gmail.com>

Hi Ms. McCurry,

Please find the attached information that I received from Cathy Phillips, Senior Manager of Benefits with Kenco Group, Inc.

Best regards,

*Scott Miller,* Senior Benefits Advisor
U.S. Department of Labor
Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, IL 60604
Phone: 312.353.4035
Fax: 312.353.1023

*This message may contain information that is privileged or otherwise exempt from disclosure under applicable law. Do not disclose without consulting the Employee Benefits Security Administration. If you think you received this message in error, please notify the sender immediately.*

---

📄 **Kenco_Requested Documents_E McCurry.pdf**
440K







# Open Enrollment Form 2016

Changes to medical, dental, vision, and/or FSA benefits can only be made during open enrollment or if a Qualifying Event occurs. Qualifying Event is defined as a major life change (IE: marriage, divorce, newborn, loss of coverage). The Qualifying Event must be relevant to the requested changes. Please attach proof of qualifying event when requesting a change to medical, dental, vision, and/or FSA coverage. <u>All changes must be requested within 30 days of Qualifying Event. Open Enrollment is October 5th- November 20th for the 2016 plan year.</u>

**Please specify type of change:**

❏ elect coverage   ❏ drop coverage   ❏ add dependent to coverage   ❏ drop dependent from coverage

**Effective Date of Open Enrollment Changes**: <u>1/1/2016</u>

**If you are adding or dropping coverage for yourself and/or dependents, please provide the information requested below ONLY for the members being added or dropped from coverage.**

| Full Name | Birth Date (MM/DD/YY) | Medical | Dental | Vision | HSA / HRA/FSA |
|---|---|---|---|---|---|
| Self:<br>SSN: | | ❏ add<br>❏ drop | ❏ add<br>❏ drop | ❏ add<br>❏ drop | ❏ HSA*<br>❏ HRA*/FSA**<br>❏ EE Contribution<br>$_____ |
| Spouse:<br>SSN:<br>Gender: | | ❏ add<br>❏ drop | ❏ add<br>❏ drop | ❏ add<br>❏ drop | Employee Max Contribution 2015:<br>HSA<br>$3350S, $6650F<br>FSA<br>$2000 |
| Dependent:<br>SSN:<br>Gender:<br>Relationship: | | ❏ add<br>❏ drop<br>❏ tax dependent | ❏ add<br>❏ drop | ❏ add<br>❏ drop | *CDHP Medical Plan participation required<br>**Medical plan participation NOT required for FSA |
| Dependent:<br>SSN:<br>Gender:<br>Relationship: | | ❏ add<br>❏ drop<br>❏ tax dependent | ❏ add<br>❏ drop | ❏ add<br>❏ drop | _____<br><br>**Dependent  Care FSA**<br>❏ Dependent Care FSA |
| Dependent:<br>SSN:<br>Gender:<br>Relationship: | | ❏ add<br>❏ drop<br>❏ tax dependent | ❏ add<br>❏ drop | ❏ add<br>❏ drop | EE Contribution:<br>$_____<br>*(Annual Max. $5000)* |

If additional space is needed to add dependents, please attach the information to this form.

SA-271

Case: 18-3206     Document: 117     Filed: 01/18/2019     Pages: 50



# Open Enrollment Form 2016

| Life Insurance Beneficiary<br>For both Base Life and Optional Life Insurance | | | |
|---|---|---|---|
| | **Full Name of Beneficiary** | **Relationship** | **Percentage** |
| Primary | | | |
| | | | |
| | | | |
| Contingent | | | |
| | | | |

Printed Employee Name:_____ Date: _____

Employee Signature: _____

**USAdmin Services**
**PO Box 11045**
**Chattanooga, TN 37401**

01/18/2016

Ms. EDITH MCCURRY
6239 S. 13110 E. Rd
PEMBROKE TOWNSHIP, IL 60958

---

Dear Ms. MCCURRY:

You are hereby notified that the monthly premium rates for the Health Benefits Continuation Plan listed below have changed.

---

| | | |
|---|---|---|
| Plan Name: | CIGNA Medical Coverage 2016 | Effective Date: 1/1/2016 |
| Coverage Level: | QB Only | Cost:    $438.88 |

Reason for Change:  Premium Rates for all employees are being changed.

Sincerely,

USAdmin Services
COBRA Administrator

---

Your current account balance is:  $483.28

Please send this payment to:
USAdmin Services LLC
P. O. Box 11045
Chattanooga, TN  37401

---

SA-273

# Kenco: Choice Fund Open Access Plus HSA

**Coverage Period: 01/01/2016 - 12/31/2016**

**Summary of Benefits and Coverage:** What this Plan Covers & What it Costs

**Coverage for:** Individual/Individual + Family | **Plan Type:** OAP

⚠️ **This is only a summary.** If you want more detail about your coverage and costs, you can get the complete terms in the policy or plan document at www.cigna.com/sp/ or by calling 1-800-Cigna24

| Important Questions | Answers | Why this Matters: |
|---|---|---|
| **What is the overall <u>deductible</u>?** | For in-network providers **$2,500** person / **$5,000** family<br>For out-of-network providers **$5,000** person / **$10,000** family<br>Deductible per person applies when the employee is the only person covered under the plan.<br>Does not apply to in-network preventive care<br>Amount your employer contributes to your account: Up to **$750** person / **$1,500** family. | You must pay all the costs up to the **<u>deductible</u>** amount before this plan begins to pay for covered services you use. Check your policy or plan document to see when the **<u>deductible</u>** starts over (usually, but not always, January 1st). See the chart starting on page 2 for how much you pay for covered services after you meet the **<u>deductible</u>**. |
| **Are there other <u>deductibles</u> for specific services?** | No. | You don't have to meet **<u>deductibles</u>** for specific services, but see the chart starting on page 2 for other costs for services this plan covers. |
| **Is there an <u>out-of-pocket limit</u> on my expenses?** | Yes. For in-network providers **$3,500** person / **$6,550** family / For out-of-network providers **$10,500** person / **$19,650** family | The **<u>out-of-pocket limit</u>** is the most you could pay during a coverage period (usually one year) for your share of the cost of covered services. This limit helps you plan for health care expenses. |
| **What is not included in the <u>out-of-pocket limit</u>?** | Premium, balance-billed charges, penalties for no pre-authorization, and health care this plan doesn't cover. | Even though you pay these expenses, they don't count toward the **<u>out-of-pocket limit</u>**. |
| **Is there an overall annual limit on what the plan pays?** | No. | The chart starting on page 2 describes any limits on what the plan will pay for *specific* covered services, such as office visits. |
| **Does this plan use a <u>network</u> of <u>providers</u>?** | Yes. For a list of participating providers, see **www.myCigna.com or call 1-800-Cigna24** | If you use an in-network doctor or other health care **<u>provider</u>**, this plan will pay some or all of the costs of covered services. Be aware, your in-network doctor or hospital may use an out-of-network **<u>provider</u>** for some services. Plans use the term in-network, **<u>preferred</u>**, or participating for **<u>providers</u>** in their **<u>network</u>**. See the chart starting on page 2 for how this plan pays different kinds of **<u>providers</u>**. |
| **Do I need a referral to see a <u>specialist</u>?** | No. You don't need a referral to see a specialist. | You can see the **<u>specialist</u>** you choose without permission from this plan. |
| **Are there services this plan doesn't cover?** | Yes. | Some of the services this plan doesn't cover are listed on page 5. See your policy or plan document for additional information about **<u>excluded services</u>**. |

Questions: Call 1-800-Cigna24 or visit us at www.myCigna.com.

If you aren't clear about any of the underlined terms used in this form, see the Glossary. You can view the Glossary at www.cciio.cms.gov or call 1-800-Cigna24 to request a copy.

1 of 7



- **Co-payments** are fixed dollar amounts (for example, $15) you pay for covered health care, usually when you receive the service.
- **Co-insurance** is *your* share of the costs of a covered service, calculated as a percent of the **allowed amount** of the service. For example, if the health plan's **allowed amount** for an overnight hospital stay is $1,000, your **co-insurance** payment of 20% would be $200. This may change if you haven't met your **deductible**.
- The amount the plan pays for covered services is based on the **allowed amount**. If an out-of-network **provider** charges more than the **allowed amount**, you may have to pay the difference. For example, if an out-of-network hospital charge is $1,500 for an overnight stay and the **allowed amount** is $1,000, you may have to pay the $500 difference. (This is called **balance billing**.)
- This plan may encourage you to use in-network **providers** by charging you lower **deductibles**, **co-payments** and **co-insurance** amounts.

| Common Medical Event | Services You May Need | Your Cost if you use an | | Limitations & Exceptions |
|---|---|---|---|---|
| | | In-Network Provider | Out-of-Network Provider | |
| **If you visit a health care provider's office or clinic** | Primary care visit to treat an injury or illness | 20% co-insurance | 40% co-insurance | -----------none----------- |
| | Specialist visit | 20% co-insurance | 40% co-insurance | -----------none----------- |
| | Other practitioner office visit | 20% co-insurance for chiropractor | 40% co-insurance | Coverage for Chiropractic care is limited to 20 days annual max. |
| | Preventive care/screening/ immunization | No charge | Not Covered/visit 40% co-insurance/screening Not Covered/immunizations | -----------none----------- |
| **If you have a test** | Diagnostic test (x-ray, blood work) | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| | Imaging (CT/PET scans, MRIs) | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| **If you need drugs to treat your illness or condition**<br><br>More information about **prescription drug coverage** is available at www.myCigna.com | Generic drugs | 20% co-insurance/prescription (retail),  20% co-insurance/ prescription (home delivery) | Not Covered | Coverage is limited up to a 30-day supply (retail) and a 90-day supply (home delivery) |
| | Preferred brand drugs | 20% co-insurance/prescription (retail),  20% co-insurance/ prescription (home delivery) | Not Covered | Coverage is limited up to a 30-day supply (retail) and a 90-day supply (home delivery) |
| | Non-preferred brand drugs | 20% co-insurance/prescription (retail),  20% co-insurance/ prescription (home delivery) | Not Covered | Coverage is limited up to a 30-day supply (retail) and a 90-day supply (home delivery) |

Questions: Call 1-800-Cigna24 or visit us at www.myCigna.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary.  You can view the Glossary at www.cciio.cms.gov or call 1-800-Cigna24 to request a copy.

2 of 7

| Common Medical Event | Services You May Need | Your Cost if you use an | | Limitations & Exceptions |
|---|---|---|---|---|
| | | In-Network Provider | Out-of-Network Provider | |
| **If you have outpatient surgery** | Facility fee (e.g., ambulatory surgery center) | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| | Physician/surgeon fees | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| **If you need immediate medical attention** | Emergency room services | 20% co-insurance | 20% co-insurance | -----------none----------- |
| | Emergency medical transportation | 20% co-insurance | 20% co-insurance | -----------none----------- |
| | Urgent care | 20% co-insurance | 20% co-insurance | -----------none----------- |
| **If you have a hospital stay** | Facility fee (e.g., hospital room) | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| | Physician/surgeon fees | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| **If you have mental health, behavioral health, or substance abuse needs** | Mental/Behavioral health outpatient services | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| | Mental/Behavioral health inpatient services | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| | Substance use disorder outpatient services | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| | Substance use disorder inpatient services | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| **If you are pregnant** | Prenatal and postnatal care | 20% co-insurance | 40% co-insurance | -----------none----------- |
| | Delivery and all inpatient services | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |

Questions: Call 1-800-Cigna24 or visit us at www.myCigna.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary.  You can view the Glossary
at www.cciio.cms.gov or call 1-800-Cigna24 to request a copy.                                    3 of 7

SA-276

| Common Medical Event | Services You May Need | Your Cost if you use an | | Limitations & Exceptions |
|---|---|---|---|---|
| | | In-Network Provider | Out-of-Network Provider | |
| If you need help recovering or have other special health needs | Home health care | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. Coverage is limited to 60 days annual max. Maximums cross-accumulate. |
| | Rehabilitation services | 20% co-insurance | 40% co-insurance | 50% penalty for failure to precertify speech therapy services. Coverage is limited to annual max of: 60 days for Rehabilitation services; 36 days for Cardiac rehab services |
| | Habilitation services | Not Covered | Not Covered | -----------none----------- |
| | Skilled nursing care | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. Coverage is limited to 60 days annual max |
| | Durable medical equipment | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| | Hospice services | 20% co-insurance | 40% co-insurance | 50% penalty for no precertification. |
| If your child needs dental or eye care | Eye Exam | Not Covered | Not Covered | -----------none----------- |
| | Glasses | Not Covered | Not Covered | -----------none----------- |
| | Dental check-up | Not Covered | Not Covered | -----------none----------- |

## Excluded Services & Other Covered Services

| Services Your Plan Does NOT Cover (This isn't a complete list. Check your policy or plan document for other excluded services.) | | |
|---|---|---|
| • Acupuncture<br>• Bariatric surgery<br>• Cosmetic surgery<br>• Dental care (Adult)<br>• Dental care (Children)<br>• Eye care (Children) | • Habilitation services<br>• Hearing aids<br>• Infertility treatment<br>• Long-term care<br>• Non-emergency care when traveling outside the U.S.<br>• Private-duty nursing | • Routine eye care (Adult)<br>• Routine foot care<br>• Weight loss programs |

| Other Covered Services (This isn't a complete list. Check your policy or plan document for other covered services and your costs for these services.) | | |
|---|---|---|
| • Chiropractic care | | |

Questions: Call 1-800-Cigna24 or visit us at www.myCigna.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary.  You can view the Glossary
at www.cciio.cms.gov or call 1-800-Cigna24 to request a copy.

SA-277

## Your Rights to Continue Coverage:

If you lose coverage under the plan, then, depending upon the circumstances, Federal and State laws may provide protections that allow you to keep health coverage. Any such rights may be limited in duration and will require you to pay a **premium**, which may be significantly higher than the premium you pay while covered under the plan. Other limitations on your rights to continue coverage may also apply.

For more information on your rights to continue coverage, contact the plan at 1-800-Cigna24. You may also contact your state insurance department, the U.S. Department of Labor, Employee Benefits Security Administration at 1-866-444-3272 or www.dol.gov/ebsa, or the U.S. Department of Health and Human Services at 1-877-267-2323 x61565 or www.cciio.cms.gov.

## Your Grievance and Appeals Rights:

If you have a complaint or are dissatisfied with a denial of coverage for claims under your plan, you may be able to **appeal** or file a **grievance**. For questions about your rights, this notice, or assistance, you can contact Cigna Customer service at 1-800-Cigna24. You may also contact the Department of Labor's Employee Benefits Security Administration at 1-866-444-EBSA (3272) or www.dol.gov/ebsa/healthreform.

## Does this Coverage Provide Minimum Essential Coverage?

The Affordable Care Act requires most people to have health care coverage that qualifies as "minimum essential coverage." **This plan or policy does provide minimum essential coverage.**

## Does this Coverage Meet the Minimum Value Standard?

The Affordable Care Act establishes a minimum value standard of benefits of a health plan. The minimum value standard is 60% (actuarial value). **This health coverage does meet the minimum value standard for the benefits it provides.**

## Language Access Services:

Spanish (Español): Para obtener asistencia en Español, llame al 1-800-244-6224.

Tagalog (Tagalog): Kung kailangan ninyo ang tulong sa Tagalog tumawag sa 1-800-244-6224.

Chinese (中文): 如果需要中文的帮助，请拨打这个号码 1-800-244-6224.

Navajo (Dine): Dinek'ehgo shika at'ohwol ninisingo, kwiijigo holne' 1-800-244-6224.

*---------------------To see examples of how this plan might cover costs for a sample medical situation, see the next page.----------*

---

Questions: Call 1-800-Cigna24 or visit us at www.myCigna.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary.  You can view the Glossary
at www.cciio.cms.gov or call 1-800-Cigna24 to request a copy.

# Coverage Examples
## About these Coverage Examples:

These examples show how this plan might cover medical care in given situations. Use these examples to see, in general, how much financial protection a sample patient might get if they are covered under different plans.

⚠️ **This is not a cost estimator.**

Don't use these examples to estimate your actual costs under this plan. The actual care you receive will be different from these examples, and the cost of that care will also be different.

See the next page for important information about these examples. Please consider any contributions you may receive in an HRA, HSA or FSA.

