Case No. 18-3206

_____

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

**EDITH McCURRY**
**Plaintiff-Appellant**

v.

**KENCO LOGISTICS, MARIO LOPEZ, MIKE MANZELLO, KEVIN WALSH, LORI VARVEL, TAMMI FOWLER, DAVID JABALEY, AND MARS, INCORPORATED**
**Defendant-Appellee**

_____

**On Appeal from the United States District Court**
**For the Central District of Illinois**
**Case No. 2:16-CV-02273**

**The Honorable Eric Long**
**and**
**The Honorable Bruce Sterling**

_____

## SUPPLEMENTAL APPENDIX
## DEFENDANT - APPELLEE MARS, INCORPORATED

_____

Kimberly J. Overbaugh, Esq.
Email:  koverbaugh@h-dlaw.com
HARMON & DAVIES, P.C.
2306 Columbia Avenue
Lancaster, PA  17603
Telephone:  717-291-2236
Facsimile:  717-291-5739
*Counsel for Appellee*

**APPELLEE BRIEF**

**SUPPLEMENTAL APPENDIX**

**TABLE OF CONTENTS**

PAGE

Section 1 - DOC #110-1 Warehouse Management Agreement    SUPP. APPX. 1

Section 2 - DOC #110-2 Declaration of Todd Moore    SUPP. APPX. 10

Section 3 - DOC #110-3 Deposition of Edith McCurry 4-18-18    SUPP. APPX. 14

Section 4 - DOC #110-4 Deposition of Edith McCurry 5-30-18    SUPP. APPX. 31

Section 5 - DOC #113-1 Excerpts of Edith McCurry Deposition 4-18-18    SUPP. APPX. 42

Section 6 - DOC #113-3 Excerpts of Declaration of Jay Elliott    SUPP. APPX. 57

SECTION 1

DOC #110-1 Warehouse Management Agreement

E-FILED
Wednesday, 20 June, 2018  08:24:19 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

INDEX TO THE 2013 - 2015
WAREHOUSE MANAGEMENT AGREEMENT

Kenco Logistic Services, LLC (Contractor)
and
Mars Chocolate North America, LLC

| Section | Title | Page |
|---|---|---|
| 1. | Scope of Agreement; Entire Agreement | 3 |
| 2. | Term; Extensions | 3 |
| | A. Term | 3 |
| | B. Extensions | 3 |
| 3. | Management Services; Standards of Performance; Hours of Operation | 4 |
| 4. | Operating Budget; Operating Expenses | 4 |
| | A. Payment by MARS | 4 |
| | B. Method of Payment | 5 |
| 5. | Management Fee | 6 |
| 6. | Contractor Responsibility for Warehoused Damage and Repairs | 6 |
| 7. | Covenants, Representations and Warranties | 6 |
| | A. Performance Warranty | 6 |
| | B. Compliance with Applicable Laws | 7 |
| | C. Status of Contractor | 7 |
| | D. International Exchange Visitors | 7 |
| 8. | Right, Title and Interest in Goods | 7 |
| 9. | Inbound Shipments; Transfer of Goods; Removal of Goods | 8 |
| 10. | Right of Refusal | 8 |
| 11. | Books, Records, Information and Data | 8 |
| 12. | On-Site Inspection | 9 |
| 13. | Termination | 9 |
| | A. Immediate Termination | 9 |
| | B. Termination After Right to Cure | 9 |
| | C. Termination at Will | 9 |
| | D. Final Accounting | 10 |
| | E. Acts of Insolvency | 10 |
| | F. Rights and Obligations of the Parties on Termination | 10 |
| | G. Operating Agreements | 11 |
| | H. Operating Assets | 11 |
| | I. Employees of Contractor | 12 |
| 14. | Indemnification | 12 |
| | A. By Contractor | 12 |
| | B. By MARS | 13 |
| 15. | Taxes | 13 |
| 16. | Confidential and Proprietary Information; Publicity | 14 |
| | A. Proprietary Information | 14 |
| | B. Publicity; Trademarks, etc | 14 |
| 17. | Assignment | 14 |
| 18. | Status as Independent Contractor | 14 |
| 19. | Insurance | 15 |
| | A. Required Coverage | 15 |
| | B. Insurance on Building Contents | 17 |

CONFIDENTIAL 1
SUBJECT TO PROTECTIVE ORDER

DEF000001

SUPP. APPX. 3

C.  Product Liability Insurance ...................................................................17
D.  Warehouseman's Legal Liability Insurance ...........................................17
E.  Notice of Loss or Damage to Goods.......................................................17
F.  Reimbursement of Insurance Premiums .................................................17
20. MASTERFOODS USA's Instructions.........................................................18
21. Demurrage and Other Charges for Delay ....................................................18
22. Force Majeure .............................................................................................18
A.  Force Majeure Defined ...........................................................................18
B.  Exclusions from Definition of Force Majeure ........................................19
23. Miscellaneous...............................................................................................19
A.  Headings ..................................................................................................19
B.  Severability..............................................................................................19
C.  Cumulation of Remedies .........................................................................19
D.  Notices .....................................................................................................19
E.  Waiver .....................................................................................................20
F.  Nondiscrimination ...................................................................................20
G.  Substance Abuse ......................................................................................21
H.  Choice of Law; Forum.............................................................................21
I.   Financial Statements ...............................................................................21
J.   Entire Agreement; Ammendments...........................................................20
K.  Non-Solicitation.......................................................................................21
L.   Preparation...............................................................................................21
M.  Attorney's Fees........................................................................................21
N.  Counterparts; Facsimile Signatures.........................................................21
O.  Survival....................................................................................................21


Signatures
Appendix A – Final Operating Budget
Appendix B – Scope of Work
     Exhibit 1 – MARS' North American Quality Manual
Appendix C – Operating Assets List
Appendix D - Transition Costs
Appendix E - Vendor Incentive Program

## 2013 WAREHOUSE MANAGEMENT AGREEMENT

THIS WAREHOUSE MANAGEMENT AGREEMENT, dated as of _____, 2013, by and between **Mars Chocolate North America, LLC** , a Delaware limited liability company having a place of business at 800 High Street, Hackettstown, NJ 07840 (hereinafter referred to as "MARS") and Kenco Logistic Services, LLC, having a main place of business located at 2001 Riverside Drive, Chattanooga, TN 37406 (hereinafter referred to as "Contractor"), sets forth the terms and conditions for Contractor's management of the warehouse facility located at 1125 Sycamore Road, Manteno, IL 60950 (hereinafter, the "Warehouse").

### I.   *SCOPE OF AGREEMENT; ENTIRE AGREEMENT*

Subject to the terms and conditions contained herein, MARS hereby engages Contractor to provide the services herein described (and defined in Section 3 as the "Management Services") for the term set forth herein. This Warehouse Management Agreement, and all appendices and attachments incorporated herein by reference (hereinafter, collectively referred to as "the Agreement"), constitute the parties' entire understanding and agreement regarding the subject matter hereof.

### 2.   *TERM; EXTENSIONS*

A.     Term.  The term of this Agreement shall commence on April 21, 2013 ("Commencement Date") and expiring on March 31, 2015 ("Expiration Date"), subject to termination pursuant to the terms and provisions of this Agreement (the "Term").

B.     Extensions. MARS shall have the option to extend this Agreement for subsequent terms (hereinafter, "Extension Term(s)") commencing immediately following the Agreement's Expiration Date of the relevant year, with a new Expiration Date to be determined (such dates also being referred to in this Agreement as the "Commencement Date" and "Expiration Date", respectively) exercisable by MARS' written notice of intent to extend (the "Extension Notice") which shall be delivered to Contractor at least ninety (90) calendar days prior to the Expiration Date of the initial Term or then-current Extension Term. MARS may, as part of its notice to Contractor, elect to negotiate new terms and conditions relevant to the Extension Term. Within thirty (30) calendar days after receiving MARS' written notice, Contractor shall deliver to MARS in writing a "Proposed Operating Budget" as described, and for the purpose set forth, in Section 5 hereof.  Thereafter, the parties hereto shall promptly enter into good faith negotiations to agree upon the "Final Operating Budget" described in Section 5, and any other amendments to this Agreement with respect to the upcoming Extension Term.  If the parties fail to reach agreement on such matters prior to the Expiration Date of the initial Term or then-existing Extension Term, which deadline shall be subject to extension by mutual written agreement of the parties, this Agreement shall expire on the Expiration Date, except as extended for the Transition Period defined below.  With respect to each Extension Term, the parties shall execute a new Final Operating Budget covering the Extension Term which shall be attached to this Agreement as Appendix A in substitution of the Final Operating Budget for the expiring Term or Extension Term, and the Contractor shall provide to MARS copies of all insurance certificates evidencing the satisfaction by Contractor of the insurance requirements set forth in Section 19 for the upcoming Extension Term.

Notwithstanding anything in the foregoing to the contrary, the Contractor may, at its option, elect not to extend this Agreement for the ensuing Extension Term by giving MARS written notice thereof (the "Termination Notice") within seven (7) calendar days after receipt of the Extension Notice. In the event that the Contractor gives a Termination Notice, or in the event that the parties fail to reach agreement as

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

DEF000003

SUPP. APPX. 5

provided in this Section 2B, then, at MARS' election, the Agreement shall be extended and the Contractor shall continue to perform all of its obligations subject to the performance standards and other requirements set forth in this Agreement, as may be amended by the parties, in a responsible, and good-faith manner, with a high level of care, skill and diligence and consistent with recognized warehouse logistic operational best practices supporting the food industry for such period of time not to exceed three (3) months after the date that otherwise would have been the Expiration Date of the initial Term or Extension Term, as the case may be, (the "Transition Period"), in order to enable MARS to locate and finalize arrangements for the orderly, uninterrupted and efficient transition of the Management Services to the satisfaction of MARS. During the Transition Period, the Contractor shall provide its full cooperation and assistance as MARS may require in the operation of the Warehouse and the transition of the Management Services to MARS or its designee. During the Transition Period, the Management Fee and other applicable costs mutually agreed upon by both parties payable to the Contractor shall remain the same as that payable during the most recent Term unless otherwise negotiated between the parties, and MARS shall continue to pay or reimburse all Allowable Operating Expenses incurred during and in respect of the Transition Period, subject to the provisions of Section 5 hereof. On the date of expiration of the Transition Period, the Contractor and MARS shall be governed by the provisions of Sections 13D, 13F, 13G, 13H and 13I as if such date were the Expiration Date.

3.     **MANAGEMENT SERVICES; STANDARDS OF PERFORMANCE; HOURS OF OPERATION**

The Contractor shall, subject to this Agreement, provide warehousing management services with a high level of care, skill and diligence and consistent with recognized warehouse logistic operational best practices supporting the food industry including management of the day-to-day operations of the Warehouse, and oversight of the planned operations in the Warehouse, including but not limited to storage, handling, recouping, transportation management (including, but not limited to load building and carrier scheduling) and all other services as mutually agreed between the parties, subject to MARS' performance standards and other requirements set forth in (1) MARS' North American Warehouse Quality Assurance Manual ("Quality Manual"), (ii) the Vendor Assurance Program compiled by Contractor for the Warehouse in accordance with MARS' "Guidelines" and subject to MARS' approval, and (iii) Vendor Competency Standards based upon MARS Warehouse Vendor Competence Review Workbook, which are summarized in Appendix B hereto and in their totality are incorporated by reference into this Agreement. The Quality Manual is furnished to Contractor with this Agreement. The foregoing services, as may be more fully described in Appendix B, and supplemented by Exhibit 1 to Appendix B describing the Scope of Services and benchmarks related to the first 90 days of Contractor's Term shall be referred to herein as the "Management Services". The days and hours of operation of the Warehouse shall be as mutually agreed in writing by the parties hereto.

4.     **OPERATING BUDGET; OPERATING EXPENSES**

A.     Payment by MARS. Contractor shall perform the Management Services at all times within the Final Operating Budget adopted in the manner herein provided. Contractor agrees to submit a "Proposed Operating Budget," as specified in Section 2B, which shall identify, describe and quantify, pursuant to the format and other requirements of MARS, all costs, expenses, and charges anticipated to be incurred in connection with operating the Warehouse. The "Proposed Operating Budget" shall be subject to negotiation between the parties, and the agreed budget resulting from said negotiations shall be the "Final Operating Budget" for the applicable period (which is subject to changes in the manner more fully described below). In the event the parties cannot reach agreement on a Final Operating Budget for the applicable Extension Term prior to its Commencement Date, then the Final Operating Budget shall be

Mgmt Agmt 2013                                    4

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

DEF000004

employees, and shall retain the right to require Contractor to present evidence of its compliance with the terms of this Section.

### 16.   *CONFIDENTIAL AND PROPRIETARY INFORMATION; PUBLICITY*

     A.    <u>Proprietary Information</u>. Each party acknowledges and agrees that any and all information emanating from the other's business (MARS' business being deemed to include the business of Mars, Incorporated, and any of Mars, Incorporated's divisions or subsidiaries), in any form including any compilations of otherwise public information is "Confidential and Proprietary Information," and each party agrees that it will not, during or after the initial Term or any Extension Term of this Agreement, permit the duplication, use or disclosure of any such Confidential and Proprietary Information to any person (other than its own employees, agents or representatives who must have such information for the performance of its or their obligations hereunder), unless such duplication, use or disclosure of such Confidential and Proprietary Information is specifically authorized in advance by the other party in writing. Each party shall be responsible for any unauthorized duplication, use or disclosure made by any of its employees, servants or agents and shall take reasonable precautions to prevent such duplication, use or disclosures. For the purposes of this subsection, the term "Confidential and Proprietary Information" is not meant to include any information which, at the time of disclosure, is generally known by the public and any competitors of MARS; information disclosed to the other party by third parties having a right to do so and who have not imposed upon the recipient thereof obligations of confidentiality, or information which is known to the other party prior to disclosure. Contractor shall promptly notify MARS of any requirements of, or requests from, any governmental authority or any request in the context of any legal proceeding to disclose any Confidential and Proprietary Information relating to MARS, and Contractor shall not disclose such information without first notifying MARS so that MARS may contest such disclosure and shall cooperate with MARS in resisting such disclosure, to the fullest extent permitted by law.