**Note:** These numbers assume enrollment in individual-only coverage.

### Having a baby
(normal delivery)

- **Amount owed to providers: $7,540**
- **Plan pays: $4,030**
- **Patient pays: $3,510**

**Sample care costs:**

| | |
|---|---|
| Hospital charges (mother) | $2,700 |
| Routine Obstetric Care | $2,100 |
| Hospital charges (baby) | $900 |
| Anesthesia | $900 |
| Laboratory tests | $500 |
| Prescriptions | $200 |
| Radiology | $200 |
| Vaccines, other preventive | $40 |
| **Total** | **$7,540** |

**Patient pays:**

| | |
|---|---|
| Deductible | $2,500 |
| Co-pays | $0 |
| Co-insurance | $980 |
| Limits or exclusions | $30 |
| **Total** | **$3,510** |

### Managing type 2 diabetes
(routine maintenance of a well-controlled condition)

- **Amount owed to providers: $5,400**
- **Plan pays: $2,110**
- **Patient pays: $3,290**

**Sample care costs:**

| | |
|---|---|
| Prescriptions | $2,900 |
| Medical equipment and supplies | $1,300 |
| Office visits & procedures | $700 |
| Education | $300 |
| Laboratory tests | $100 |
| Vaccines, other preventive | $100 |
| **Total** | **$5,400** |

**Patient pays:**

| | |
|---|---|
| Deductible | $2,500 |
| Co-pays | $0 |
| Co-insurance | $510 |
| Limits or exclusions | $280 |
| **Total** | **$3,290** |

Questions: Call 1-800-Cigna24 or visit us at www.myCigna.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary.  You can view the Glossary at www.cciio.cms.gov or call 1-800-Cigna24 to request a copy.

6 of 7

SA-279

# Questions and answers about the Coverage Examples:

## What are some of the assumptions behind the Coverage Examples?

- Costs don't include **premiums**.
- Sample care costs are based on national averages supplied by the U.S. Department of Health and Human Services, and aren't specific to a particular geographic area or health plan.
- The patient's condition was not an excluded or pre existing condition.
- All services and treatments started and ended in the same coverage period.
- There are no other medical expenses for any member covered under this plan.
- Out-of-pocket expenses are based only on treating the condition in the example.
- The patient received all care from in-network **providers**. If the patient had received care from out-of-network **providers**, costs would have been higher.

## What does a Coverage Example show?

For each treatment situation, the Coverage Example helps you see how **deductibles**, **co-payments**, and **co-insurance** might add up. It also helps you see what expenses might be left up to you to pay because the service or treatment isn't covered or payment is limited.

## Does the Coverage Example predict my own care needs?

✖ **No.** Treatments shown are just examples. The care you would receive for this condition could be different based on your doctor's advice, your age, how serious your condition is, and many other factors.

## Does the Coverage Example predict my future expenses?

✖ **No.** Coverage Examples are **not** cost estimators. You can't use the examples to estimate costs for an actual condition. They are for comparative purposes only. Your own costs will be different depending on the care you receive, the prices your **providers** charge, and the reimbursement your health plan allows.

## Can I use Coverage Examples to compare plans?

✔ **Yes.** When you look at the Summary of Benefits and Coverage for other plans, you'll find the same Coverage Examples. When you compare plans, check the "Patient Pays" box in each example. The smaller that number, the more coverage the plan provides.

## Are there other costs I should consider when comparing plans?

✔ **Yes.** An important cost is the **premium** you pay. Generally, the lower your **premium**, the more you'll pay in out-of-pocket costs, such as **co-payments**, **deductibles**, and **co-insurance**. You also should consider contributions to accounts such as health savings accounts (HSAs), flexible spending arrangements (FSAs) or health reimbursement accounts (HRAs) that help you pay out-of-pocket expenses.

**Plan ID:** 4400833  **BenefitVersion:** 5
**Plan Name:** 4400833 HSA Plan 2016

Questions: Call 1-800-Cigna24 or visit us at www.myCigna.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary.  You can view the Glossary
at www.cciio.cms.gov or call 1-800-Cigna24 to request a copy.

7 of 7

SA-280

Case: 18-3206    Document: 11-7    RESTRICTED    Filed: 01/18/2019    Pages: 50

SECTION XVII



SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402-2289
423-756-6600
FAX 423-785-8480

**ATTORNEYS AT LAW**

Karen M. Smith

Direct Dial 423-785-8209
Direct Fax 423-321-1565
ksmith@millermartin.com

August 7, 2014

**VIA FEDERAL EXPRESS**

Intake Unassigned Case Unit
Illinois Department of Human Rights
100 W. Randolph St., 10th Floor
Chicago, IL 60601

     Re:    <u>Tracy Davis v. Kenco Logistic Services, LLC</u>
              IDHR # 2014CF3162; EEOC #21BA41748

To Whom It May Concern:

On behalf of the Respondent, Kenco Logistic Services, LLC ("Kenco"), please accept the following position statement in response to the above-referenced charge filed by Tracy Davis, as well as Kenco's Verified Response and response to the Agency's questionnaire.[1]

As you know, the Complainant, Tracy Davis, filed a charge of discrimination alleging that he was terminated because of his race, Black, and gender, male. As will be discussed more fully herein, Kenco denies these allegations.

## I. BACKGROUND

Kenco is a third-party logistics company ("3PL") that operates and manages warehouses and order fulfillment operations for other companies. On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for Mars, Inc. While the Manteno facility was in operation prior to August 2013, it was managed by a different 3PL. When Kenco took over the site, it hired most of the employees working at the site but implemented its own policies and procedures.

The Complainant was hired by Kenco as a warehouse associate on April 21, 2013. At the time he was hired, Complainant received copies of Kenco's Prohibited Conduct and Non-Exempt Attendance Policies. <u>See</u> Policy sign off form signed by Complainant, contained in

---

[1] This position statement is submitted in order to assist the IDHR in its investigation of the above-referenced charge. The information set forth in the position statement, while believed to be true and correct, has been prepared based on preliminary interviews of those individuals believed to have the most relevant knowledge of this matter. It does not constitute an affidavit and is not intended to be used as evidence in any administrative or judicial proceeding. By submitting this position statement, the Respondent does not waive its right to present new or additional facts, arguments, or evidence. Likewise, inclusion of information in this statement does not constitute a waiver of any objections the Respondent may have to the relevancy of the information provided or to this or any future discovery or information requests in this or any subsequent proceeding.

August 7, 2014
Page 2

Exhibit 3. Pursuant to the Prohibited Conduct policy, the Complainant, like all Kenco employees, could be terminated for excessive absenteeism and tardiness. See Exhibit 4. Indeed, Kenco has an established point system under which non-exempt employees, including Complainant, are assessed points and portions of points for missed punches, tardiness, and absences. The policy also sets forth the level of discipline that will be issued as various point levels are reached. Ultimately, employees are subject to termination after reaching a total of 10 points. See Exhibit 5.

Complainant was disciplined and ultimately terminated in accordance with Kenco's attendance policy. Specifically, he received the following write-ups, or opportunities for improvement:

| | |
|---|---|
| Verbal Warning | August 6, 2013 |
| First Written Warning | September 27, 2013 |
| Second Written Warning | October 3, 2013 |
| Suspension | October 16, 2013 |
| Termination | May 19, 2014 |

See documents contained in Exhibit 3. Mike Manzello, Caucasian, Operations Manager, issued each of these write-ups and consulted with Tammi Fowler, Caucasian, Senior Employee Relations Manager, prior to terminating Complainant's employment. Complainant signed each write up, acknowledging receipt, and never made any written comments or otherwise claimed that he had not been absent on the days indicated in the write-ups or that he should not have otherwise been assessed the points indicated. Likewise, Complainant never submitted any internal complaint or grievance regarding the write-ups or any other issues at work.

## II. LEGAL ARGUMENT[2]

### A. Burden of Proof

The burden of proof in establishing a *prima facie* claim of discrimination lies with the complainant. A complainant seeking to establish a claim under either the Illinois Human Rights Act ("IHRA") or Title VII of the Civil Rights Act of 1964 ("Title VII") may rely on either direct or circumstantial evidence. Direct evidence is evidence that proves the existence of a fact without requiring any inferences. It is "smoking gun" evidence, "such as 'We fired you because of your race and/or national origin.'" Aguilera v. Village of Hazel Crest, 234 F. Supp. 2d 840, 848 (N.D. Ill. 2002). In this case, the Complainant has not alleged any direct evidence of discrimination or retaliation.

In the absence of direct evidence, a complainant must rely on circumstantial evidence to establish his claims. The order, allocation, and standards of proof generally applicable to discrimination cases under Title VII based on circumstantial evidence were first established in

---

[2] Cases brought under the Illinois Human Rights Act ("IHRA") are analyzed in the same manner as cases brought under Title VII of the Civil Rights Act of 1964. Alcequeire v. Human Rights Commission, 292 Ill. App. 3d 515, 685 N.E.2d 974, 976 (Ill. App. Ct. 1997). Thus, reference to federal case law decided under Title VII is appropriate.

August 7, 2014
Page 3

McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 804 (1973), and clarified in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981):

> First, the [complainant] has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the [complainant] succeeds in proving the prima facie case, the burden shifts to the [respondent] to "articulate some legitimate, non-discriminatory reason for the employee's rejection" . . . Third, should the [respondent] carry this burden, the [complainant] must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reason but were a pretext for discrimination.

See also Burks v. Wisconsin Dept. of Transp., 464 F.3d 744, 750-51 (7th Cir. 2006); Aguilera, 234 F. Supp. 2d at 848-49.

Nevertheless, the complainant at all times carries the ultimate burden of proving discrimination. Even though the burden of going forward with the evidence may shift between the parties, the burden of persuasion always remains with the complainant. Aguilera, 234 F. Supp. 2d at 848 (plaintiff bears the ultimate burden of proving that he was terminated because of his race); Lalvani v. Illinois Human Rights Comm'n, 324 Ill. App. 3d 774, 790, 755 N.E.2d 51, 64 (Ill. Ct. App. 2001) (same). The employer is never required to prove the "absence" of a discriminatory motive, and "it is not enough . . . [simply] to disbelieve the employer." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 512 n.4 (1993).

As set forth more fully herein, Mr. Davis has not alleged any facts or circumstances sufficient to carry his burden on his claim.

## B.     The Complainant Cannot Establish Unlawful Discrimination

In order to establish a *prima facie* case of either race or gender discrimination, a complainant must prove all of the following elements:

> (1)  he was a member of a protected class,
> (2)  he was doing his job well enough to meet his employer's legitimate expectations,
> (3)  he suffered an adverse employment action, and
> (4)  another similarly situated individual who was not in the protected class was treated more favorably.

Burks, 464 F.3d at 750-51; Aguilera, 234 F. Supp. 2d at 849; Raines v. Health Care Serv. Corp., 1988 WL 58591 *3 (N.D. Ill. May 31, 1988). A failure to establish even one of these elements is fatal to a complainant's claims. Traylor v. Brown, 295 F.3d 783, 790 (7th Cir. 2002).

August 7, 2014
Page 4

### 1.  The Complainant was not Meeting Kenco's Legitimate Performance Expectations

Kenco has a well-established and circulated attendance policy in place. See Exhibit 5. The Complainant was aware of this policy and had, in fact, been warned on several occasions that his continued violation of the policy could lead to his termination. See Exhibit 3. Courts in Illinois have recognized that an employee's failure to follow the employer's attendance requirements constitutes a failure to meet the employer's legitimate performance expectations, thereby making it impossible for the employee to establish a *prima facie* case of discrimination.

In Serritella v. Midwest Dental Products Corp., 1996 WL 495563 (Aug. 28, 1996 N.D. Ill.), the plaintiff claimed, among other things, that she was discriminated against under Title VII when she was terminated for excessive absenteeism.[3] In granting the employer's summary judgment motion as to this claim, the court noted:

> **Nor can plaintiff establish a prima facie case under the *McDonnell Douglas* framework.** She cannot show that she was meeting her employer's legitimate expectations at the time of her discharge.... It is undisputed that Serritella had excessive, unexcused absences in violation of the company attendance policy. Her total number of points actually exceeded the number required for termination. She was repeatedly warned for the consequences of continued absences. As her points accrued, Midwest issued verbal and written warnings in which it stressed the importance of reliability in order to maintain its production schedule. Such concerns are valid; an employer has a legitimate interest in insuring that employees work at a steady pace to meet the employer's production needs. Similarly, reliability and promptness are important considerations in maintaining a work force.... Midwest's attendance records indicate that Serritella was not living up to the expectations for employees, as outlined in its attendance plan.

Serritella, 1996 WL 495563 *5 (emphasis added). See also McDuffy v. Federal Express Corp., 130 Fed. Appx. 49, 50 (7th Cir. 2005) (plaintiff was not meeting defendant's "legitimate expectations because she was repeatedly written up for poor attendance" and, therefore, could not establish a *prima facie* case); Contreras v. Suncast Corp., 237 F.3d 756, 760-61 (7th Cir. 2001) (proper attendance is an implicit expectation of every employer).

Like the plaintiff in Serritella, Mr. Davis was not meeting Kenco's expectations as outlined in its attendance plan. Thus, Mr. Davis cannot establish a *prima facie* case of discrimination.

### 2.  The Complainant Cannot Point to any Similarly Situated Individuals Who Were Treated Differently

To be similarly situated, an employee must be "directly comparable to [the Complainant] in all material respects." Burks v. Wisconsin Dept. of Transp., 464 F.3d 744, 751 (7th Cir. 2006).

---

[3] The employer in Serritella had a point system under which the accumulation of 20 points was grounds for termination.

August 7, 2014
Page 5

"An employee is similarly situated to a [complainant] if the two employees not only report to the same supervisor, but also have engaged in similar conduct without such differentiating circumstances as would diminish the employer's treatment of them." Williams v. U.S. Steel Corp., 2012 WL 3233736 *8 (N.D. Ind. Aug. 6, 2012). See also Aguilera, 237 F. Supp. 2d at 850 (Courts should consider "whether the same decision makers, standards, and conduct were involved.").

In this case, Mr. Davis alleges that Esmeralda Phillips was treated differently from him in that she has not been terminated. Ms. Phillips, however, is not similarly situated to Mr. Davis in that she has not accumulated 10 or more attendance points. See Absent Report for Ms. Phillips, attached hereto as Exhibit 7. Moreover, other individuals have been terminated for violation of the attendance policy, including the following:

| Name | Race | Gender | Date of Termination |
|------|------|--------|---------------------|
| Jason Walker | White | Male | 03/05/2014 |
| Chad Schultz | White | Male | 02/14/2014 |
| Giacomo Purvis | White | Male | 06/06/2013 |

See Exhibit 6.

Based on the above, Mr. Davis has not established that similarly situated employees have been treated differently because of their race or gender, and his *prima facie* case must fail. See McDuffy, 130 Fed. Appx. at 50.

C.    **The Complainant Cannot Establish Pretext**

Even assuming that Mr. Davis can establish a *prima facie* case of either race or gender discrimination, Kenco has articulated a legitimate, non-discriminatory reason for the action taken, i.e., Mr. Davis accumulated over 10 points under its attendance policy. "Chronic absenteeism or tardiness are legitimate, non-discriminatory reason for firing an employee." Raines, 1988 WL 58591, *3. See also Hermann v. Cencom Cable Associates, Inc., 1994 WL 496857 *4 (July 12, 1994 S.D. Ill.) (poor attendance is a legitimate reason for termination); Lacy v. Ameritech Mobile Comm., Inc., 965 F. Supp. 1056, 1070 (N.D. Ill. 1997) (poor performance and attendance are legitimate, non-discriminatory reasons for denying a promotion).

Because Kenco has articulated a legitimate, non-discriminatory reason for its actions, Mr. Davis must prove pretext. To do this, he must show that Kenco's articulated reason:

    (1)    had no basis in fact;
    (2)    was not the real reason for his termination; or
    (3)    was insufficient to warrant termination.

Hermann, 1994 WL 496857 *5; Lacy, 965 F. Supp. At 1069.

In this case, Mr. Davis cannot prove any of these three things. He does not deny that he was absent/tardy on the days for which points were issued. Indeed, he never challenged any of the write-ups he received. No other basis for his termination has been identified or articulated,

12335810v1 05742-0276

August 7, 2014
Page 6

and excessive absenteeism is sufficient to warrant termination, as evidenced by the fact that others have been terminated for such.

## III. CONCLUSION

Based on the above, Kenco submits that Mr. Davis has failed to establish unlawful race or gender discrimination and that a determination should be issued in Kenco's favor.