     B.    <u>Publicity; Trademarks, etc.</u> Contractor shall not use the name, trademarks or trade names (whether registered or not) of Mars, Incorporated or of any of its divisions or subsidiaries in publicity releases or advertising, or in any other manner, including customer lists, without the prior written consent of Mars, Incorporated.

### 17.   *ASSIGNMENT*

     Neither party shall assign or subcontract the whole or any part of this Agreement without the other party's written consent, except that (i) MARS may assign this Agreement without the consent of the Contractor to any corporate affiliate of MARS provided that MARS remains the guarantor of, and is fully liable for, the performance of all of its obligations under this Agreement, and (ii) Contractor may assign its right to receive payments under this Agreement to such third parties as Contractor may desire without consent of MARS, provided that Contractor gives written notice (including evidence of such assignment) to MARS thirty (30) days in advance of any payment so assigned. Any subcontract made by Contractor with the consent of MARS as aforesaid shall incorporate by reference all terms of this Agreement.

### 18.   *STATUS AS INDEPENDENT CONTRACTOR*

     It is agreed and understood by both parties that the relationship of Contractor to MARS is one of an independent contractor, that Contractor shall not represent to anyone in any manner, express or implied, that Contractor is an employee, or that Contractor's personnel are employees, of MARS, and that

Mgmt Agmt 2013    CONFIDENTIAL    14

SUBJECT TO PROTECTIVE ORDER

nothing in this Agreement shall be construed to confer on Contractor any authority, express or implied, to bind or commit MARS to any third party in any way whatsoever. As an independent contractor, neither Contractor nor Contractor's personnel is entitled to the benefits provided by MARS to its employees, including, but not limited to, group and health insurance, deferred compensation and retirement benefits. As an independent contractor, Contractor has sole authority with respect to its employment policies, including, but not limited to, promotions, discipline, relocation, or termination, and such policies are not subject to agreement or consent on the part of MARS. Nothing in this Agreement shall be construed to suggest that the parties hereto are general partners, joint venturers or joint employers.

## 19.    *INSURANCE*

A.    Required Coverage. Contractor is responsible for obtaining and maintaining in full force and effect commercial general liability, workers' compensation, employers' liability, business automobile liability, warehouse legal liability and umbrella liability insurance pursuant to the minimum limits and other requirements contained herein or reasonably requested by MARS. Coverage shall be maintained insuring Contractor and MARS, against liabilities whether or not asserted by or on behalf of Contractor's employees, invitees, officers, owners, directors, contractors, subcontractors or agents. Contractor shall comply with all state and local insurance statutes and regulations. Contractor's commercial general liability and umbrella insurance policies shall include contractual liability, with limits of not less than the amounts specified below, and shall include all defense costs, including, but not limited to, attorneys' fees, court costs, and other similar costs and expenses. It is understood and agreed that any insurance limits shall not be construed as a limitation on Contractor's liability except as specifically addressed in Section 19 D. The policies shall provide coverage for any liability Contractor (including its employees, agents, invitees, contractors or subcontractors) may have for bodily injury or death, personal and advertising injury, or property damage. MARS, including its divisions, subsidiaries, parent and corporate affiliates, and its owners, shareholders, officers, directors, employees, and agents shall be included as "additional insureds" under all insurance policies provided by Contractor (except workers' compensation and warehouse legal liability and umbrella coverage (which follows form). MARS shall not be deemed to fall within the definition of "an Insured" for purposes of any damage, loss, bodily injury or death to employee exclusions that may exist within Contractor's policies, and Contractor shall provide an endorsement to that effect. All such policies shall be primary to, and not contributory with, any coverage which may otherwise be available to MARS. Each such policy shall contain a "separation of insureds" clause which shall have the effect of insuring each person, firm or corporation insured hereunder in the same manner and to the same extent as if a separate policy has been issued to each.

All insurance required hereunder shall be obtained through an insurance company with a minimum rating of A-VII or better as evaluated by the most current A.M. Best rating guide. If the insurance company has a rating less than A-VII, Contractor must receive specific written approval from MARS prior to proceeding.

Not later than ten (10) days prior to the expiration of, or the effective date of any material change in, any policy or policies hereunder, Contractor shall deliver (or cause the insurance company to deliver) to MARS written notice if the policy or policies will be cancelled or the coverage materially changed. As evidence of renewal, Contractor shall, not later than ten (10) days prior to expiration, either (i) deliver (or cause the insurance company to deliver) to MARS a new certificate of insurance, together with evidence of payment of the premiums for the renewal period, or (ii) if Contractor is unable, after a good faith effort, to deliver any such policy or certificate by the specified date, Contractor shall notify MARS in writing of the reasons why such insurance has not been renewed, shall advise MARS of the anticipated date of such renewal and shall deliver to MARS copies of any such policy or certificate, and evidence of payment, promptly upon their becoming available. Failure to deliver such notices, policies or certificates, as the

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

M.    Attorneys' Fees. The prevailing party in any arbitration or other action to enforce any of the terms hereof shall be entitled, in addition to any other relief granted, to all actual out-of-pocket costs and expenses incurred by such prevailing party in connection with such action, including, without limitation, all reasonable legal fees, and a right to such costs and expenses shall be deemed to have accrued upon the commencement of such action.

N.    Counterparts; Facsimile Signatures. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and together shall constitute one and the same instrument. Facsimile signatures shall be as valid as the original signatures. Signatures delivered by facsimile shall be followed by delivery of the original signed document.

O.    Survival. Any obligation of a party that by its terms or nature arises at, or is intended to continue beyond, the expiration or termination of this Agreement or a Services Addendum shall survive the termination or expiration of this Agreement or Services Addendum.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

CONTRACTOR:                                    Mars Chocolate North America, LLC

_____                      _____
Signature                                      Signature
Dwight Crawley                                 STEVEN F. SHELDON
Typed Name                                     Typed Name
Chief Financial Officer                        COMMERCIAL MANAGER
Title                                          Title

4-18-13                                        April 22, 2013
Date                                           Date

Mgmt Agmt 2013    CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER    22

DEF000022

SUPP. APPX. 9

SECTION 2

DOC #110-2 Declaration of Todd Moore

E-FILED
Wednesday, 20 June, 2018  08:24:19 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

## DECLARATION OF TODD MOORE

I am Todd Moore, Senior Logistics Manager for Mars Wrigley Confectionery. I make this Declaration from my personal knowledge, and I am competent to testify as to the matters contained herein, if called upon to do so.

1.  For a period of time, Kenco Logistic Services, LLC ("Kenco"), served as the third party management company responsible for managing the Manteno, Illinois facility pursuant to a contract between Kenco and Mars Chocolate North America, LLC.

2.  I have knowledge of the contractual relationship between Mars and Kenco and am familiar with the terms of the contract.

3.  Pursuant to the contract, Kenco was responsible for, among other things, management of the day-to-day operations of the warehouse.

4.  Robert Coffey ("Coffey") served as Regional Distribution Manager ("RDM") for Mars from April 2012 to February 2015.

5.  During the time that Kenco managed the Manteno facility, I served as Coffey's manager.

6.  Coffey had responsibility for various Mars distribution facilities including the facility located in Manteno, Illinois, which was managed by Kenco for a period of time.

7.  As RDM, Coffey was responsible for ensuring compliance with the contract between Mars and the management company responsible for running the distribution facilities for which he had oversight with respect to the quality of the product coming out of the facility.

8.  Pursuant to the contract between Kenco and Mars, Kenco had sole authority with respect to the handling of its employment matters, including, but not limited to, its employment policies, promotions, discipline, and termination.

9.     The individuals who worked at the Manteno facility were employees of Kenco and managed by Kenco pursuant to the contract.

10.     Kenco was expected to perform its management services within the Final Operating Budget agreed to between the parties.

11.     The Final Operating Budget included, among other things, wages to be provided to Kenco employees.

12.     According to the contract, Mars was not obligated to pay or reimburse Kenco for any expenses over a certain dollar amount which was not previously included in the Final Operating Budget absent written approval in advance of Mars' RDM or other authorized Mars personnel.

I declare under the penalty of perjury that the foregoing statements are true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed on this ___18___ day of June, 2018.

Todd Moore

2

SUPP. APPX. 13

SECTION 3

DOC #110-3 Deposition of Edith McCurry 4-18-18

E-FILED
Wednesday, 20 June, 2018  08:24:19 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT C

CERTIFIED TRANSCRIPT

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF ILLINOIS
 3                   URBANA DIVISION
 4
    EDITH McCURRY,              )
 5                              )
                Plaintiff,      )
 6                              )
         vs                     )  2:16-cv-02273-CSB-EIL
 7                              )
    KENCO LOGISTIC SERVICES,    )
 8  LLC., a Tennessee           )
    Limited Liability           )
 9  Company, MARS, INC.,        )
    KELVIN WALSH, MIKE          )
10  MANZELLO, DAVID JABALEY,    )
    TAMMI FOWLER, and MARIO     )
11  LOPEZ,                      )
                                )
12              Defendants.
13
14           The deposition of EDITH McCURRY called
15  for examination pursuant to notice and pursuant to
16  the Federal Rules of Civil Procedure for the United
17  States District Courts pertaining to the taking of
18  depositions taken before JO ANN LOSOYA, Certified
19  Shorthand Reporter within and for the County of Cook
20  and State of Illinois at 150 North Michigan,
21  Chicago, Illinois, on April 18, 2018 at the hour of
22  10:00 o'clock a.m.
23
24
```

SUPP. APPX. 16

Page 178

```
 1        REPORTER CERTIFICATE

 2

 3        I, JO ANN LOSOYA, a Certified Shorthand

 4   Reporter within and for the County of Cook and State

 5   of Illinois, do hereby certify:

 6            That previous to the commencement

 7   of the examination of the witness, the witness was

 8   duly sworn to testify the whole truth concerning the

 9   matters herein;

10            That the foregoing deposition

11   transcript was reported stenographically by me, was

12   thereafter reduced to typewriting under my personal

13   direction and constitutes a true record of the

14   testimony given and the proceedings had;

15            That the said deposition was taken

16   before me at the time and place specified;

17            That I am not a relative or

18   employee or attorney or counsel, nor a relative or

19   employee of such attorney or counsel for any of the

20   parties hereto, nor interested directly or

21   indirectly in the outcome of this action.

22

23

24
```

Page 179

```
 1        IN WITNESS WHEREOF, I do hereunto set my

 2   hand this April 30, 2018.

 3

 4

 5

 6

 7

 8

     JO ANN LOSOYA, CSR

 9   C.S.R. No. 84-002437

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

46 (Pages 178 - 179)

SUPP. APPX. 17

P.O. Box 1607
2001 Riverside Drive (37406)
Chattanooga, TN 37401

Phone 423-622-1113
Fax 423-643-3325
www.kencogroup.com



**KENCO**

April 2, 2013

EDITH MCCURRY
6239 S. 13110 E. Rd
Pembroke Township, IL 60958

Dear EDITH:

It is a pleasure to confirm our offer of employment to you. You will be employed at our KENCO MARS facility in Manteno, IL as a Clerk on the 1st Shift.

Below are the details of the offer:

- Your start date is April 21, 2013
- Your starting base pay will be $15.81, per hour, paid weekly
- You are eligible for a transition bonus of $1300.00, to be paid out in $433.33 increments following your 30th, 60th and 90th day of employment. If your employment ends within 90 days, the increments that the transition bonus is paid will not be paid in a prorated amount.
- You will begin accruing PTO under Kenco's PTO policy on April 21, 2013.
- The rate that you will accrue PTO under Kenco's PTO Policy will be based off of your 4Ts anniversary date of 6/14/1999.
- Based on completion of defined goals, objectives, and overall financial performance of the Company you may receive an increase in your wage. This will be determined through annual performance evaluations with your manager.

Kenco will be paying for temporary health coverage during the first 90 days of employment through Starbridge. You will have 30 days to elect the coverage level, but regardless of when you enroll, both the coverage and the premium are retroactive to your start date. Enrollment in Starbridge will take place during your new hire orientation. Your temporary health care coverage will end on your 90th day of employment.

You are eligible for the company benefit program on your 91st day of employment. The company's benefit program includes medical, dental and prescription drug coverage, an employer-matched 401(k) plan, short and long-term disability coverage, group life insurance and PTO.

The offer of employment is contingent upon the completion of a successful pre-employment drug screen analysis and criminal background check. We reserve the right to withdraw this offer if the drug screen analysis result or the background check is unfavorable. Your employment with Kenco is at-will and either party can terminate the relationship at any time, with or without cause and with or without notice.