Very truly yours,

Karen M. Smith

KMS/sw
Enclosures

STATE OF ILLINOIS
DEPARTMENT OF HUMAN RIGHTS

In the Matter of:

TRACY DAVIS,                    )
                                )
        Complainant,            )
                                )
                                )    Charge No. 2014CF3162
and                             )    EEOC No. 21BA41748
                                )
KENCO LOGISTIC SERVICES, LLC,   )
                                )
        Respondent.             )

### VERIFIED RESPONSE

Now comes the Respondent, Kenco Logistic Services, LLC ("Kenco"), and responds to

the Charge of Discrimination filed against it by the Complainant, Tracy Doss, as follows:

I.    A.   ISSUE/BASIS
           DISCHARGE, ON OR ABOUT MAY 19, 2014, BECAUSE OF MY RACE,
           BLACK.

      B.   PRIMA FACIE ALLEGATIONS.
           1.   The allegations contained in paragraph I.B.1. are admitted.

           2.   It is admitted that the Complainant was hired by Respondent on April
                21, 2013.  The remaining allegations contained in paragraph I.B.2. are
                denied.

           3.   The allegations contained in paragraph I.B.3. are admitted.

           4.   The allegations contained in paragraph I.B.4. are denied.

II.   A.   ISSUE/BASIS
           DISCHARGE, ON OR ABOUT MAY 19, 2014, BECAUSE OF MY SEX,
           MALE.

      B.   PRIMA FACIE ALLEGATIONS
           1.   The allegations contained in paragraph II.B.1. are admitted.

           2.   It is admitted that the Complainant was hired by Respondent on April
                21, 2013.  The remaining allegations contained in paragraph II.B.2. are
                denied.

           3.   The allegations contained in paragraph II.B.3. are admitted.

4.    The allegations contained in paragraph II.B.4. are denied.

## VERIFICATION

STATE OF ILLINOIS            )
                             ) SS
COUNTY OF KANKAKEE           )

Mike Manzello being first duly sworn, deposes and says that he is an Operations Manager at Kenco Logistic Services and that he has read the foregoing verified response to the charge of discrimination; that he knows the contents thereof; and that said response is true and correct to the best of his knowledge, information and belief.

_____
                            Mike Manzello

SUBSCRIBED and SWORN to before me this
___5ᵗʰ___ day of ___August___, 2014

_____
Notary Public

My commission expires___10/11/2017___

```
"OFFICIAL SEAL"
LEONARD A SZPLETT
Notary Public, State of Illinois
My Commission Expires 10/11/2017
```

2

12219234v1  05742-0276

SA-289

Respectfully submitted,

MILLER & MARTIN PLLC

By _Karen M. Smith_

Karen M. Smith

1000 Volunteer Building
832 Georgia Avenue
Chattanooga, TN 37402-2289
(423) 785-8209

Attorneys for Respondent


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Verified Response to the charge of discrimination was served upon:

Mr. Tracy Davis II
22438 Regency Drive, Apt. GA
Richton Park, IL 60471

Unassigned Case Unit
Intake Division
Illinois Department of Human Rights
100 West Randolph Street
James R. Thompson Center, Suite 10-100
Chicago, IL 60601

By depositing same in the U.S. Mail on the _7th_ day of _August_ , 2014.

_Karen M. Smith_

Karen M. Smith

3

Case: 18-3206    Document: 16    RESTRICTED    Filed: 01/23/2019    Pages: 348
Case: 18-3206    Document: 11    RESTRICTED    Filed: 01/18/2019    Pages: 50

2:16-cv-02273-CSB-EIL   # 81-14   Page 14 of 15

Express

Extremely Urgent

Page 1 of 1

FedEx Express

From: (423) 785-8205
KAREN V K SMITH ESQ
MILLER & MARTIN PLLC
SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TN 37402

SHIP TO: (312) 814-1431
Intake Unassigned Case Unit
Illinois Department of Human Rights
100 W RANDOLPH ST
James R. Thompson Center, St.10-100
CHICAGO, IL 60601

Ship Date: 07AUG14
ActWgt 3.0 LB
CAD: 154539/NET7859

Delivery Address Bar Code

Ref #
Invoice #
PO #
Dept #

TRK# 7707 8278 8930

XH CHIA

FRI - 08 AUG 10:30A
PRIORITY OVERNIGHT

60601
IL-US
ORD

Dept. of Human Rights
INTAKE UNIT
AUG 8 2014
RECEIVED

After reprinting this label:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

SA-291

Case: 18-3206    Document: 11-7    RESTRICTED    Filed: 01/18/2019    Pages: 50

# SECTION XVIII

25,28,APPEAL,CLOSED,CONSOL,LEAD,PROSE,REFER,RULE 16 CONFERENCE HELD

## U.S. District Court
## CENTRAL DISTRICT OF ILLINOIS (Urbana)
## CIVIL DOCKET FOR CASE #: 2:16–cv–02273–CSB–EIL

McCurry v. Kenco Logistic Services LLC et al
Assigned to: Judge Colin Stirling Bruce
Referred to: Magistrate Judge Eric I. Long
Member case:
   2:16–cv–02277–CSB–EIL
Cause: 28:1331 Fed. Question: Employment Discrimination

Date Filed: 08/29/2016
Date Terminated: 08/14/2018
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Edith McCurry**
                    represented by  **Edith McCurry**
6239 South 13110 East Road
Pembroke Township, IL 60958
815–735–4281
PRO SE

V.

**Defendant**

**Kenco Logistic Services LLC**
*a Tennessee Limited Liability Company*
                    represented by  **Jody Wilner Moran**
JACKSON LEWIS PC
Suite 2500
150 North Michigan Avenue
Chicago, IL 60601
312–787–4949
Fax: 312–787–4995
Email: moranj@jacksonlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Pearce Argentieri**
JACKSON LEWIS PC
Suite 2500
150 North Michigan Avenue
Chicago, IL 60601
312–787–4949
Fax: 312–787–4995
Email: julia.argentieri@jacksonlewis.com
*ATTORNEY TO BE NOTICED*

**Kathryn Montgomery Moran**
JACKSON LEWIS PC
Suite 2500
150 North Michigan Avenue
Chicago, IL 60601
312–787–4949

Fax: 312–787–4995
Email: <u>Kathryn.Moran@jacksonlewis.com</u>
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mars Inc**                                   represented by   **Thomas R Davies**
HARMON & DAVIES PC
2306 Columbia Avenue
Lancaster, PA 17603
717–291–2236
Fax: 717–291–5739
Email: <u>tdavies@h–dlaw.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Harry R Harmon**
HARMON & DAVIES PC
2306 Columbia Avenue
Lancaster, PA 17603
717–291–2236
Fax: 717–291–5739
Email: <u>rharmon@h–dlaw.com</u>
*ATTORNEY TO BE NOTICED*

**Kimberly J Overbaugh**
HARMON & DAVIES PC
2306 Columbia Avenue
Lancaster, PA 17603
717–291–2236
Fax: 717–291–5739
Email: <u>koverbaugh@h–dlaw.com</u>
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kelvin Walsh**                               represented by   **Jody Wilner Moran**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Pearce Argentieri**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Montgomery Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mike Manzello**                              represented by   **Jody Wilner Moran**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Julia Pearce Argentieri**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Montgomery Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**David Jabaley**                    represented by    **Jody Wilner Moran**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Pearce Argentieri**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Montgomery Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tammi Fowler**                    represented by    **Jody Wilner Moran**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Pearce Argentieri**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Montgomery Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mario Lopez**                    represented by    **Jody Wilner Moran**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Pearce Argentieri**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Montgomery Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lori Varvel**                                    represented by   **Jody Wilner Moran**
*from consolidated case 16–2277*                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Julia Pearce Argentieri**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Kathryn Montgomery Moran**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/29/2016 | 1 | | COMPLAINT against Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Mars Inc, Kelvin Walsh, filed by Edith McCurry. (Attachments: # 1 Exhibit)(DS, ilcd) (Additional attachment(s) added on 9/1/2016: # 2 Summons & USM–285 Forms) (DS, ilcd). (Entered: 08/30/2016) |
| 08/29/2016 | 2 | | MOTION for Leave to Proceed in forma pauperis by Plaintiff Edith McCurry. (DS, ilcd) (Entered: 08/30/2016) |
| 08/31/2016 | 3 | | ORDER entered by Magistrate Judge Eric I. Long on 8/31/2016. Plaintiff is to submit completed summons and USM–285 forms for each defendant within 21 days. See written Order. (Miscellaneous Deadline 9/21/2016)(DS, ilcd) (Entered: 08/31/2016) |
| 09/07/2016 | 4 | | ORDER Entered by Magistrate Judge Eric I. Long on 9/7/16 granting 2 Motion for Leave to Proceed in forma pauperis. IT IS ORDERED that the United States Marshal serve a copy of the complaint, summons, and order granting leave to proceed in forma pauperis upon the Defendant as directedby the Plaintiff. SEE WRITTEN ORDER. (Attachments: # 1 Consent Forms) (SKR, ilcd) (Entered: 09/07/2016) |
| 09/07/2016 | 5 | | Summons Issued as to Kenco Logistic Services LLC and forwarded to the US Marshal for service. (SKR, ilcd) (Entered: 09/07/2016) |
| 09/07/2016 | 6 | | Summons Issued as to Mars Inc and forwarded to the US Marshal for service. (SKR, ilcd) (Entered: 09/07/2016) |
| 09/07/2016 | 7 | | Summons Issued as to Kelvin Walsh and forwarded to the US Marshal for service. (SKR, ilcd) (Entered: 09/07/2016) |
| 09/07/2016 | 8 | | Summons Issued as to David Jabaley and forwarded to the US Marshal for service. (SKR, ilcd) (Entered: 09/07/2016) |
| 09/07/2016 | 9 | | Summons Issued as to Tammi Fowler and forwarded to the US Marshal for service. (SKR, ilcd) (Entered: 09/07/2016) |
| 09/07/2016 | | | TEXT ORDER Entered by Magistrate Judge Eric I. Long on 9/7/16. Pursuant to the Courts Order on September 7, 2016, Plaintiff submitted completed |

| | | | summons and USM–285 forms for most Defendants, but failed to provide the summons and USM forms for Defendants Mike Manzello and Mario Lopez. The Court directs Plaintiff to submit completed summons and USM–285 forms for Defendants Mike Manzello and Mario Lopez within 14 days. ( Miscellaneous Deadline 9/21/2016 set for summons/USM 285 forms) (SKR, ilcd) (Entered: 09/07/2016) |
|------------|----|--|---------------------------------------------------------------------------|
| 09/26/2016 | 10 |  | Remark: Plaintiff has submitted completed summonns' and USM–285 Forms for Manzello & Lopez. (Attachments: # 1 USM–285) (DS, ilcd) (Entered: 09/26/2016) |
| 09/28/2016 | 11 |  | Summons Issued as to Mario Lopez, Mike Manzello and forwarded to the US Marshal for service. (DS, ilcd) (Entered: 09/28/2016) |
| 10/10/2016 | 12 |  | NOTICE of Appearance of Attorney by Jody Wilner Moran on behalf of Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Kelvin Walsh (Moran, Jody) (Entered: 10/10/2016) |
| 10/10/2016 | 13 |  | NOTICE of Appearance of Attorney by Julia Pearce Argentieri on behalf of Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Kelvin Walsh (Argentieri, Julia) (Entered: 10/10/2016) |
| 10/10/2016 | 14 |  | MOTION for Extension of Time to File Answer *or Otherwise Plead* by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Kelvin Walsh. Responses due by 10/27/2016 (Attachments: # 1 Exhibit A)(Moran, Jody) (Entered: 10/10/2016) |
| 10/11/2016 |    |  | TEXT ORDER entered by Magistrate Judge Eric I. Long on 10/11/2016. Defendants' Unopposed Motion for an Extension of Time to Answer or Otherwise Plead 14 is GRANTED. Defendants' deadline to file an Answer or otherwise plead in extended to November 14, 2016. (Tammi Fowler answer due 11/14/2016; David Jabaley answer due 11/14/2016; Kenco Logistic Services LLC answer due 11/14/2016; Mario Lopez answer due 11/14/2016; Mike Manzello answer due 11/14/2016; Kelvin Walsh answer due 11/14/2016) (DS, ilcd) (Entered: 10/11/2016) |
| 10/24/2016 | 15 |  | RESPONSE to Motion re 14 MOTION for Extension of Time to File Answer *or Otherwise Plead* filed by Plaintiff Edith McCurry. (Attachments: # 1 Exhibit)(DS, ilcd) (Entered: 10/24/2016) |
| 11/14/2016 | 16 |  | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Kelvin Walsh. Responses due by 12/1/2016 (Moran, Jody) (Entered: 11/14/2016) |
| 11/14/2016 | 17 |  | MEMORANDUM in Support re 16 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Kelvin Walsh. (Moran, Jody) (Entered: 11/14/2016) |
| 11/14/2016 | 18 |  | RULE 56 NOTICE re 16 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM to pro se plaintiff. (DS, ilcd) (Entered: 11/14/2016) |
| 11/14/2016 | 19 |  | CERTIFICATE OF INTEREST pursuant to Local Rule 11.3 by Kenco Logistic Services LLC. (Moran, Jody) (Entered: 11/14/2016) |

| 11/14/2016 | 20 | | Summons Returned Unexecuted by Edith McCurry as to Mars Inc. (DS, ilcd) (Entered: 11/14/2016) |
|---|---|---|---|
| 11/28/2016 | 21 | | Alias Summons Issued as to Mars Inc and forwarded to the US Marshal for service. (DS, ilcd) (Main Document 21 replaced on 11/28/2016) (DS, ilcd). (Entered: 11/28/2016) |
| 11/29/2016 | 22 | | MOTION for Extension of Time to File Response as to 16 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Plaintiff Edith McCurry. Responses due by 12/16/2016. (DS, ilcd) (Entered: 11/29/2016) |
| 11/29/2016 | | | TEXT ORDER entered by Judge Colin Stirling Bruce on 11/29/2016. Plaintiff's 22 pro se Motion for Extension of Time to File is GRANTED. Plaintiff is allowed until 12/15/2016 to respond to 16 Defendants' Motion to Dismiss. (Responses due by 12/15/2016)(DS, ilcd) (Entered: 11/29/2016) |
| 12/02/2016 | 23 | | SUMMONS Returned Executed as to Fowler, Jabaley and Kenco by Edith McCurry. (KM, ilcd) (Entered: 12/02/2016) |
| 12/12/2016 | 24 | | ALIAS SUMMONS Returned Executed by Edith McCurry. Mars Inc served on 12/9/2016, answer due 12/30/2016. (DS, ilcd) (Entered: 12/12/2016) |
| 12/20/2016 | 25 | | RESPONSE to Motion re 16 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Plaintiff Edith McCurry. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit)(DS, ilcd) (Entered: 12/20/2016) |
| 12/29/2016 | 26 | | NOTICE of Appearance of Attorney by Thomas R Davies on behalf of Mars Inc (Davies, Thomas) (Entered: 12/29/2016) |
| 12/29/2016 | 27 | | NOTICE of Appearance of Attorney by Harry R Harmon on behalf of Mars Inc (Harmon, Harry) (Entered: 12/29/2016) |
| 12/29/2016 | 28 | | NOTICE of Appearance of Attorney by Kimberly J Overbaugh on behalf of Mars Inc (Overbaugh, Kimberly) (Entered: 12/29/2016) |
| 12/30/2016 | 29 | | ANSWER to 1 Complaint, AND AFFIRMATIVE DEFENSES by Mars Inc.(Davies, Thomas) (Entered: 12/30/2016) |
| 12/30/2016 | 30 | | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Defendant Mars Inc. Responses due by 1/13/2017 (Davies, Thomas) (Entered: 12/30/2016) |
| 12/30/2016 | 31 | | MEMORANDUM in Support re 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Defendant Mars Inc. (Davies, Thomas) (Entered: 12/30/2016) |
| 12/30/2016 | 32 | | RULE 56 NOTICE entered re 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (DS, ilcd) (Entered: 12/30/2016) |
| 01/03/2017 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 1/3/2017. Plaintiff has filed two cases with this court (2:16−cv−2273 and 2:16−cv− 2277). Plaintiff subsequently filed a Motion to Consolidate Cases in case number 2:16−cv−2277, which was granted by the Court on January 3, 2017. Therefore, this Court consolidates cases 2:16−cv−2273 and 2:16−cv−2277. All claims currently brought by Plaintiff in the two cases listed above will proceed in this case. (DS, ilcd) (Entered: 01/03/2017) |