EXHIBIT

KENCO 000216

## Kenco Employee New Hire Form

**Employment Information. Must be completed by the hiring manager / administrator**

| | | | |
|---|---|---|---|
| Action: | ☑ Hire   ☐ Rehire | Position: | ☑ New   ☐ Existing |

Date of Hire/Rehire: 4/21/13   If rehire, original DOH: 6 14 99

Employee Classification: ☑ Full time   ☐ Part Time  ☑ Regular  ☐ Seasonal  ☐ Temporary  ☐ Intern

Site Name: Marc   Location: Manteno, IL

Job Title: HR clerk-1   Supervisor:   Dept. Manager:

Work Phone: 815-468-4464   Cell: 815-735-4281   Fax: 815-468-2468

Work E-mail:   Work Zip Code: 60950

UltiPro Location Code: KLS101   UltiPro Dept. Code: 100051

Employee #: 204030   Badge #: 04984

Pay Rate: 15.81   per: ☑ hour  ☐ year   ☑ Hourly   ☐ Salaried

Pay Cycle: ☐ Biweekly  ☑ Weekly  ☐ Semi-Monthly   WK Comp Codes (8292, 3632, 8810, 2305):

State employee works in: IL   State Tax  ☑ Y  ☐ N   Code:   Local Tax  ☐ Y  ☑ N   Code:

Employer Signature: Edith McCurry  X McCurry   Date: 4/19/13

**Personal Information. New Employee should complete this section**

Last Name: McCURRY   First Name: Edith   Middle Initial:

Preferred Name:   Date of Birth: 8/26/1962

Social Security Number:   Gender:  ☐ Male  ☑ Female

Home Phone: 815-944-5673  Cell: 815-735-4281   Email: remccurry@aol.com

Address
Street: 6239 S. 13110 E. Rd.   City: Pembroke Township

State: Illinois   County: Kankakee   Zip Code: 60958

| Marital Status | Ethnicity | |
|---|---|---|
| ☐ Single | Hispanic or Latino  ☐ Yes  ☑ No | |
| ☑ Married | Race | |
| ☐ Divorced | ☐ Asian      ☐ White    ☑ Black / African American | |
| ☐ Legally Separated | ☐ American Indian / Alaska Native  ☐ Native Hawaiian / Pacific Islander | |
| ☐ Widowed | ☐ Two or more races | |

United States Citizenship
☑ US Citizen   ☐ Permanent Resident   ☐ Authorized   I9 Review Date:

Emergency Contact Information
Contact Name: Richard McCurry   Relationship: Spouse

Work Phone: N/A   Home Phone: 815-944-5673

Contact Name:   Relationship:

Work Phone:   Home Phone:

Employee Signature: Edith McCurry   Date: 4/19/13

**EXHIBIT**
6

KENCO 000206



January 27, 2015

Edith McCurry                                                        <u>By Mail</u>
6239 S. 13110 E. Rd
Pembroke Township, IL 60958

Dear Edith,                              Position: HR Clerk

Kenco Logistic Services, LLC was recently informed by Mars that our logistic services contract with them has been cancelled. As a result of this contract cancellation, we regret to inform you that all Kenco Logistics Services regular, full-time and temporary associates who are employed at 1125 Sycamore Street, Manteno, Illinois 60950 will be terminated effective March 29, 2015.

All Kenco regular, full-time and temporary associates at this location will be terminated. You have no "bumping rights." In other words, you cannot take another associate's position. As part of the transition process, Mars' new logistics provider may allow associates to apply for positions within their organization. Information pertaining to the new provider will be presented to you through group meetings and notifications on the bulletin boards throughout the facility going forward.

This notice is being given to you pursuant to the Worker Adjustment and Retraining Notification Act of 1988. This Act requires employers to give official notice to affected employees of a pending mass layoff or facility shutdown. Should you have any questions, please contact Susan Denman at (423) 643-3396.

Sincerely,

*Mario Lopez*

Mario Lopez
General Manager



KENCO 000917

SUPP. APPX. 20





**2001 Riverside Drive**
Chattanooga, TN 37406
Toll Free 1.800.758.3289
Direct 423.622.1113
Fax 423.643.3325
www.kencogroup.com

Ms. Edith McCurry
6239 S. 13110 E. Rd
Pembroke Township, IL 60958

Dear Edith:

As you know, Exel Logistics has been awarded the Mars Manteno, IL 3PL contract. Since you did not apply for work with Exel, your employment will end when Kenco transitions the work. That is happening sooner than we thought (February 28). But, since you are not continuing employment with Exel, they are requiring us to remove you – and anyone else not continuing work employment with Exel – from work today.

However, Kenco has made the decision to continue your employment through March 29, 2015, your termination date. You will also be paid out any accrued but unused vacation/PTO you may have. You will not need to be onsite again, with the exception of arranging with me (423.280.8937) a mutually agreeable date and time to come and pick up any personal belongings and to return Kenco property to include your access badge, keys, files, cell phone, laptop, etc. as applicable.

After your termination date, you may be eligible for unemployment with the state, once they make a determination of your unemployment benefits. Enclosed for your review is information from the IL Department of Employment Security.

If you currently have medical, dental, or vision insurance, after your termination date you will be able to elect coverage through COBRA. You will receive a packet of information about this option within 15 days of March 29, 2015. If you have additional benefits such as 401(k), long term care, life insurance, etc., information about them is enclosed.

If you are currently receiving short or long term disability benefits, you will continue to receive them until your claim expires.

Thank you for your service to Kenco.

Sincerely,

Eddy Register, Human Resources
Kenco Management Services

KENCO 000915

SUPP. APPX. 22

# KENCO

## Opportunity for Improvement Form

| Date Completed: | 12-17-14 | | |
|---|---|---|---|
| | | **Employee Information** | |
| Employee's Name: | Edith Mccurry | Employee's Title: | HR Clerk |
| Location: | Mars- Manteno | Shift: | 1 |
| Date of Violation: | 12/9/2014 | Manager/Supervisor: | Lori Varvel |

Type of Warning:

☒ Verbal    ☐ 1ˢᵗ Written    ☐ 2ⁿᵈ Written    ☐ 3 Day Suspension without Pay    ☐ Termination

**Nature of violation or infraction of company rule(s) or policies.**
STD-HR- 1003 (Prohibited Conduct Policy) & STD - HR - 1007 ( Non Exempt Timekeeping Policy)

Edith presented a Time Adjustment Form, for a missing out punch for Tuesday, 12/9/14. The time that she recorded was 5:00 pm. The correct time that Edith left for the day was 6:39pm. Edith recorded on the document that she was certain that she swiped out on the time clock. She, in fact, did not swipe out before she left the building (hence, the missed punch). Not only was the information that she provided on the document, false, the overtime that she worked was not approved.

**Additional Details and Facts**

**Action to be Taken**
Failure to follow the prohibited conduct and non - exempt timekeeping policies will result in disciplinary action up to, and including, termination.

**Employee's Comments**

| | | | |
|---|---|---|---|
| _OPT_ Facilitated by | 12-19-14 | HR Review | 12-14-14 |
| Facilitated by | Date | HR Review | Date |

CP-HR-1000-1 Opportunity for Improvement Form

**EXHIBIT**
1 U

KENCO 000195

SUPP. APPX. 23

# KENCO

## TIME ADJUSTMENT FORM

### Employee Information

Employee Name: M<sup>c</sup>CuRRy          Edith          M.I.
              Last              First

Department: _____    Date: 12/11/14

### Adjustment Information

**Reason for Time Adjustment:**

I'm certain I punched out.

| | DATE | HOURS | IN | OUT |
|---|---|---|---|---|
| Missed Punch/Punches | 12/9/14 | | | 5:00pm |
| Clock Malfunction | | | | |
| Interrupted Meal Period | | | | |
| PTO | | | | |
| Other: (specify) | | | | |

### Approval

| | DATE | MINUTES |
|---|---|---|
| Missed Meal Period | | |

Supervisor Signature: _____    Date: 12/12/14

Employee Signature: Edith McCurry    Date: 12/11/14

Adjustment Made By: _____    Date: 12/12/14

Date Paid: _____

POL-HR-6.2.2.001-1 Effective 01/01/14

KENCO 000196



Effective Monday, 12/22/2014, we will transition into a new schedule structure, in an effort to consistently meet business needs. This schedule is subject to adjustments upon peak season.

Below, is your new schedule:

**EDITH MCCURRY**

Schedule: 8:00am – 4:30pm

- At this time, all associates will be required to clock out for a 30 minute meal period.
    - The meal period is to be taken within the 1st – 5 hours of the start of your shift. You, and your Supervisors, will be responsible for making sure that this is adhered to. Failure to adhere to this may result in disciplinary action (OFI).
    - The meal period needs to be a full 30 minutes. Anything under 30 minutes may result in disciplinary action (OFI). You will be allowed to take up to a 33 minute meal. Anything over 33 minutes will result in an attendance point.
    - All meal periods will be unpaid
- You may not clock in more than 6 minutes before the start of your schedule.
- If you volunteer for overtime, you will be required to work the shift. If you are unable to work, you will need to request the time off. Approval/Denial will remain at the discretion of the Supervisor and/or Operations Manager
- All overtime must be authorized. Unauthorized overtime may result in disciplinary action up to, and including, termination.

Associate Name (Print): _Edith McCurry_

Associate Name (Sign): _Edith McCurry_

Date: _12/19/14_

KENCO 000199

SUPP. APPX. 25

Page 70

BY MS. ARGENTIERI:

Q. So, can you tell me why you requested FMLA leave?

A. Yes. I was not feeling well. I had a -- I was really stressed really bad, I just was not well.

Q. Was there a particular medical condition, if you know, that required that you take a leave of absence from work?

A. Well, I went to the doctor, and remember, I was diagnosed with the post-traumatic stress disorder from the psychiatrist.

Q. Was that -- you were diagnosed with PTSD before you took a leave of absence?

A. No.

Q. After?

A. Yes.

Q. Were you diagnosed with any medical conditions at the time that you took this leave of absence?

A. I'm sorry.

Q. I'm just trying to understand if there was a certain medical condition that required you to take that leave of absence? You had previously said

Page 71

that you were not feeling well and that you were stressed. Does that cover it? Was there any other -- was there a medical condition that you been diagnosed with as of January, 2015 when you requested a leave of absence?

A. I don't know if it was at that specific time I was diagnosed -- I have been diagnosed with fibromyalgia.

Q. Okay.

A. My hands swell, hurt all the time.

Q. Do you know why your hands hurt? Is that from fibromyalgia?

A. I don't know, and I know I have headaches all the time.

Q. Do you know if Kenco approved for you to be on -- it appears to me it looks like you started a leave of absence of January 25, 2015 and your Family Medical Leave Act leave was eligible until March 29, 2015; is that -- is that correct?

A. Yes.

Q. Okay.

A. I'm sorry. You said what went to March 29, 2015?

Q. FMLA.

Page 72

A. Yes. You're saying it went through to that time period?

Q. That you were eligible to be on a leave of absence under the FMLA until March 29, 2015?

A. I was -- I was on it until then. I mean, I was not actually like -- well, they terminated at that time. So, they terminated on March 29, 2015.

Q. And do you recall how you were notified about your employment being terminated?

A. A letter.

Q. When did you receive the letter?

A. I'm not exactly sure. It was earlier than March. Maybe February, I'm thinking. Early February. It may have -- I may have gotten a letter.

MS. ARGENTIERI: I'm going to hand you Exhibit 8.

(Deposition Exhibit 8 was marked for identification.)

BY MS. ARGENTIERI:

Q. So first, just please take a look at the first page of this exhibit. Do you recognize if this is the letter that was mailed to you at the time that Kenco lost the contract with Mars and had

Page 73

to terminate all the Manteno, Illinois staff?

A. This effective March 29 date, I'm not sure of it, but all the rest of it looks familiar to you -- to me.

Q. So the letter looks familiar?

A. Yes.

Q. Is that your address at the top of the letter?

A. Yes.

Q. And then if you turn to the second page of this, it looks like it's a copy of the envelope that the letter was sent in?

A. Yes.

Q. And it looks like it was mailed out, the first postmarked date is January 28, 2015. Do you see that?

A. Yes.

Q. Do you have any reason to believe that that date is incorrect or do you --

A. I mean, I don't know I believe --

Q. Do you know when you received the letter?

A. In February sometime.

Q. Okay.

A. This says I got it February 13.

19 (Pages 70 - 73)

SUPP. APPX. 26

Page 74

```
 1    Q.   At the time that you received this
 2 letter, had you determined that you were unable to
 3 return to work?
 4    A.   No.
 5    Q.   Or were you trying to return to work at
 6 that time?
 7    A.   No.
 8    Q.   You were not trying to return to work or
 9 you were?
10    A.   I was not trying to return to work at
11 this time.
12    Q.   Okay.
13    A.   I was still under doctor's care.
14    Q.   Was there at any point from January,
15 2015, until today, have you ever explored trying to
16 return to work?
17    A.   No.
18    Q.   Okay. Is that -- that's because you do
19 not believe that you're medically able to be working
20 at this time; is that correct?
21    A.   Yes.
22    Q.   And while we have this letter that we're
23 looking at in front of us, Ms. McCurry, do you --
24 you understand that at the time that you were
```

Page 75

```
 1 terminated from Kenco, every employee at the
 2 Manteno, Illinois facility was terminated from
 3 Kenco?
 4    A.   From what I understood, yes.
 5    Q.   And Kenco lost the contract with Mars at
 6 that time?
 7    A.   Yes.
 8    Q.   So they laid off the whole staff at that
 9 site?
10    A.   Yes.
11    Q.   Am I -- am I understanding correctly then
12 that the lawsuit that you filed against Kenco, the
13 reason, you know, why we're all sitting here today,
14 you are not claiming that your termination was
15 discriminatory; is that correct?
16         Tell me if you want me to rephrase
17 the question.
18    A.   I mean, yes. Yes. Can you rephrase it?
19    Q.   I'll rephrase the question.
20         You are bringing claims against Kenco
21 and Mars in your lawsuit, and you know we are here
22 because you are claiming that you are -- you were
23 discriminated against. I have shown you this
24 letter, and we were just a few moments ago
```

Page 76

```
 1 discussing the fact that you were terminated at the
 2 same time that every employee at the whole site was
 3 terminated because Kenco lost the contract with
 4 Mars, right?
 5    A.   Yes.
 6    Q.   So I'm just -- I'm trying to confirm and
 7 I want you to tell me if I'm correct that your
 8 lawsuit is not related to your termination?
 9    A.   My lawsuit is what it is, what I turned
10 it in to be.
11    Q.   I don't think that answers my question.
12 Are you disagreeing with Kenco's decision to
13 terminate you? Do you think it was unfair that you
14 were terminated?
15    A.   I don't disagree with the letters. I
16 don't disagree.
17    Q.   I don't know that I understand your
18 answer. Do you feel that it was unfair that you
19 were terminated from Kenco?
20    A.   I don't know what you mean by that. I
21 know that this letter came because they lost their
22 contract.
23    Q.   Okay. So, here, let me try to ask this
24 in a different way. When you file a lawsuit and you
```