| 01/03/2017 | <u>33</u> | | ORDER setting Rule 16 Scheduling Conference entered by Magistrate Judge Eric I. Long on 1/3/2017. Rule 16 Scheduling Conference set for 2/7/2017 at 10:45 AM by telephone from Urbana (court will place call) before Magistrate Judge Eric I. Long. See written Order.(DS, ilcd) (Entered: 01/03/2017) |
| 01/18/2017 | <u>34</u> | | RESPONSE to Motion re <u>16</u> MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Plaintiff Edith McCurry. (Attachments: # <u>1</u> Exhibit)(DS, ilcd) (Entered: 01/18/2017) |
| 02/01/2017 | <u>35</u> | | WAIVER OF SERVICE Returned Executed by Edith McCurry. Lori Varvel waiver sent on 1/19/2017, answer due 3/20/2017. (DS, ilcd) (Entered: 02/01/2017) |
| 02/03/2017 | <u>36</u> | | CERTIFICATE of Service/Counsel *for Defendants' Initial Rule 26a Disclosures* by Jody Wilner Moran on behalf of Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Kelvin Walsh (Moran, Jody) (Entered: 02/03/2017) |
| 02/07/2017 | <u>37</u> | | CERTIFICATE *of Service for Defendant's Initial Rule 26(a) Disclosures*. (Davies, Thomas) (Entered: 02/07/2017) |
| 02/07/2017 | <u>38</u> | | Minute Entry for proceedings held 2/7/2017 before Magistrate Judge Eric I. Long. Appearance of Plaintiff McCurry. Appearance for Defendants by Julia Argentieri and Thomas Davies. Court advises pro se plaintiff of pertinent Federal Rules of Civil Procedure regarding discovery. Rule 16 conference held by telephone. Plan approved; dates set. Consent to magistrate judge discussed (form attached). ADR options offered, including court–hosted settlement conference. The following discovery deadlines are set: Initial disclosure due by 3/7/17; Amended pleadings due by 3/21/17; Plaintiff's expert disclosure due by 7/14/17; Plaintiff shall make experts available for deposition by 8/11/17; Defendant's expert disclosure due by 9/15/17; Defendant shall make experts available for deposition by 10/13/17; Discovery due by 10/13/17; Case dispositive motions due by 10/27/17. Status Hearing set before Judge Long on 5/16/17 at 11:00 AM by telephone to discuss possible court hosted mediation or summary trial. Final Pretrial Conference is scheduled for 2/12/18 at 2:00 PM by personal appearance before Judge Colin S. Bruce, Courtroom A, Urbana. Jury Selection/Jury Trial is scheduled for 2/20/18 at 9:30 AM before Judge Colin S. Bruce, Courtroom A, Urbana, (3 days). (Tape #UR–B 10:47 AM.) (DS, ilcd) (Entered: 02/07/2017) |
| 02/07/2017 | <u>39</u> | | ORDER entered by Judge Colin Stirling Bruce on 2/7/2017. Defendant's Motion to Dismiss <u>16</u> is GRANTED. Mars' Motion to Dismiss <u>30</u> is GRANTED. This case is referred to Judge Long for further proceedings. See written Order. (DS, ilcd) (Entered: 02/07/2017) |
| 02/08/2017 | <u>40</u> | | SCHEDULING ORDER entered by Magistrate Judge Eric I. Long on 2/8/2017. Discovery due by 10/13/2017. Motions due by 10/27/2017. Final Pretrial Conference is set for 2/12/2018 at 2:00 PM in Courtroom A in Urbana before Judge Colin Stirling Bruce. Jury Selection/Jury Trial set for 2/20/2018 at 9:30 AM in Courtroom A in Urbana before Judge Colin Stirling Bruce. See written Order.(DS, ilcd) (Entered: 02/08/2017) |
| 02/13/2017 | <u>41</u> | | NOTICE of Appearance of Attorney by Jody Wilner Moran on behalf of Lori Varvel (Moran, Jody) (Entered: 02/13/2017) |

| 02/13/2017 | 42 | | NOTICE of Appearance of Attorney by Julia Pearce Argentieri on behalf of Lori Varvel (Argentieri, Julia) (Entered: 02/13/2017) |
|---|---|---|---|
| 02/21/2017 | 43 | | MOTION for Extension of Time to File Answer re 1 Complaint, *or Otherwise Plead* by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 3/7/2017 (Moran, Jody) (Entered: 02/21/2017) |
| 02/22/2017 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 2/22/2017. Defendants' Motion for an Extension of Time to Answer or Otherwise Plead 43 is GRANTED. Defendants Kenco, Walsh, Manzello, Jabaley, Fowler, Varvel, and Lopez's deadline to file an Answer or to otherwise respond to Plaintiff's Complaint is extended to March 23, 2017. (Tammi Fowler answer due 3/23/2017; David Jabaley answer due 3/23/2017; Kenco Logistic Services LLC answer due 3/23/2017; Mario Lopez answer due 3/23/2017; Mike Manzello answer due 3/23/2017; Lori Varvel answer due 3/23/2017; Kelvin Walsh answer due 3/23/2017)(DS, ilcd) (Entered: 02/22/2017) |
| 02/23/2017 | 44 | | MOTION for Clarification & Reconsideration re 39 Order on Motion to Dismiss for Failure to State a Claim, by Plaintiff Edith McCurry. Responses due by 3/9/2017. (DS, ilcd) (Entered: 02/23/2017) |
| 02/24/2017 | | | TEXT ORDER entered by Judge Colin Stirling Bruce on 2/24/2017. On 2/7/2017, this court entered a 14–page Order 39 ruling on the Motions to Dismiss filed by Defendants. This court carefully and thoroughly explained its ruling on all issues. This court also noted that it had concerns about whether Plaintiff's pro se filings were "a cut and paste job done by the plaintiff in one of the other cases against Mars and Kenco" and noted its "strong suspicion that Plaintiff is not actually the author of the documents filed in this case." This court ended the Order by stating "Plaintiff is hereby admonished that it is illegal in Illinois and against this court's Local Rules to practice law without a license. Therefore, a litigant, like Plaintiff, who knowingly allows a non–lawyer to represent her is subject to sanctions and other penalties for this behavior. All further filings in this case must be authored by Plaintiff herself to be considered by the court." On 2/23/2017, a 12–page pro se Motion for Clarification and Reconsideration 44 was filed in this case. The Motion is very similar to other documents filed in this case, documents which raised this court's concerns and strong suspicion that Plaintiff was not actually the author of the documents. The Motion 44 is therefore subject to being stricken because it appears that it was not authored by Plaintiff herself. In any case, this court concludes that there is no merit to the Motion for Clarification and Reconsideration 44 and it is DENIED. This court thoroughly explained the legal basis for its rulings and what Plaintiff purportedly "believes" about what the law is cannot and does not change those rulings. (DS, ilcd) (Entered: 02/24/2017) |
| 03/13/2017 | 45 | | MOTION for Clarification by Plaintiff Edith McCurry. Responses due by 3/27/2017. (DS, ilcd) (Entered: 03/13/2017) |
| 03/14/2017 | | | TEXT ORDER entered by Judge Colin Stirling Bruce on 3/14/2017. Plaintiff's 45 pro se Motion for Clarification is DENIED. (DS, ilcd) (Entered: 03/14/2017) |
| 03/22/2017 | 46 | | |

| | | | |
|---|---|---|---|
| | | | MOTION for Extension of Time to Submit an Amended Complaint, filed by Plaintiff Edith McCurry. Responses due by 4/5/2017. (DS, ilcd) (Entered: 03/22/2017) |
| 03/23/2017 | 47 | | ANSWER to 1 Complaint, AND AFFIRMATIVE DEFENSES by Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh.(Moran, Jody) (Entered: 03/23/2017) |
| 03/24/2017 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 3/24/2017. Plaintiff's Motion for Extension of Time to Extend the Deadline Time to Submit an Amended Complaint 46 is DENIED. Plaintiff's deadline to file an Amended Complaint was March 21, 2017. Plaintiff filed the instant Motion on March 22, 2017. To amend a pleading after the expiration of the trial court's Scheduling Order deadline to amend pleadings, the moving party must show "good cause." Fed. R. Civ. P. 16(b). Here, Plaintiff's Motion asks for an extension of time to file an Amended Complaint based on the fact that Defendant has been given an extension of time to file an Answer. Plaintiff does not put forth a reason for filing an Amended Complaint or even indicate whether she plans on doing so. Therefore, Plaintiff has failed to show good cause to extend her deadline to file an Amended Complaint. The Court notes that if Plaintiff is able to show good cause to amend her Complaint at a later date, she may seek leave to file an Amended Complaint at that time. Plaintiff is also advised that any future Motion for leave to file an Amended Complaint must have Plaintiff's proposed Amended Complaint attached to the Motion. (DS, ilcd) (Entered: 03/24/2017) |
| 05/16/2017 | | | Minute Entry for proceedings held 5/16/2017 before Magistrate Judge Eric I. Long. Appearance of the plaintiff Edith McCurry. Appearance for the defendant by Julia Argenteri. Status Conference held by telephone. Status of case discussed. Discovery discussed. Further Status Conference set for 9/12/2017 at 10:15 AM by telephone from Urbana (court will place call) before Magistrate Judge Eric I. Long. (Tape #UR–B 11:02 AM.) (DS, ilcd) (Entered: 05/16/2017) |
| 07/14/2017 | 48 | | MOTION for Extension of Time to Submit Expert Witnesses by Plaintiff Edith McCurry. Responses due by 7/28/2017. (DS, ilcd) (Entered: 07/14/2017) |
| 07/17/2017 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 7/17/2017. Any objection to Plaintiff's Motion for Extension of Time to Submit Expert Witnesses 48 is due by the close of business on 7/24/17. (DS, ilcd) (Entered: 07/17/2017) |
| 07/18/2017 | | | Set/Reset Deadlines: Responses due by 7/28/2017 (DS, ilcd) (Entered: 07/18/2017) |
| 07/19/2017 | 49 | | RESPONSE to Motion re 48 MOTION for Extension of Time to File filed by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Moran, Jody) (Entered: 07/19/2017) |
| 07/20/2017 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 7/20/2017. Plaintiff's Motion for Extension of Time to Submit Expert Witnesses 48 is GRANTED. The following deadlines are set: Plaintiff's expert disclosure due by 8/14/17; Plaintiff shall make experts available for deposition by 9/11/17; Defendant's expert disclosure due by 10/16/17; Defendant shall make experts |

| | | | |
|---|---|---|---|
| | | | available for deposition by 11/13/17; Discovery due by 11/13/17; Case dispositive motions due by 11/27/17. (DS, ilcd) (Entered: 07/20/2017) |
| 09/07/2017 | 50 | | MOTION to Compel *Discovery from Plaintiff* by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 9/21/2017 (Moran, Jody) (Entered: 09/07/2017) |
| 09/07/2017 | 51 | | MEMORANDUM in Support re 50 MOTION to Compel *Discovery from Plaintiff* filed by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Moran, Jody) (Entered: 09/07/2017) |
| 09/08/2017 | 52 | | MOTION for Protective Order by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 9/22/2017 (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Moran, Jody) (Entered: 09/08/2017) |
| 09/11/2017 | 53 | | MOTION to Strike *and Bar Plaintiff's Proposed Expert James Kolka* by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 9/25/2017 (Moran, Jody) (Entered: 09/11/2017) |
| 09/11/2017 | 54 | | MEMORANDUM in Support re 53 MOTION to Strike *and Bar Plaintiff's Proposed Expert James Kolka* filed by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. (Attachments: # 1 Exhibit A – Part 1, # 2 Exhibit A – Part 2, # 3 Exhibit A – Part 3, # 4 Exhibit A – Part 4, # 5 Exhibit A – Part 5, # 6 Exhibit A – Part 6, # 7 Exhibit A – Part 7, # 8 Exhibit A – Part 8, # 9 Exhibit A – Part 9, # 10 Exhibit A – Part 10, # 11 Exhibit A – Part 11, # 12 Exhibit A – Part 12, # 13 Exhibit A – Part 13, # 14 Exhibit A – Part 14, # 15 Exhibit A – Part 15, # 16 Exhibit A – Part 16, # 17 Exhibit A – Part 17, # 18 Exhibit A – Part 18, # 19 Exhibit A – Part 19, # 20 Exhibit A – Part 20, # 21 Exhibit B)(Moran, Jody) (Entered: 09/11/2017) |
| 09/12/2017 | | | Minute Entry for proceedings held 9/12/2017 before Magistrate Judge Eric I. Long. Appearance of the plaintiff. Appearance for the defendant by Julia Argentieri and Kimberly Overbaugh. Status Conference held by telephone. Status of case discussed. Motion for Protective Order 52 Granted. Written Order to be entered. Discovery discussed. Further Status Conference set for 11/9/2017 at 10:15 AM by telephone from Urbana (court will place call) before Magistrate Judge Eric I. Long. (Tape #UR–B 10:15 AM.) (DS, ilcd) Modified on 9/12/2017 to correct date (DS, ilcd). (Entered: 09/12/2017) |
| 09/12/2017 | 55 | | CONFIDENTIALITY ORDER entered by Magistrate Judge Eric I. Long on 9/12/2017. See written Order. (DS, ilcd) (Entered: 09/12/2017) |
| 09/18/2017 | 56 | | Response re 55 Confidential Order by Edith McCurry. (DS, ilcd) (Entered: 09/18/2017) |
| 09/21/2017 | 57 | | RESPONSE to Motion re 50 MOTION to Compel *Discovery from Plaintiff* filed by Plaintiff Edith McCurry. (Attachments: # 1 Exhibit, # 2 Exhibit)(DS, ilcd) Modified on 9/22/2017 to correct filed date (DS, ilcd). (Entered: |

| | | | |
|---|---|---|---|
| | | | 09/22/2017) |
| 09/21/2017 | <u>58</u> | | MOTION to Compel by Plaintiff Edith McCurry. (Attachments: # <u>1</u> Exhibit, # <u>2</u> Exhibit, # <u>3</u> Exhibit, # <u>4</u> Exhibit, # <u>5</u> Exhibit, # <u>6</u> Exhibit) Responses due by 10/5/2017.(DS, ilcd) (Entered: 09/22/2017) |
| 09/26/2017 | <u>59</u> | | RESPONSE to Motion re <u>53</u> MOTION to Strike *and Bar Plaintiff's Proposed Expert James Kolka* filed by Plaintiff Edith McCurry. (Attachments: # <u>1</u> Exhibit, # <u>2</u> Exhibit, # <u>3</u> Exhibit)(DS, ilcd) (Entered: 09/26/2017) |
| 09/28/2017 | <u>60</u> | | RESPONSE to Motion re <u>58</u> MOTION to Compel filed by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> Exhibit E)(Moran, Jody) (Entered: 09/28/2017) |
| 11/02/2017 | <u>61</u> | | NOTICE of Appearance of Attorney by Kathryn Montgomery Moran on behalf of Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh (Moran, Kathryn) (Entered: 11/02/2017) |
| 11/02/2017 | <u>62</u> | | MOTION for Extension of Time to Complete Discovery *and Re−Set the Trial Date* by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 11/16/2017 (Moran, Kathryn) (Entered: 11/02/2017) |
| 11/06/2017 | <u>63</u> | | MOTION for Protective Order *Regarding Plaintiff's Discovery* by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 11/20/2017 (Moran, Kathryn) (Entered: 11/06/2017) |
| 11/06/2017 | <u>64</u> | | MEMORANDUM in Support re <u>63</u> MOTION for Protective Order *Regarding Plaintiff's Discovery* filed by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> Exhibit E)(Moran, Kathryn) (Entered: 11/06/2017) |
| 11/08/2017 | <u>65</u> | | RESPONSE/OBJECTION to Defendants' <u>62</u> MOTION for Extension of Time to Complete Discovery *and Re−Set the Trial Date* filed by Plaintiff Edith McCurry. (Attachments: # <u>1</u> Exhibits) (KM, ilcd) (Entered: 11/08/2017) |
| 11/08/2017 | <u>66</u> | | ORDER Entered by Magistrate Judge Eric I. Long on 11/8/17 granting in part and denying in part <u>50</u> Motion to Compel. Defendants request for sanctions is denied. SEE WRITTEN ORDER. (SKR, ilcd) (Entered: 11/08/2017) |
| 11/08/2017 | <u>67</u> | | ORDER Entered by Magistrate Judge Eric I. Long on 11/8/17. Plaintiffs Motion to Compel Defendants Lori Varvel, Mike Manzello, and Kenco Logistics <u>58</u> is DENIED as moot. SEE WRITTEN ORDER. (SKR, ilcd) (Entered: 11/08/2017) |
| 11/09/2017 | | | Minute Entry for proceedings held 11/9/2017 before Magistrate Judge Eric I. Long. Appearance of the plaintiff Edith McCurry. Appearance for the defendants by Julia Pearce Argentieri and Kimberly Overbaugh. Status Conference held by telephone. Status of case discussed. Motion for Extension of Time <u>62</u> is GRANTED. The discovery schedule is amended as follows: Discovery due by 4/6/2018; Motions due by 5/5/2018. Final Pretrial |