Page 77

```
 1 are claiming that Kenco discriminated against you,
 2 it is your obligation to be telling us what Kenco
 3 did that was discrimination. Are you following me?
 4    A.   I filed what I considered to be
 5 discrimination.
 6    Q.   Right. Right. Right. Understood. So,
 7 as far as I can tell, you are not claiming that your
 8 termination was discriminatory. You're not saying
 9 that you were treated unfairly in being terminated
10 because you were terminated at the same time that
11 every employee at the whole site was terminated?
12    A.   I agreed that I was terminated according
13 to what the letter says, as far as them losing their
14 contract.
15    Q.   Do you disagree with Kenco's decision to
16 terminate you?
17    A.   I don't know if that was an agreeable or
18 disagreeable situation. I mean, I don't understand.
19    Q.   When you file a lawsuit and you are
20 saying that you are discriminated against, you --
21 you have to say how Kenco discriminated against you.
22 We are here today to talk to you about how you were
23 discriminated against. I do not think that you are
24 claiming that your termination was part of the
```

20 (Pages 74 - 77)

Page 78

1  discrimination, but I am asking you to confirm that.
2     A.  I can only confirm what I put on my
3  charges is what I'm agreeing to.
4     Q.  Right.  And I'm not trying to confuse
5  you.  I'm not trying to trick you.  Your charges are
6  extremely long and not the most clear as to what you
7  are claiming.  And I'm just -- do you think that
8  your termination was a discriminatory action?
9     A.  I think my termination is -- was given in
10  respect to this letter, according to them,
11  they lost their contract.
12     Q.  Do you agree that they lost their
13  contract?
14     A.  They said they did.  Did they?
15     Q.  Well, they did.  I mean, do you -- do
16  you -- do you believe that your termination was
17  discriminatory?
18     A.  Should I?
19     Q.  I cannot answer that question for you.
20     A.  Well, I don't know.  I mean, you are
21  asking me, but I don't know what you're -- so, I
22  can't give you legal advice and my role here is to
23  represent Kenco and just to gather information about
24  the lawsuit that you filed and what your claims are

Page 79

1  in the lawsuit.
2     Q.  The questions --
3     A.  I'm going by this letter.  So, I mean, if
4  this letter means something else, then I mean...
5     Q.  Let me try asking it this way:  Do you
6  think the only reason that you terminated from
7  Kenco is because Kenco lost the contract with Mars?
8     A.  At this time.
9     Q.  That's -- was that yes?
10     A.  Yes, at this time.
11     Q.  I don't know what you mean by "at this
12  time."
13     A.  Because you are asking me these
14  questions, and it is just making me think maybe now
15  there is something else I should be looking at, but
16  I don't know.  So I mean, I only went by this
17  letter.
18     Q.  I am not trying to make you think that
19  there should be something else.  The reason that
20  we're here is we are trying to gather the
21  information about what you are claiming.
22     A.  I filed what I was claiming.
23     Q.  Okay.
24     A.  And I just took this as its word.

Page 80

1     Q.  So is it fair to say that you agree that
2  the only reason you were terminated from Kenco is
3  because Kenco lost the contract with Mars?
4     A.  According to this letter and what I
5  understand at this time, yes.
6     Q.  Let's just move on from that for now.
7  When you worked at Kenco, were you aware that Kenco
8  had policies against harassment and discrimination?
9     A.  I'm not, I'm not -- yes.
10     Q.  You were?
11     A.  Yes.
12     MS. ARGENTIERI:  I'm going to give you
13  this, which is Exhibit 9.
14        (Deposition Exhibit 9 was marked
15         for identification.)
16  BY MS. ARGENTIERI:
17     Q.  Is this your signature at the top
18  confirming on April 19, 2013, that you received a
19  copy of Kenco's general employment policies,
20  prohibited conduct policy, workplace violence,
21  anti harassment, and a number of other policies.
22     A.  Yes.
23     Q.  While you were working at Kenco, did you
24  ever make a complaint to Kenco about discrimination?

Page 81

1     A.  Yes.
2     Q.  And let me make sure I'm being clear.
3  I'm not talking about complaints that you made
4  outside of Kenco to the Illinois Department of Human
5  Rights or anyone else.  I'm just talking about
6  complaining within Kenco.
7     A.  Yes.
8     Q.  Okay.  Who did you complain to?
9     A.  Lori Varvel.
10     Q.  You complained to Lori Varvel?
11     A.  Yes.
12     Q.  When did you complain to Lori?
13     A.  At the time she was doing, at the time
14  she was harassing me, her and Mario Lopez, and I
15  told her, you know, that that's what she was doing.
16     Q.  So, let's backup a little bit from that.
17  What did Lori Varvel do that you're saying was
18  harassing toward you?
19     A.  She wrote me up with the policy that
20  wasn't in effect.  She looked at the camera when
21  they didn't do that to anyone else except for me.
22  She, her and Mario threatened me and forced me to
23  sign a form, the write-up form, that they -- when
24  they wrote me up.  And that's just a few things that

21 (Pages 78 - 81)

SUPP. APPX. 28

Page 86

1  BY MS. ARGENTIERI:
2      Q.  Let's take a look at Exhibit 11, first,
3  Ms. McCurry because I think that that one is earlier
4  in time.  Do you recognize what this document is?
5      A.  It looks like -- it looks familiar, yes.
6      Q.  Is this a memo that Lori Varvel gave you
7  in November, 2014, with some job expectations?
8      A.  Yes.
9      Q.  On the second page of the document, is
10  that, did you prepare that?
11     A.  Yes.
12     Q.  Let's look now instead at the exhibit
13  labeled 10.
14          (Deposition Exhibit 10 was
15          marked for identification.)
16  BY MS. ARGENTIERI:
17     Q.  You were talking about a few moments ago
18  how Lori Varvel wrote you up.  Is this the write-up
19  that you're talking about?
20     A.  This looks like it.
21     Q.  What is your understanding of why you
22  received this write-up or do you know why you
23  received the write-up?
24     A.  So you are asking me?

Page 87

1      Q.  Why did you receive the write-up?
2      A.  It says here that I presented a time
3  adjustment form for December 9, 2014, the time I
4  recorded was 5:00 p.m., it says -- and it says the
5  correct time that Edith left for the date was
6  6:39 p.m.  Edith recorded on the document that she
7  was certain that she swiped out on the time clock.
8  She, in fact, did not swipe out before she left the
9  building, hence the missed punch.  Not only was the
10  information that she provided on the document false,
11  the overtime that she worked was not approved.
12         So from what she wrote here is the
13  only reason I can think that she wrote me up.
14     Q.  Do you think it was unfair that you
15  received this write-up?
16     A.  I think it was a violation on my rights
17  and policy.
18     Q.  It was a violation of your rights?
19     A.  And policy.
20     Q.  And policy.  Why don't we talk about what
21  policies were or were not being violated.
22         This is Exhibit 12.
23          (Deposition Exhibit 12 was
24          marked for identification.)

Page 88

1  BY MS. ARGENTIERI:
2      Q.  Can you flip to the third page?
3      A.  I don't even know why we're looking at
4  this for me.  This policy is not effective for me.
5  The effective date is 12/15/14.  This does not apply
6  to me.
7      Q.  But the date -- this incident occurred
8  12/9/14.
9      A.  I'm sorry.  Could you say that again?
10     Q.  You're saying that you don't agree that
11  the policy applied at the time that this happened,
12  is that what you're saying?
13     A.  You said the incident was when?
14     Q.  Well, that's -- I mean, that's for you to
15  tell me; but based on the write-up, it says that it
16  was December 9 of 2014.
17     A.  Effective date on this policy was
18  December 15, 2014.  This does not apply to me.  This
19  is an ineffective policy.
20     Q.  Well, it's not an ineffective policy --
21     A.  For me, it is.
22     Q.  Well, no, I mean, you were still working
23  at Kenco as of December --
24     A.  It does not matter.  I hadn't been

Page 89

1  trained on this, and this does not apply to me in
2  this incident.  So, this is not relevant.
3      Q.  It's not irrelevant.  Why don't turn to
4  Page 3, please?
5      A.  I don't know why I would turn to Page 3
6  because this policy is not effective for me.  It
7  says 12/15/14.  According to Kenco policy, you have
8  to be trained on a policy and notified -- if this
9  went into effect December 15, 2014, I have to have
10  been trained and know about this policy.
11     Q.  The good thing is that Kenco actually
12  documented all the changes to this policy.  So we're
13  going to go through what those changes are and we're
14  going to confirm that the part that I'm asking you
15  to look at has not changed during this time period.
16  So, can you read for me where it says 8?
17     A.  I object to this.  I would like to go on
18  record stating that I object to this policy and
19  anything that it has to do with it, and --
20     Q.  Do you see where it says history of the
21  policy on Page 3?  Do you see where it lists the
22  dates that the policy was revised and the changes
23  that are made?  Can you tell me if you see that?
24     A.  I see where it says history.

23 (Pages 86 - 89)

Page 110

1    your COBRA?
2        A.  I don't know.  I never received it.  I
3    never got to see it.
4        Q.  Right.  But I'm just trying to understand
5    why you think -- why you believe that was harmful to
6    you?
7        A.  It was harmful.  I was treated different.
8    Why do I have to call the government to ask for
9    help?  No one else had to.
10       Q.  Okay.  Did we talk about everything that
11   you are claiming is disability discrimination?
12       A.  I'm sorry.  Are we claiming --
13       Q.  Did we cover all of the examples of what
14   you're saying was disability discrimination?
15       A.  I don't know if I have covered
16   everything.
17       Q.  Can you think of anything else that we
18   haven't covered right now?
19       A.  I can't be specific.  I don't know.
20       Q.  You have told me all the specifics that
21   you can think of at this time?
22       A.  If we're being specific, whatever I could
23   think of at this moment.
24       Q.  You have told me.

Page 111

1        A.  Yes.  I know there's other things, but I
2    just can't recall right now.
3        Q.  And you will tell me if you think of
4    something else --
5        A.  If I think of something else.
6        Q.  -- during the deposition.
7            Are you claiming you were
8    discriminated against based on your gender?
9        A.  Yes.
10       Q.  Why do you believe you were discriminated
11   against based on your gender?
12       A.  Because my pay was half the amount of a
13   male and we were doing the same duties.
14       Q.  You mentioned when we talked about the
15   race discrimination -- are you talking about Len
16   Szplett?
17       A.  Yes.
18       Q.  Are you saying it was race discrimination
19   and gender discrimination that Len was paid more
20   than you?
21       A.  Yes.
22       Q.  Is there anything else that happened
23   while you were employed at Kenco that you felt was
24   gender discrimination?

Page 112

1        A.  Not that I can recall.
2        Q.  Do you know how much money Len was making
3    when he worked at 4Ts?
4        A.  I knew what he made.
5        Q.  Did Len make more than you when you
6    worked at 4Ts?
7        A.  Yes.
8        Q.  Did Kenco bring you on at a similar pay
9    to what you made at 4Ts?
10       A.  Yes.
11       Q.  Are you making a claim that Kenco
12   retaliated against you?
13       A.  Yes.
14       Q.  So, what actions were taken against you
15   that you believe were retaliation?
16       A.  When Mary Madison had a hearing at the
17   Department of Human Rights, she -- Karen Smith, the
18   lawyer, had asked me some questions concerning her
19   allegations so Karen Smith knew what I was going to
20   say.  When it came time for the hearing, Len was
21   asked to come to be a witness, but not me.  So, I
22   saw that.
23       Q.  You thought it was retaliation that Kenco
24   did not ask you to be a witness at the Illinois

Page 113

1    Department of Human Rights?
2        A.  That, and them bringing on Lori and them
3    reducing my duties, things of that nature.
4        Q.  Is there anything else that we haven't
5    talked about that you think was retaliation?
6        A.  It's what I can think of right now.
7        Q.  Okay.  Am I correct that you are also
8    alleging that Kenco and all the defendants engaged
9    in a conspiracy against you?
10       A.  Yes.
11       Q.  What -- why are you bringing a claim of
12   conspiracy?
13       A.  Just things that occurred, the way things
14   occurred, and especially with the -- when we were --
15   when I went to the IDHR, they -- they hired Jay
16   Elliott as an employee and at my -- at my hearing at
17   the IDHR, he came, he filed an appearance, and then
18   he presented himself as a witness, and he spoke as
19   having firsthand knowledge in my hearing, and he did
20   not have firsthand knowledge.  I think they hired
21   him just to have an advantage or for whatever
22   reasons they did that.  Like I said, bringing in
23   Lori --
24       Q.  So --

29 (Pages 110 - 113)

SECTION 4

DOC #110-4 Deposition of Edith McCurry 5-30-18

E-FILED
Wednesday, 20 June, 2018  08:24:19 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT D

Page 1

 1

 2          IN THE UNITED STATES DISTRICT COURT

 3            CENTRAL DISTRICT OF ILLINOIS

 4              URBANA DIVISION

 5

     EDITH McCURRY,                )

 6                                 )

              Plaintiff,           )

 7                                 )

         vs                        )     2:16-cv-02273-CSB-EIL

 8                                 )

     KENCO LOGISTIC SERVICES,      )

 9   LLC., a Tennessee             )

     Limited Liability            )

10   Company, MARS, INC.,          )

     KELVIN WALSH, MIKE            )

11   MANZELLO, DAVID JABALEY,      )

     TAMMI FOWLER, and MARIO       )

12   LOPEZ,                        )

                                   )

13            Defendants.

14

15          The deposition of EDITH McCURRY called

16   for examination pursuant to notice and pursuant to

17   the Federal Rules of Civil Procedure for the United

18   States District Courts pertaining to the taking of

19   depositions taken before JO ANN LOSOYA, Certified

20   Shorthand Reporter within and for the County of Cook

21   and State of Illinois at 150 North Michigan,

22   Chicago, Illinois, on May 30, 2018 at the hour of

23   11:00 o'clock a.m.