| | | | |
|---|---|---|---|
| | | | Conference set for 9/10/2018 at 11:00 AM in Courtroom A in Urbana before Judge Colin Stirling Bruce. Jury Selection/Jury Trial set for 9/18/2018 at 9:30 AM in Courtroom A in Urbana before Judge Colin Stirling Bruce. Further Status Conference set for 1/29/2018 at 10:00 AM by telephone from Urbana (court will place call) before Magistrate Judge Eric I. Long. (Tape #UR–B 10:21 AM.) (DS, ilcd) (Entered: 11/09/2017) |
| 11/30/2017 | 68 | | MOTION for Sanctions *under Rule 37 (Renewed)* by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 12/14/2017 (Moran, Jody) (Entered: 11/30/2017) |
| 12/07/2017 | 69 | | MOTION to Supplement 68 MOTION for Sanctions *under Rule 37 (Renewed)* by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 12/21/2017 (Attachments: # 1 Exhibit A)(Moran, Jody) (Entered: 12/07/2017) |
| 12/07/2017 | 70 | | ORDER entered by Magistrate Judge Eric I. Long on 12/7/2017. Defendants' Motion to Strike and Bar Plaintiff's Expert James Kolka 53 is GRANTED. Plaintiff will not be permitted to use Kolka's expert witness report or present testimony from Kolka at trial. See written Order. (DS, ilcd) (Entered: 12/07/2017) |
| 12/08/2017 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 12/8/2017. Defendants' Motion to Supplement Defendants' Renewed Motion for Sanctions Under Rule 37 69 is GRANTED. The Court will consider the additional information presented in Defendants' Motion to Supplement 69 when ruling on Defendants Renewed Motion for Sanctions Under Rule 37 68 . Accordingly, Plaintiff's deadline to respond to Defendants' Renewed Motion for Sanctions Under Rule 37 68 is extended to December 21, 2017 in order to give Plaintiff an opportunity to respond to the new information presented in Defendants' Motion to Supplement. (Responses due by 12/21/2017)(DS, ilcd) (Entered: 12/08/2017) |
| 12/08/2017 | 71 | | ORDER entered by Magistrate Judge Eric I. Long on 12/8/2017. Defendant's Motion for Protective Order 63 is GRANTED in part and DENIED in part. Plaintiff's Requests to Admit are STRICKEN. Plaintiff may propound no more than 25 Requests to Admit on Defendants within 14 days of the entry of this order. Plaintiff's Document Production Requests filed between 10/4/17 and 10/17/17 are STRICKEN. Plaintiff shall not propound any further Interrogatories or Documents Production Requests. Defendant's request for sanctions is DENIED. Any further abuse of the discovery process by Plaintiff will result in sanctions up to and including dismissal of this action. See written Order. (DS, ilcd) (Entered: 12/08/2017) |
| 12/14/2017 | 72 | | +++ **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO RENEW ITS MOTION FOR SANCTIONS 68 . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (TC, ilcd) Modified on 12/18/2017 to unseal all documents except Exhibit [72–1] as directed in the Court's 12/18/17 text order (DS, ilcd). (Entered: 12/15/2017)** |
| 12/18/2017 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 12/18/2017. On December 14, 2017, Plaintiff filed a Response to Defendant's Motion to Renew its Motion for Sanctions 72 . Because Plaintiffs Response contained Plaintiff's |

| | | | personal information, including her social security number and tax return information, the Court directed the Clerk to seal Plaintiff's response until the Court could review the information in detail. After review, Plaintiff's personal information is only contained in Exhibit 1 filed in conjunction with her response. Accordingly, the Court directs the Clerk to unseal Plaintiff's Response to Defendant's Motion to Review Its Motion for Sanctions 72 , including all attached Exhibits, with the exception of Exhibit 1 [72−1] which shall remain under seal. (DS, ilcd) (Entered: 12/18/2017) |
|---|---|---|---|
| 12/21/2017 | 73 | | RESPONSE to Motion re 69 MOTION to Supplement 68 MOTION for Sanctions *under Rule 37 (Renewed)* filed by Plaintiff Edith McCurry. (Attachments: # 1 Exhibits) (TC, ilcd) (Entered: 12/21/2017) |
| 12/22/2017 | 74 | | Second MOTION to Supplement 68 MOTION for Sanctions *under Rule 37 (Renewed) or Request for an Evidentiary Hearing* by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 1/5/2018 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Moran, Jody) (Entered: 12/22/2017) |
| 01/05/2018 | 75 | | RESPONSE to Motion re 74 Second MOTION to Supplement 68 MOTION for Sanctions under Rule 37 (Renewed) or Request for an Evidentiary Hearing filed by Plaintiff Edith McCurry. (SKR, ilcd) (Entered: 01/05/2018) |
| 01/29/2018 | | | Minute Entry for proceedings held 1/29/2018 before Magistrate Judge Eric I. Long. Appearance of the plaintiff Edith McCurry. Appearance for the defendant by Julia Argentieri. Status Conference held by telephone. Status of discovery discussed. Further Status Conference set for 3/14/2018 at 10:15 AM by telephone from Urbana (court will place call) before Magistrate Judge Eric I. Long. (Tape #UR−B 10:04 AM.) (DS, ilcd) (Entered: 01/29/2018) |
| 03/05/2018 | 76 | | ORDER entered by Magistrate Judge Eric I. Long on 3/5/2018. Defendants' Second Motion to Supplement 74 is DENIED. Defendants' Renewed Motion for Sanctions Under Rule 37 68 is GRANTED in part and DENIED in part. See written Order. (DS, ilcd) (Entered: 03/05/2018) |
| 03/14/2018 | | | Minute Entry for proceedings held 3/14/2018 before Magistrate Judge Eric I. Long. Appearance of the plaintiff, Edith McCurry. Appearance for the defendant by Julia Argentieri and Kimberly Overbaugh. Status Conference held by telephone. Status of case and discovery discussed. Discovery will close with the exception of the deposition of Edith McCurry. Motion deadline extended to 5/21/2018. (Motions due by 5/21/2018) (Tape #UR−B 10:22 AM.) (DS, ilcd) (Entered: 03/14/2018) |
| 03/21/2018 | 77 | | MOTION to Bar Plaintiff from Seeking Damages Beyond Nominal Damages Pursuant to Court's March 5, 2018 Order by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 4/4/2018 (Attachments: # 1 Exhibit A)(Moran, Jody) (Entered: 03/21/2018) |
| 03/22/2018 | 78 | | MOTION to Bar Plaintiff from Seeking Damages Beyond Nominal Damages Pursuant to Court's March 5, 2018 Order re 76 Order on Motion for Sanctions, Order on Motion to Supplement,, by Defendant Mars Inc. Responses due by 4/5/2018 (Overbaugh, Kimberly) (Entered: 03/22/2018) |

| 03/23/2018 | 79 | MOTION to Compel Discovery From Defendants Lori Varvel, Mike Manzello, Kelvin Walsh, David Jabaley, Tammi Fowler, Mario Lopez & Kenco Logistics by Plaintiff Edith McCurry. Responses due by 4/9/2018. (Attachments: # 1 Exhibit I, # 2 Exhibit II, # 3 Exhibit III)(DS, ilcd) (Entered: 03/26/2018) |
|---|---|---|
| 03/23/2018 | 80 | Exhibit re 79 MOTION to Compel by Edith McCurry. (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F, # 6 Exhibit G, # 7 Exhibit H, # 8 Exhibit I, # 9 Exhibit J, # 10 Exhibit K, # 11 Exhibit L, # 12 Exhibit M, # 13 Exhibit N)(DS, ilcd) (Entered: 03/26/2018) |
| 03/23/2018 | 81 | Exhibit re 79 MOTION to Compel by Edith McCurry. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10, # 10 Exhibit 11, # 11 Exhibit 12, # 12 Exhibit 13, # 13 Exhibit 14, # 14 Exhibit 15, # 15 Exhibit 16, # 16 Exhibit 17, # 17 Exhibit 18, # 18 Exhibit 19, # 19 Exhibit 20)(DS, ilcd) (Entered: 03/26/2018) |
| 03/23/2018 | 82 | Exhibit re 79 MOTION to Compel by Edith McCurry. (Attachments: # 1 Exhibit 22, # 2 Exhibit 23, # 3 Exhibit 24, # 4 Exhibit 25, # 5 Exhibit 26, # 6 Exhibit 27, # 7 Exhibit 28, # 8 Exhibit 29, # 9 Exhibit 30, # 10 Exhibit 31, # 11 Exhibit 32, # 12 Exhibit 33, # 13 Exhibit 34, # 14 Exhibit 35, # 15 Exhibit 36, # 16 Exhibit 37, # 17 Exhibit 38, # 18 Exhibit 39, # 19 Exhibit 40)(DS, ilcd) (Entered: 03/26/2018) |
| 03/23/2018 | 83 | Exhibit re 79 MOTION to Compel by Edith McCurry. (Attachments: # 1 Part 2, # 2 Part 3, # 3 Part 4, # 4 Part 5 Part 1, # 5 Part 5 Part 2, # 6 Part 5 Part 3, # 7 Exhibit 42, # 8 Exhibit 43, # 9 Exhibit 44, # 10 Exhibit 45 Part 1, # 11 Exhibit 45 Part 2, # 12 Exhibit 46, # 13 Exhibit 47, # 14 Exhibit 48, # 15 Exhibit 49, # 16 Exhibit 50, # 17 Exhibit 51, # 18 Exhibit 52, # 19 Exhibit 53, # 20 Exhibit 54, # 21 Exhibit 55, # 22 Exhibit 56, # 23 Exhibit 57, # 24 Exhibit 58, # 25 Exhibit 59, # 26 Exhibit 60, # 27 Exhibit 61, # 28 Exhibit 62, # 29 Exhibit 63, # 30 Exhibit 64, # 31 Exhibit 65, # 32 Exhibit 66, # 33 Exhibit 67)(DS, ilcd) (Entered: 03/26/2018) |
| 03/23/2018 | 84 | MOTION for Leave to File Additional Exhibit Under Seal by Plaintiff Edith McCurry. Responses due by 4/9/2018. (DS, ilcd) (Entered: 03/26/2018) |
| 04/02/2018 | 85 | RESPONSE to Motion re 79 MOTION to Compel *and Renewed Request for Sanctions* filed by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Moran, Jody) (Entered: 04/02/2018) |
| 04/05/2018 | 86 | MOTION to Compel by Plaintiff Edith McCurry. Responses due by 4/19/2018. (Attachments: # 1 Exhibit)(DS, ilcd) Modified on 4/6/2018 as to defendant Mars Inc (KM, ilcd). (Entered: 04/05/2018) |
| 04/05/2018 | 87 | RESPONSE to Motion re 78 MOTION to Bar Plaintiff from Seeking Damages and re 77 MOTION to Bar Plaintiff from Seeking Damages filed by Plaintiff Edith McCurry. (Attachments: # 1 Exhibit)(DS, ilcd) (Entered: 04/05/2018) |
| 04/06/2018 | 88 | MOTION for Leave to File Documents for Court's Review Under Seal in Support of pla's Motion to Compel defendant Mars Inc in Compliance to the Court's Order of Protection by Plaintiff Edith McCurry. Responses due by 4/20/2018. (KM, ilcd) (Entered: 04/06/2018) |

| 04/06/2018 | 89 | | +++ **SEALED EXHIBITS (part 1)** with regard to Motion to Compel Discovery 86 from Defendant Mars Inc (Attachments: # 1 Exhibits Part 2, # 2 Exhibits Part 3, # 3 Exhibits Part 4, # 4 Exhibits Part 5)(KM, ilcd) (Entered: 04/06/2018) |
| 04/06/2018 | 90 | | MOTION for Leave to File Documents for Court's Review Under Seal in Support of pla's Motion to Compel defendants Varvel, Lopez, Walsh, Manzello, Fowler, Jabaley, and Kenco in Compliance to the Court's Order of Protection by Plaintiff Edith McCurry. Responses due by 4/20/2018. (KM, ilcd) (Entered: 04/06/2018) |
| 04/06/2018 | 91 | | +++ **SEALED EXHIBITS (part 1)** with regard to Motion to Compel Discovery 79 from Defendants Varvel, Lopez, Walsh, Manzello, Fowler, Jabaley, and Kenco (Attachments: # 1 Exhibits Part 2, # 2 Exhibits Part 3, # 3 Exhibits Part 4, # 4 Exhibits Part 5, # 5 Exhibits Part 6)(KM, ilcd) (Entered: 04/06/2018) |
| 04/10/2018 | 92 | | ORDER entered by Magistrate Judge Eric I. Long on 4/10/2018. The Kenco Defendants' Motion to Bar Plaintiff from Seeking Damages Beyond Nominal Damages Pursuant to Court's March 5, 2018 Order 77 and Defendant Mars Incorporated's Motion to Bar Plaintiff from Seeking Damages Beyond Nominal Damages Pursuant to court's March 5, 2018 Order 78 are DENIED. See written Order. (DS, ilcd) (Entered: 04/10/2018) |
| 04/13/2018 | 93 | | REPLY to Response to Motion re 79 MOTION to Compel and Renewed Motion for Sanctions filed by Plaintiff Edith McCurry. (JMB, ilcd) (Entered: 04/13/2018) |
| 04/17/2018 | 94 | | RESPONSE to Motion re 86 MOTION to Compel filed by Defendant Mars Inc. (Attachments: # 1 Exhibit Ex A Mars Initial Discl, # 2 Exhibit Ex B Plaintiff's March 6 2018 letter, # 3 Exhibit Ex C Mars March 16 2018 letter, # 4 Text of Proposed Order Proposed Order)(Overbaugh, Kimberly) (Entered: 04/17/2018) |
| 04/19/2018 | 95 | | OBJECTION to Defendants' Counsel's Phone Conference/Communication with Judge Long Regarding the April 18, 2018 Deposition, filed by Edith McCurry. (Attachments: # 1 Exhibits) (TC, ilcd) (Entered: 04/19/2018) |
| 04/19/2018 | 96 | | MOTION to Bar/Exclude Defendants Evidence by Plaintiff Edith McCurry. Responses due by 5/3/18. (Attachments: # 1 Exhibits) (TC, ilcd) (Entered: 04/19/2018) |
| 04/20/2018 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 4/20/2018. Plaintiff's Motion to Bar/Exclude Defendants' Evidence 96 is DENIED. Plaintiff may raise her arguments for excluding evidence that she believes was not timely disclosed as a motion in limine in advance of trial after dispositive motions (if any) have been ruled upon. (DS, ilcd) (Entered: 04/20/2018) |
| 04/25/2018 | 97 | | MOTION for Extension of Time to File *Motion to Extend Dispositive Motion Deadline* by Defendant Mars Inc. Responses due by 5/9/2018 (Attachments: # 1 Exhibit Ex A Email dated April 17, 2018, # 2 Exhibit Ex B Notice of Deposition, # 3 Text of Proposed Order Proposed Order)(Overbaugh, Kimberly) (Entered: 04/25/2018) |
| 04/26/2018 | | | |