24                **MARS EXAMINATION**

Page 6

1  deposition, April 18, and today?
2     A.   Have I had -- is there anyone specific?
3     Q.   Anyone other than counsel for Kenco, the
4  Judge, or me, counsel for Mars?
5     A.   Yes.
6     Q.   Who have you spoken with?
7     A.   Family, friends.
8     Q.   And just about the fact that you're
9  giving a deposition today?
10    A.   Yes.
11    Q.   What friends have you spoken to?
12    A.   I have spoken to -- I have spoken --
13  excuse me.  I have spoken to Mary.  I have spoken --
14    Q.   Mary Madison?
15    A.   Yes.  I have spoken to friends of my
16  sister's.  I can't think of her name right now.  I
17  have spoken to a friend named Derrick.  And I don't
18  know.  Various people I'm sure.
19    Q.   So aside from Mary Madison, is there
20  anyone else that you have spoken to that had
21  litigation filed against both Kenco and Mars similar
22  to what you have filed?
23    A.   No.  Not that I can recall.  No.
24    Q.   Did you speak to Mary Madison about her

Page 7

1  deposition with Mars' attorney in the litigation she
2  had filed?
3     A.   Not recently.
4     Q.   Ever?
5     A.   Yes.
6     Q.   What did she share with you about that
7  deposition?
8     A.   Just the general things that went on, how
9  she felt about it.
10    Q.   Did she instruct you as to how you should
11  answer any questions today?
12    A.   No.
13    Q.   Did she speak to you about the type of
14  questions that the Mars' attorney had asked her?
15    A.   She -- well, I received a part of her
16  deposition in one of the -- one of the papers that
17  were filed by Kenco.  So I read part of her
18  deposition.
19    Q.   So you read her deposition testimony?
20    A.   Some of it, whatever Kenco sent to me is
21  what I read.
22    Q.   You're saying Kenco sent you Mary
23  Madison's testimony?
24    A.   Part of it.  It was in a -- I believe it

Page 8

1  was in a motion or something that they sent and
2  filed and that her deposition was part of it.
3     Q.   Okay.  So aside from that, have you
4  received any other excerpts or full deposition
5  transcripts of Mary Madison's deposition in her case
6  against Kenco and Mars?
7     A.   No.
8     Q.   So, she hasn't provided you with any
9  documents related to her lawsuit, correct?
10    A.   Correct.
11    Q.   When did you last speak with Ms. Madison
12  about your deposition today?
13    A.   This morning.
14    Q.   What did you talk about this morning?
15    A.   She just told me to have faith and be
16  confident.  That's it.  Mostly about the way I feel
17  about things.
18    Q.   How long did you guys speak for?
19    A.   Not long.
20    Q.   So half an hour?
21    A.   No, not that long.
22    Q.   Five minutes?
23    A.   Maybe a little longer than that.
24    Q.   All right.  Less than 15 minutes?

Page 9

1     A.   Around that, maybe.
2     Q.   And how about attorney Hoffman, did you
3  have any conversations with him about coming here
4  today?
5     A.   No.
6     Q.   You have filed this lawsuit against Mars
7  as well as Kenco.  Is there a reason that you have
8  named Mars other than the fact that the Kenco
9  location you worked distributed Mars product?
10    A.   Because they knew about what happened,
11  they knew about the things that were occurring at
12  the facility.
13    Q.   So tell me what things they knew about
14  first, and then you can tell me who the "they" is?
15    A.   Well, the "they" is Robert Coffey, he's
16  their RDM, and he's in charge or responsible for the
17  Manteno facility, and the things that he was aware
18  of was the hiring of Lori Varvel, the accidents that
19  were going on at the facility, just general issues
20  that happened there between employees Vernon Henry
21  and his issue with Pete Monstwillo, just the list
22  goes on.  I don't know if there's anything he
23  wouldn't be familiar with, plus they had morning
24  meetings and they discussed everything that went on

3 (Pages 6 - 9)

Veritext Legal Solutions

SUPP. APPX. 34

Page 10

1  at the Manteno facility. So he would know what was
2  going on there.
3      Q.  Tell me what you actually know Robert
4  Coffey knew?
5      A.  Well, I know he knew about Lori Varvel's
6  being hired. I read the emails.
7      Q.  How did you know of that?
8      A.  I read the emails that were sent to me in
9  discovery. He knew about that. Mars had an issue
10  with wanting to pay for her salary, and I also know
11  he knew about issues because we sat across from each
12  other at one time at the office, at the Manteno
13  facility, and we discussed things, more specifically
14  Kelvin Walsh's issues -- issues with Kelvin Walsh,
15  and just general behavior. So, I knew he -- I knew
16  he was -- had issues with or concerns with Kelvin
17  Walsh, in discussing things with me and so we
18  talked.
19      Q.  So, back to Lori Varvel, so you are
20  referring to an email related to her hiring and
21  salary; is that correct?
22      A.  Yes, an email where they were discussing
23  not wanting to pay her wages. I can't remember the
24  specific terminology that was used, but they had an

Page 11

1  issue with wanting to pay for her.
2      Q.  Do you know if Robert Coffey interviewed
3  Lori Varvel?
4      A.  I don't know.
5      Q.  You said Robert Coffey knew about
6  accidents that were going on. What are those
7  accidents that you're referencing?
8      A.  I'm sorry. I can't remember exactly. It
9  was in the emails that were sent to me.
10      Q.  Okay. Do they somehow relate to your
11  lawsuit against Mars?
12      A.  I mean, I'm not sure at this time.
13      Q.  Well, this is your time to tell me why
14  you're suing Mars. It's my job to figure out why
15  are we in this lawsuit to begin with. So you
16  mentioned Robert Coffey knew about the hiring of
17  Lori Varvel, he knew about some accidents. You said
18  he knew something about Vernon Henry. What did he
19  know about Vernon Henry?
20      A.  He knew about Vernon Henry being called a
21  "nigger" by Pete Monstwillo. He knew that was -- he
22  knew that situation.
23      Q.  How do you know he knew that?
24      A.  Because everything is discussed in the

Page 12

1  morning meetings.
2      Q.  You say this situation between Vernon
3  Henry and Pete was addressed in a morning meeting?
4      A.  I'm not exactly sure that it was
5  addressed, but what I do know is that they discussed
6  a lot of things. Mars has access to all information
7  that is relevant at the Mars -- that's relevant at
8  the Mars Manteno facility.
9      Q.  And what do you base that off of?
10      A.  Off of -- I mean, I talks to everyone at
11  that facility. He's not -- how do you say -- not
12  unapproachable.
13      Q.  "He" as in Robert Coffey, is that who
14  you're talking about?
15      A.  Yes. He was our RDM when we were there.
16  I mean, you could approach him to talk about any
17  situation that you had. I mean, no employee was
18  afraid to come and talk to him.
19      Q.  But the fact that no employee was afraid
20  to talk to him doesn't mean that he happened to know
21  about a situation with Vernon Henry and Pete,
22  correct?
23      A.  He should know. He and the general
24  manager discussed issues that go on at the Mars

Page 13

1  Manteno facility.
2      Q.  Did you attend the morning meetings?
3      A.  I used to attend the morning meetings
4  back in the past.
5      Q.  When did you stop attending those?
6      A.  When I had -- when my position kept
7  growing.
8      Q.  Okay. When was that?
9      A.  That was before Kenco. So I don't
10  remember exactly. But Len attended the meeting --
11  Len attended the meetings and we would discuss, you
12  know, things. They discussed production. They
13  discussed any issues that went on at that location.
14      Q.  When you attended these meetings before
15  Kenco, was Robert Coffey in those meetings with you?
16      A.  No, he wasn't there at the time.
17      Q.  Okay. And Len, Len worked for Kenco,
18  correct?
19      A.  Yes. We all worked for Mars.
20      Q.  Your offer letter was from Kenco; wasn't
21  it?
22      A.  Yes.
23      Q.  Who gave you your paychecks?
24      A.  Kenco gave me my paychecks.

4 (Pages 10 - 13)

Page 14

1    Q.   Who were your benefits provided by?
2    A.   Kenco.
3    Q.   Who provided those?
4    A.   Kenco provided my benefits that were
5  reimbursed by Mars.
6    Q.   Who did you complain to at Mars about
7  discrimination?
8    A.   I didn't complain to Mars.
9    Q.   How did Robert Coffey discriminate
10  against you?
11    A.   Robert Coffey was aware of situations
12  that occurred at that facility and they didn't do
13  anything to deter or prevent those things from
14  occurring.  They had a shooting at the facility.
15  They had a -- and they knew that the environment was
16  vulnerable, and so, other situations occurred, like
17  the Vernon Henry situation, like the Scott
18  Marksteiner situation where he didn't get promoted
19  to supervisor, all these situations were volatile, I
20  mean.
21    Q.   Okay.  With respect to this lawsuit that
22  you have filed against Mars and Kenco, what did you
23  communicate to Robert Coffey?
24    A.   What do you mean?

Page 15

1    Q.   Well, you have said Robert Coffey knew
2  all these things, but you also testified, well, you
3  don't really know if he knew, he should have known.
4  So I'm trying to find out what did you actually tell
5  Robert Coffey that we know he would have known
6  because you told him?
7    A.   I didn't tell Robert Coffey anything in
8  respect to my situation.
9    Q.   And so did you just list Mars in this
10  lawsuit because of the fact that this facility
11  distributed Mars products?
12    A.   No.  I listed them because they're
13  responsible.  They're responsible for the people
14  that they hire.  They hired Kenco.  So that makes
15  them responsible as well.
16    Q.   You acknowledge that Mars didn't actually
17  hire the individual Kenco employees, correct?
18    A.   They didn't hire me as far as onto their
19  payroll, but they do reimburse Kenco for the
20  payroll, for expenses.
21    Q.   If you would please provide Plaintiff
22  with Exhibit 15 from the first deposition.  It's
23  Plaintiff's Initial Rule 26A disclosures.
24    A.   I have it.

Page 16

1    Q.   So, the first question asks for you to
2  identify people that have discoverable information,
3  and there are quite a few individuals listed here,
4  and I'd just like you to take a look at all of these
5  names that you have provided and let me know which
6  of those people you believe were actually Mars
7  employees.
8    A.   We're all Mars employees.
9    Q.   Through the relationship with Kenco, is
10  that your position?
11    A.   Yes.
12    Q.   Do you know if Mars interviewed any of
13  these people?
14    A.   No, I don't know.
15    Q.   Do you know if Mars provided paychecks to
16  any of these people?
17    A.   I don't know.
18    Q.   Do you know if Mars was involved in any
19  disciplinary action with respect to any of these
20  people?
21    A.   It's possible.
22    Q.   Did Mars ever issue you any disciplinary
23  action?
24    A.   No.

Page 17

1    Q.   Do you know if Robert Coffey was ever
2  consulted about any disciplinary action given to
3  you?
4    A.   Not to me.
5    Q.   Who was he consulted about as far as
6  disciplinary action?
7    A.   I don't know.
8    Q.   On Page 7 there, if we could turn to
9  that, kind of mid-to-the-bottom of the page, you're
10  referencing, I guess, relevant documents here, and
11  you refer to someone -- it says:  Emails, written
12  correspondence, affidavits, logs.  Do you see that
13  there?
14    A.   Oh, yes.
15    Q.   Who is Robert Cates.
16    A.   I don't know who Robert Cates is.
17    Q.   Why would you put a name on here when you
18  don't know who the person is?
19    A.   I don't remember.  I'm not saying that I
20  don't know who this person is because when I read --
21  I don't remember.  I'm not saying this is not a
22  relevant person.  I'm saying I don't remember.
23    Q.   Did you know anyone with that name?
24    A.   I don't remember.

5 (Pages 14 - 17)

SUPP. APPX. 36

Page 22

1  complaint. The page numbers up at the top.
2        So you're saying that Mars, I guess,
3  violated Section 1981, which prohibits
4  discrimination. It's on the basis of race as far as
5  your complaint is concerned, and you are referring
6  us to these numbers here, and it talks about various
7  people. There's DeRosier. I'm trying to figure how
8  Mars is related here. And Paragraph 113 says you
9  complained to management.
10        Can you tell me how Mars violated
11  Section 1981 in these paragraphs; what it was you
12  were trying to communicate?
13    A.  I was trying to communicate the fact that
14  I was hired in to be responsible for the truck
15  builders and Marcy DeRosier, who at the time I
16  believe was an OS&D clerk, she was promoted over me
17  to be office manager.
18    Q.  And so, this time period you're
19  complaining about, was she employed by Kenco, Marcy
20  DeRosier?
21    A.  No.
22    Q.  Who was she employed by?
23    A.  4T was the hiring manager, but we were
24  all under Mars. And Mars paid -- reimbursed 4Ts for

Page 23

1  our salaries as they had done when Kenco was there.
2    Q.  Okay. But did Mars Inc. determine that
3  this Marcy was going to get hired and what job she
4  was going to perform?
5    A.  I don't know.
6    Q.  You had testified that you were hired by
7  Kenco, that was your offer letter. Who was this
8  that you complained to management about this stuff
9  above in Paragraph 113? Who is "management"?
10    A.  At the time, it was Darla Conifer, I
11  complained to her.
12    Q.  Who is that?
13    A.  She was the office manager under 4Ts.
14    Q.  The 4Ts office manager?
15    A.  Yes.
16    Q.  Okay. And then on the next page, your
17  interrogatory responses also refer us to
18  Paragraph 116 to 119, and again, it's talking about
19  4Ts.
20        Paragraph 117 says:
21  African-Americans who complained to McCurry and
22  management, and then 119 refers to complained to
23  management.
24        Who was the management in these

Page 24

1  instances?
2    A.  I'm sorry. What are you asking me about
3  these, these --
4    Q.  I'm asking you who it is -- who is the
5  management, again, that you are referring to?
6    A.  Oh, I see. Darla Conifer, that was the
7  management at that time.
8    Q.  That's the management you are referring
9  to in those paragraphs?
10    A.  Yes.
11    Q.  Correct?
12    A.  Yes.
13    Q.  And then the next page, Paragraph 123 to
14  135, I guess it goes over to the next pages, the
15  next two pages, when you talk about management, I
16  see Szplett's name in there and Walsh's name. Is
17  there other management that you were intending to
18  refer to by using that general term?
19        Are those the managers you were
20  talking about?
21    A.  So, supervisors, general manager.
22    Q.  Who were the Mars people that you were
23  referring to?
24    A.  Is there anything specific that you see?