| | | | |
|---|---|---|---|
| | | | TEXT ORDER entered by Judge Colin Stirling Bruce on 4/26/2018. Defendant's 97 Motion for Extension of Time is GRANTED. The dispositive motion deadline is extended until June 21, 2018. (Motions due by 6/21/2018.)(DS, ilcd) (Entered: 04/26/2018) |
| 05/01/2018 | 98 | | MOTION to Compel *Text Messages that McCurry Identified During Her Deposition, but Refused to Produce* by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 5/15/2018 (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Moran, Jody) (Entered: 05/01/2018) |
| 05/01/2018 | 99 | | Response by Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh re 95 Objection . (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Moran, Jody) (Entered: 05/01/2018) |
| 05/10/2018 | 100 | | OBJECTION to Text Order on Motion for Extension of Time to File, dated 4/26/2018 by Edith McCurry. (DS, ilcd) (Entered: 05/10/2018) |
| 05/10/2018 | 101 | | Motion/Request for Judicial Notice by Plaintiff Edith McCurry. Responses due by 5/24/2018. (DS, ilcd) (Entered: 05/10/2018) |
| 05/11/2018 | 102 | | ORDER entered by Magistrate Judge Eric I. Long on 5/11/2018. Plaintiff's Motions to Compel 79 and 86 are DENIED. Plaintiff's Motions for Leave to File Exhibits Under Seal 84 , 88 , 90 are DENIED as moot. See written Order. (DS, ilcd) (Entered: 05/11/2018) |
| 05/11/2018 | 103 | | MOTION to Compel *Plaintiff's Deposition & Extend Dispositive Motion Deadline* by Defendant Mars Inc. Responses due by 5/25/2018 (Attachments: # 1 Exhibit Ex A Notice of Deposition, # 2 Exhibit Ex B UPS Next Day Air Delivery Notification, # 3 Exhibit Ex C Text Message to Ms. McCurry, # 4 Exhibit Ex D Email to Ms McCurry re: Deposition, # 5 Exhibit Ex E May 2, 2018 ltr to Ms. McCurry, # 6 Exhibit Ex F Fax from Ms. McCurry dated May 9, 2018, # 7 Text of Proposed Order Proposed Order)(Overbaugh, Kimberly) (Entered: 05/11/2018) |
| 05/11/2018 | 104 | | MOTION for Leave to File Document Under Seal by Defendant Mars Inc. Responses due by 5/25/2018 (Attachments: # 1 Text of Proposed Order Proposed Order)(Overbaugh, Kimberly) (Entered: 05/11/2018) |
| 05/11/2018 | 105 | | **+++ SEALED DOCUMENT.. (Overbaugh, Kimberly) (Entered: 05/11/2018)** |
| 05/11/2018 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 5/11/18. On May 10, 2018, Plaintiff filed a Motion for Judicial Notice 101 asking the Court to take judicial notice of what Plaintiff alleges are various violations of the Federal Rules of Civil Procedure, as well as "schemes and antics directed toward Plaintiff" and "attacks on the judicial system." Pursuant to Federal Rule of Evidence 201(b), the Court may take judicial notice of a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Plaintiff's request does not satisfy Rule 201 as the "facts" that she asks the Court to take judicial notice of are subject to reasonable dispute, are not generally known within the Court's territorial jurisdiction, and cannot be accurately and readily |

| | | | |
|---|---|---|---|
| | | | determined from sources whose accuracy cannot reasonably be questioned. Accordingly, Plaintiff's Motion for Judicial Notice 101 is DENIED. (KM, ilcd) (Entered: 05/11/2018) |
| 05/15/2018 | 106 | | RESPONSE to Motion re 103 MOTION to Compel *Plaintiff's Deposition & Extend Dispositive Motion Deadline* filed by Plaintiff Edith McCurry. (Attachments: # 1 Exhibit A)(KE, ilcd) (Entered: 05/15/2018) |
| 05/15/2018 | 107 | | MOTION to Supplement 100 Objection by Plaintiff Edith McCurry. Responses due by 5/29/2018 (Attachments: # 1 Exhibit A, # 2 Exhibit B)(KE, ilcd) (Entered: 05/15/2018) |
| 05/16/2018 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 5/16/2018. At the request of the Court this case is set for a Status Conference on May 21, 2018, at 1:30 P.M. by telephone from Urbana (Court will place call) before Magistrate Judge Eric I. Long. (JMB, ilcd) (Entered: 05/16/2018) |
| 05/21/2018 | 108 | | RESPONSE in Opposition to Defendant Mars Incorporated's 103 MOTION to Compel *Plaintiff's Deposition & Extend Dispositive Motion Deadline* filed by Plaintiff Edith McCurry. (Attachments: # 1 Exhibits). (KM, ilcd) (Entered: 05/21/2018) |
| 05/21/2018 | | | Minute Entry for proceedings held 5/21/2018 before Magistrate Judge Eric I. Long. Appearance of plaintiff Edith McCurry by phone. Appearances on behalf of defendants by Jody Moran, Julia Argentieri and Thomas Davies by phone. Status hearing held. Pending motions discussed. Motion to Compel Text Messages 98 is denied based on Ms. McCurry's representations. If any of the representations are determined to be false, sanctions will be imposed. Motion to Compel Plaintiff's Deposition 103 is granted. Plaintiff is ordered to submit to a deposition on 5/30/18 at 11:00 AM by personal appearance at the Jackson Lewis Law Office, 150 North Michigan Avenue, Suite 2500, Chicago, IL 60601. Motion to Extend Dispositive Motion Deadline 103 is denied. The dispositive motion deadline remains 6/21/18. Motion for Leave to File Document Under Seal 104 is granted. Motion to Supplement 107 is granted in part and denied in part as stated on the record. (Tape #UR–B 1:31 PM.) (DS, ilcd) (Entered: 05/21/2018) |
| 06/20/2018 | 109 | | MOTION for Summary Judgment by Defendant Mars Inc. Responses due by 7/11/2018 (Attachments: # 1 Text of Proposed Order Proposed Order)(Overbaugh, Kimberly) (Entered: 06/20/2018) |
| 06/20/2018 | 110 | | MEMORANDUM in Support re 109 MOTION for Summary Judgment filed by Defendant Mars Inc. (Attachments: # 1 Exhibit Ex A Warehouse Management Agreement, # 2 Exhibit Ex B Declaration of Todd Moore, # 3 Exhibit Ex C Deposition of Edith McCurry 4–18–18, # 4 Exhibit Ex D Deposition of Edith McCurry 5–30–18)(Overbaugh, Kimberly) (Entered: 06/20/2018) |
| 06/20/2018 | 111 | | RULE 56 NOTICE entered to pro se plaintiff Edith McCurry re 109 MOTION for Summary Judgment . (KM, ilcd) (Entered: 06/20/2018) |
| 06/21/2018 | 112 | | MOTION for Summary Judgment by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. Responses due by 7/12/2018 (Moran, Jody) (Entered: 06/21/2018) |

| 06/21/2018 | 113 | MEMORANDUM *in Support of Their Motion for Summary Judgment* re 112 MOTION for Summary Judgment by Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kevin Walsh. (Attachments: # 1 Exhibit A (Part 1 of 2), # 2 Exhibit A (Part 2 of 2), # 3 Exhibit B)(Moran, Jody) Modified on 6/21/18 to add Kevin Walsh per Defendant's request. (TC, ilcd). (Entered: 06/21/2018) |
|---|---|---|
| 06/21/2018 | 114 | RULE 56 NOTICE entered re 112 MOTION for Summary Judgment to plaintiff Edith McCurry. (DS, ilcd) (Entered: 06/21/2018) |
| 07/10/2018 | 115 | MOTION for Extension of Time to File Response as to 112 MOTION for Summary Judgment by Plaintiff Edith McCurry. Responses due by 7/24/2018. (DS, ilcd) (Entered: 07/10/2018) |
| 07/10/2018 | | TEXT ORDER entered by Judge Colin Stirling Bruce on 7/10/2018. Plaintiff's 115 Motion for Extension of Time to Respond to Defendants' 109 and 112 Motions for Summary Judgment is granted. Plaintiff has until July 23, 2018 to file her responses. Any future request for an additional extension of time to respond to the motions will be denied. (Responses due by 7/23/2018) (DS, ilcd) (Entered: 07/10/2018) |
| 07/16/2018 | 116 | PRETRIAL ORDER entered by Judge Colin Stirling Bruce on 7/16/2018. This matter is scheduled for a final pretrial conference by personal appearance before the undersigned on 9/10/2018 at 11:00 a.m., in Courtroom A. All motions in limine or any other pretrial motions must be filed with the Court by the close of business on August 20, 2018. Any responses to those motions must be filed by the close of business on August 31, 2018. This matter is set for jury selection and jury trial on 9/18/2018 at 9:00 a.m., in Courtroom A. See written Order. (DS, ilcd) (Entered: 07/16/2018) |
| 07/18/2018 | | Set/Reset Hearings: Jury Trial set for 9/18/2018 at 9:00 AM in Courtroom A in Urbana before Judge Colin Stirling Bruce. (DS, ilcd) (Entered: 07/18/2018) |
| 07/26/2018 | 117 | RESPONSE to Motion re 109 MOTION for Summary Judgment , 112 MOTION for Summary Judgment filed by Plaintiff Edith McCurry. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit Ba, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit Y) (Additional Exhibits to be filed separately.) (TC, ilcd) (Entered: 07/26/2018) |
| 07/26/2018 | 118 | Exhibit BB re 117 Response to Motion 109 , by Edith McCurry. (Attachments: # 1 Exhibit FF, # 2 Exhibit GG, # 3 Exhibit HH, # 4 Exhibit II, # 5 Exhibit KK, # 6 Exhibit LL, # 7 Exhibit MM, # 8 Exhibit NN, # 9 Exhibit OO, # 10 Exhibit RR, # 11 Exhibit UU, # 12 Exhibit XX, # 13 Exhibit ZZ) (Additional Exhibits to be filed separately.) (TC, ilcd) (Entered: 07/27/2018) |
| 07/26/2018 | 119 | Exhibit Declaration of Leonard Szplett re 117 Response to Motion 109 , by Edith McCurry. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 9, # 7 Exhibit 10, # 8 Exhibit 20, # 9 Declaration of Edith McCurry, # 10 Exhibit 1, # 11 Exhibit 2, # 12 Exhibit 3, # 13 Exhibit 4, # 14 Exhibit 5, # 15 Exhibit 6, # 16 Exhibit 7, # 17 Exhibit 8, # 18 Exhibit 12, # 19 Exhibit 20, # 20 Exhibit 22, # 21 Exhibit 25) (Additional Exhibits to be filed separately.) (TC, ilcd) (Entered: 07/27/2018) |

| 07/26/2018 | 120 | | Exhibit Declaration of Anthony Willis re 117 Response to Motion 109 , by Edith McCurry. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Declaration of Todd Moore, # 5 Exhibit A, # 6 Exhibit B, # 7 Exhibit C, # 8 Exhibit D, # 9 Exhibit E, # 10 Envelope postmarked 7/23/18 for 117 118 119 120 .) (TC, ilcd) (Entered: 07/27/2018) |
|---|---|---|---|
| 07/31/2018 | 121 | | REPLY to Response to Motion re 112 MOTION for Summary Judgment filed by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. (Moran, Jody) (Entered: 07/31/2018) |
| 08/01/2018 | 122 | | MOTION in Limine to Exclude Defendant Mars' Deposition of Edith McCurry and the Declaration of Todd Moore. by Plaintiff Edith McCurry. Responses due by 8/15/2018. (DS, ilcd) (Entered: 08/01/2018) |
| 08/01/2018 | 123 | | MOTION in Limine to Exclude Defendant Kenco's Deposition of Edith McCurry and the Medical Records from Dr. Troupe, Gulati and Cosey by Plaintiff Edith McCurry. Responses due by 8/15/2018. (Attachments: # 1 Exhibit)(DS, ilcd) (Entered: 08/01/2018) |
| 08/14/2018 | 124 | | RESPONSE to Motion re 122 MOTION in Limine filed by Defendant Mars Inc. (Attachments: # 1 Exhibit Ex 1 Declaration of Kimberly J. Overbaugh)(Overbaugh, Kimberly) (Entered: 08/14/2018) |
| 08/14/2018 | 125 | 23 | ORDER entered by Judge Colin Stirling Bruce on 8/14/2018. Defendants' Motion for Summary Judgment 109 , 112 are both GRANTED in full. Judgment is entered in favor of Defendants and against Plaintiff. The final pretrial date of 9/10/2018 and the jury trial date of 9/18/2018 are VACATED. All other pending motions are denied as MOOT. This case is terminated. See written Order. (DS, ilcd) (Entered: 08/14/2018) |
| 08/14/2018 | 126 | 43 | JUDGMENT entered in favor of Kenco Logistic Services LLC, Mars Inc, David Jabaley, Kelvin Walsh, Lori Varvel, Mario Lopez, Mike Manzello, Tammi Fowler and against Edith McCurry. (DS, ilcd) (Entered: 08/14/2018) |
| 08/28/2018 | 127 | | MOTION for Reconsideration re 125 Order on Motion for Summary Judgment by Plaintiff Edith McCurry. Responses due by 9/11/2018. (Attachments: # 1 Exhibit Local Rules, # 2 Exhibit Local Rules)(DS, ilcd) (Entered: 08/28/2018) |
| 09/11/2018 | 128 | | RESPONSE to Motion re 127 MOTION for Reconsideration re 125 Order on Motion for Summary Judgment,,,, Order on Motion in Limine,,, filed by Defendants Tammi Fowler, David Jabaley, Kenco Logistic Services LLC, Mario Lopez, Mike Manzello, Lori Varvel, Kelvin Walsh. (Moran, Jody) (Entered: 09/11/2018) |
| 09/17/2018 | 129 | 44 | ORDER entered by Judge Colin Stirling Bruce on 9/17/2018. Plaintiff's Motion to Reconsider 127 is DENIED. This case remains closed. See written Order. (DS, ilcd) (Entered: 09/17/2018) |
| 10/17/2018 | 130 | 21 | NOTICE OF APPEAL as to 129 Order on Motion for Reconsideration by Edith McCurry. Filing fee $505; paid. Receipt #24626008159 and #24626008160. (DS, ilcd) (Entered: 10/17/2018) |
| 10/17/2018 | | | USCA Appeal Fees received $220.00 receipt number 24626008159 re 130 Notice of Appeal filed by Edith McCurry. (DS, ilcd) (Entered: 10/17/2018) |

| 10/17/2018 | | | USCA Appeal Fees received $285.00 receipt number 24626008160 re 130 Notice of Appeal filed by Edith McCurry. (DS, ilcd) (Entered: 10/17/2018) |

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION



FILED
OCT 17 2018
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

Edith McCurry
_____
Plaintiff

V

Case number : 16 CV 2273

Kenco Logistics, et al
_____
Defendant

## NOTICE OF APPEAL

I, Edith McCurry _____ (plaintiff) do hereby appeal the decision of this

Court entered on September 17, 2018.

Signed _Edith McCurry_

Address: 6239 S. 13110 East Rd.
Prembroke, IL 60958
815-735-4281

| Peoria Division | Urbana Division | Springfield Division | Rock Island Division |
|---|---|---|---|
| 100 N.E. Monroe St. | 201 S. Vine St. | 600 E. Monroe St. | 211 19th St. |
| Room 309 | Room 218 | Room 151 | Room 40 |
| Peoria, IL 61602 | Urbana, IL 61802 | Springfield, IL 62701 | Rock Island, IL 61201 |
| 309.671.7117 | 217.373.5830 | 217.492.4020 | 309.793.5778 |

CERTIFICATE OF SERVICE

Please take notice that on October 17, 2018, I, EDITH MCCURRY, hereby, certify that I did file a

Notice of Appeal with the Central District of Illinois Urbana Division in the foregoing matter of Case

No. 16-cv-02273-CSB-EIL and have served the persons identified on the docket's service list through

Notice of Electronic Filing generated by the Court's CM/ECF system.


*Edith McCurry*

Pro Se
EDITH MCCURRY
6239 South 13110 East Rd.
Pembroke Township, IL 60958
815-735-4281

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| EDITH MCCURRY, | ) |
| | ) |
| **Plaintiff,** | ) |
| v. | )     **Case No. 16-CV-2273** |
| | ) |
| KENCO LOGISTICS SERVICES, MARS | ) |
| INC., KELVIN WALSH, MIKE | ) |
| MANZELLO, DAVID JABALEY, TAMMI | ) |
| FOWLER, LORI VARVEL, and | ) |
| MARIO LOPEZ, | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

Defendant Mars, Inc. filed a Motion for Summary Judgment (#109) on June 20, 2018. The other Defendants, Kenco Logistics Services, Kelvin Walsh, Mike Manzello, David Jabaley, Tammi Fowler, Lori Varvel, and Mario Lopez, (collectively, "Kenco Defendants") filed their Motion for Summary Judgment (#112) on June 21, 2018.

*Pro se*[1] Plaintiff Edith McCurry filed her Response (#117) on July 26, 2018. While the Response was filed late, it appears to have been mailed on the due date. In its discretion, because the Response was mailed on the due date, the court will exercise lenience and will consider it.

---

[1]Plaintiff claims to be representing herself at this time. She stated in a deposition that she previously had an attorney, Jordan Hoffman, to whom she owes over $75,000 for work on the administrative charge which led to this case. She also asked Hoffman for help regarding an expert and damages, and did not know if she had asked him for additional assistance.