Page 25

1    Q.  No, I don't. I was just asking you. I
2  didn't. That's why I was asking. I don't see
3  anyone from Mars listed. I just was confirming.
4        And then in support of that
5  Section 1981 claim, you say in your interrogatory
6  responses a very large span of Paragraphs, 149 to
7  389. I guess it might be easier to confirm who at
8  Mars did you think was discriminating against you?
9    A.  Just the company in general because
10  they're responsible for the actions of the employees
11  that they hire, and they know what's going on at the
12  facility, and they did nothing to change the
13  situation. They hired the managers.
14    Q.  Mars hired Kenco to perform work pursuant
15  to a contract, correct?
16    A.  Correct, to the best of my knowledge.
17    Q.  Who was it that Mars hired as far as
18  individual employees?
19    A.  Mars hired Kenco.
20    Q.  Is that the end of your answer?
21    A.  Yes.
22    Q.  And so you also have a claim here
23  for conspiracy under Section 1985. Why are you
24  alleging that Mars engaged in a conspiracy?

Page 26

1    A.   Well, for one instance, right offhand,
2    Lori Varvel, when she was hired, I was never written
3    up for anything all the time that I worked there.
4    I've never had any issues.  And then -- well, not
5    all the time I was there, I never had any issues.  I
6    have never had any issues as far as my behavior and
7    my being written up and my performance doing poorly.
8         So, when things occurred in the way
9    that they occurred with the hiring of Lori Varvel,
10   them not wanting to pay for her, the things that
11   occurred when she came there, me being written up,
12   all the things that happened to me, them looking at
13   cameras, Mars knew about those things.
14        So, if I had no issues, why am I
15   being treated like -- why do I now have issues and
16   Mars knew about all of these things.  So they're
17   part of the conspiracy that Kenco participated in
18   with one another.  They didn't --
19   Q.   Sorry.  Go ahead.
20   A.   I'm fine.
21   Q.   So, who at Mars knew that you were
22   written up?
23   A.   I don't know who knew, but I do know they
24   are informed about the things that go on in that

Page 27

1    facility.
2    Q.   Do you think that someone at Mars is
3    advised every time someone at the Kenco -- a Kenco
4    employee is written up?
5    A.   I don't know.  But I do know that they
6    participated in the hiring of Lori.  Someone had to
7    make that decision -- someone had to assess a need
8    for her.  So it had to be discussed.  Mars pays for
9    everything.  So they have to be told what they're
10   going to pay for.  And then they did it in their
11   emails.  They're saying they didn't want to pay,
12   so...
13   Q.   So you're saying Mars' emails, which
14   unfortunately we don't have in front of us, they say
15   they don't want to pay for Lori.  How is that Mars
16   conspiring?
17   A.   Because they participated in her being
18   there and not following -- Kenco not following their
19   policies and procedures.  They knew all of these
20   things were going on and they did nothing about
21   them.
22   Q.   What things going on?
23   A.   Many things.  The situation with Nathan
24   Doss, with Vernon Henry, Jack Morrison, and the

Page 28

1    candy being stolen.  It's a list that goes on and
2    on.  You can't tell me that Mars did not know about
3    these things.
4    Q.   Who at Mars knew about these things?
5    A.   The RDM for sure, and he discussed things
6    with his boss, Todd Moore.  You have emails going
7    back and forth, and I can tell that there's emails
8    missing, I didn't receive them all.  But from
9    reading those documents, those emails, I can tell
10   that they knew, Mars knew.
11   Q.   With respect to this lawsuit that you
12   filed, Ms. McCurry, what did Mars or Mr. Coffey know
13   about?
14   A.   They knew about everything.  They knew
15   about the facility in general.  They definitely knew
16   about Lori coming there.
17   Q.   What did Mr. Coffey tell you he knew
18   about?
19   A.   He didn't tell me.
20   Q.   How do you know he knew anything?
21   A.   The emails.
22   Q.   There's an email about you getting
23   written up somewhere from Mr. Coffey?
24   A.   No, there isn't.

Page 29

1    Q.   Okay.  You mentioned an email about Lori
2    Varvel and Mars not wanting to pay her salary.  So
3    what are the other things that are related to those
4    claims that you have in this lawsuit against Mars
5    that Mr. Coffey knew about from you?
6    A.   He knew about all the things that
7    occurred at that facility.  He's the RDM.
8    Q.   You're assuming he knew, correct?
9    A.   They have morning meetings with the
10   general managers and the office managers.  They
11   discussed production, situations that go on at the
12   facility, all those lawsuits that came, the filings
13   that came to the office because they said that it
14   was so many filings coming to the office, that they
15   were going to hire Lori, and they discussed that.
16   Q.   Who is "they"?
17   A.   They discussed those things in the
18   emails.
19   Q.   Who is "they"?
20   A.   Robert Coffey and whomever he emailed.
21   Q.   I didn't see any email from Robert Coffey
22   talking about complaints.  So that's an email that
23   you have that wasn't provided to me.  You need to do
24   that.

8 (Pages 26 - 29)

SUPP. APPX. 38

Page 30

1    A.   I didn't say about complaints.  I said
2  that they knew everything that goes on in that
3  facility through different means.  They know what's
4  going on in that facility.  It's their facility.
5    Q.   Okay.  Ms. McCurry, I'm asking -- back to
6  my original question about how Mars conspired
7  against you.  You have mentioned you think they -- I
8  don't know exactly what you're saying about Ms.
9  Varvel because you said she was hired but then you
10 said Mars didn't want to pay for her.  Then you
11 admitted to saying, no, they didn't know anything
12 about you being written up.
13         In what other ways did Mars
14 participate in a conspiracy against you?
15   A.   I said I didn't know.
16         They are responsible for that
17 facility.
18   Q.   Because this is a Mars distribution
19 facility, they have somehow conspired against you?
20   A.   They participated in all what I have said
21 they -- that the conspiracies were.
22   Q.   Why do you think they conspired against
23 Edith McCurry?
24   A.   I don't know why people think the way

Page 31

1  they think.
2    Q.   Do you know whether Robert Coffey was
3  involved in any discussions about you at all related
4  to your employment?
5    A.   I don't know.
6    Q.   You don't know?
7    A.   No.
8    Q.   You didn't include Mars on your original
9  charge of discrimination, correct?
10   A.   I don't think that's correct.
11   Q.   Did Mars participate in any process of
12 your underlying administrative charges?
13   A.   I don't understand.  What do you mean?
14   Q.   Let's look at the exhibit.  I guess it
15 was attached to your complaint that was Exhibit 13.
16 It's Exhibit 1-1, Page 3.
17         Do you recall, Ms. McCurry, anyone
18 participating in your underlying action prior to you
19 filing this lawsuit?
20   A.   What did they participate in?
21   Q.   I'm asking you who from Mars participated
22 in your underlying action?  You had complained about
23 Jay Elliot and other Kenco people, but I'm asking
24 you who at Mars was involved in any of this?

Page 32

1    A.   I don't think I'm understanding what you
2  are asking me.
3    Q.   I'm asking what involvement did Mars in
4  your administrative filing that precipitated the
5  filing of this lawsuit?
6         Did you ever receive any awareness of
7  a response from Mars to your underlying charge?
8         You participated in various meetings,
9  didn't you, with respect to the charge of
10 discrimination you filed against Kenco?
11   A.   What kind of meetings?  What do you mean
12 "meeting"?
13   Q.   With the Illinois Department of Human
14 Rights.
15   A.   You mean the hearings from the --
16   Q.   Yes.
17   A.   No.  Mars was not there that I know of.
18   Q.   You had testified in April about going to
19 the Illinois Attorney General with complaints about
20 Kenco.  Do you remember that?
21   A.   Yes.
22   Q.   Did you go to the Illinois Attorney
23 General with complaints about Mars?
24   A.   From what I understand, it was both, but

Page 33

1  I don't know exactly what I said to her.  I can't
2  remember.
3    Q.   You had also testified at the last
4  deposition about having a Social Security
5  disabilities claim that was in the appeals process.
6  Do you remember that?
7    A.   Yes.
8    Q.   Did you hear any outcome on that yet?
9    A.   No.
10   Q.   Did they give you an idea of when it
11 might be that you might hear something?
12   A.   No.
13   Q.   Exhibit 6 to your last deposition was a
14 new hire form.  Did you ever receive an employee new
15 hire form like this from Mars?
16   A.   No.
17   Q.   Did you ever receive any documents from
18 Mars as far as employment-type paperwork?
19   A.   No, not that I can recall.
20   Q.   When you took a leave of absence from
21 your job for medical reasons, did you complete any
22 paperwork for Mars related to that?
23   A.   No.
24   Q.   It was Kenco that you needed to provide

9 (Pages 30 - 33)

Page 34

1    that information with, correct?
2    A.   Correct.
3    Q.   You had also testified the last time
4    around about you asking for a verification of
5    employment from Lori Varvel.
6         Do you remember that?
7    A.   I'm sorry.  Could you repeat that?
8    Q.   You had discussed asking for a
9    verification of employment from Lori Varvel and you
10   had said she wouldn't give you one.  Do you remember
11   that?
12   A.   Yes, I do.
13   Q.   Did you ever ask anyone at Mars for a
14   verification of employment?
15   A.   No, I didn't.
16   Q.   Why not?
17   A.   Because Kenco was the manager who I was
18   supposed to go to to ask for those things.
19   Q.   Did you ever feel like anyone from Mars
20   was engaging in harassment directed toward you?
21   A.   Not directly.
22   Q.   And I guess that would be indirectly
23   somehow; is that correct?
24   A.   I would say indirectly.

Page 35

1    Q.   And how indirectly?
2    A.   By not doing something about their
3    manager by not allowing them to harass me.
4    Q.   Was Robert Coffey engaging in harassment
5    towards you?
6    A.   Not directly.
7    Q.   How was he indirectly doing that?
8    A.   I don't know.  Robert is the RDM.  He's
9    responsible for that facility.  So I would say that
10   that will be something indirect that he would be
11   responsible for.
12   Q.   What are the other reasons?
13   A.   The fact that they know.
14   Q.   Is that related to the testimony you
15   provided earlier about you thinking they should have
16   known about things because of meetings, et cetera?
17   A.   I believe so.
18   Q.   You also testified back in April you
19   didn't think you were able to perform any work.  Are
20   you able to perform work now?
21   A.   No.
22   Q.   As far as the performance reviews that
23   you received during your employment, did anyone at
24   Mars ever conduct those reviews with you?

Page 36

1    A.   No.
2    Q.   Who would have done that?
3    A.   Len, Len Szplett.
4    Q.   Do you know if Mars had anything to do
5    with Kenco's hiring of Jay Elliot?
6    A.   I don't know.
7    Q.   Do you know if Mars had anything to do
8    with your eligibility to elect COBRA when your
9    employment ended?
10   A.   I'm not sure.  I don't know.
11   Q.   When you submitted the information to
12   enroll in benefits, to elect your benefits each
13   year, who did you provide that paperwork to?
14   A.   Kenco.
15   Q.   And then back to Exhibit 15, which was
16   your Plaintiff's Initial Rule 26A disclosures.
17   A.   I have it.
18   Q.   On Page 9, the last entry, its Roman VI,
19   you have got -- this is your computation of damages
20   at that point in time.  It says attorneys' fees and
21   costs in excess of 75K and accruing.
22        Since you filed this, have you
23   accrued any additional attorneys' fees?
24   A.   I'm not really sure.  I didn't -- I don't

Page 37

1    have a bill.
2    Q.   What attorneys' fees were you referring
3    to at that point in time?
4    A.   The attorneys' fees that I accrued for
5    this complaint.
6    Q.   So, is Mr. Hoffman representing you with
7    respect to this complaint?
8    A.   He doesn't represent me for this portion.
9    I do get -- I do ask questions if I have consulting
10   or if I -- like when I needed an expert -- when I
11   thought I needed an expert witness, I asked for help
12   with that.  When I needed help with my damages, I
13   asked for -- I asked for that help as well.  I
14   can't -- right offhand, I can't think of what else I
15   have asked for.
16   Q.   So, since filing these initial
17   disclosure, you have asked Mr. Hoffman for help with
18   respect to an expert and damages, that's what you
19   can recall right now?
20   A.   Yes, right now.
21   Q.   Could you have possibly asked him for
22   more assistance than that?
23   A.   I don't know at this time.  I really
24   don't know.