However, the court will not consider two Motions in Limine (#122, #123) that Plaintiff filed on August 1, 2018. To the extent that the Motions in Limine respond to Defendants' motions for summary judgment by seeking to exclude evidence from being considered at the summary judgment stage, the court notes that Plaintiff's Response was due on July 23, 2018, and filed on July 26, 2018. Any arguments responsive to the Defendants' Motions for Summary Judgment should have been included in that response. While the court is willing to consider the late Response that was mailed on the due date, the court will not allow the even later, piecemeal addition of arguments.

The Kenco Defendants' Reply (#121) was filed on July 31, 2018. For the following reasons, Defendants' Motions for Summary Judgment (#109, 112) are GRANTED in full.

## I. FACTS[2]

Defendant Kenco Logistics is a third-party logistics company engaged in the business of transportation management, distribution, material handling, and related services. Defendants Kelvin Walsh, David Jabeley, Mario Lopez, Tammi Fowler, Lori Varvel, and Mike Manzello are supervisors or managers for Kenco.

On April 21, 2013, Kenco began performing logistics services for Defendant Mars, Inc., at Mars' warehouse located in Manteno, Illinois, pursuant to the terms of a

---

[2]Even *pro se* parties must comply with the court's local rules. *Garcia v. Illinois State Police*, 545 F. Supp. 2d 823, 836 (C.D. Ill. 2015). Plaintiff's Response fails to comply with Rule 7.1(D) of the Local Rules of the Central District of Illinois. Pursuant to Local Rule 7.1(D)(2)(b)(6), Defendants' Facts are deemed admitted. And, due to the extent of its non-compliance with Local Rule 7.1(D)(2), this court will not attempt to glean any additional material facts from Plaintiff's Response.

written agreement with Mars. Kenco operated as an independent contractor, providing warehouse management services at Mars' Manteno facility. Under the terms of the agreement, Kenco had exclusive authority with respect to its employment policies, promotions, discipline, and termination. Under the written agreement, Kenco itself was not an employee of Mars, nor were Kenco's employees. Kenco was responsible for the day-to-day operations of the warehouse. Kenco had policies in place to prohibit discrimination and harassment, including requiring reasonable medical accommodations to qualified individuals.

Kenco hired all of the individuals who worked at the Manteno facility. They were all employees of Kenco, managed by Kenco. Kenco hired Plaintiff, Edith McCurry, who is black and was born in 1962, as a Human Resources Administrator for the Manteno Mars facility. She began working for Kenco effective April 21, 2013. She filled out a Kenco Employee New Hire Form, not a Mars form. She does not remember ever receiving any employment paperwork from Mars.

Plaintiff's duties were clerical, and included handling payroll, generating reports, assisting with employee relations, and other related duties. She never supervised employees, nor was she responsible for investigating complaints.

Kenco hired Plaintiff from the Manteno facility's predecessor management company. Kenco also hired a Human Resources manager, Leonard Szplett, from the predecessor management company. Szplett, with both accounting and Human Resources duties, conducted Plaintiff's performance reviews. No Mars employee ever

3

evaluated Plaintiff's performance. Kenco paid Plaintiff and Szplett at similar rates of

pay to their prior salaries, with Szplett earning more than Plaintiff.

On October 17, 2014, Kenco hired Lori Varvel, who was born in 1980, as a

Human Resources Manager. Plaintiff did not apply for the position. Varvel started

working for Kenco on November 10, 2014, and she became Plaintiff's supervisor at that

time. Varvel would approve McCurry's requests for overtime when necessary. Varvel

also supervised Valerie Lillie. Prior to working at Kenco, Varvel worked as a Human

Resources Manager for Sears Logistics Services at a salary of $73,600, overseeing

policies, supervising other Human Resources employees, and investigating complaints

of harassment and discrimination. Kenco hired her at a similar rate of pay to her prior

salary.

Varvel took on some of Plaintiff's duties concerning employee relations matters,

but Plaintiff's pay did not change. Prior to Varvel's hiring, McCurry simply passed on

complaints to Tammi Fowler, in Kenco's corporate office, to investigate.

Plaintiff received a write-up, filled out by Varvel, on December 19, 2014. It

appeared to Kenco that Plaintiff had worked until 6:39 p.m. after clocking out at 5:00

p.m. on December 9, in violation of company timekeeping policy. Plaintiff admits that

she stayed at the Manteno facility until 6:39 p.m. that day, but does not recall what she

was doing there. The write-up warned Plaintiff for working 1.5 hours of overtime

without authorization, misrepresenting her hours worked, and failing to report the

correct hours worked. Plaintiff is unaware of any other Kenco employees who worked

unapproved overtime or misrepresented their hours, but did not receive a write-up. No one from Mars was involved in the write-up.

On January 7, 2015, McCurry filed a charge with the Illinois Department of Human Rights ("IDHR"). She was approved by Kenco for a job-protected medical leave of absence under the FMLA beginning on January 25, 2015. She did not interact with Mars regarding the leave of absence. On January 29, 2015, Kenco mailed notice to all of its employees at the Manteno facility to inform them that all Manteno employees were being terminated effective March 29, 2015, because Kenco lost its contract with Mars. Plaintiff maintains that she is still medically unable to work, and she has not worked since January 25, 2015.

After her termination, Plaintiff signed up for COBRA. She stated in her deposition that her COBRA costs changed a few times, and she did not receive open enrollment paperwork on one occasion. Her disability benefits were reduced after a third-party benefits administrator issued a determination that Plaintiff was capable of working 20 hours per week.

Plaintiff's coworker, Mary Madison, filed a charge with the IDHR. Kenco did not ask Plaintiff to be a witness in that case. Kenco hired in-house legal counsel to defend against Plaintiff's lawsuit, an action Plaintiff alleges is a conspiracy.

Plaintiff alleges that Mars' Regional Distribution Manager Robert Coffey knew about the hiring of Lori Varvel because Mars did not want to pay Varvel's salary. Plaintiff alleges that Coffey knew about accidents at the Manteno facility and issues between two Manteno Kenco employees because Coffey went to morning meetings

where he could have learned about those issues. Plaintiff never attended any morning
meetings when Coffey was present, so she could not be sure what was discussed there.
Coffey was very approachable, so employees were not afraid to talk to him about any
situations that arose. She did not tell Coffey or anyone else at Mars about any
discrimination against her.

## II. ANALYSIS

Plaintiff filed her lengthy Complaint (#1) on August 29, 2016. Following this
court's Order (#39) of February 7, 2017, ruling on motions to dismiss, the only claims
surviving to the summary judgment stage are: (1) a claim against Kenco, under Title VII
of the Civil Rights Act of 1964 ("Title VII"), that Kenco discriminated on the basis of
race and gender; (2) a racial discrimination claim against Kenco, Mars, and the
individual Defendants under 42 U.S.C. § 1981; (3) a claim under the Age Discrimination
in Employment Act (ADEA) against Kenco; (4) a claim under the Americans with
Disabilities Act (42 U.S.C. § 12101 et. seq.) ("ADA") against Kenco; and (5) a federal
conspiracy claim under 42 U.S.C. § 1985(3) against Kenco, Mars, and the individual
Defendants. The Defendants now seek summary judgment in their favor on all of
Plaintiff's claims.

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

6

In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. See *Singer*, 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's characterization of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it

bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

    B.  <u>Plaintiff's Claims Against the Kenco Defendants</u>

    The Kenco Defendants seek summary judgment in their favor on all of Plaintiff's claims against them: (1) racial and gender discrimination under Title VII and § 1981; (2) disability discrimination under the ADEA; (3) age discrimination under the ADA; and (4) conspiracy under 42 U.S.C. § 1985(3).

        1.  *Discrimination Under Title VII and § 1981*

    The court will merge its discussion of the Title VII and § 1981 claims, because the legal analysis is identical for those claims.  *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015).  Plaintiff's Title VII claim of racial and gender discrimination is against Kenco only.  Her § 1981 claim of racial discrimination is against all Kenco Defendants, and Mars.  The § 1981 claim against Mars will be discussed separately, below.

    The legal standard for determining whether an employment discrimination claim should survive summary judgment is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The court explained:

> Evidence must be considered as a whole, rather than asking whether
> any particular piece of evidence proves the case by itself—or whether
> just the "direct" evidence does so, or the "indirect" evidence. Evidence
> is evidence. Relevant evidence must be considered and irrelevant

8

> evidence disregarded, but no evidence should be treated differently
> from other evidence because it can be labeled "direct" or "indirect."

*Id.*

The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973) provides a formal way to analyze circumstantial evidence in some discrimination

cases.[3] Under *McDonnell Douglas*, a plaintiff establishes a *prima facie* case of racial

discrimination if she demonstrates, by a preponderance of the evidence, that: (1) she is a

member of a protected class; (2) she was meeting her employer's legitimate

employment expectations; (3) in spite of meeting the legitimate employment

expectations of her employer, she suffered an adverse employment action; and (4) she

was treated less favorably than one or more similarly situated employees who were not

in the protected class. *McDonnell Douglas*, 411 U.S. at 802; *Ferrill*, 860 F.3d at 500.

If Plaintiff makes this *prima facie* showing, the burden shifts to Defendants to

come forward with a legitimate, nondiscriminatory reason for the challenged

employment action and, if Defendants do this, then the burden shifts back to Plaintiff to

produce evidence establishing a genuine dispute of fact about whether Defendants'

reason was a pretext for discrimination. *Ferrill*, 860 F.3d at 500. "Pretext" is more than a

mere mistake; it "means a lie"—a "phony reason" for the employment action. *Ferrill*,

860 F.3d at 500.

---

[3]*Ortiz* did not displace the *McDonnell Douglas* burden-shifting analysis. *Ferrill v.
Oak-Creek Franklin Joint Sch. Dist.*, 860 F.3d 494, 499-500 (7th Cir. 2017).

Plaintiff believes she was discriminated against on the basis of her race or gender because: (1) she was paid her less than the white, male Human Resources manager, Leonard Szplett; (2) she received a write-up in December 2014; (3) Kenco hired Lori Varvel as a Human Resources Manager for the Manteno facility instead of promoting Plaintiff to that position; and (4)  Plaintiff's duties were reduced when Varvel was hired. Plaintiff also alleges that Defendant Kenco retaliated against her by: (1) not selecting her as a witness when Mary Madison filed an IDHR charge; and (2) hiring Varvel and reducing Plaintiff's duties.

### a.  Unequal Pay

Plaintiff has failed to support her allegation that discrimination caused her to be paid less than Szplett.  Szplett was not similarly situated to Plaintiff.  Unlike Plaintiff, Szplett was a manager.  In fact, he was *her* manager.  They were both hired from the predecessor management company, and they were hired at similar rates of pay to what they had been earning for that company.  Because Plaintiff has not shown that her job entailed equal skill, effort, and responsibility to her manager's job, or that of anyone else who received higher pay, she has failed to make out a *prima facie* case of unequal pay. See *Leong v. SAP America, Inc.*, 67 F. Supp. 3d 972, 985 (N.D. Ill. 2014).  Thus, summary judgment in favor of Defendants is proper as to that claim.  *Id.*

b. Write-Up

Plaintiff received a write-up in December 2014, which she believes was discriminatory. Defendants argue that the write-up was neither discriminatory nor an adverse action. The court agrees with both of Defendants' arguments.

Not everything that makes an employee unhappy is an adverse employment action under § 1981 or Title VII. *Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007). A materially adverse employment action is something that is more disruptive than a mere inconvenience or an alteration of job responsibilities, because "[o]therwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Nichols*, 510 F.3d at 780. The Seventh Circuit has specifically held that "written reprimands without any changes in the terms or conditions of ... employment are not adverse employment actions." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009).

Here, Plaintiff has shown no evidence that the write-up changed the terms or conditions of her employment. Therefore, it is not an adverse employment action. Moreover, there is no evidence that it was issued because of Plaintiff's race, gender, or any other protected category. Plaintiff has thus failed to establish a prima facie case, and Defendants are entitled to summary judgment on this claim.

#### c.  Failure to Promote

Plaintiff also argues that she was discriminated against when Kenco hired Lori Varvel as a Human Resources Manager.  Plaintiff did not apply for Varvel's position, but she felt it should have been offered to her.

> To demonstrate a *prima facie* case for failure to promote, a plaintiff must produce evidence showing that: (1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position.

*Riley v. Elkhart Cmty Sch.*, 829 F.3d 886, 892 (7th Cir. 2016), citing *Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016).  A plaintiff's failure to establish any one of those elements warrants summary judgment for the employer.  *Riley*, 829 F.3d at 892.

Plaintiff has not even established that she sought the position in question.  She did not apply for it.  Nor has she established that she was better qualified than Varvel.  Varvel, unlike Plaintiff, had prior managerial experience.  Plaintiff's duties were clerical, and included handling payroll, generating reports, assisting with employee relations, and other related duties.  Plaintiff never supervised employees, nor was she responsible for investigating complaints.  Prior to working at Kenco, Varvel worked as a Human Resources Manager for Sears Logistics Services, overseeing policies, supervising other Human Resources employees, and investigating complaints of harassment and discrimination.

12

In the absence of any evidence that hiring Varvel instead of promoting Plaintiff had anything to do with race, age, or any other protected factor, Defendants are entitled to summary judgment on the failure to promote claim.

### d. Reduction in Duties

Plaintiff further believes that a reduction in her job duties constituted racial discrimination. Initially, employees would report incidents to Plaintiff, and Plaintiff would pass on those reports to Tammi Fowler. After Varvel's hiring, Varvel handled employee relations matters. Defendants argue that this change in duties was not an adverse employment action.

The court agrees with Defendants. Plaintiff has not shown some action that is more disruptive than an alteration of job duties, so she has not established an adverse action. *Nichols*, 510 F.3d at 780. Nor is there any indication that the decision to have Varvel deal with employee relations matters directly (in place of Plaintiff forwarding complaints to Fowler) had anything to do with Plaintiff's race or any other protected status. Plaintiff failed to meet her burden of demonstrating a prima facie case. Defendants are entitled to summary judgment on this claim.

### e. Retaliation

Plaintiff alleges that Defendant Kenco retaliated against her by: (1) not selecting her as a witness when Mary Madison filed an IDHR charge; and (2) hiring Varvel and reducing Plaintiff's duties. To make out a *prima facie* claim of retaliation, plaintiff must show that: "(1) she engaged in protected activity; (2) she suffered an adverse

employment action; and (3) a causal connection exists between the two." *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017). Plaintiff cannot make a *prima facie* case that she suffered an "adverse employment action" with regard to either retaliation allegation.

Kenco's decision not to call Plaintiff in the course of defending itself in an IDHR proceeding has nothing to do with the terms and conditions of Plaintiff's employment. It is not a materially adverse employment action, as it is not even an employment action. Hiring Varvel was not a materially adverse employment action either. While Varvel handled some employee relations matters previously handled by Plaintiff, that minor reduction in duties did not rise to the level of a materially adverse employment action, as discussed above. Nor is there any evidence that Kenco's manner of defending itself before the IDHR or hiring Varvel was in any way related to any protected activity. Summary judgment in favor of the Defendants is warranted on this claim.

### 2. *Discrimination Under the ADEA*

An ADEA claim against Defendant Kenco also survived to the summary judgment stage. The only alleged age discrimination that Plaintiff identifies is Kenco's hiring Varvel, who is younger than Plaintiff, as a Human Resources manager. Plaintiff feels she should have been offered the position even though she did not apply for it. As the court stated above in discussing the failure to promote claim, there is no evidence that hiring Varvel instead of promoting Plaintiff had anything to do with Plaintiff's age. Defendants are entitled to summary judgment on the ADEA claim.

14

### 3. *Discrimination Under the ADA*

The ADA makes it unlawful for an employer to discriminate against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Plaintiff claims that Defendant Kenco discriminated against her on the basis of disability when, after her termination, her COBRA costs changed and she did not receive COBRA open enrollment paperwork. Defendant Kenco argues that such actions, even if true, are not attributable to it.

A third-party benefits administrator, not Kenco, handled COBRA notices and any communications related to changes in COBRA costs. "It is well-established that in ERISA and COBRA-related disputes about the duties of the Plan Administrator, the proper defendant is the Plan Administrator." *Thurston v. Borden Waste-Away Service, Inc.*, 1998 WL 456441, at *11 (N.D. Ind., May 19, 1998). Kenco is not a proper defendant, and it is thus entitled to summary judgment on this claim.