10 (Pages 34 - 37)

Page 46

1      MS. MORAN:  So we would still be then --
2  just for the record, we would still be about an
3  hour.  I have a few more questions to ask in follow
4  up, and Ms. McCurry is refusing to answer those
5  questions.
6      THE WITNESS:  No, I object because it is
7  not about an hour.  It is over an hour.  It was
8  11:08 when we began.  And it is -- even after that,
9  it was after like 12, it was --
10      MS. MORAN:  12:15.  So we had a few more
11  minutes.
12      THE WITNESS:  No, you did not.
13      MS. MORAN:  What time is it now?
14      THE WITNESS:  12:15 is past 12:08.  I
15  object.
16      MS. MORAN:  Okay.  We understand your
17  position.  Thank you very much.  Have a nice day.
18      THE WITNESS:  Thank you.  You, too.
19          (Witness excused at 12:26 p.m.)
20
21
22
23
24

Page 47

1      REPORTER CERTIFICATE
2
3      I, JO ANN LOSOYA, a Certified Shorthand
4  Reporter within and for the County of Cook and State
5  of Illinois, do hereby certify:
6          That previous to the commencement
7  of the examination of the witness, the witness was
8  duly sworn to testify the whole truth concerning the
9  matters herein;
10          That the foregoing deposition
11  transcript was reported stenographically by me, was
12  thereafter reduced to typewriting under my personal
13  direction and constitutes a true record of the
14  testimony given and the proceedings had;
15          That the said deposition was taken
16  before me at the time and place specified;
17          That I am not a relative or
18  employee or attorney or counsel, nor a relative or
19  employee of such attorney or counsel for any of the
20  parties hereto, nor interested directly or
21  indirectly in the outcome of this action.
22
23
24

Page 48

1      IN WITNESS WHEREOF, I do hereunto set my
2  hand this June 3, 2018.
3
4
5
6
7
8
   JO ANN LOSOYA, CSR
   C.S.R. No. 84-002437
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

13 (Pages 46 - 48)

SECTION 5

DOC #113-1 Excerpts of Edith McCurry Deposition 4-18-18

Page 58

```
 1        Q.    What type of work was that?
 2        A.    Picking beans and greens and corn and
 3   then I worked at the Dairy Queen.
 4        Q.    Was 4Ts the first job where you worked in
 5   some type of human resources or clerical role?  Do
 6   you understand my question?
 7        A.    Could you ask me --
 8        Q.    You worked at 4Ts Management before
 9   Kenco; is that correct?
10        A.    Correct.
11        Q.    I don't -- I'm not concerned with what
12   your exact job title was, whether it was an HR
13   clerk, an HR administrator, an HR assistant.  I
14   think you were in a human resources role at 4Ts; is
15   that correct?
16        A.    HR and accounting.
17        Q.    Prior to 4Ts, did you do any HR or
18   accounting work?
19        A.    Yes.
20        Q.    Where was that?
21        A.    At -- it was a book company in Momence,
22   Illinois, a book distribution I worked in
23   accounting.
24        Q.    What years was that approximately?
```

Page 59

```
 1        A.    Approximately 1999 -- no -- '98, '97
 2   maybe '96.  I think those are the years.
 3        Q.    Was that your first accounting or human
 4   resources job?
 5        A.    I can't remember.
 6        Q.    Okay.
 7        A.    Right now.
 8        Q.    It sounds like that started shortly after
 9   you graduated from college with the accounting
10   degree.  When you left the job with the book
11   company, did you start working at 4Ts?
12        A.    Yes.
13        Q.    Do you know approximately what year you
14   started working at 4Ts?
15        A.    1999.
16        Q.    Okay.  Did you have a job title at 4Ts?
17        A.    HR and accounting.
18        Q.    When you applied to Kenco and you listed
19   your employment history and you put accounting/HR
20   assistant as your job title, does that sound
21   accurate?
22        A.    Yes.
23        Q.    Do you have a Facebook account?
24        A.    No.
```

Page 69

1    had to seek approval.

2        Q.    So, prior to Lori being hired, did you

3    communicate with anyone if you needed to work

4    overtime?

5        A.    No.

6        Q.    After Lori was hired, you communicated

7    with Lori if you felt that you needed to work

8    overtime?

9        A.    Yes.

10       Q.    Okay.  And Lori would approve the

11   overtime if she felt it was necessary?

12       A.    Yes.

13       Q.    At some point while you were working at

14   Kenco, you took a leave of absence; is that correct?

15       A.    I'm sorry.  Could you say that again,

16   please.

17       Q.    Yes.  Of course.  At some point while you

18   were working at Kenco, you took a medical leave of

19   absence; is that correct?

20       A.    Yes.

21            MS. ARGENTIERI:  I'm going to mark this

22   as Exhibit 7 and hand you a copy.

23                     (Deposition Exhibit 7 was marked

24                      for identification.)

Page 83

```
 1          A.     As things were happening.  I mean, I
 2    would say you are doing this to me, this is --
 3    you're harassing me.  I complained.  This isn't
 4    fair.  You didn't do this to other people.  I'm
 5    telling her all the while.
 6          Q.     So who did you think that Lori was
 7    treating more favorably than you?
 8          A.     The rest of the people who were able to
 9    do the things that were taken away from me.
10          Q.     Well, who else did Lori supervise?
11          A.     I mean, she was -- she was employee
12    relations to the entire warehouse.  She told
13    everyone what to do.
14          Q.     Did Lori directly supervise anyone
15    besides you?
16          A.     Valerie Lillie for sure I knew.
17          Q.     She directly supervised Valerie Lillie?
18          A.     Yes.
19          Q.     What was her job title?
20          A.     She was quality.
21          Q.     When was Valerie Lillie hired?
22          A.     I can't remember.  Before Lori, after
23    Mary, but I can't remember the exact date.
24          Q.     Valerie was a female?
```

Page 91

```
1        Q.    For 5:00 p.m.?

2        A.    Correct.  But that's a punch out.

3        Q.    But you left for the day at 6:39 p.m.?

4        A.    I left the building at 6:39 p.m.

5        Q.    Yes.  Do you recall what you were doing

6   from 5:00 p.m. to 6:39 p.m.?

7        A.    No, I do not.

8        Q.    Do you understand that working from

9   5:00 p.m. to 6:39 p.m. when you have clocked out at

10  5:00 violates Kenco's policies and the law?

11       A.    I am aware that there are policies

12  related to this situation.

13       Q.    And do you understand more generally just

14  with laws that you have to report the time that you

15  work for your employer to pay you for that time?

16       A.    I understand.

17       Q.    Okay.  Do you agree that if you had been

18  working from 5:00 p.m. to 6:39 p.m., that would have

19  been violating Kenco's policies?

20       A.    I understand what it says here that I

21  would have violated it.  But I didn't violate.  The

22  time that I wrote out is the time that I worked.

23       Q.    Okay.  I thought you just told me a

24  moment ago that you don't know what you were doing
```

Page 95

1      Q.    Okay.   And please make sure that you give

2   verbal answers so the court reporter can write it

3   down.

4      A.    Yes.

5      Q.    Okay.   Why do you believe that the

6   write-up was race discrimination?

7      A.    Because the policy says that when

8   someone -- when someone misses a punch, they fill

9   out the adjustment form and they hand it in and they

10  get a half a point.   But that didn't happen to me.

11  I received the half point.   I also was tracked on

12  camera, and I was treated unfairly.

13     Q.    Do you understand that the write-up you

14  received was not solely about missing a punch, it

15  was about misrepresenting the hours that you worked?

16     A.    I didn't misrepresent the hours I worked.

17     Q.    Okay.

18     A.    And they -- when other people fill out

19  missed punch slips, where does their

20  misrepresentation come in if that's the case.

21     Q.    Do you know of other employees who worked

22  for approximately an hour and a half after their

23  punch out time and didn't report those hours and did

24  not receive a write-up?

Page 96

```
 1        A.    I don't know of anyone who worked and
 2    didn't receive their hours.
 3        Q.    Did you understand the question that I
 4    asked?
 5        A.    Can you ask me again.
 6        Q.    Sure.  Kenco gave you a write-up, Lori
 7    Varvel presented the write-up to you.  We already
 8    reviewed the write-up.  We marked it previously
 9    as -- let me see -- the exhibit number here,
10    exhibit --
11              MS. OVERBAUGH:  I think it is 10.
12              MS. ARGENTIERI:  10.
13    BY MS. ARGENTIERI:
14        Q.    I'm not asking whether you agree with the
15    write-up or not.  What I'm just asking you is
16    whether you know of other employees that you are
17    saying engaged in that same conduct that is stated
18    in this write-up but did not receive a write-up?
19        A.    No one received a write-up like this
20    except me.
21        Q.    Do you think there are people who should
22    have received a write-up like this?
23        A.    I think they should have followed the
24    policy.
```

SUPP. APPX. 49

Page 97

1    Q.    I'm not sure -- do you think there are

2    other people that should have received a write-up

3    like this?

4    A.    Not to my knowledge.  I don't --

5    Q.    Okay.  You also mentioned that

6    you thought there was race discrimination regarding

7    your wages.  When we were talking, I asked you to

8    identify the reasons that you were claiming race

9    discrimination.  What do you feel was race

10   discrimination regarding your wages?

11   A.    I did -- my duties that I performed were

12   like another employee's and they made twice as much

13   as I did.

14   Q.    So, what employees do you believe were

15   paid unequally to you?

16   A.    Len Szplett.

17   Q.    Is there anyone else?

18   A.    Not that I can think of at this moment.

19   Q.    You then mentioned that another type of

20   action that you believed was race discrimination was

21   taking duties away from you?

22   A.    Yes.

23   Q.    Tell me what happened with duties being

24   taken away from you.

```
                                                    Page 98
 1          A.    They wouldn't allow any other employees
 2     to report to me as they had in the past.
 3          Q.    When you say report to you, are you --
 4     were you supervising employees?
 5          A.    As far as incidents, things -- or things
 6     that they wanted to complain about.
 7          Q.    So, not reporting, meaning supervising,
 8     meaning that employees bringing an HR issue to your
 9     attention?
10          A.    Yes.
11          Q.    Okay.  And when they hired Lori Varvel,
12     she became responsible for handling the employee
13     relations matters?
14          A.    Yes, but they took that duty before she
15     got there.
16          Q.    Who handled it before Lori?
17          A.    Well, they -- they -- I was reporting
18     that any incidents to Tammi Fowler.  So, I shared
19     that with -- those issues with Tammi Fowler.  She
20     told me to start telling the employees to -- or she
21     didn't tell the employees, but she told me to
22     have -- to report the issues to her and then when
23     Lori got there, it was -- I was to talk to no
24     employees about it.  That's what happened.
```

Page 99

1             And an employee, Scott Marksteiner,
2    talked to me about an issue, and Lori told me not to
3    respond back to him at all.  And so, that was part
4    of when they were removing that duty away from me.
5         Q.    Okay.  When they -- when Kenco removed
6    your employee relations role or a portion of your
7    duties, did your pay change?
8         A.    No.
9         Q.    Okay.  Did we cover -- did we cover all
10   of the things that occurred during your employment
11   that you feel were race discrimination?
12        A.    I'm sure there's other things, but right
13   now, they have just left my mind.
14        Q.    Is that all you can think of now?
15        A.    Right now.
16        Q.    If you think of something before the
17   deposition ends, you can always stop me and say "I
18   want to bring this up."  I do want to remind you
19   that today is your only opportunity to provide all
20   this information to us in this setting.  So if
21   there's other things that you can think of, please
22   make sure that you share whatever information you
23   have with us today.
24        A.    Okay.  Yes.

Page 100

```
 1        Q.    You also have a claim for age
 2   discrimination; is that correct?
 3        A.    Yes.
 4        Q.    So can you tell me what actions occurred
 5   while you worked at Kenco that you believe are age
 6   discrimination?
 7        A.    When they brought Lori in, she's younger
 8   than I am.
 9        Q.    Okay.
10        A.    And they didn't offer me the position.
11        Q.    Did you apply for the position?
12        A.    No.
13        Q.    Okay.  So you did not apply but you felt
14   that the position should have been offered to you?
15        A.    Yes.
16        Q.    For Lori's role.
17               Was there anything else that happened
18   to you while you worked at Kenco that you felt was
19   age discrimination?
20        A.    No.
21        Q.    Okay.  Do you know how old Lori is?
22        A.    I knew she was in her 30s.
23        Q.    She was in her 30s in 2014?
24        A.    Yes.
```

SUPP. APPX. 53

Page 101

```
 1        Q.    Did you ever complain to Kenco that you
 2   thought that this was age discrimination?
 3        A.    I don't recall.
 4        Q.    I can try to ask it a different way.  I
 5   mean, did you ever tell anyone at Kenco that you
 6   thought that you were being discriminated against
 7   because of your age?
 8        A.    I don't recall.
 9        Q.    How about your race?  Did you ever tell
10   anyone at Kenco that you thought you were being
11   discriminated against because of your race?
12        A.    Yes.
13        Q.    Who was that?
14        A.    Lori.
15        Q.    So we talked about earlier this morning
16   that you complained to her when you were written up.
17   Is that what you are referring to?
18        A.    That, and I talked to Len about
19   everything.  I told Len everything.
20        Q.    Okay.  What did you tell Len?
21        A.    I told Len about -- I told Len about the
22   situation with Tammi as far as telling her about the
23   employees, all the situations that occurred with the
24   employees and their discrimination complaints.
```

SUPP. APPX. 54

Page 114

1          A.      -- and not offering me a position, things

2     of that nature.

3          Q.     Who was part of the conspiracy?

4          A.     Well, it starts at the top.  If you are

5     hiring Jay Elliott as a VP of legal.  So, from

6     the --

7          Q.     Why is it a conspiracy to hire Jay

8     Elliott as the VP of legal?

9          A.     To further whatever cause they have to

10    against the employees.

11         Q.     If Kenco needed a vice president of legal

12    and they hired someone, why do you think that that

13    is something harmful to you?

14         A.     Did they need a vice president of legal?

15    He was already their counsel before.  Karen Smith

16    was there.  They had people there, legal team.

17    So...

18         Q.     How did it damage you that Kenco hired a

19    vice president of legal?

20         A.     My IDHR case was damaged.  I mean, I

21    had -- I had to file a case.

22         Q.     So you think it was a conspiracy that

23    Kenco hired legal representation to defend against

24    your claims?

Page 115

1      A.    And others.

2      Q.    Okay.  If we cover -- did we cover all of

3   the actions and the Lori Varvel actions that we've

4   already talked about that you feel were a

5   conspiracy?

6      A.    That I can think of.  I don't -- I

7   don't -- I'm not sure.

8           MS. ARGENTIERI:  Did we leave off at

9   Exhibit 12?

10          MS. OVERBAUGH:  Yes.

11          MS. ARGENTIERI:  I'm going to show you a

12  copy of your complaint, Ms. McCurry, and mark this

13  as Exhibit 13.

14                       (Deposition Exhibit 13 was

15                        marked for identification.)

16  BY MS. ARGENTIERI:

17     Q.    Do you recognize this document?  And I'm

18  not asking you to read the whole thing because that

19  would take a very long time, but do you recognize

20  this?