### 4. *Conspiracy Under § 1985*

A federal conspiracy claim under 42 U.S.C. § 1985(3) against all Kenco Defendants and Mars also survived to the summary judgment stage. In order to state a claim under § 1985(3), a plaintiff must demonstrate: (1) the existence of a conspiracy; (2) a purpose of depriving a person or class of persons of equal protection of the laws; (3) an act in furtherance of a conspiracy; and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens. *Hernandez v. Joliet Police Dep't.*, 197 F.3d 256, 263 (7th Cir. 1999). The plaintiff also must show some racial, or

15

otherwise class-based, invidiously discriminatory animus behind the conspirators'

actions, and that the conspiracy aimed at interfering with rights that are protected

against private, as well as official, encroachment. *Green v. Benden*, 281 F.3d 661, 665 (7th

Cir. 2002).

      To establish the existence of a conspiracy, a plaintiff must show that the

conspirators agreed to inflict injury upon her; in other words, that they acted with a

single plan, the general nature and scope of which was known to each conspirator.

*Green*, 281 F.3d at 665.  Agreement may be inferred from circumstantial evidence, but

only if it is sufficient to permit a reasonable jury to conclude that a meeting of the minds

had occurred and that the parties had an understanding to achieve the conspiracy's

objectives. *Green*, 281 F.3d at 665-66.

      Plaintiff claims that the Kenco Defendants engaged in a conspiracy under

§ 1985(3) by hiring Jay Elliot as the Vice President of Legal to handle various IDHR

charges.  Defendants argue that Plaintiff has not properly alleged a conspiracy.  The

court agrees with Defendants.  An employer's decision to hire an attorney to defend it

in a legal action is not a conspiracy.  See *Amadasu v. The Christ Hosp.*, 514 F.3d 504, 507

(6th Cir. 2008).

Plaintiff also appears to allege that Mars participated in a conspiracy, presumably with the Kenco Defendants, by discriminating against her. She claims that Mars conspired against her by participating in racial discrimination against her, alleging that Mars played a role in hiring Varvel and that Mars was responsible for the Manteno facility.

Section 1985(3) has a limited application to private conspiracies, and it does not provide a means for bringing a racial, gender, age, or disability discrimination claim. See *Comtel Technologies, Inc. v. Paul H. Schwendener, Inc.*, 2005 WL 433327, at *7 (N.D. Ill., February 22, 2005) ("The great weight of precedential authority [ ] supports the traditional limitation of § 1985(3) to questions of interstate travel and involuntary servitude and does not suggest that §§ 1981 or 1982 claims in general may form the basis of a § 1985(3) action."). Similarly, under the intracorporate conspiracy doctrine, "managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990) (citing *Dombrowski v. Dowling*, 459 F.2d 190, 196 (1972)). Instead, 42 U.S.C. § 1981 provides the proper means for bringing a discrimination claim, not 42 U.S.C. § 1985(3). Thus, it does not appear that § 1985(3) applies to Plaintiff's claim of a conspiracy to discriminate.

Even if § 1985(3) applied to such a claim, the court has already concluded that the

Kenco Defendants are entitled to summary judgment on all of Plaintiff's discrimination

claims.  Therefore, Defendants cannot have participated in a conspiracy to unlawfully

discriminate against Plaintiff.

C.  Plaintiff's Claims Against Defendant Mars

Defendant Mars seeks summary judgment in its favor on both of Plaintiff's

remaining claims against it: (1) racial discrimination under § 1981; and (2) conspiracy

under 42 U.S.C. § 1985(3).

1.  *Discrimination Under § 1981*

Plaintiff states that she sued Mars because Mars was responsible for hiring Kenco

and because Mars, through its Regional Distribution Manager Robert Coffey, was aware

of the hiring of Varvel and accidents and issues at the Manteno facility.  The court has

already concluded that the Kenco Defendants are entitled to summary judgment on

Plaintiff's conspiracy and racial discrimination claims.  Plaintiff does not allege that

Mars took any actions beyond employing Kenco and having knowledge of the Manteno

facility's operations.  Because Plaintiff failed to establish that Kenco discriminated

against her on the basis of her race, even if Mars were liable for the actions of Kenco,

Plaintiff has not established any discrimination for which Mars could have any liability.

18

2. *Conspiracy Under § 1985*

Plaintiff's only allegation that Defendant Mars participated in any conspiracy consists of her repeating her claim that Mars discriminated against her. She claims that Mars conspired against her by participating in racial discrimination against her, alleging that Mars played a role in hiring Varvel and that Mars was responsible for the Manteno facility. Again, § 1985 does not provides a means for bringing a discrimination claim. Further, even if it did, the court has already concluded that all Defendants are entitled to summary judgment on all of Plaintiff's discrimination claims. Therefore, Defendant Mars cannot have participated in a conspiracy to unlawfully discriminate against Plaintiff. Under these facts, Plaintiff cannot make any claim for racial discrimination against Mars under §§ 1981 or 1985. Judgment is entered for Mars on Plaintiff's claims.

IT IS THEREFORE ORDERED:

(1)    Defendants' Motions for Summary Judgment (#109), (#112) are both GRANTED in full. Judgment is entered in favor of Defendants and against Plaintiff. The final pretrial date of September 10, 2018, and jury trial date of September 18, 2018 are hereby VACATED. Any other pending motions are denied as MOOT.

(2)     This case is terminated.


ENTERED this <u>14th</u> day of August, 2018.

s/Colin S. Bruce

_____
COLIN S. BRUCE
U.S. DISTRICT JUDGE

20

# UNITED STATES DISTRICT COURT

for the
Central District of Illinois

| | |
|---|---|
| **Edith McCurry,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **Case Number: 16-2273** |
| | ) |
| **Kenco Logistic Services LLC, Mars Inc,** | |
| **Kelvin Walsh, Mike Manzello, David** | |
| **Jabaley, Tammi Fowler, Mario Lopez,** | |
| **Lori Varvel,** | ) |
| | ) |
| **Defendant.** | ) |

## JUDGMENT IN A CIVIL CASE

☐ **JURY VERDICT.**    This action came before the Court for a trial by jury.    The issues have been tried and the jury has rendered its verdict.

☒ **DECISION BY THE COURT.**    This action came before the Court and a decision has been rendered.

     **IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of Defendants and against Plaintff.

**Dated: August 14, 2018**

s/ Denise Koester
Denise Koester
Acting Clerk, U.S. District Court

Case: 2:16-cv-02273-CSB-EIL Document #: 131 Filed 09/17/18 Page 1 of 8
Case: 18-3206 Document: 16 RESTRICTED Filed: 01/23/2019 Pages: 348

E-FILED
Monday, 17 September, 2018 01:17:22 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| EDITH MCCURRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No. 16-CV-2273** |
| | ) | |
| KENCO LOGISTICS SERVICES, MARS | ) | |
| INC., KELVIN WALSH, MIKE | ) | |
| MANZELLO, DAVID JABALEY, TAMMI | ) | |
| FOWLER, LORI VARVEL, and | ) | |
| MARIO LOPEZ, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

On August 14, 2018, this court entered an Order (#125) granting the Motions for

Summary Judgment (#109, #112) filed by Defendants. On August 28, 2018, Plaintiff

filed a Motion to Reconsider (#127). Plaintiff argues that the court made numerous

factual and legal errors in its Order granting the Motions to for Summary Judgment.

She argues that Defendants did not address many of the issues raised in her complaint.

She also asserts that she raised issues of material fact concerning the hiring of Varvel,

the write-up, Mars' misconduct, and conspiracy, and that Defendants should have

provided transcripts of her deposition to her sooner.

Defendants, Kenco Logistics Services, Kelvin Walsh, Mike Manzello, David

Jabaley, Tammi Fowler, Lori Varvel, and Mario Lopez, (collectively, "Kenco

Defendants") filed a Response (#128) on September 11, 2018. The Kenco Defendants

note that a motion to reconsider is not meant to give litigants a second bite at the apple, and they argue that Plaintiff's request to re-litigate the court's prior rulings should be denied.

 "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit v. CBI Indus.*, 90 F.3d 1264, 1269 (7th Cir. 1996).  It is inappropriate to argue matters that could have been raised in prior motions or rehash previously rejected arguments in a motion to reconsider.  *Id.* at 1270.

The court sees no reason to reconsider its prior Order.  Plaintiff believes that her version of events should have carried the day.  She claims that she followed the court's local rules.  She did not.  As noted in the court's Order, Plaintiff's Response did not comply with Local Rule 7.1(D) which concerns motions for summary judgment and responses and replies to such motions.  The court will now provide greater detail about Local Rule 7.1(D) and Plaintiff's Response's extensive lack of compliance with it.

Local Rule 7.1(D) states that a response to a motion for summary judgment must include specific sections with appropriate headings: introduction, response to undisputed material facts, and argument.  Local Rule 7.1(D)(2)(a) provides that the introduction section must include a brief summary of the legal and factual basis for opposition to the motion for summary judgment, and Local Rule 7.1(D)(2)(c) provides that the argument section must respond directly to the argument in the motion for summary judgment.  Local Rule 7.1(D)(2)(b) further provides that the response to undisputed material facts section must include, in separate subsections: undisputed

material facts, disputed material facts, disputed immaterial facts, undisputed immaterial facts, and additional material facts. Each fact conceded to be undisputed and material must be listed by number. Each fact conceded to be material, but claimed to be disputed, must be listed by number and supported by evidentiary documentation referenced by specific page. For each fact that is disputed and immaterial, the response must list the fact by number, state why it is immaterial, and support the claim that it is disputed with evidentiary documentation referenced by specific page. Each fact which is undisputed, but claimed to be immaterial, must be listed by number with a reason stated why the fact is immaterial. Additional facts must be listed and numbered and supported by evidentiary documentation referenced by specific page. Under Local Rule 7.1(D)(2)(b)(6), "[a] failure to respond to any numbered fact will be deemed an admission of the fact."

Plaintiff's Response did not contain any of these sections. It did not include an introduction containing a summary of the legal and factual basis for opposition to the Motions for Summary Judgment, or a self-contained argument section responding directly to the argument in those Motions. While it contained no labeled argument section, it appears that if an argument section had been delineated, it would have violated the page and type volume limitations as described in Local Rule 7.1(D)(5) as various arguments appear scattered across most of the 61 pages of the Response. Plaintiff responded to some facts by number, but only to say, in one sentence, that she "objected" to them. She did not state the basis for her objections or respond to each such fact with evidentiary documentation referenced by specific page or a reason why

any facts were immaterial, as required by Local Rule 7.1(D)(2)(b). She did not list and number additional facts in their own section, as required by Local Rule 7.1(D)(2)(b)(5). While she did sometimes include some citations to exhibits, and she did attach exhibits, she did not reference specific pages in those exhibits as required by Local Rule 7.1(D)(2)(b)(5).

As a consequence of Plaintiff's non-compliance with Local Rule 7.1(D) and pursuant to Local Rule 7.1(D)(2)(b)(6), the court in its Order (#125) deemed Defendants' facts admitted, and it did not attempt to glean additional facts from Plaintiff's Response. Plaintiff argues that the court did not view the evidence in the light most favorable to her. This is incorrect. Moreover, the court attempted to be as indulgent as possible with Plaintiff, as Plaintiff was proceeding *pro se.* Nevertheless, the court simply applied its Local Rules. Even *pro se* parties must comply with the court's local rules. *Garcia v. Illinois State Police*, 545 F. Supp. 2d 823, 836 (C.D. Ill. 2015).

Plaintiff argues that Defendants' Motions for Summary Judgment did not address all of the claims she raised in her complaint. However, not all of Plaintiff's claims survived to the summary judgment stage. As noted in the court's Order granting summary judgment in favor of defendants, the court had previously dismissed many claims. The court's Order (#39) ruling on motions to dismiss stated that the only claims surviving to the summary judgment stage were: (1) a claim, under Title VII of the Civil Rights Act of 1964, that Kenco discriminated on the basis of race and gender; (2) a racial discrimination claim against Kenco, Mars, and the individual Defendants under 42 U.S.C. § 1981; (3) a claim under the Age Discrimination in Employment Act

4

against Kenco; (4) a claim under the Americans with Disabilities Act against Kenco; and (5) a federal conspiracy claim under 42 U.S.C. § 1985(3) against Kenco, Mars, and the individual Defendants.  The Defendants' Motions for Summary Judgment, and the court's ruling on those motions, addressed all of the surviving claims.  Defendants had asked Plaintiff about all of those claims when deposing her, and Defendants' Motions for Summary Judgment responded to all of Plaintiff's specific deposition testimony as to how she claimed her rights were violated.

Plaintiff argues that Defendants could not support their Motions for Summary Judgment with her deposition because they did not send her transcripts of it before filing the Motions for Summary Judgment.  The court disagrees.  Plaintiff obviously was present at her own deposition, and Defendants attached the relevant transcripts to their Motions for Summary Judgment.  The court does not find that Defendants had any additional unmet obligation to more quickly provide Plaintiff with transcripts of her own deposition.

Plaintiff's Motion to Reconsider also expresses disagreement with and befuddlement by the court's rulings on issues relating to Varvel and Mars.  However, a plaintiff cannot use a motion to reconsider to rehash previously rejected arguments. *Caisse Nationale de Credit*, 90 F.3d at 1270.  The court previously concluded that Plaintiff failed to sufficiently show that any action relating to Varvel amounted to an adverse employment action or had anything to do with Plaintiff's age, race, or gender, and the court also found that Plaintiff failed to show Mars had any liability for discrimination or conspiracy.  The court will not depart from those prior findings at this time.

Plaintiff suggests that Defendant Mars' failure to respond to her Response to its Motion for Summary Judgment means that Mars' Motion for Summary Judgment should have been denied. The Local Rules provide otherwise. While a non-movant must either file a response to a motion for summary judgment or be deemed to admit the motion, a movant is not required to file a reply to the non-movant's response. See Local Rule 7.1(D). Local Rule 7.1(D)(3) states that the movant "*may* file a reply" to a non-movant's response. Local Rule 7.1(D)(3) (emphasis added). In this case, Plaintiff did not include a numbered section containing additional facts, so there were no such facts requiring a reply. The court properly granted Defendant Mars' Motion for Summary Judgment even though Mars did not file a reply to Plaintiff's Response to the Motion.

The court's Order (#125) properly granted the Defendants' Motions for Summary Judgment. The court properly applied its Local Rules, and it did not refuse to consider the facts in the light most favorable to Plaintiff. Defendants addressed all of Plaintiff's remaining claims in their Motions for Summary Judgment, and the court will not discuss previously rejected arguments as to those claims. Defendants properly referred to Plaintiff's deposition in their Motions for Summary Judgment, and Mars was not required to file a reply to Plaintiff's Response. Reconsideration is not warranted in this case.

6

Case: 2:16-cv-02237-CSB-EIL 1:31-cv-02237-CSB-EIL Document 131 Document 501295 Filed 09/17/18 Page 7 of 8

Case: 18-3206 Case: 18-3206 Document: 16 Document: 16 RESTRICTED Filed: 01/23/2019 Filed: 01/18/2019 Pages: 348 Pages: 48

IT IS THEREFORE ORDERED THAT:

(1) Plaintiff's Motion to Reconsider (#127) is DENIED.

(2) This case remains closed.

ENTERED this 17th day of September, 2018.

s/COLIN S. BRUCE
U.S. DISTRICT JUDGE

SA-343

Case: 18-3206    Document: 11-6    RESTRICTED    Filed: 01/18/2019    Pages: 48

SECTION XIX

Case: 18-3206    Document: 11-6    Filed: 01/18/2019    Pages: 348

## Doss, Nathan

| | |
|---|---|
| **From:** | Doss, Nathan |
| **Sent:** | Tuesday, June 03, 2014 7:39 PM |
| **To:** | Walsh, Kelvin |
| **Subject:** | WORK SCHEDULE |

So I filled out the shift change reports as you requested. So to be CLEAR I'm to work Mon.-Thurs. & Sat. (6/2 – 6/5 & 6/7…6/9 – 6/12 & 6/14)
And for the week of 6/16 I am to report back to work on Thurs. (6/19) to resume the 2.3 shift. So I guess my question is it a definite that 2.3 will start back up
6/16? Because if not I would not how to proceed. If you can confirm this for me it would be a great help.

Thanks
**Nathan Doss**

**Second Shift Lead**
1125 Sycamore Dr • Manteno, IL  60950
Office: 815-468-4414

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee.  Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful.  If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

**SA-346**