21     A.    It looks familiar.

22     Q.    Why don't you turn to page -- if you look

23  at the page numbers on the top, can you turn to the

24  Page 10 of 77?

SECTION 6

DOC #113-3 Excerpts of Declaration of Jay Elliott

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT
## URBANA DIVISION

| | | |
|---|---|---|
| Edith McCurry, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:16-cv-02273-CSB-EIL |
| | ) | |
| v. | ) | Judge Colin Stirling Bruce |
| | ) | Magistrate Judge Eric I. Long |
| | ) | |
| Kenco Logistic Services, LLC, | ) | |
| *a Tennessee Limited Liability Company,* | ) | |
| Mars, Inc., Kelvin Walsh, Mike Manzello, | ) | |
| David Jabaley, Tammi Fowler, Lori Varvel | ) | |
| and Mario Lopez | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF JAY ELLIOTT

Under the penalty of perjury as provided by law, the undersigned certifies pursuant to 28 U.S.C. §1746 that the factual statements set forth below are true and correct to the best of his knowledge, information and belief:

1. I am the Vice President of Legal at Kenco Management Services, LLC and have held this title since my hire in November 2014.

2. Kenco Logistics Services, LLC ("Kenco") is a subsidiary of Kenco Group and I handle employment law matters for Kenco in the course of my job duties.

3. I am familiar with Kenco's employment policies as well as Kenco's procedures for storing employee personnel documents.

4. As part of my job duties, I have assisted in gathering and reviewed pertinent personnel documents, and Kenco policies for the above-referenced litigation.

5. The personnel records and policy documents referred to in this Declaration, Exhibits 1, 2, 3, 4, 5, 6, 7, 8 and 9, were made at or near the time each record states by someone with personal knowledge, and were kept in the ordinary course of Kenco's business practices in maintaining HR policies, personnel and pay records; making those records was part of Kenco's regular practice.

6. Exhibit 1, attached, is a true and correct copy of McCurry's acknowledgment of Kenco's Anti-Harassment Policy that was in effect during McCurry's employment.

7.  Exhibit 2, attached is a true and correct copy of Kenco's Non-Exempt Timekeeping Policy that was in effect during McCurry's employment.

8.  Exhibit 3 is a true and correct copy of McCurry's write-up dated December 19, 2014 from her personnel file.

9.  Exhibit 4, attached, is a true and correct copy of McCurry's pay records.

10. Exhibit 5, attached, is a true and correct copy of Leonard Szplett's pay records.

11. Exhibit 6, attached is a true and correct copy of Lori Varvel's pay records.

12. Exhibit 7, attached, is a true and correct copy of Lori Varvel's resumé and job application.

13. Exhibit 8, attached, is a true and correct copy of new hire paperwork from Varvel's personnel file reflecting her start date at Kenco.

14. Exhibit 9, attached, is a true and correct copy of McCurry's job application and new hire paperwork from her personnel file and her termination letter.

DECLARANT SAYETH NOTHING FURTHER.

Dated: June 18 2018

Jay Elliott
Vice President of Legal, Kenco Group

# EXHIBIT 3

# KENCO

| Opportunity for Improvement Form | | | |
|---|---|---|---|
| Date Completed: | 12-17-14 | | |
| Employee Information | | | |
| Employee's Name: | Edith Mccurry | Employee's Title: | HR Clerk |
| Location: | Mars- Manteno | Shift: | 1 |
| Date of Violation: | 12/9/2014 | Manager/Supervisor: | Lori Varvel |

Type of Warning:

☒ Verbal  ☐ 1st Written  ☐ 2nd Written  ☐ 3 Day Suspension without Pay  ☐ Termination

**Nature of violation or infraction of company rule(s) or policies.**
STD-HR- 1003 (Prohibited Conduct Policy) & STD - HR - 1007 ( Non Exempt Timekeeping Policy)

Edith presented a Time Adjustment Form, for a missing out punch for Tuesday, 12/9/14. The time that she recorded was 5:00 pm. The correct time that Edith left for the day was 6:39pm. Edith recorded on the document that she was certain that she swiped out on the time clock. She, in fact, did not swipe out before she left the building (hence, the missed punch). Not only was the information that she provided on the document, false, the overtime that she worked was not approved.

**Additional Details and Facts**

**Action to be Taken**
Failure to follow the prohibited conduct and non - exempt timekeeping policies will result in disciplinary action up to, and including, termination.

**Employee's Comments**

Facilitated by _____  Date  12-19-14     HR Review _____  Date  12-19-14

CP-HR-1000-1 Opportunity for Improvement Form

KENCO 000195



# KENCO

## TIME ADJUSTMENT FORM

### Employee Information

Employee Name: _McCurry_    _Edith_    _____
              Last          First         M.I.

Department: _____    Date: _12/11/14_

### Adjustment Information

Reason for Time Adjustment:    *I'm certain I Punched Out.*

| | DATE | HOURS | IN | OUT |
|---|---|---|---|---|
| Missed Punch/Punches | 12/9/14 | | | 5:00pm |
| Clock Malfunction | | | | |
| Interrupted Meal Period | | | | |
| PTO | | | | |
| Other: (specify) | | | | |

### Approval

| | DATE | MINUTES |
|---|---|---|
| Missed Meal Period | | |

Supervisor Signature: _____    Date: _12/12/14_

Employee Signature: _Edith McCurry_    Date: _12/11/14_

Adjustment Made By: _____    Date: _12/12/14_

Date Paid: _____

POL-HR-6.2.2.001-1 Effective 01/01/14

KENCO 000196

# EXHIBIT 7

# Lori L. Varvel
# REDACTED

| | |
|---|---|
| **Objective:** | To obtain a position within the Human Resources field utilizing my education, experience, interpersonal communication and teamwork skills. |
| **Work Experience:** | **Sears Logistics Services**<br>February 2010-Present<br>Manteno, IL |

- **Human Resources Manager (CDFC)-Sears.com**
  - Manages and oversees the administration of human resources policies and procedures
  - Responsible for the day to day Human Resources function for approximately 100 - 300 associates.
  - Oversee 1 HR Generalist
  - Oversee all HR Generalist responsibilities
  - Build consistency with policies/procedures
  - Investigates and reviews complaints including harassment or discrimination.
  - Represents organization at unemployment hearings
  - Facilitate Leader in Training Program
  - Oversee compliance with Affirmative Action Plans
  - Provide HR support to the Kmart Jewelry Center DC
  - Co-Chair for March of Dimes across DC network
  - Oversee DC Workers Compensation process
  - Oversee Benefit Enrollment
  - Oversee HRIS

January 2008- February 2010
Manteno, IL

- **Human Resources Generalist (RRC and CDFC)**
  - Oversee (Supervise) two HR Representatives
  - Full cycle recruitment for warehouse, clerical and management positions utilizing Brassring and E-hire
  - Payroll utilizing Kronos for approximately
  - Complete monthly HR Scorecard and Associate Roundtables
  - Worker's Compensation in accordance with Risk Console and Sedgwick
  - FMLA and Benefits administration
  - Process quarterly gainsharing
  - Recruitment of 280+ associates for two distribution units during 4th QTR
  - Maintain HR Database
  - Respond to unemployment claims
  - Monitor attendance
  - Build consistency with policies/procedures
  - Build the HR Database/Coaching Matrix

**Menard, Inc.**
November 2002-January 2008
Bradley, IL

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

- **Human Resources Coordinator**
  - Prepare and complete weekly payroll for approximately 200 team members
  - Prescreen applications for qualified applicants, set up and perform on site interviews, administer pre-employment testing, follow up with qualified applicants to offer employment
  - Perform new team member orientation, covering the completion of benefit, tax, and I-9 forms.
  - Answer all questions concerning benefits, salary information, FMLA, and policies/procedures
  - Manage personnel records
  - Utilize the HRIS in accordance with updating all team member related information, including salary data, job titles and descriptions
  - Provide support on various processes, including performance appraisals, position transfers, and terminations
  - Complete special tasks assigned by the General Managers

**Computer Skills:** Microsoft Office   Internet Explorer   WorkBrain (payroll)   Kronos (payroll)   Red Prairie (Payroll)   Outlook   People Planner (payroll)   Peoplesoft   Brassring

**Education:** **Bachelor of Science in Business Management,** May 2002
Concentration: Human Resources Management
Millikin University, Decatur, Illinois

INFORMATION FOR PROCESSING OF BACKGROUND SCREEN REPORTS ONLY
(to be used for no other purposes)

Full Name  Lori Lynn Varvel ▮

Date of Birth: ▮ 1980    Social Security #: ▮

Driver's License Number: ▮    State of Issue: Illinois

Current Residence Address: ▮
                              (Number and Street)

▮    IL    60914
City                State                Zip Code

Other Names Used & Date Changed: ▮

List all Residence Addresses in Past Seven Years (attach additional sheets if necessary)

▮

_____

_____

_____

Have you ever been charged with or convicted of a Misdemeanor or Felony crime? ☐ Yes ☒ No

If Yes, please list the charge, what county and state, and what year:

_____

_____

List any college or university attended:  Millikin University

Did you graduate? ☒ Yes  ☐ No

What was the **month/day/year** that you began college?  8/1998

What was the **month/day/year** that you graduated college?  5/2002

What was your name at the time of degree receipt?  Lori White

KENCO 001270

SUPP. APPX. 66

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

| Your Job Title<br>**HR Manager** | Pay Rate<br>Begin:<br>**$73,600 WB**   End: | Supervisor Name and Title<br>**John Macaluso - Assistant General Manager** |
|---|---|---|
| Description of your duties : **Payroll, Attendance, Benefits, Work Comp, FMLA, Chair March of Dimes, Facilitate Leader in Training program, Oversee HR Generalist, Oversee all Employee Relations, Onboarding, Orientations, Terminations, Coach, Affirmative Action Plans, HRIS, Unemployment** | | Employment Dates<br>From (Mo./Yr.) **02/2010**   To (Mo./Yr.) **current**<br><br>May we contact you at your present place of employment?  Yes _No X |
| Reason for leaving<br><br>**The organization is no longer that of a stable retailer** | | May we contact your present employer for a reference?<br>Yes _**X**_<br>If yes, please provide name and phone number of contact. |

| Employer : **Sears Logistics Services** | | Street Address, City, State, Zip<br>**1600 Boudreau Rd - Manteno, IL 60950** |
|---|---|---|
| Your Job Title<br>**HR Generalist** | Pay Rate<br>Begin:<br>**$45,000**   End: | Supervisor Name and Title<br>**Robin Batka - HR Manager** |
| Description of your duties : **oversee 2 HR Reps, Payroll, Attendance, Benefits, Work Comp, FMLA, Unemployment, HRIS, Onboarding, Employee Relations, Benefits** | | Employment Dates<br>From (Mo./Yr.) **01/2008**   To (Mo./Yr.) **02/2010**<br><br>May we contact for a reference? Yes __  No **X**   If yes, please provide name and phone number of contact. |
| Reason for leaving<br>**Internal Promotion** | | |

| Employer - **Menards** | | Street Address, City, State, Zip<br>**Christine Dr. Bradley, IL 60915** |
|---|---|---|
| Your Job Title<br>**HR Coordinator** | Pay Rate<br>Begin:<br>**$37,000**   End: | Supervisor Name and Title<br>**Gene Farquer - General Manager** |
| Description of your duties : **Payroll, interview, onboard, FMLA, Work Comp, unemployment, HRIS, Employee Relations, Store set ups** | | Employment Dates<br>From (Mo./Yr.) **11/2002**   To (Mo./Yr.) **01/2008**<br><br>May we contact for a reference? Yes _**X**_  No __   If yes, **please provide name and phone number of contact. Gene Farquer - 815-936-1820** |
| **Reason for leaving**<br>**Career Growth** | | |

CP-HR-6.2.2.013-2 Effective 09/01/13

# EXHIBIT 8

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Oct 21 14 11:06a                                                                                           p.1

P.O. Box 1607
2001 Riverside Drive (37406)
Chattanooga, TN 37401

Phone 423-622-1113
Fax 423-643-3325
www.kencogroup.com



**KENCO**

October 17, 2014

Ms. Lori L. Varvel

# REDACTED

Dear Lori:

It is a pleasure to confirm our offer of employment to you. You will be employed at our KENCO Mars facility in Manteno, IL as a Human Resources Manager and will report directly to me.

Below are the details of the offer:
- Your starting base salary will be $3,166.66, paid semi-monthly.
- You will be eligible for a performance incentive of up to $7,000.00 based on completion of defined goals and objectives and overall financial performance of the Company. This amount will be prorated for the remainder of 2014.
- For the remainder of 2014, you will have 2 vacation days available to you. Beginning in 2015, you will have 10 vacation days available to you annually.
- Your start date is November 10, 2014.

On your 91st day of employment you will be eligible for the following company benefits: medical, prescription drug coverage, dental, vision, short and long-term disability coverage, group life insurance, long term care coverage, employer-matched 401(k) plan. On your start date you will be eligible for vacation and paid holidays. You will be contacted by a Human Resources representative regarding your benefits enrollment paperwork once you have accepted our offer and all contingency requirements are met.

The offer of employment is contingent upon the completion of a pre-employment drug screen analysis and criminal background check. We reserve the right to withdraw this offer if the drug screen analysis result or the background check is unfavorable. Your employment with Kenco is at-will and either party can terminate the relationship at any time, with or without cause and with or without notice.

Lori, we are excited about you joining us at Kenco. Please indicate your acceptance of this offer by signing at the bottom of the letter and returning it to me and faxing a copy to Chelsea Henley-Corporate HR at 423-643-3325. Please retain a copy for your records. If you have any questions, do not hesitate to contact me.

Sincerely,

Tammi Fowler
Sr. Manager, Employee Relations

Offer Accepted:

Lori L. Varvel                                            10/21/2014
                                                               Date

Director of Recruiting and Development        10/23/14
                                                               Date